**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENDURO RESOURCE PARTNERS LLC, *et al.*, | ) Case No. 18-11174 (___) |
| | ) |
| Debtors.[1] | ) (Joint Administration Requested) |
| | ) |
| | ) |

**DECLARATION OF KIMBERLY A. WEIMER, VICE PRESIDENT AND**
**CHIEF FINANCIAL OFFICER OF ENDURO RESOURCE PARTNERS LLC,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, Kimberly A. Weimer, declare as follows under penalty of perjury:

1.      I am the Vice President and Chief Financial Officer of Enduro Resource Partners LLC ("***Enduro***"), a corporation organized under the laws of the state of Delaware and one of the debtors and debtors in possession in the above-captioned Chapter 11 Cases (collectively, the "***Debtors***"). I am also the Vice President and Chief Financial Officer of each of the other Debtors. I am authorized to submit this declaration (the "***First Day Declaration***") on behalf of the Debtors.

2.      As a result of my responsibilities and activities as the Debtors' Vice President and Chief Financial Officer, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I am familiar with the Debtors' business, financial condition, policies and procedures, day-to-day operations, and books and records.

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's United States federal tax identification number, if applicable, or other applicable identification number, are: Enduro Resource Partners LLC (6288); Enduro Resource Holdings LLC (5571); Enduro Operating LLC (7513); Enduro Management Company LLC (5932); Washakie Midstream Services LLC (7562); and Washakie Pipeline Company LLC (7798). The debtors' mailing address is 777 Main Street, Suite 800, Fort Worth, Texas 76102.

Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees who report to me in the ordinary course of business or from the Debtors' advisors. I am authorized by each of the Debtors to submit this First Day Declaration. References to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters, are based on my understanding of such matters in reliance on the explanation, and the advice, of counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.       On the date hereof (the "*Petition Date*"), the Debtors filed voluntary petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "*Court*"). The Debtors will continue to operate their businesses and manage their properties as debtors in possession. I submit this First Day Declaration on behalf of the Debtors in support of the Debtors' (a) voluntary petitions for relief that were filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "*Bankruptcy Code*") and (b) "first-day" pleadings, filed concurrently herewith (collectively, the "*First Day Motions*"). The Debtors seek the relief set forh in the First Day Motions to minimize the adverse effects of the commencement of the Chapter 11 Cases on their businesses. I have reviewed the Debtors' petitions and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' businesses and to successfully maximize the value of the Debtors' estates.

4.       Part I of this First Day Declaration provides an overview of the Debtors' businesses, operations, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtors' financial performance and the events

leading to the Debtors' chapter 11 filings.[2]  Part II sets forth relevant facts in support of the First Day Motions.

## PRELIMINARY STATEMENT

5.     The Debtors commence these Chapter 11 Cases with a clear path for efficiently maximizing and realizing the value of their estates, swiftly proceeding to chapter 11 plan confirmation, and responsibly winding down their affairs.  Although the Debtors and their businesses have been undermined by persistently low oil and gas prices during the past several years, they have worked tirelessly—going back years before the Petition Date—to address their capital structure and, once their debt burden became insurmountable, deliberately and diligently coordinated with their senior secured lenders on a path forward.  These cases are the result of those efforts:  the Debtors enter chapter 11 with consensual use of cash collateral, a chapter 11 plan with the support of a class-carrying majority of first lien claimholders, an agreement in principle regarding plan distributions supported by their second lien claimholders, and three stalking horse bidders setting a floor for the Debtors' anticipated re-marketing and auction process for substantially all of the Debtors' assets.

6.     Like many other upstream energy companies, the Debtors did not anticipate in the early part of this decade that they would eventually succumb to the demands of repaying the capital they borrowed to invest in their exploration and production activities.  But the prices of crude oil and natural gas declined dramatically beginning mid-year 2014, as a result of robust non-Organization of the Petroleum Exporting Countries' ("*OPEC*") supply growth led by unconventional production in the United States, weakening demand in emerging markets, and OPEC's decision to continue to produce at high levels.  Faced with this reality, the Debtors

---

[2]    Many of the financial figures presented in this declaration are unaudited and potentially subject to change, but reflect the Debtors' most recent review of their business.  The Debtors reserve all rights to revise and supplement the figures presented herein.

dedicated time and effort to streamlining their operations and containing costs to maximize cash flows and secure their financial footing. Furthermore, the Debtors proactively began working to manage their balance sheet, hiring advisors and initiating negotiations with their secured lenders and equity sponsor in early 2016 around potential capital structure solutions. These discussions ultimately resulted in a net $26 million capital infusion (after a required debt paydown) and an improved liquidity profile.

7.      Ultimately, the early 2016 transactions were not enough to solve the Debtors' debt burden completely. By September 2017, the Debtors determined that they would not be able to refinance or repay their first lien credit facility when it matured on March 30, 2018. The Debtors' cash position had improved, thanks largely to the 2016 restructuring, but profits simply were not sufficient at then-current commodity prices. Accordingly, the Debtors once again engaged with their investors, beginning a dialogue with the First Lien Agent (as defined below) and a steering committee of first lien lenders (the "*Steering Committee*") that underpinned the Debtors' preparations for these Chapter 11 Cases. With the support of the First Lien Agent and the Steering Committee, embodied in the *Sale and Plan Support Agreement* that the Debtors entered into with them on May 15, 2018 (the "*SAPSA*"),[3] and buy-in from all of their second lien lenders on their recovery under a chapter 11 plan, the Debtors are ready to run simultaneous sale and plan confirmation processes to ensure value is maximized and distributed efficiently and appropriately.

8.      Importantly, the Debtors and their advisors conducted a robust marketing process prepetition. They contacted hundreds of potential bidders, dozens of whom engaged with the Debtors and reviewed the Debtors' assets through access to a virtual data room, eventually

---

[3]      A copy of the SAPSA is attached hereto as **Exhibit A**.

resulting in three stalking horse bids for certain of the asset packages.  Despite this substantial activity, the Debtors believe it is appropriate to re-market their assets under the auspices of this Court for a reasonable period and with the benefit of the stalking horse bids in place.  To that end, the Debtors intend to launch marketing immediately, with a bid deadline in approximately seven weeks.  Based on the engagement by bidders in the prepetition process, the Debtors are hopeful for an active auction.

9.      In tandem with the marketing process and the auction, the Debtors are pursuing confirmation of their prearranged plan with the support of the First Lien Agent, the Steering Committee, and their entire second lien lender group.  The Debtors intend to file their proposed chapter 11 plan of liquidation (the "*Plan*") and accompanying disclosure statement (the "*Disclosure Statement*") in short order, with hearings to consider approval of the Disclosure Statement and, later, confirmation of the Plan to follow on an efficient timeline that honors all applicable notice and timing requirements.  Generally, the Plan and, importantly, the SAPSA and anticipated sale terms, call for reserves to be set aside from sale proceeds to pay all secured, administrative, and priority claims and to fund distributions to the second lien lenders and unsecured creditors and a post-effective date wind-down process.  The balance of the sale proceeds will be paid to the Debtors' first lien lenders, on account of their liens on and security interests in substantially all of the Debtors' assets and the current aggregate purchase price between the three stalking horse bids.

10.      This path forward reflects the Debtors' foremost objectives:  to maximize the value of their assets and achieve timely distributions of sale proceeds and Plan confirmation, while ensuring sufficient funds will remain to pay all administrative expenses of these cases and allowing for a responsible wind-down process after the sales close and distributions are made.

Guided by these objectives, the Debtors anticipate moving swiftly through the chapter 11 process, all the while remaining responsible stewards for their estates and stakeholders.

## PART I

### I.    BUSINESS OF THE DEBTORS

#### A.    Overview

11.    The Debtors are an independent oil and natural gas company engaged in the acquisition, exploration, exploitation, development, and operation of oil and gas properties. The Debtors have both operated and non-operated[4] oil and gas assets in Texas, Louisiana, New Mexico, North Dakota, and Wyoming, as well as royalty interests in certain properties in Montana.

12.    The Debtors have conventional oil assets[5] in North Dakota and Wyoming with large original oil-in-place fields and owned infrastructure, including a sour gas plant and an oil pipeline system. As of September 2017, these assets had a net production of 2,650 barrels of oil equivalent per day. The Debtors also have unconventional assets in North Louisiana and Shelby County, Texas, with significant development opportunities available on those properties with the assistance of modern technology. As of September 2017, the unconventional assets had a net production of 7.0 million cubic feet equivalent per day.

13.    In addition, the Debtors have royalty and working interests in non-operated assets in the Permian Basin in New Mexico and Texas and in the Haynesville Shale in Louisiana that

---

[4]    An "operated" property is one for which the Debtors serve as the "operator" under a joint operating agreement with other parties that own interests in the same property. The operator generally is responsible for operational decisions, marketing production, and paying expenses with respect to the property. In turn, the economics of operating the property are shared with the other parties to the joint operating agreement in accordance with its terms.

[5]    Generally, a property being labeled "conventional" means that its oil and gas deposits are formed in discrete accumulations or pools, making them relatively easier to produce, typically through the use of a simple vertical well bore. An "unconventional" property, on the other hand, is one in which the resource deposits are more difficult to produce due to the nature of the rock bed in which they sit. Unconventional properties typically require horizontal drilling and hydraulic fracturing (or "fracking") to produce the hydrocarbons.

are subject to an eighty percent (80%) net profits interest held by Enduro Royalty Trust, a publicly-traded entity, as described further below.  Enduro Resource Partners LLC owns 26.1 percent of Enduro Royalty Trust's public equity units.  For the avoidance of doubt, Enduro Royalty Trust is not a Debtor in these Chapter 11 Cases, nor do the Debtors have a controlling position in Enduro Royalty Trust's equity units.

### B.      The Debtors' History

14.      Enduro Resource Partners LLC is a privately-held, Delaware limited liability company that was founded in 2010 by Riverstone Holdings LLC (the "***Sponsor***"), a private investor group, and certain individual investors.  In July 2011, Enduro Resource Holdings LLC ("***Enduro Holdings***") was formed, and became the sole member of Enduro.

### C.      Corporate Structure

15.      Enduro Holdings is the ultimate corporate parent of the Debtors, and the other Debtors are all of its direct and indirect, wholly-owned subsidiaries.  The Debtors' corporate organization structure is as follows:



16.     **Enduro Royalty Trust**.  In 2011, the Debtors established and offered to the public a "royalty trust," which is a trust entity formed for the sole purpose of owning specified oil and gas interests.  These entities are often used as financing vehicles by upstream oil and gas companies, similar to the way other businesses might securitize other types of assets.  The company contributes interests that it owns to the trust and offers equity in the trust to raise capital for the company's operations.  Note that despite the term "royalty trust," it is not always royalty interests that are contributed to the trust.

17.     In the Debtors' case, Enduro established Enduro Royalty Trust, a Delaware statutory trust formed on May 3, 2011, pursuant to a trust agreement (as amended and restated on November 3, 2011) among Enduro, as trustor, The Bank of New York Mellon Trust Company, N.A., as trustee, and Wilmington Trust Company, as Delaware trustee.  Enduro Royalty Trust

was created to acquire and hold for the benefit of its unitholders a net profits interest[6] representing the right to receive 80 percent of the net profits from the sale of oil and natural gas production from certain properties owned by the Debtors in the states of Texas, Louisiana, and New Mexico (the "***Net Profits Interest***").  The creation of the Net Profits Interest occurred by that certain *Conveyance of Net Profits Interest*, dated effective as of July 1, 2011 (the "***Conveyance***"), and the properties in which Enduro Royalty Trust holds the Net Profits Interest are referred to as the "***Underlying Properties***."  After the formation of Enduro Royalty Trust and the creation of the Net Profits Interest, Enduro consummated two public offerings of Enduro Royalty Trust units (the "***Trust Units***"), and it retains 26.1 percent of the outstanding Trust Units as of the Petition Date.

18.    The diagram below summarizes the current corporate relationship between Enduro and Enduro Royalty Trust.  No other Debtors own any Trust Units, and Enduro Royalty Trust is not a Debtor in these Chapter 11 Cases.



---

[6]    A "net profits interest" is generally considered as the right to receive a specified portion of the net profits—in other words, revenues minus costs—arising from ownership of an oil and gas property.

## II.    OVERVIEW OF THE DEBTORS' PREPETITION CAPITAL STRUCTURE

19.    Prior to the Petition Date, the Debtors entered into two secured credit facilities, as described below, and they held approximately $25 million in cash as of the Petition Date.  The following table summarizes the Debtors' indebtedness.

| Indebtedness | Approximate Principal Amount as of Petition Date[7] |
|---|---|
| First Lien Credit Facility | $208,707,926 |
| Second Lien Credit Facility | $141,176,036 |

### A.    First Lien Credit Facility

20.    Enduro, as borrower, and Bank of America, N.A., as administrative agent (the "***First Lien Agent***"), and the lenders party thereto (the "***First Lien Lenders***"), are parties to that certain *Amended and Restated Credit Agreement*, dated as of August 1, 2013 (as modified, amended, or supplemented from time to time, the "***First Lien Credit Agreement***").  In connection with the First Lien Credit Agreement, the Debtors entered into security documents providing for liens on substantially all of their owned real property and mineral interests, all accounts receivable, inventory, intangibles, and fixed assets, and the retained Trust Units.  In addition, each of the Debtors other than Enduro provided guarantees of all obligations under the First Lien Credit Agreement.

### B.    Second Lien Term Loan

21.    Enduro, as borrower, and Wilmington Trust, National Association, as administrative agent (the "***Second Lien Agent***"), and the lenders party thereto (the "***Second Lien Lenders***"), are parties to that certain *Second Lien Term Loan Agreement*, dated as of June 5, 2015 (as modified, amended, or supplemented from time to time, the "***Second Lien Credit Agreement***").  In connection with the Second Lien Credit Agreement, the Debtors entered into

---

[7]    These figures reflect principal amount outstanding and do not include accrued but unpaid interest.

security documents providing for liens on substantially all of their owned real property and mineral interests, all accounts receivable, inventory, intangibles, and fixed assets, and the retained Trust Units.  In addition, each of the Debtors other than Enduro provided guarantees of all obligations under the Second Lien Credit Agreement.  The Debtors, the First Lien Agent, and the Second Lien Agent are parties to an intercreditor agreement that sets forth the relative rights and priorities as between the First Lien Agent and First Lien Lenders, on the one hand, and the Second Lien Agent and Second Lien Lenders, on the other.

## III.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.   Collapse in Oil Prices

22.   The Debtors, like numerous other upstream oil and gas companies, have come under financial stress as a direct result of the historical drop and sustained depressed levels in oil and gas prices, which never recovered far enough to make the Debtors' capital structure sustainable.  Despite substantial efforts the Debtors undertook to reduce long-term debt, reduce spending, and otherwise improve their capital and financial strength, as discussed below, the Debtors were unable to position themselves to repay or refinance the First Lien Credit Facility at or before its March 30, 2018 maturity.  Based on current market conditions, the Debtors believe that a sale of substantially all of their assets under chapter 11 of the Bankruptcy Code will yield the highest recovery to their various constituencies.

### B.   March 2016 Out-of-Court Restructuring Transactions

23.   In response to deteriorating commodity prices, which saw crude oil spot prices fall to roughly one third of their August 2014 value by the end of January 2016, the Debtors worked diligently to reduce spending and consummated a number of strategic transactions which, as further described below, permitted the Debtors to pay down and amend the First Lien

Credit Agreement, restructure the Second Lien Credit Agreement, and establish a new class of units to infuse additional capital into the Company.

24.     In late 2015, the Debtors began working with Latham & Watkins LLP ("*Latham*"), as counsel, and Evercore Group LLC ("*Evercore*"), as financial advisor, to assist them in developing and implementing a comprehensive restructuring plan.   The Debtors determined that a restructuring was in their best interests in light of numerous factors, including the dramatic decline in commodity prices, their significant secured indebtedness, the likelihood that commodity prices would remain at depressed levels, and the potential need for them to seek bankruptcy protection in the absence of a restructuring.

25.     After engaging in good faith, arms' length negotiations with all constituencies in their capital structure, on March 4, 2016, the Debtors executed an out-of-court restructuring of their debt and equity (the "*2016 Restructuring*").   The core components of the 2016 Restructuring included:  (a) the waiver of certain defaults under and other amendments to the First Lien Credit Agreement that, among other things, reduced the Debtors' cash interest obligations, accompanied by a $15 million cash paydown to the lenders thereunder; (b) the amendment and restatement of the Second Lien Credit Agreement to provide for a new, $8 million first out, second lien loan and an additional $22 million lent by the Sponsor (through its affiliate that holds the membership interests in Enduro Holdings) on a second-out basis thereunder; (c) the issuance of new equity and warrants and the re-designation and splitting of existing equity units; and (d) a cash infusion from the Sponsor and certain individual equity holders, in exchange for new equity that substantially diluted then-existing equity.  By reducing the liquidity demands of their debt and obtaining substantial new capital, the Debtors hoped that

the 2016 Restructuring would enable them to weather the commodity price environment and address their capital structure through repayment or refinancing, as and when needed.

### C.    September 2017 Permian Asset Sale

26.    After a robust marketing process, on September 12, 2017, Enduro Operating LLC, with the approval of the requisite percentage of holders of Trust Units, sold certain of its oil and gas properties in the Permian Basin, located in New Mexico and Texas, for $49.1 million (the "*September 2017 Asset Sale*").   Under the Conveyance, Enduro Royalty Trust was entitled to and received eighty percent (80%) of the net proceeds from the transaction.   After closing this transaction, the Debtors paid down $10 million of the First Lien Credit Agreement with proceeds from the September 2017 Asset Sale and other cash on hand.

### D.    2017 Forbearance Agreement and Restructuring Negotiations

27.    Despite the best efforts of the Debtors and their senior management to actively manage their capital structure and reduce their interest expense and debt obligations, the significant and sustained drop in oil and natural gas prices and related decrease in the Debtors' revenues and cash flows from operations left the Debtors under a cloud of uncertainty as to whether they would be able to address, by repayment or refinancing, the March 30, 2018 maturity of the First Lien Credit Agreement.

28.    Thus, in early 2017, the Debtors and their advisors commenced negotiations with the First Lien Agent and its restructuring advisors and with the Steering Committee regarding the Debtors' financial position, defaults under the First Lien Credit Agreement relating to the inclusion of a "going concern" qualification from the Debtors' auditor in their 2016 financial statements, and the maturity of the First Lien Credit Agreement.   As a result of these discussions, the parties entered into a forbearance agreement on April 28, 2017 (the "*April 2017 Forbearance Agreement*"), which required the Debtors to, among other things, deliver proposals

by September 29, 2017, for repaying or refinancing the First Lien Credit Agreement that were acceptable in form and substance to the First Lien Agent and a majority of the First Lien Lenders (the "*September 29 Covenant*").  The Forbearance Agreement also required the Debtors and a majority of the First Lien Lenders to reach a final agreement on pursuing such a proposal by December 15, 2017 (the "*December 15 Covenant*").

29.     On September 27, 2017, the Debtors delivered a proposal to the First Lien Agent, in accordance with the September 29 Covenant.  On October 10, 2017, the First Lien Lenders and the First Lien Agent delivered a reservation of rights letter to the Debtors, preserving their right to assert an event of default based on their position that the Debtors' proposal had not satisfied the September 29 Covenant.

30.     On October 26, 2017, the Debtors, the First Lien Agent, and certain First Lien Lenders executed a further forbearance agreement, relating to the September 29 Covenant and December 15 Covenant (the "*October 2017 Forbearance Agreement*").  The October 2017 Forbearance Agreement required the Debtors to deliver a marketing plan acceptable to the First Lien Agent and a majority of the First Lien Lenders for the sale of substantially all of their assets by November 10, 2017, and to comply with additional milestones in marketing and selling their assets.  Over the ensuing months, the Debtors arranged a plan for maximizing the value of their assets through a comprehensive marketing and sale process, as further described below.  After designing that plan, the Debtors discussed it with the First Lien Agent and its advisors, as well as advisors to the majority Second Lien Lender, and incorporated feedback from those parties before embarking on their sale process.

### E.     Prepetition Sale Process

31.     The agreed-upon sale process contemplated a broad initial outreach to a large list of potential buyers, followed by targeted follow-up with a tailored buyer list.  The sale process

also contemplated selling the Debtors' assets in three parts: (a) assets in North Dakota and Wyoming (the "*Package 1 Assets*"), (b) assets in North Louisiana (the "*Package 2 Assets*"), and (c) the Underlying Properties associated with Enduro Royalty Trust and the Trust Units owned by Enduro (the "*Package 3 Assets*"). At the time of the marketing process, these packages were composed as depicted below.



32.     On January 12, 2018, the Debtors launched their sale process. Communication between Evercore and potential counterparties began immediately after the launch and increased during the following weeks. Evercore distributed a teaser regarding the sale to a total of 908 potential buyers. More than 130 potential buyers engaged with Evercore following the initial launch, and forty-nine executed confidentiality agreements to receive more information and were given access to the Debtors' virtual data room in order to conduct due diligence regarding the Debtors' assets. Throughout this process, the Debtors worked closely with their advisors to respond to bidder inquiries, strategize ways to encourage participation and bids, and advance bidders through the process, all with an eye toward maximizing competition and value.

33.     The deadline for submission of bids was February 23, 2018. The Debtors received eight conforming bids, as well as four bids that did not conform to the Debtors' requirements. Over the ensuing weeks, the Debtors engaged with a number of these bidders simultaneously, ultimately narrowing the field to one bidder for the Package 3 Assets, and two

bidders for two sub-sets of the Package 1 Assets (divided between assets in North Dakota (the "***Package 1A Assets***") and in Wyoming (the "***Package 1B Assets***")).  While the Debtors received interest from several parties in the Package 2 Assets, they were unable to advance any of those bids far enough to finalize a stalking horse agreement for the Package 2 Assets.  As currently constituted, the asset packages are as illustrated below:



34.     After substantial good faith, arms' length negotiations, the Debtors and each of the bidders agreed to definitive documentation providing for these bidders to act as stalking horses for certain of the asset packages.  On May 14, 2018, Enduro Operating LLC executed a purchase and sale agreement with each of the three bidders (the "***Stalking Horse PSAs***").  The applicable bidder (each, a "***Stalking Horse Bidder***") under each of the Stalking Horse PSAs and the proposed purchase price are set forth below.

| Asset Package | Stalking Horse Bidder | Purchase Price |
|---|---|---|
| Package 1A | Cobra Oil & Gas Corporation | $45,000,000 |
| Package 1B | Mid-Con Energy Properties, LLC | $5,000,000 |
| Package 3 | Evolution Petroleum Corporation | $27,500,000 |

35.     The Debtors intend to seek approval of bidding procedures for and the sale of substantially all of their assets in these Chapter 11 Cases and to restart their marketing efforts immediately following the Petition Date.

F.     **2018 Negotiations With First Lien Agent and Second Lien Lender**

36.     As the maturity of the First Lien Credit Agreement on March 30, 2018, neared, the Debtors engaged in renewed negotiations with the First Lien Agent around the terms of a further forbearance agreement, which was executed by the Debtors, the First Lien Agent, and a majority of the First Lien Lenders on May 1, 2018.

37.     In addition, the Debtors and the First Lien Agent began discussions around the terms for an agreed-upon path through chapter 11.  After considerable arms' length negotiations, the Debtors, the First Lien Agent, and certain of the First Lien Lenders (the "***Consenting First Lien Lenders***") holding approximately 78 percent of the outstanding claims under the First Lien Credit Agreement (the "***First Lien Claims***") executed the SAPSA on May 15, 2018.  The SAPSA embodies the Consenting First Lien Lenders' consent to and support for funding a value-maximizing chapter 11 sale process and responsible wind down after closing of the sales.  In addition, the SAPSA contains customary covenants, termination rights, and transfer restrictions as to the First Lien Claims held by the First Lien Agent and the Consenting First Lien Lenders.

38.     Just before commencing these Chapter 11 Cases, the Debtors learned that the First Lien Agent and the Consenting First Lien Lenders had agreed with the majority Second Lien Lender that, subject to the Second Lien Credit Agreement, a $1.1 million cash distribution would be made on account of second lien claims under the Plan, and the Debtors understand that this distribution is supported by all of the Second Lien Lenders.  In addition, the Plan will provide for a distribution for general unsecured claimants at least equal to the rate of recovery being provided to the Second Lien Lenders.

39.     Thus, as a result of all the parties' concerted efforts, the Debtors have support from a substantial majority of the holders of First Lien Claims and all of their Second Lien Lenders for their path forward, paving the way to swift confirmation of the Plan and execution of the Debtors' primary objectives in these Chapter 11 Cases.

## PART II

40.     In furtherance of the objective of successfully selling their assets at maximum value, the Debtors have sought approval of the First Day Motions and related orders (the "***Proposed Orders***"), and respectfully request that the Court consider entering the Proposed Orders granting such First Day Motions.  For the avoidance of doubt, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

41.     I have reviewed each of the First Day Motions, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  Moreover, I believe that the relief sought in each of the First Day Motions is vital to enabling the Debtors to liquidate in chapter 11 with minimal interruption and disruption to their businesses and concomitant loss of productivity and value.

## I.     ADMINISTRATIVE AND PROCEDURAL PLEADINGS

### A.     Joint Administration Motion

42.     The Debtors seek the joint administration of their Chapter 11 Cases, six in total, for procedural purposes only.  Many of the motions, hearings, and other matters involved in these Chapter 11 Cases will affect all of the Debtors.  Thus, I believe that the joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, thereby saving considerable time and expense for the Debtors and

resulting in substantial savings for their estates.  I also believe that joint administration of these Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest.

### B.    Retention Applications

43.    I believe that the retention of chapter 11 professionals is essential to the Chapter 11 Cases.  Accordingly, in connection with these Chapter 11 Cases, the Debtors anticipate that they will request permission to retain, among others, the following professionals:  (a) Latham & Watkins LLP, as co-counsel; (b) Young Conaway Stargatt & Taylor, LLP, as co-counsel; (c) Alvarez & Marsal North America, LLC, as restructuring advisor; (d) Evercore Group, L.L.C., as financial advisor; and (e) Kurtzman Carson Consultants, LLC, as claims and noticing agent and as administrative advisor.  I believe that the above professionals are well qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of these Chapter 11 Cases, and the professionals will coordinate their services to avoid duplication of efforts.  I understand that the Debtors may find it necessary to seek retention of additional professionals as the Chapter 11 Cases progress.

## II.    BUSINESS OPERATION MOTIONS

### A.    Cash Management Motion[8]

44.    In the Cash Management Motion, the Debtors seek entry of interim and final orders, (a) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash management system, including maintenance of the Debtors' existing bank accounts, checks, and business forms; (b) granting the Debtors a waiver of certain bank account

---

[8]    "*Cash Management Motion*" means the *Motion of Debtors for Interim and Final Orders (A) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (B) Authorizing Continuation of Existing Deposit Practices, (C) Waiving Certain U.S. Trustee Guidelines, (D) Authorizing Continuation of Intercompany Transactions, and (E) Granting Priority Status to Postpetition Intercompany Claims*, and the proposed orders granting it are referred to as the "*Cash Management Order*."

and related guidelines of the Office of the United States Trustee for the District of Delaware (the "***U.S. Trustee Guidelines***") to the extent that the requirements are inconsistent with the Debtors' practices under their existing cash management system or other actions described herein; (c) authorizing, but not directing, the Debtors to continue to maintain and use their existing deposit practices; (d) authorizing, but not directing, the Debtors to continue certain ordinary course intercompany transactions; (e)  according  superpriority  status  to  postpetition  intercompany claims arising from certain of those transactions; and (f) authorizing the Debtors to open and close bank accounts.

### 1.      The Debtors' Cash Management System and Bank Accounts

45.      In the ordinary course of their businesses, the Debtors maintain a complex cash management system (the "***Cash Management System***") that includes operating and disbursement accounts, and other accounts.   I believe that this system is integral to the operation and administration of their businesses.   Specifically, the Cash Management System allows the Debtors to (a) monitor and control all of their cash receipts and disbursements, (b) identify their cash requirements, (c) transfer cash as needed in light of those cash requirements, and (d) track intercompany cash transfers.  I also believe that the Debtors believe that the Cash Management System is similar to those used by other companies of similar size and complexity to collect, transfer, and disburse funds in a cost-effective and efficient manner.

46.      The Cash Management System is managed by the financial personnel of the Debtors located in Fort Worth, Texas, where they oversee the administration of the various bank accounts to effect the collection, disbursement, and movement of cash.   I believe that the Debtors' supervision of the Cash Management System enables the Debtors to, among other things, (a) accurately forecast and report their cash flow requirements and (b) monitor the collection and disbursement of funds to and from the Bank Accounts (as defined below).

47.    I believe that the Cash Management System is organized to appropriately respect the separate cash funding and operating needs of the Debtors.  A diagram depicting the Cash Management System is annexed as **Attachment 1** to the Cash Management Motion.  As of the Petition Date, the Debtors maintain ten bank accounts (the "***Bank Accounts***") with Frost Bank and Bank of America (collectively, and including any new banks with which the Debtors maintain any bank accounts following the Bank Transition (as defined below), "***Banks***"),[9] financially stable institutions that are insured by the Federal Deposit Insurance Corporation (up to an applicable limit per Debtor per institution).  The Debtors pay the Banks ordinary course fees and expenses in connection with maintaining the Bank Accounts (the "***Bank Fees and Expenses***"), typically by authorizing the Banks to deduct them from the relevant Bank Accounts in accordance with the applicable deposit agreements.  The Debtors estimate that they owe approximately $2,500 in Bank Fees and Expenses, all to be paid within twenty-one (21) days of the Petition Date.

48.    Of the Bank Accounts, three are held in the name of Enduro Resource Partners LLC, two are held in the name of Enduro Management Company LLC, three are held in the name of Enduro Operating LLC, one is held in the name of Washakie Pipeline Company LLC, and one is held in the name of Washakie Midstream Services LLC.  The Debtors hold their cash entirely in the Bank Accounts and maintain no other accounts holding cash.  A detailed schedule of the Bank Accounts is set forth in the Cash Management Motion.

49.    The Debtors are in the process of transitioning nine of their Bank Accounts from Frost Bank to another institution (the "***Bank Transition***").  The Debtors will work to complete

---

[9]    For the avoidance of doubt, the Debtors request that any relief granted pursuant to the Cash Management Motion apply to any additional bank accounts later opened by the Debtors and any additional banks that may maintain them.

the Bank Transaction as soon as possible and anticipate that this transition will be completed within 60 days of the Petition Date.

50.     On May 14, 2018 the Debtors entered into escrow agreements (the "***Escrow Agreements***") with each of its three stalking horse purchasers (the "***Stalking Horse Purchasers***") in connection with the sale of all or substantially all of its assets (the "***Sale Transaction***").   Under the Escrow Agreements, each of the Stalking Horse Purchasers will deposit funds in connection with the Sale Transaction into segregated escrow accounts maintained by Wells Fargo, National Association, for distribution in accordance with the terms of each Stalking Horse Purchaser's applicable asset purchase agreement.  For the avoidance of doubt, these escrow accounts shall be governed exclusively by the Escrow Agreements, notwithstanding anything in the Proposed Orders

### 2.     Continued Use of the Debtors' Existing Cash Management System and the Bank Accounts

51.     I believe that the Cash Management System is an ordinary-course, customary, and essential business practice, the continued use of which is essential to the Debtors' business operations during these Chapter 11 Cases and their goal of maximizing value for the benefit of all parties in interest.  I believe that requiring the Debtors to adopt a new cash management system at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption.  Any disruption in the collection of funds as currently implemented would adversely (and perhaps irreparably) affect the Debtors' ability to maximize estate value for the benefit of the Debtors' creditors and other parties in interest.  Thus, in my opinion, maintaining the existing Cash Management System without disruption is both essential to the Debtors' ongoing operations and restructuring and in the best interests of the Debtors, their estates, and all interested parties.

52.     If the relief requested in the Cash Management Motion is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court.  The Debtors submit that they are able to work with the Banks to ensure that this goal of separation between the prepetition and postpetition periods is observed and that enforcement of certain of these U.S. Trustee Guidelines would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.  In light of the scope and complexity of the Cash Management System, I believe it would be onerous for the Debtors to meet the U.S. Trustee Guidelines requiring them to close all existing bank accounts and open new debtor in possession accounts. And doing so would also risk material operational problems, as the Debtors' business partners and own personnel transition to a wholly-new system.

### 3.     Continued Use of the Debtors' Existing Checks and Business Forms

53.     To minimize expenses to their estates, the Debtors seek authorization to continue using all checks substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession.  I believe that changing the Debtors' existing checks, correspondence, and other business forms would be expensive, unnecessary, and burdensome to the Debtors' estates.  Further, such changes would be disruptive to the Debtors' business operations, may create friction with their customers and vendors, and would not confer any benefit upon parties that deal with the Debtors.

### 4.     Waiver of Certain Requirements of the United States Trustee

54.     I have been generally informed of the applicable requirements of the U.S. Trustee Guidelines.  As set forth above, I believe that (a) the Debtors are able to work with their current Banks to ensure that this goal of separation between the prepetition and postpetition periods is

01:23192978.2

observed and (b) enforcing certain of the U.S. Trustee Guidelines would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

55.     In light of the complexity of the Cash Management System, I believe that it would be onerous for the Debtors to meet the requirement of closing all existing bank accounts and opening new debtor in possession bank accounts.  Indeed, not only would the Debtors be unnecessarily inconvenienced, but doing so would also risk material operational problems, as the Debtors' business partners and own personnel transition to a wholly-new system.

56.     Furthermore, I believe that it would be unnecessary and inefficient to require the Debtors to abide by the U.S. Trustee Guidelines to establish specific debtor in possession accounts for tax payments (including payroll taxes) and to deposit to the accounts sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll and other tax obligations.  I believe that the Debtors can pay their tax obligations most efficiently from their existing accounts in accordance with their existing practices, and the U.S. Trustee will have wide latitude to monitor the flow of funds into and out of the accounts.  I also believe that the creation of new debtor in possession accounts designated solely for tax obligations would be unnecessarily burdensome.

57.     Additionally, I believe it is unnecessary to require the Debtors to abide by the requirement to establish specific debtor in possession accounts for cash collateral.  The Debtors have provided safeguards to ensure that parties with security interests in the Debtors' cash are adequately protected and that those parties have been provided with notice of the proposed use of the cash collateral.

58.     Finally, for the reasons noted above, I believe that compliance with the U.S. Trustee Guideline that a debtor must immediately obtain checks for all debtor in possession

accounts that bear the designation "Debtor In Possession," the bankruptcy case number, and the type of account, is unnecessarily burdensome in these Chapter 11 Cases.

5.   **Continued Ordinary-Course Intercompany Transactions and Postpetition Intercompany Claims and Granting of Superpriority Status**

59.   The Debtors conduct various business transactions with each other (the "***Intercompany Transactions***"), including moving cash within the Cash Management System between different Debtors.   As a result, there may be intercompany claims owing among the Debtors at any given time (the "***Intercompany Claims***"), including outstanding prepetition Intercompany Claims.   With the help of the Cash Management System and the Debtors' treasury personnel, the Debtors are able to track and account for each Intercompany Transaction and the resulting Intercompany Claims.

60.   Before the commencement of these Chapter 11 Cases, the Debtors engaged in many types of Intercompany Transactions in the ordinary course of business.   These included, without limitation, (a) cash transfers between the Bank Accounts; (b) the purchase of natural gas by Washakie Midstream Services LLC from Enduro Operating LLC, and the resale of fuel to Enduro Operating LLC after the natural gas is processed; and (c) tariff payments by Enduro Operating LLC to Washakie Pipeline Company LLC.   I believe that these and other Intercompany Transactions ensure the smooth functioning and operation of the Debtors' businesses, as certain of the Debtors perform critical functions to the businesses on behalf of other Debtors.   For that reason, continuing the Intercompany Transactions in the ordinary course is critical to maximizing the value of the Debtors' assets.

### B.    Cash Collateral Motion[10]

61.    In the Cash Collateral Motion, the Debtors request the ability to use cash receipts and equivalents constituting the Cash Collateral (as defined in the Cash Collateral Motion) of the Prepetition Secured Parties (as defined in the Cash Collateral Motion).  Prior to the Petition Date, the Debtors, the First Lien Lenders, and their respective advisors engaged in extensive, arm's length negotiations regarding the terms and conditions of a proposed consensual cash collateral order.  These efforts resulted in an agreement with the First Lien Lenders regarding the consensual use of Cash Collateral that is reflected in the Cash Collateral Motion and proposed order granting it.

62.    I understand that, as part of the consensual arrangement, and as adequate protection for any diminution in value during these cases, the Debtors have agreed to provide the Prepetition Secured Parties with adequate protection that includes: (a) granting of adequate protection liens to the Prepetition Secured Parties and granting of allowed superpriority claims to the extent of any Diminution in Value (as defined in the Cash Collateral Motion) of the Prepetition Secured Parties' interest in the Prepetition Collateral (as defined in the Cash Collateral Motion, including the Cash Collateral) from and after the Petition Date; and (c) certain other budget and reporting requirements.

63.    Moreover, I am aware that in the Cash Collateral Motion and Cash Collateral Order the Debtors have admitted, stipulated, and agreed to various facts, including but not limited to: (a) that the Debtors are truly and justly indebted and liable to the Prepetition Secured Parties, without defense, counterclaim, recoupment, or offset of any kind; (b) that the Secured

---

[10]   "***Cash Collateral Motion***" means the *Motion of Debtors for Orders (a) Authorizing the Debtors to Use Cash Collateral, (b) Granting Adequate Protection to the Prepetition Secured Parties, (c) Scheduling a Final Hearing, and (d) Granting Related Relief,* and the proposed orders granting it are referred to as the "***Interim Cash Collateral Order***" and "***Final Cash Collateral Order,***" and collectively the "***Cash Collateral Order.***"

Obligations (as defined in the Cash Collateral Motion) are secured by a perfected first-priority lien and security interest in, to, and against substantially all of the real and personal property (including substantially all of the oil and gas leases, rights of way and property interests, including wells, improvements and other property located on such oil and gas properties) of the Debtors, including, without limitation, Cash Collateral, the as-extracted collateral therefrom, the cash and noncash proceeds, receivables and rights in and to all imbalances, joint interest billings and payments from first party purchasers, and other rights arising from all prepetition collateral; and (c) this prepetition indebtedness owed by the Debtors is secured by valid, binding, perfected, and enforceable liens and security interests in, to and against the Prepetition Collateral.

64.    I understand that, subject to paragraph 12 of the Interim Cash Collateral Order, these stipulations and admissions by the Debtors contained in the Interim Cash Collateral Order are binding upon all other parties in interest, including any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors, for all purposes, unless subject to a successful challenge that specifically challenges the Debtors' stipulations prior to the Challenge Termination Date (as defined in the Interim Cash Collateral Order).  As to the Debtors, however, and subject to paragraph 12 of the Interim Cash Collateral Order, I understand that all such challenges are irrevocably waived pursuant to the Interim Cash Collateral Order and relinquished effective as of the Petition Date.

65.    I have also been informed that notwithstanding the Debtors' stipulations in the Interim Cash Collateral Order, the Debtors' irrevocably waive the right to challenge or contest in any way the perfection, validation, and enforceability of the Prepetition Liens (as defined in the Interim Cash Collateral Order) or the validity or enforceability of the Secured Obligations and the Credit Documents (as defined in the Interim Cash Collateral Order).  I understand that the

Debtors' stipulations and admissions with respect to the Prepetition Liens will be binding upon the Debtors and any successors thereto in all circumstances, unless a challenge that specifically challenges the Debtors' stipulations is received prior to the Challenge Termination Date, and the Court rules in favor of the plaintiff sustaining any such supplemental challenge.

66.     I believe that the Debtors need authorization to use the Cash Collateral to pay operating expenses associated with their business operations, all in accordance with the budget (the "***Approved Budget***").  Indeed, I believe that absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

67.     I also believe that the Debtors' use of Cash Collateral is critical to preserve the value of their assets and property during the Chapter 11 Cases and will avoid immediate and irreparable harm to the Debtors' estates and creditors.  The use of Cash Collateral constituting proceeds of the Prepetition Collateral generated following the Petition Date will also allow the Debtors to avoid the increased costs and administrative burdens that would follow if the Debtors were required to immediately segregate and not use their operating cash.  I believe that the terms and conditions on which the Debtors may use Cash Collateral have been carefully designed, and extensively negotiated, to meet the dual goals of sections 361 and 363 of the Bankruptcy Code. If the Interim Cash Collateral Order is entered, I believe the Debtors will have ample working capital to operate their businesses and provide an opportunity to maximize value for the benefit of their stakeholders.  At the same time, I believe that the Prepetition Secured Parties will be adequately protected with the adequate protection liens on all assets of the Debtors, superpriority claims, immediate and current payment of interest, and reimbursement of professional fees and expenses.

68.     As discussed above, a significant portion of the Prepetition Collateral consists of the Debtors' oil and gas properties and related assets (including real property and personal property related thereto), which includes the hydrocarbons extracted by the Debtors from those properties and the proceeds generated from sales thereof.  The Debtors' business model is predicated upon their ability to exploit their hydrocarbon assets, bring them to market, and use the proceeds in their business operations.  Thus, I believe the orderly continuation of the Debtors' operations and the preservation of their going concern value is largely dependent upon their ability to regularly convert the Prepetition Collateral into Cash Collateral and use it in their operations.  The Debtors rely on the Cash Collateral generated from their operations to fund working capital, capital expenditures, and for other general corporate purposes.

69.     I have been informed that the Debtors, with the assistance of their financial advisors, have prepared an Approved Budget showing sources and uses of cash necessary for the Debtors' operations on a weekly basis for the first four (4) weeks of these Chapter 11 Cases.  As set forth in the Interim Cash Collateral Order and the Approved Budget, the Debtors intend to use Cash Collateral for, among other things, (i) working capital, general corporate purposes, and administrative costs and expenses of the Debtors incurred in the Chapter 11 Cases, including first-day related relief subject to the terms hereof; and (ii) adequate protection payments to the Prepetition Secured Parties.  The Debtors will adhere to the Approved Budget, subject to the approved variances set forth in paragraph 3 of the Interim Cash Collateral Order.

### C.   Workforce Obligations Motion[11]

70.    In the Workforce Obligations Motion, the Debtors seek entry of interim and final orders (a) authorizing them, in their discretion, to pay, continue, or otherwise honor various prepetition labor-related obligations (collectively, the "***Prepetition Workforce Obligations***")[12]; (b) authorizing them to pay, continue, or otherwise honor each of the Workforce Programs[13] and the Director Compensation (as defined below) in the ordinary course of business during the pendency of these cases; (c) authorizing them to pay any and all local, state, and federal withholding and payroll-related or similar taxes and other deductions relating to the Prepetition Workforce Obligations; (d) authorizing them, in their discretion, to pay any prepetition claims of administrators and providers in the ordinary course of business to the extent that any of the Prepetition Workforce Obligations and the Workforce Programs are administered, insured, or paid through a third-party administrator or provider.

71.    As of the Petition Date, the Debtors employed approximately 70 employees (the "***Employees***"), of whom 42 were located at the Debtors' headquarters in Fort Worth, Texas, and 28 were located in the field, supporting the Debtors' operations in Texas, North Dakota, Wyoming and Louisiana.  Approximately 47 of the Debtors' current Employees are salaried

---

[11]   "***Workforce Obligations Motion***" means the *Motion of Debtors for Interim and Final Orders (a) Authorizing Payment of Certain Prepetition Workforce Obligations, (b) Authorizing Continuance of Workforce Programs, (c) Authorizing Payment of Withholding and Payroll-Related taxes, and (d) Authorizing Payment of Prepetition Claims Owing to Workforce Program Administrators or Providers*, and the proposed orders granting it are referred to as the "***Workforce Obligations Order***."

[12]   More specifically, the "***Prepetition Workforce Obligations***" are comprised of all prepetition obligations owed on account of the Compensation Obligations, Administrative Fee Obligations, PTO and Vacation Time, Reimbursable Expense Obligations, Employee Benefits Obligations, and Workers' Compensation Claims, each as defined in the Workforce Obligations Motion.

[13]   The "***Workforce Programs***" are comprised of PTO, Vacation Time and holiday pay policies, postpetition Reimbursable Expense Obligations, Employee Benefits Plans, and Workers' Compensation Claims, each as defined in the Workforce Obligations Motion.

Employees and approximately 23 are hourly Employees. As of the Petition Date, 69 of the Employees work full-time and 1 Employee works part-time.

72.     The Debtors also regularly utilize the services of contract workers (the "***Independent Contractors***" and, together with the Employees, the "***Workforce***") to provide a variety of services to fill immediate business needs of the Debtors and allow the Debtors to have a flexible workforce to meet their operational needs in a cost-effective manner.

73.     I believe that the Debtors' ability to preserve their businesses and safely and productively operate their businesses is dependent on the expertise and continued enthusiasm and service of their Workforce. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the continuity and competence of their Workforce would be jeopardized if the relief requested herein is not granted.

74.     It is my belief that if the Debtors fail to pay the Prepetition Workforce Obligations in the ordinary course of business, the Workforce will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. This would have a highly negative impact on Workforce morale and productivity, thereby resulting in immediate and irreparable harm to the Debtors' continuing operations and their estates. Accordingly, I believe that continuation of the Workforce Programs is vital to preventing the loss of key members of the Workforce during the pendency of the Chapter 11 Cases and to maintaining the continuity and stability of the Debtors' operations.

### 1.     Prepetition Workforce Compensation

75.     ***Compensation Obligations***. Current Employees are paid semi-monthly (on or around the fifteenth and last business day of each month), with an average payroll each pay period of approximately $354,000. The Employees are paid all compensation on time, except

with respect to overtime pay for the Debtors' hourly Employees, which is paid two weeks in arrears.

76.    In the ordinary course of their businesses, the Debtors make deductions from Employees' paychecks for payments to third parties on behalf of Employees for various federal, state, and local income, employment, payroll, and other taxes, as well as for savings programs, benefit plans, flexible savings accounts, insurance programs, and other similar programs (collectively, the "**Deductions**").   Over the past twelve months, the Debtors' average semi-monthly Deductions for Employees aggregated approximately $113,000.

77.    The Debtors estimate that, as of the Petition Date, accrued but unpaid wages and other compensation, including the Deductions, total approximately $184,300 (comprised of $43,000 owed to Employees, $16,000 owed to Independent Contractors, $118,000 owed on behalf of statutory deductions, and $7,300 attributable to the Deductions, specifically payroll taxes).

78.    ***PTO, Vacation Time, and Holiday Pay Policies***.   The Debtors offer their full time Employees paid sick days ("***PTO***"), vacation time ("***Vacation Time***"), and holiday pay.  I believe these programs are typical and customary, and continuing to offer them is necessary for the Debtors to retain Employees during the reorganization process.

79.    ***Bonus Programs***.   In the ordinary course of business, in addition to regular payroll, the Debtors currently maintain certain bonus programs for their Employees.  The first is an annual bonus program for the Debtors' Employees working in the field at the sites of the Debtors' oil and gas wells and properties (the "***Field Personnel Bonuses***").   The Field Personnel Bonuses are generally paid at the Debtors' discretion and were paid in March 2018, consistent

with the Debtors' historical practice.  Thus, no amounts are outstanding as of the Petition Date for the Field Personnel Bonuses.

80.     Additionally, a bonus program was instituted by the Debtors for their executive management team in connection with the Debtors' marketing and sale efforts to incentivize these Employees to maximize value in that process.  I understand that the Debtors do not seek authority under the Workforce Obligations Motion to honor these particular bonus programs.

81.     Finally, the Debtors also put in place a bonus program for 35 Employees, who are not members of the Debtors' management team, to incentivize them to remain with the Debtors and continue to work diligently through the Debtors' sale process (the "***Sale Incentive Program***") to help maximize value.  The Sale Incentive Program provides for a bonus to be paid to these Employees in three equal installments, each upon the closing of the sale of one of the three asset packages originally marketed by the Debtors prepetition.  The maximum amount potentially to be paid under the Sale Incentive Program is approximately $1,525,021.

### 2.     Prepetition Employee Reimbursements

82.     ***Business Expenses***.  The Debtors, in the ordinary course of business, reimburse Employees for a variety of ordinary, necessary, and reasonable business-related expenses that the Employees incur on behalf of the Debtors in the scope of their employment (the "***Reimbursable Expenses***").  In certain instances, Employees may be issued corporate credit cards through American Express to pay for Reimbursable Expenses.

83.     The Debtors estimate that, as of the Petition Date, their obligation to Employees for accrued, Reimbursable Expenses (submitted and un-submitted) aggregate approximately $90,000, inclusive of amounts owed to American Express for business-related expenses owed in connection with the credit cards and certain payments made to Wex Bank related to gas cards used for the Debtors' vehicles in the field.

### 3.    Employee Benefits

84.    Prior to the Petition Date, the Debtors offered all full-time Employees and their eligible spouses and dependents various standard employee benefits, including, without limitation, (a) prescription and medical benefits (the "*Medical Plan*"), dental care (the "*Dental Plan*"), and vision coverage (the "*Vision Plan*", and collectively, with the Medical Plan and the Dental Plan, the "*Health Plans*"); (b) participation in tax-advantaged flexible spending accounts (the "*FSA Plan*") and employer health reimbursement arrangements (the "*HRA Plan*" and collectively, with the FSA Plan, the "*Flexible Benefits Plans*"); (c) basic life and accidental death and dismemberment insurance, short- and long-term disability insurance, and supplemental life insurance (collectively, the "*Income Protection Plans*"); (d) a retirement savings 401(k) plan (the "*401(k) Plan*"); (e) subsidized parking permits (the "*Parking Permit Program*"); (f) on-site safety services (the "*Safety Program*" and collectively with the Health Plans, the Flexible Benefits Plans, the Income Protection Plans, the 401(k) Plan and the Parking Permit Program, the "*Employee Benefits*").   As of the Petition Date, the Debtors were obligated to pay certain contributions or provide benefits in connection with certain of the Employee Benefits.

85.    *Health Plans*.  All full-time Employees are eligible to participate in the Medical Plan, Dental Plan, and Vision Plan.  The Debtors subsidize monthly Employee premiums in connection with the Medical Plan, Dental Plan, and Vision Plan, which are paid in advance for the upcoming month.  The total cost, inclusive of Employee contributions, of (a) the Medical Plan is approximately $95,803 per month, (b) the Dental Plan is approximately $6,070 per month, and (c) the Vision Plan is approximately $1,027 per month.  As of the Petition Date, there are no outstanding obligations due in connection with the Medical Plan.

86.    *Flexible Benefits Plans*.  All benefits-eligible Employees may elect to participate in the Debtors' FSA Plan and HRA Plan.  The Debtors also subsidize or continue to provide

certain benefits to certain former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**").  The Flexible Benefits Plans as well as COBRA benefits are administered by TaxSaver.

87.     As of the Petition Date, the Debtors believe that $14,600 is owed in connection with the Flexible Benefits Plans, of which approximate $4,200 is owed in connection with the FSA Plan, approximately $9,300 is owed in connection with the HRA Plan, and approximately $1,100 in administrator fees.

88.     ***Income Protection Programs***.  The Debtors maintain certain income protection plans including primary life and accidental death and dismemberment insurance ("***Life and AD&D Insurance***") through Dearborn National Life Insurance Company.  Life and AD&D Insurance costs the Debtors approximately $2,550 per month, which is paid in advance for the upcoming month.  I have been informed that, as of the Petition Date, there are no outstanding obligations due on account of Life and AD&D Insurance.

89.     The Debtors also offer benefits-eligible Employees long-term disability insurance through Dearborn National Life Insurance Company ("***Long-Term Disability Insurance***").  I understand that Long-Term Disability Insurance costs the Debtors approximately $1,730 per month, which is paid in advance for the upcoming month.  I have been informed that, as of the Petition Date, there are no outstanding obligations due on account of Long-Term Disability Insurance.

90.     The Debtors also offer benefits-eligible Employees short-term disability insurance ("***Short-Term Disability Insurance***"), which   is administered by Dearborn National Life Insurance Company and has a monthly administration fee of approximately $200 per month.  I

understand that the Debtors' Short-Term Disability Insurance policy is self-insured, and that, as of the Petition Date, there are no outstanding obligations due on account of Short-Term Disability Insurance.

91.    The Debtors also offer benefits-eligible Employees voluntary supplemental insurance life and accidental death and dismemberment insurance through Dearborn National Life Insurance Company ("***Supplemental Insurance***").    I understand that Supplemental Insurance costs the Debtors approximately $660 per month, which is paid in advance for the upcoming month.    I have been informed that, as of the Petition Date, there are no outstanding obligations due on account of Supplemental Insurance.

92.    ***The 401K Plan***.  The Debtors maintain the 401(k) Plan, a retirement savings plan for eligible Employees pursuant to section 401 of the Internal Revenue Code.  I understand that approximately 69 Employees currently participate in the 401(k) Plan, and 401(k) semi-monthly contributions total approximately $43,600, which includes approximately $27,900 of withholdings from participating Employees' paychecks and approximately $15,700 of the Debtors' matching contributions.  The Debtors match the Employees' 401(k) Plan contributions dollar-for-dollar in an amount up to 200 percent of the first 3 percent of an Employee's eligible compensation.

93.    The 401(k) Plan is administered by Fidelity, and the Debtors pay Fidelity approximately $10,000 in annual administrative fees.  As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid obligations on account of the 401(k) Plan is $7,000, of which approximately $5,000 is owed in connection with the 401(k) Plan, and approximately $2,000 is owed in administrator fees.

94.     ***Parking Permit Program.***    Forty three Employees are provided with fully-subsidized parking permits at the Debtors headquarters under the Debtors' Parking Permit Program.  The Debtors expend approximately $7,400 per month in the aggregate on account of the Parking Permit Program.  As of the Petition Date, there are no outstanding amounts in connection with the Parking Permit Program.

95.     ***Safety Program.***    Twenty eight of the Debtors' Employees that work in the field are provided with on-site safety trainings under the Safety Program, which is administered by Airgas and Frandson Safety.  I understand that the Safety Program trains those Employees working on the Debtors' oil and gas properties to properly and effectively protect themselves in such a dangerous and technical industrial setting.  The total cost of the Safety Program is approximately $18,000 per month, and that as of the Petition Date, the aggregate amount of accrued but unpaid obligations on account of the Safety Program is $30,000.

### 4.      Workers Compensation

96.     The Debtors maintain insurance policies that cover workers' compensation claims with Federal Insurance Co., the State of Wyoming and the State of North Dakota.[14]  The Debtors have no deductibles under each of the workers' compensation insurance policies.  I understand that there are no current workers' compensation claims open against the Debtors.  The Debtors believe that no amounts were paid by the Debtors in fiscal year 2017 on account of claims covered by any current or previous workers' compensation policies.

---

[14]    Authority to continue the Debtors' workers' compensation insurance policies is sought in the *Motion of Debtors Order Authorizing (A) Payment of Prepetition Insurance Obligations and Prepetition Bonding Obligations, and (B) Maintenance of Postpetition Insurance Coverage and Bonding Program*, which was filed with the Court concurrently herewith.  The Debtors' workers' compensation policies with the State of Wyoming and the State of North Dakota provide stop-gap coverage only.

### 5.    Director Compensation

97.    Debtor Enduro Resource Holdings LLC is the ultimate parent entity of all of the Debtors.  Its board of managers includes three independent directors who are each compensated $200,000 annually, paid in semi-annual installments, and are entitled to expense reimbursement for out-of-pocket expenses (the "***Director Compensation***").

98.    The Debtors prepaid the Director Compensation prepetition for the period from May 1, 2018 through October 31, 2018.  Thus, there are no obligations outstanding with respect to the Director Compensation as of the Petition Date.

### D.    Tax Motion[15]

99.    In the Tax Motion, the Debtors seek entry of interim and final orders authorizing, but not directing them, to remit and pay, in their sole discretion, any prepetition tax and fee obligations including, without limitation, sales and use taxes; franchise taxes; real and personal property taxes; other business or regulatory taxes or fees; other types of taxes, fees, or charges; and any penalty, interest, or similar charges (collectively, the "***Taxes and Fees***") owing to various federal, state, and local governmental entities (the "***Taxing Authorities***").

100.    It is my understanding that payment of the Taxes and Fees pursuant to the Tax Motion would be discretionary, allowing the Debtors, among other things, to pay the Taxes and Fees that would subject their officers and directors to personal liability in the event of nonpayment prior to any other Taxes and Fees.  Likewise, I understand that the Tax Motion would extend to the payment of Taxes and Fees relating to tax audits that have been completed, are in progress, or arise from prepetition periods.  In addition, I believe that authorization sought

---

[15]    "***Tax Motion***" means the *Motion of Debtors for Interim and Final Orders Authorizing Payment of Prepetition Taxes and Fees*, and the proposed orders granting it are referred to as the "***Tax Order***."

pursuant to the Tax Motion would be without prejudice to the Debtors' rights to contest the amounts of the Taxes and Fees on any grounds.

101.    By paying the Taxes and Fees in the ordinary course of business, as and when due, I believe the Debtors will avoid unnecessary disputes with taxing authorities and expenditures of time and money resulting from such disputes over myriad issues that are typically raised by such authorities as they attempt to enforce their rights to collect Taxes and Fees.

102.    Prior to the Petition Date, the Debtors incurred obligations to federal, state, and local governments.  Although, as of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees, certain Taxes and Fees attributable to the prepetition period were not yet due.  Certain prepetition Taxes and Fees will not be due until the applicable monthly, quarterly, or annual payment dates -- in some cases immediately and in others not until next year.  I have been informed that, as of the Petition Date, the Debtors' accrued and unpaid liabilities for the Taxes and Fees were approximately $2,068,000.

103.    I believe that the continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful chapter 11 process.  If such obligations are not timely paid, I believe that the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Governmental Unit's applicable laws.

104.    Moreover, I believe that nonpayment or delayed payment of the Taxes and Fees may also subject the Debtors to efforts by certain governmental entities, whether or not permissible under the Bankruptcy Code, to revoke the Debtors' licenses and other privileges

either on a postpetition or post-confirmation basis.  Moreover, certain of the Taxes and Fees may be considered to be obligations as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment.  In such events, I believe that collection efforts by the governmental entities would create obvious distractions for the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

### E.    Utilities Motion[16]

105.    In the Utilities Motion, the Debtors request entry of interim and final orders, approving procedures that would provide adequate assurance of payment to their utility service providers (the "*Utility Companies*") under Bankruptcy Code Section 366, while allowing the Debtors to avoid the threat of imminent termination of electricity, water, natural gas, waste removal, telephone, internet, alarm, telecommunication and similar utility products and services (collectively, the "*Utility Services*") from the Utility Companies.

106.    As of the Petition Date, approximately 38 Utility Companies provide Utility Services to the Debtors at various locations through.  A non-exclusive list of the Utility Companies and the Utility Services they provide is attached to the Utilities Motion as **Exhibit C**. In order to successfully locate, develop, extract, and market oil and natural gas from the ground, the Debtors must maintain the ability to run their equipment in a near-constant state.  The Debtors' operations also require electricity and gas for lighting, heating, and air conditioning.  In addition to the exploration and production processes conducted in the field, the Debtors operate a corporate office responsible for ensuring the smooth operation of the Debtors' business.  The office requires electricity, telecommunications, internet, water, and waste management

---

[16]    "*Utilities Motion*" means the *Motion of Debtors for Interim and Final Orders (a) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (b) Approving Deposit as Adequate Assurance of Payment, and (c) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment*, and the proposed orders granting it are referred to as the "*Utilities Order*."

(including sewer and trash) services to operate. I am not currently aware of any past due amounts owed to any of the Utility Companies. Based on the timing of the filings in relation to the Utility Companies' billing cycles, however, there may be utility costs that have been invoiced to the Debtors for which payment is not yet due and utility costs for services provided since the end of the last billing cycle that have not yet been invoiced to the Debtors.

107.    I understand that the Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors will deposit $187,000, which is an amount equal to approximately fifty percent (50%) of the estimated monthly cost of the Utility Services, into a newly created, segregated, interest-bearing account, within twenty (20) days of the Petition Date (the "***Adequate Assurance Deposit***"). The Adequate Assurance Deposit will be maintained during the Chapter 11 Cases, subject to adjustment by the Debtors to account for the termination or beginning of new Utility Services by the Debtors or entry into other arrangements with respect to adequate assurance of payment reached with individual Utility Companies.

## F.    Insurance and Bonding Program Motion[17]

108.    In the Insurance and Bonding Program Motion, the Debtors seek entry of an order, authorizing the Debtors to (a) pay prepetition claims arising under their ordinary course insurance program and bonding program; and (b) maintain their insurance program and bonding program in the ordinary course postpetition.

109.    While I do not believe Court approval is required to maintain, amend, extend, or renew the Insurance Policies or the Bonding Program (each as defined below), or to procure new

---

[17]    "***Insurance and Bonding Program Motion***" means the *Motion of Debtors for Interim and Final Orders Authorizing (a) Payment of Prepetition Insurance Obligations and Prepetition Bonding Obligations, and (b) Maintenance of Postpetition Insurance Coverage and Bonding Program*, and the proposed order granting it is referred to as the "***Insurance and Bonding Program Order***."

insurance policies or financial assurance instruments, in the ordinary course of business following the Petition Date, out of an abundance of caution, the Debtors request entry of an order authorizing them to pay their Prepetition Insurance Obligations and their Prepetition Bonding Program Obligations (each as defined in the Insurance and Bonding Program Motion), if any, which are necessary to maintain their Insurance Policies and Bonding Program or new insurance policies or financial assurance instruments, if any.

### 1.     The Debtors' Insurance Obligations

110.    In the ordinary course of business, I understand that the Debtors maintain certain insurance policies that are administered by multiple third-party insurance carriers (the "***Insurance Carriers***"), which provide coverage for, among other things, worker's compensation, control of well (producing and drilling), general liability, commercial property, pollution liability, commercial auto, excess liability, commercial umbrella, gas plant, directors' and officers' liability ("***D&O Liability***"), and management practices liability (collectively, the "***Insurance Policies***").  A detailed list of the Insurance Policies that are currently held by the Debtors is attached to the Insurance and Bonding Program Motion as **Exhibit B**.  I believe that the Insurance Policies are essential to the preservation of the Debtors' businesses, properties, and assets, and, in some cases, such coverage is required by various federal and state laws and regulations, as well as the terms of the Debtors' various commercial contracts.  It is my understanding that the Insurance Policies provide coverage that is typical in scope and amount for businesses within the Debtors' industry.

111.    I believe that maintenance of insurance coverage under the various Insurance Policies is essential to the continued operation and preservation of value of the Debtors' assets and, indeed, it is my understanding that it is required under the U.S. Trustee Guidelines, the federal laws and regulations applicable to the Debtors' business, the laws of the various states in

which the Debtors operate and the Debtors' various contractual commitments.  Thus, I believe the Debtors should be authorized, but not directed, to continue to pay premiums, taxes, claims, deductibles, charges, fees, indemnity obligations and other obligations, including broker's fees, owed under or with respect to the Insurance Policies as such obligations come due in the ordinary course of the Debtors' business.  Moreover, I believe the Debtors' maintenance of their relationships with the Insurance Carriers is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods.

112.    Premiums under the Insurance Policies are paid annually in advance in either September, December or January, depending on the policy.  As a result, the Insurance Obligations are largely paid in advance, and therefore do not relate to prepetition obligations. The total amount paid in annual premiums and payments associated with all of the Insurance Policies is approximately $1,341,362.

113.    As of the Petition Date, the Debtors believe that no prepetition obligations are outstanding for any Insurance Policy.  I further understand that the Debtors do not believe that there are any accrued and unpaid amounts owed to the Broker (as defined in the Insurance and Bonding Program Motion) as of the Petition Date.

### 2.    The Debtors' Bonding Program

114.    In the ordinary course of business, the Debtors are required by certain applicable statutes, rules, and regulations to maintain bonds in favor of certain third parties to secure the Debtors' payment or performance of certain obligations, often to governmental units or other public agencies (the "***Bonding Program***").  The Bonding Program covers a range of obligations, including, among other things obligations related to state and federal programs, plugging and abandonment obligations, surface damage obligations, taxes, and utilities (the "***Covered Obligations***").  A detailed list of the bonds that are currently maintained by the Debtors is

01:23192978.2

attached to the Insurance and Bonding Motion as **Exhibit C**.  I believe that the Bonding Program provides coverage that is typical in scope and amount for businesses within the Debtors' industry.

115.    To continue their business operations, I understand that the Debtors must be able to provide financial assurances to federal and state governments, regulatory agencies, and other third parties.  This in turn requires the Debtors to maintain the existing Bonding Program, including paying the Bonding Obligations (as defined in the Insurance and Bonding Program Motion) as they come due, as well as renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of their businesses, requesting releases from obsolete bonding obligations, and executing other agreements in connection with the Bonding Program.  Moreover, as of the Petition Date, all of the surety bonds are cash collateralized and if a surety bond expires or a new bond is needed during the Chapter 11 Cases, the Debtors may need to outlay cash as collateral for a new or replacement surety bond.  I believe that the success of the Debtors' efforts to operate effectively and efficiently will depend on the maintenance of the Bonding Program on an uninterrupted basis.  I believe that no feasible alternative to maintaining the Bonding Program exists.

116.    The surety bonds each renew at various points throughout the year.  Upon renewal, the Debtors' pay the surety bond premium for the following year.  The surety bond premiums currently equal one percent of the total surety bond amount, and are invoiced by the Broker upon renewal.  The total amount paid in annual premiums and payments associated with all of the surety bonds is approximately $34,000.

117.    As of the Petition Date, the Debtors estimate that all premium payments due and owing under the Bonding Program have been paid in full, and the Debtors are not aware of any

pending requests for payment by the Surety (as defined in the Insurance and Bonding Programs Motion).

## III.    CLAIMS PAYMENT MOTIONS

### A.    Royalty Motion[18]

118.    In the Royalty Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay in the ordinary course of business, whether such obligations were incurred prepetition or will be incurred postpetition, (a) Royalty Payments, (b) Working Interest Disbursements, and (c) Other Obligations (each as defined in the Debtors' Royalty Motion).

### 1.    Royalty Payments

119.    The Debtors are parties to approximately 4,996 Oil and Gas Leases (as defined in the Royalty Motion) located in Texas, Louisiana, New Mexico, North Dakota, Montana, and Wyoming, each of which is subject to one or more Royalty Interests.  Although the monthly amount of the Debtors' Royalty Payments (as defined in the Royalty Motion) varies based on actual production, over the last twelve (12) months, the Debtors made an average of approximately 935 Royalty Payments each month in an average monthly amount of approximately $992,000.

120.    The Debtors estimate that, as of the Petition Date, there are approximately $3,691,000 in unpaid prepetition Royalty Payments.  I understand that failure to pay Royalty Payments could result in actions seeking the forfeiture, cancellation, or termination of the Oil and Gas Leases under the terms thereof, or the assertion of liens or other interests under applicable state law.  Accordingly, the Debtors request authority to (a) remit up to $1,287,000 of

---

[18]    "**Royalty Motion**" means the *Motion of Debtors for Interim and Final Orders Authorizing Payment of (a) Royalty Payments, (b) Working Interest Disbursements, and (c) Other Obligations in the Ordinary Course of Business*, and the proposed orders granting it are referred to as the "**Royalty Order**."

such prepetition Royalty Payments under the interim Royalty Order, and any and all prepetition Royalty Payments upon entry of the final Royalty Order, and (b) continue making such Royalty Payments in the ordinary course of business on a postpetition basis, irrespective of when accrued.

121.    In addition, the Debtors have working interests in properties in Texas, Louisiana, and New Mexico that are subject to an eighty percent (80%) net profits interest held by Enduro Royalty Trust.  I understand the Debtors receive all of the revenues from these properties, including the portion attributable to Enduro Royalty Trust's net profits interest, and then they remit payment to Enduro Royalty Trust every month ("***Trust NPI Payments***") for its share.  The Debtors estimate that, as of the Petition Date, there are approximately $7,671,000 in unpaid prepetition Trust NPI Payments.  Accordingly, the Debtors request authority to remit up to $1,300,000 of such prepetition Trust NPI Payments.

### 2.    Working Interest Disbursements and Joint Interest Billings

122.    As with Royalty Payments, the Debtors make Working Interest Disbursements to Non-Operating Working Interest Owners (each as defined in the Royalty Motion) by the end of the month in which the Debtors receive production receipts for oil production, and by the end of the following month with respect to natural gas and NGLs production.  Over the last twelve (12) months, the Debtors generated approximately, on average, $6,000,000 in revenue each month from operations on Oil and Gas Leases for which the Debtors serve as the Operator (as defined in the Royalty Motion).  These revenues were then divided among the Debtors and the other Working Interest Owners (as defined in the Royalty Motion) of the underlying Oil and Gas Leases through the payment of Working Interest Disbursements (as defined in the Royalty Motion).  In the twelve (12) months preceding the Petition Date, the Debtors remitted approximately $7,091,118 in Working Interest Disbursements.

123.    The Debtors are typically required to pay Operating Expenses (as defined in the Royalty Motion) within 30 to 60 days of receiving an invoice from the Mineral Contractors (as defined in the Royalty Motion) and other third-party providers.  In turn, at the end of each calendar month, the Debtors generate, and promptly mail or post on a web-based billing system, a Joint Interest Billing invoice (the "***JIB Statement***") for each holder of a Non-Operating Working Interest.  Non-Operating Working Interest Owners typically remit payment to the Debtors within 30 to 60 days following the receipt of their JIB Statement.  In the twelve (12) months preceding the Petition Date, the Debtors paid in the aggregate approximately $27.4 million in Operating Expenses.  Of that amount, the Non-Operating Working Interest Owners reimbursed the Debtors for approximately $3.4 million on account of Joint Interest Billings (as defined in the Royalty Motion).

124.    The Debtors request authority from the Court to remit undisputed, prepetition Working Interest Disbursements in the ordinary course of business.  As of the Petition Date, the Debtors estimate that they have generated and currently hold prepetition Working Interest Disbursements owed to Working Interest Owners in the approximate amount of $2,033,000.  The Debtors request authority to (a) remit up to $634,000 of such prepetition Working Interest Disbursements on an interim basis and (b) subject to entry of the final Royalty Order, continue making all Working Interest Disbursements in the ordinary course of business, regardless of when accrued.

### 3.    Additional Obligations

125.    As described in greater detail in the Royalty Motion, when the Debtors receive revenues from first purchasers and remit and distribute revenues, the Debtors are required to pay certain taxes and make certain payments on behalf of Royalty Interest Owners (as defined in the Royalty Motion) and Working Interest Owners.  The Debtors may also be required to make

payments to Oil and Gas Lease lessors in addition to Royalty Payments, including, but not limited to, non-royalty lease payments such as delay rental payments,[19] lease extension payments,[20] shut-in royalty payments,[21] and minimum royalty payments[22] (the "***Lease Obligations***", and the Lease Obligations, together with the Escheat Obligations and Gas Purchasing Obligations (each as defined below), the "***Other Obligations***").

126.    In addition, I have been informed that the Debtors may be required to make payments to state authorities in connection with unclaimed mineral payments under the Oil and Gas Leases, including, escheat payments (the "***Escheat Obligations***").

127.    Finally, the Debtors, in connection with certain of their properties, purchase gas production from third parties for processing and further sale.  These purchases are made under agreements with the third parties and are paid in arrears, generally on a monthly basis (the "***Gas Purchasing Obligations***").

128.    As of the Petition Date, the Debtors estimate that they owe approximately $107,500 on account of prepetition Other Obligations.  Accordingly, the Debtors request authority to remit (a) up to $58,800 of prepetition Other Obligations under the Royalty Order and (b) any and all prepetition Other Obligations upon entry of the final order, and to continue making such Other Obligation payments in the ordinary course of business on a postpetition basis.

---

[19]    Some Oil and Gas Leases require the Working Interest Owner to make an annual payment where a well is not drilled on the leased property (a "***Delay Rental***") to perpetuate the Oil and Gas Lease.

[20]    Some Oil and Gas Leases require the Working Interest Owner to make a payment to the Mineral Interest Owner to extend a lease where a well is not drilled on the leased property in the primary term (a "***Lease Extension***"). Lease Extensions are usually optional and simply extend the expiration of the primary term of the applicable Oil and Gas Lease.

[21]    Some Oil and Gas Leases require the Working Interest Owner to make monthly payments as a substitute for Royalty Payments to hold a lease in the secondary term where a well has been drilled on the leased property and is capable of production, but is not actually producing (a "***Shut-In Payment***").

[22]    Some Oil and Gas Leases require the Working Interest Owner to make a minimum royalty payment where the value of the royalty revenue is below a certain level.

## B.     Lien Motion[23]

129.   In the Lien Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, them to remit and pay in the ordinary course of business, in their sole discretion, any prepetition and postpetition amounts owing on account of (i) operating expenses, (ii) joint interest billings, (iii) marketing expenses, (iv) claims held by shippers and warehousemen, and (v) certain claims arising under section 503(b)(9) of the Bankruptcy Code; (b) confirming the administrative expense priority status of Outstanding Orders (as defined below); and (c) authorizing financial institutions to honor and process related checks and transfers.

130.   These claims and rights, and the Debtors' justifications for paying the related outstanding amounts, are discussed further below and in the Lien Motion.  In the aggregate, the Debtors seek authority to pay $6,045,000 on an interim basis, and $14,807,000 on a final basis, of outstanding Operating Expenses, Joint Interest Billings, Marketing Expenses, Lien Claims, and 503(b)(9) Claims (each as defined in the Lien Motion) (collectively, the "*Obligations*").

### 1.     Operating Expenses

131.   Operating Expenses typically are not uniform and are not entirely predictable on a month-to-month basis.  In the Debtors' case, in the twelve months ended February 28, 2018, the Debtors paid in the aggregate approximately $27,405,000 in Operating Expenses.

132.   As of the Petition Date, the Debtors estimate that they have approximately $5,500,000 of Operating Expenses outstanding, for which they will be reimbursed approximately $650,000 by holders of Non-Operating Working Interests.  The Debtors request approval to pay

---

[23]  "*Lien Motion*" means the *Motion of Debtors for Entry of Interim and final Orders (a) Authorizing Payment of Perpetition Operating Expenses, Joint Interest Billings, Marketing Expenses, Lien Claims, and 503(b)(9) Claims, and (b) Confirming Administrative Expense Priority of Outstanding Orders*, and the proposed orders granting it are referred to as the "*Lien Order*."

up to $2,370,000 of the prepetition Operating Expenses on an interim basis and up to $5,500,000 upon entry of the final Lien Order and to continue paying Operating Expenses in the ordinary course of business on a postpetition basis.

### 2.    Joint Interest Billings

133.    The Debtors hold Non-Operating Working Interests in many oil and gas properties.  In the twelve months preceding the Petition Date, the Debtors paid approximately $33,698,000 in Joint Interest Billings.  As of the Petition Date, the Debtors estimate that they have approximately $8,953,000 of prepetition Joint Interest Billings outstanding.  To preserve and protect their share of production from such oil and gas properties and to maintain their relationships with the applicable third-party Operators, both during and after the pendency of the Chapter 11 Cases, the Debtors request approval to pay up to $3,440,000 in prepetition Joint Interest Billings on an interim basis, up to $8,953,000 upon entry of the final Lien Order, and to continue paying such Joint Interest Billings in the ordinary course of business on a postpetition basis.

### 3.    Marketing Expenses

134.    In order to market or sell production from oil and gas properties operated by the Debtors effectively, the Debtors, as Operator, will make contractual arrangements (the "***Marketing Arrangements***") by which third parties will charge the Operator for gathering, transportation, treating, dehydration, compression, processing, fractionation, and other similar services necessary or desirable to get the oil and natural gas production to market in a condition ready for sale (such charges, collectively, the "***Marketing Expenses***").

135.    In the twelve months preceding the Petition Date, the Debtors paid approximately $790,000 in Marketing Expenses.  I have also been informed that as of the Petition Date, the Debtors estimate that they have approximately $214,000 of prepetition Marketing Expenses

outstanding. To preserve and protect their relationships with the applicable Marketing Arrangement counterparties, both during and after the pendency of the Chapter 11 Cases, the Debtors request approval to pay up to $100,000 in prepetition Marketing Expenses on an interim basis, up to $214,000 upon entry of the final Lien Order, and to continue paying such Marketing Expenses in the ordinary course of business on a postpetition basis.

### 4. Lien Claims

136. The Debtors owe, either directly or indirectly, certain prepetition shipping, delivery, warehousing, and related charges (all such charges, the *"Shipping and Warehousing Claims"*) to certain third-party haulers, common carriers, truckers, and/or other transporters (collectively, the "*Shippers*") and to certain third-party warehousemen (the "*Warehousemen*") for prepetition shipping and warehousing services provided to the Debtors (collectively, the "*Shipping and Warehousing Services*"). In the ordinary course of business, the Debtors rely on the Shippers to ship, transport, store, and otherwise facilitate the movement of their oilfield equipment, and supplies (the "*Supplies*") through established distribution networks and the Warehousemen to store these Supplies while they are in transit and/or awaiting delivery to the drill sites.

137. In the twelve months preceding the Petition Date, the Debtors paid approximately $53,000 in Shipping and Warehousing Claims. As of the Petition Date, the Debtors estimate that they have approximately $10,000 of prepetition Shipping and Warehousing Claims outstanding. To continue using Shippers' and Warehousemen's services and have access to the materials held or controlled thereby, the Debtors request approval to pay up to $5,000 in prepetition Shipping and Warehousing Claims on an interim basis, up to $10,000 upon entry of the final Lien Order, and to continue paying such Shipping and Warehousing Claims in the ordinary course of business on a postpetition basis.

### 5.    The 503(b)(9) Claims

138.    The Debtors may have received certain inventory, goods, or materials from various vendors (collectively, the "***503(b)(9) Claimants***") within the twenty (20)-day period immediately preceding the Petition Date, thereby giving rise to claims that are afforded administrative priority under section 503(b)(9) of the Bankruptcy Code (the "***503(b)(9) Claims***").

139.    The Debtors believe that as of the Petition Date, they owe approximately $130,000 on account of goods delivered within the twenty (20) days prior to the Petition Date. Accordingly, the Debtors request the authority, but not the direction, to pay those undisputed 503(b)(9) Claims.  The Debtors do not seek to accelerate or modify existing payment terms with respect to the 503(b)(9) Claims.  Rather, the Debtors will pay the 503(b)(9) Claims as they come due in the ordinary course of business.

### 6.    Outstanding Orders

140.    Prior to the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "***Outstanding Orders***").  I believe certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respected to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition, which could cause material disruptions in the Debtors' businesses and could jeopardize value.

## IV.    CONCLUSION

141.    The Debtors' ultimate goal in these Chapter 11 Cases is to maximize recoveries for the Holders of Claims and Interests.  In the near term, however, to minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the early stages of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.  I believe that if the Court grants the relief requested in each of the First

01:23192978.2

US-DOCS\101350347.3

Day Motions, the prospect for achieving these objectives and completing a successful reorganization of the Debtors' businesses will be substantially enhanced.

142.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of May, 2018.

Kimberly A. Weimer
Vice President & Chief Financial Officer
Enduro Resource Partners LLC

[Signature Page to First Day Declaration]

**<u>Exhibit A</u>**

**Sale and Plan Support Agreement**

*EXECUTION VERSION*

# SALE AND PLAN SUPPORT AGREEMENT

This SALE AND PLAN SUPPORT AGREEMENT (as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of May 15, 2018, is entered into by and among Enduro Resource Holdings LLC ("***Holdings***"), Enduro Resource Partners LLC ("***Borrower***") Enduro Operating LLC, Enduro Management Company LLC, Washakie Pipeline Company LLC, Washakie Midstream Services LLC (such entities together with Holdings and Borrower, the "***Enduro Entities***" or the "***Company***"), each of the first lien lenders party hereto (each, a "***Consenting First Lien Lender***",[1] and collectively, the "***Consenting First Lien Lenders***") and Bank of America, N.A., in its capacity as agent for the Lenders (the "***First Lien Agent***"). Each of the Enduro Entities, the First Lien Agent and the Consenting First Lien Lenders are referred to herein individually as a "***Party***", and collectively as the "***Parties***".

# RECITALS

WHEREAS, certain Enduro Entities are party to that certain Amended and Restated Credit Agreement, dated as of August 1, 2013 (as amended, modified, supplemented or waived from time to time, the "***First Lien Credit Agreement***"), by and among Borrower, the Lenders (as defined in the First Lien Credit Agreement and hereinafter referred to as the "***First Lien Lenders***") and the First Lien Agent for the First Lien Claimholders (as defined in that certain Intercreditor Agreement, dated as of June 5, 2015 (the "***Intercreditor Agreement***")), among the Borrower and the other Grantors referred to therein, the First Lien Agent and Wilmington Trust, National Association, as second lien agent (the "***Second Lien Agent***") for the Second Lien Lenders (as defined in the Intercreditor Agreement) under that certain Second Lien Term Loan Agreement, dated as of June 5, 2015, between the Borrower, the Second Lien Agent and the other parties thereto (the "***Second Lien Credit Agreement***");

WHEREAS, each of the Enduro Entities are party to that certain Amended and Restated Guaranty, dated as of August 1, 2013 (as the same may have been modified or supplemented from time to time, the "***First Lien Guaranty***"), among Holdings, the Guarantors (as defined in the First Lien Guaranty) and the First Lien Agent;

WHEREAS, as of May 1, 2018, Enduro, Holdings and the Guarantors were obligated pursuant to the First Lien Credit Agreement and First Lien Guaranty for an aggregate outstanding principal amount of First Lien Loan Claims (as defined below) equal to $211,905,624.38;

WHEREAS, subject to the terms and conditions of this Agreement, the Parties have agreed to support the Sale (as defined below);

---

[1] For the purposes of this Agreement, where the signature block of a party indicates that such party enters into this Agreement on behalf of a business unit, group, division or similar entity of such party, "Consenting First Lien Lender" shall mean, with respect to such party, such business unit, group, division or similar entity of such party as defined in the signature block of such party.

WHEREAS, the Parties have agreed that the Enduro Entities will commence voluntary cases (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code (as amended from time to time, the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***") to effectuate the Sale and to liquidate the Enduro Entities' estates pursuant to a plan of liquidation substantially in the form attached hereto as <u>Exhibit A</u> (the "***Plan***").

NOW, THEREFORE, in consideration of the premises and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Incorporation of Defined Terms</u>.  Capitalized terms used and not defined in this Agreement shall have the meaning ascribed to them in the Plan attached hereto or First Lien Credit Agreement, as applicable.

2.    <u>Definitions</u>.  The following terms shall have the following definitions:

"***Affiliate***" means, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

"***Agreement***" has the meaning set forth in the preamble hereof.

"***Agreement Effective Date***" has the meaning set forth in Section 6 hereto.

"***Alternative Transaction***" means a transaction involving any or all of (i) a chapter 11 plan or other financial and/or corporate restructuring of any or all of the Enduro Entities, (ii) the sale or disposition by the Enduro Entities of any Enduro Entity, or the sale or disposition of any assets of an Enduro Entity, (iii) a merger, consolidation, business combination, liquidation, any debt or equity refinancing or recapitalization of any or all of the Enduro Entities or (iv) any similar transaction involving any or all of the Enduro Entities, in each case other than the Sale or the transactions contemplated by the Plan.

"***Assets***" means all or substantially all of the assets of the Enduro Entities.

"***Asset Purchase Agreement(s)***" mean the purchase and sale agreement or agreements executed in connection with the Sale.

"***Bankruptcy Code***" has the meaning set forth in the recitals hereto.

"***Bankruptcy Court***" has the meaning set forth in the recitals hereto.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court, each as amended from time to time.

"***Beneficial Ownership***" means, with respect to any security, "beneficial ownership" of such security as determined pursuant to Rule 13d-3 of the Exchange Act.

"***Bidding Procedures***" means the bidding procedures substantially in the form attached hereto as <u>Exhibit C</u>.

"***Bidding Procedures Order***" means an order of the Bankruptcy Court, approving, among other things, the Bidding Procedures.

"***Business Day***" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"***Carve-Out***" has the meaning set forth in the Interim Cash Collateral Order.

"***Cash Collateral***" means "cash collateral," as defined in Section 363 of the Bankruptcy Code, in which the First Lien Agent and/or the First Lien Claimholders, as applicable, have a lien, security interest or other interest (including, without limitation, any adequate protection liens or security interests), in each case whether existing on the Petition Date, arising pursuant to the Cash Collateral Order or otherwise, and which the Company shall be permitted to use in accordance with the Cash Collateral Order.

"***Cash Collateral Order***" has the meaning set forth in Section 4.a hereto.

"***Chapter 11 Cases***" has the meaning set forth in the recitals hereto.

"***Claims***" has the meaning assigned to such term in the Bankruptcy Code.

"***Collateral***" means all of the Collateral (as defined in the Intercreditor Agreement) that is subject to a valid and perfected security interest in favor of the First Lien Agent or the Second Lien Agent.

"***Committed Loans***" has the meaning given to such term in the First Lien Credit Agreement.

"***Company***" has the meaning set forth in the preamble hereof.

"***Confirmation Order***" means an order of the Bankruptcy Court confirming the Plan.

"***Consenting First Lien Lenders***" has the meaning set forth in the preamble hereof.

"***Consenting First Lien Lender Claims***" has the meaning set forth in Section 10.a hereof.

"***Davis Polk***" means Davis Polk & Wardwell LLP, as counsel to the First Lien Agent.

"***Definitive Documents***" has the meaning set forth in Section 3.a hereof.

"***First Lien Agent***" has the meaning set forth in the preamble hereof.

"***First Lien Credit Agreement***" has the meaning set forth in the recitals hereto.

"***First Lien Guaranty***" has the meaning set forth in the recitals hereto.

"***First Lien Lenders***" has the meaning set forth in the recitals hereto.

"***First Lien Loan Claims***" means all claims of any kind whatsoever arising under the First Lien Credit Agreement and the other Loan Documents.

"***First Lien Obligations***" shall have the meaning assigned to such term in the Intercreditor Agreement without giving effect to any cap provided for therein.

"***Final Order***" means (a) an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, (b) an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which any appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance reasonably satisfactory to the Company and the Required Supporting Lenders, (c) in the event that an appeal or writ of certiorari, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been upheld by the highest court to which such order was appealed, or certiorari, reargument or rehearing shall have been denied or resulted in no modification of such order or judgment or (d) an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which an appeal, petition for certiorari, reargument or rehearing is pending but as to which no stay request is pending or has been granted; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

"***Holdings***" has the meaning set forth in the preamble hereof.

"*Intercreditor Agreement*" has the meaning set forth in the recitals hereto.

"*Interim Cash Collateral Order*" means an order approved by the Bankruptcy Court substantially in the form attached hereto as Exhibit B.

"*KEIP Amounts*" means all amounts contemplated to be paid under the KEIP Plans, *provided*, *however*, that with respect to any assets ownership of which is transferred to be held directly or indirectly by the First Lien Agent and/or the First Lien Lenders, (x) the Company shall not pay any amounts to Jon S. Brumley, Chief Executive Officer of the Enduro Entities, upon the signing of any purchase and sale agreement or other document in connection with such transfer or the closing of such transfer; and (y) any incentive bonus amounts to be paid to any other executive employee of the Company upon the transfer of or the execution of any agreement to transfer such assets, whether pursuant to a chapter 11 plan or otherwise, shall be conditioned on such employee, upon the request of the First Lien Agent and First Lien Lenders holding a majority of all outstanding First Lien Claims, providing transition services with respect to such assets of a scope reasonably acceptable to the First Lien Agent and such First Lien Lenders through December 31, 2018, or such later date as may be agreed by an employee (as to herself or himself) and such First Lien Lenders (the "*Transition Services Period*"), with such executive employee being paid 150% of his or her base salary and receiving either the same benefits or comparable benefits as currently in effect at no increased cost to the executive employees or, if it is not commercial reasonable for such employee to be provided with the same or comparable benefits, additional cash compensation sufficient to put such employee in a reasonably equivalent position, from and after closing of such transfer (without duplication of any compensation provided in connection with the provision of services in connection with the wind-down of the Enduro Entities or otherwise), and any such incentive bonus amounts shall be paid at the end of such Transition Services Period or, if earlier, upon termination of the employee without cause.

"*KEIP Plans*" means the Key Employee Incentive Plan, the Key Employee Incentive Plan for Executives, and any bonus letter executed by the Company with any employee, in each case that has previously been delivered to the First Lien Agent or its professionals, including as may be modified or amended with the approval of the First Lien Agent and First Lien Lenders holding a majority of all outstanding First Lien Claims.

"*Milestones*" means the milestones set forth on Exhibit D hereto, as may be extended, modified or waived in accordance with the terms hereof.

"*Marketing Process*" means the marketing process that the Company and its retained professionals have commenced to solicit bids for the purchase of any or all of the Assets.

"*Package 1 Assets*" means the assets that the Package 1 Stalking Horse Bidders have agreed to purchase pursuant to the Package 1 Stalking Horse APAs.

"*Package 1 Stalking Horse Bidders*" means (a) Cobra Oil & Gas Corporation and (b) Mid-Con Energy Properties, LLC.

"*Package 1 APAs*" means (a) that certain *Purchase and Sale Agreement*, dated as of May 14, 2018, by and between Enduro Operating LLC, as seller, and Cobra Oil & Gas Corporation, as buyer; and (b) that certain *Purchase and Sale Agreement*, dated as of May 14, 2018, by and between Enduro Operating LLC, as seller, and Mid-Con Energy Properties, LLC, as buyer, or such other higher and better purchase and sale agreement for the Package 1 Assets in form and substance acceptable to the Debtors, the First Lien Agent and the Required Supporting Lenders.

"*Package 2 Assets*" means those certain unconventional assets located in the Haynesville Cotton Valley which, for the avoidance of doubt, are comprised of substantially all oil and gas properties of the Debtors that are not Package 1 Assets or Package 3 Assets.

"*Package 2 APA(s)*" means that certain purchase and sale agreement for the Package 2 Assets in form and substance acceptable to the Debtors, the First Lien Agent and the Required Supporting Lenders, which, for the avoidance of doubt, may be the NewCo Purchase Agreement (as defined in the Plan).

"*Package 3 Assets*" means the assets that the Package 3 Stalking Horse Bidder has agreed to purchase pursuant to the Package 3 Stalking Horse APA.

"*Package 3 Stalking Horse Bidder*" means Evolution Petroleum Corporation.

"*Package 3 APA*" means that certain *Purchase and Sale Agreement*, dated as of May 14, 2018, by and between Enduro Operating LLC, as seller, and the Package 3 Stalking Horse Bidder, as buyer, or such other higher and better purchase and sale agreement for the Package 3 Assets in form and substance acceptable to the Debtors, the First Lien Agent and the Required Supporting Lenders.

 "*Parties*" has the meaning set forth in the preamble hereof.

"*Person*" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any other legal entity or association.

"*Petition Date*" means the date the Chapter 11 Cases are commenced.

"*Plan*" has the meaning set forth in the recitals hereof.

"*Prevailing Bidder(s)*" means the Person(s), entity or entities that are determined by the Company, with the consent of the Required Supporting Lenders, to have been the highest or otherwise best bid(s) for the Assets at the conclusion of the Marketing Process.

#90559476v21

"***Qualified Marketmaker***" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of the Company (or enter with customers into long and short positions in claims against the Company), in its capacity as a dealer or market maker in claims against the Company, and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"***Required Supporting Lenders***" means the First Lien Lenders holding a majority of the outstanding principal amount of the First Lien Obligations held by all Consenting First Lien Lenders as determined at the time of such consent.

"***Sale***" means the sale of substantially all of the Package 1 Assets, the Package 2 Assets, or the Package 3 Assets free and clear of all liens, claims, encumbrances and other interests and, if applicable, pursuant to, *inter alia,* Sections 105, 363 and 365 of the Bankruptcy Code, to the Prevailing Bidder(s) in accordance with terms and conditions hereof.

"***Sale Order***" means the order or orders of the Bankruptcy Court which, among other things, (i) approves the Sale, (ii) approves the assumption by the Company (and, if applicable, assignment to the Prevailing Bidder(s)) of any contracts pursuant to Section 365 of the Bankruptcy Code, (iii) contains findings of fact and conclusions of law that the Prevailing Bidder(s) is or are a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and (iv) provides that the Net Sale Proceeds, in accordance with and subject to Section 4(b) hereof, be paid by the Company upon consummation of the applicable Asset Purchase Agreement(s) to the First Lien Agent for distribution to the First Lien Lenders.

"***Second Lien Agent***" has the meaning set forth in the recitals hereto.

"***Second Lien Credit Agreement***" has the meaning set forth in the recitals hereto.

"***Second Lien Lender Claims***" means all claims of any kind whatsoever related to or arising under the Second Lien Credit Agreement and the other Loan Documents (as defined in the Second Lien Credit Agreement).

"***Termination Date***" has the meaning set forth in Section 8 hereof.

"***Termination Event***" has the meaning set forth in Section 7 hereof.

"***Transfer***" has the meaning set forth in Section 14 hereof.

"***Transfer Agreement***" means the form attached hereto as <u>Exhibit E</u>, as may be amended, modified or supplemented only in accordance with Section 17 hereof.

3.      <u>Obligations of the Parties</u>.  Subject to the terms and conditions of this Agreement, each of the Parties agrees as follows:

#90559476v21

a.      to promptly negotiate, in good faith, the definitive documents relating to the implementation and effectuation of each Asset Purchase Agreement, the Sale and the Plan, including, but not limited to, (i) the Disclosure Statement, (ii) the Plan, (iii) the Cash Collateral Order, (iv) the Sale Order, (v) the Confirmation Order, and (vi) the Bidding Procedures Order, (iv) all other agreements, documents, exhibits, annexes, schedules and any orders of the Bankruptcy Court, as applicable, that are necessary or appropriate for the prompt consummation of each Asset Purchase Agreement, the Sale and the Plan (all of the foregoing, collectively with this Agreement the Asset Purchase Agreement(s), in each case as amended, modified or supplemented from time to time in accordance with the terms hereof or thereof, the "***Definitive Documents***"); <u>provided</u> that, in each case, such Definitive Documents shall be in form and substance reasonably acceptable to the Enduro Entities and the Required Supporting Lenders; and

b.      to promptly execute and deliver (to the extent a party thereto), and otherwise support the prompt consummation of the transactions contemplated by, the Definitive Documents.

4.      <u>Obligations of the Consenting First Lien Lenders</u>.

a.      <u>Consent to Use of Cash Collateral</u>.  Each of the First Lien Agent and the Consenting First Lien Lenders shall consent to the Company's use of Collateral (including, without limitation, Cash Collateral) pursuant to the terms set forth in this Agreement and the Interim Cash Collateral Order as such order may be superseded by a final and/or supplemental order(s) in form and substance substantially similar to the Interim Cash Collateral Order (each a "***Cash Collateral Order***").

b.      <u>Consenting First Lien Lenders Consent to Distribution of Cash Consideration</u>.  In furtherance of the confirmation of a Plan, upon and following the closing of any Asset Purchase Agreement, the First Lien Agent and each of the Consenting First Lien Lenders hereby consent to the use of the Net Sale Proceeds as follows:

(i)      <u>first</u>, an amount equal to any break-up fee or expense reimbursement payable under any Asset Purchase Agreement(s) due on account of such closing, as applicable and which in each case if any, shall be paid directly from the applicable Prevailing Bidder(s) to any applicable stalking horse purchaser under the applicable Asset Purchase Agreement(s);

(ii)      <u>second</u>, an amount shall be deposited into an account (the "***Professional Fee Designated Account***") maintained by the Company that is subject to the springing control of the First Lien Agent equal to (A) solely to the extent a Carve-Out Trigger Notice has been delivered pursuant to the Cash Collateral Order, the Post-EoD Carve-Out Amount (as defined in the Cash Collateral Order) to the extent it has not previously been funded and (B) solely to the extent a Carve-Out Trigger Notice has not been delivered pursuant to the Cash Collateral Order, an amount equal to all accrued but unpaid fees and expenses, and all estimated fees and expenses through the

-8-

Effective Date, of the professionals of the Company and any creditors committee appointed in the Chapter 11 Cases, if any, including the asset sale fee due and owing to Evercore Group L.L.C. ("*Evercore*") pursuant to that certain engagement letter, dated October 2, 2017, between Evercore and Enduro (the "***Asset Sale Fee***"), which shall be used to pay such professionals in accordance with the compensation procedures approved by the Bankruptcy Court and subject to the terms and conditions of the Cash Collateral Order;

(iii)     third; an amount equal to the following, without duplication, if such amount is a positive sum, shall be deposited in an account or accounts maintained by the Company that is subject to the springing control of the First Lien Agent:

(A)     the aggregate amount of cure amounts asserted by cure claimants whose contracts are being assumed in the Sale for which the Company is responsible, in each case, in accordance with the applicable Asset Purchase Agreement; *plus*

(B)     an amount equal to all accrued but unpaid administrative expenses (other than administrative expenses to be paid from the Professional Fee Designated Account), all KEIP Amounts not previously paid, claims under section 503(b)(9) of the Bankruptcy Code, and other priority claims, in each case that are not assumed by the Prevailing Bidder(s) pursuant to the Asset Purchase Agreement(s), for payment of such claims and expenses subject to the terms and conditions of the Cash Collateral Order and, to the extent applicable, in accordance with the Plan; *plus*

(C)     the amount of the Wind Down Budget (or, in the event that the applicable Plan Supplement document has not been filed, the amount of a draft Wind Down Budget reasonably acceptable to the First Lien Agent and Required Supporting Lenders); *plus*

(D)     solely with respect to the first closing of a Sale, an amount equal to the projected net operating expenditures of the Company from the closing of such Sale through and including the projected "Effective Date" of the Plan as set forth in the most recent Budget approved by the First Lien Agent that takes effect after such closing and incorporates the effects of such Closing (calculated as the sum of the "Operating Cash Flow" line item for such period), for payment of such amounts by the Company as and when due and subject to the terms and conditions of the Cash Collateral Order; *plus*

(E)     the Claims Reserve Cash Amount; *less*

(F)     the Company's unrestricted cash balance as of such date,

(iv)     fourth; after making the payments and distributions set forth in these Sections 4(b)(i)-(iv), the remaining Net Sale Proceeds shall be paid by the Company upon the consummation of the applicable Asset Sale to the First Lien Agent on behalf of the First Lien Lenders, and shall be immediately applied toward the First Lien Obligations until such First Lien Obligations have been satisfied in full.

For the avoidance of doubt, the liens of the First Lien Agent and the other creditors secured by the Assets, if any, shall attach to the Net Sale Proceeds in the same priority and to the

same extent as existed on the Assets prior to the consummation of the Sale; <u>provided</u>, that distributions, if any, of the Net Proceeds for payment of professional fees, cure costs, administrative expenses, the break-up fee or expense reimbursement under any Asset Purchase Agreement or any distribution to creditors, in each case in accordance with the terms of this agreement, shall be distributed free and clear of any liens, claims, interests or encumbrances of the First Lien Agent).

Notwithstanding anything to the contrary in this Agreement, Claims, other claims, equity interests, actions or activities of a Consenting First Lien Lender subject to this Agreement shall not include any Claims, other claims, equity interests, actions or activities held or performed in a fiduciary capacity or held, acquired or performed by any other division, business unit or trading desk of such Consenting First Lien Lender (other than the division, business unit or trading desk expressly identified on the signature pages hereto), unless and until such division, business unit or trading desk is or becomes a party to this Agreement.

      c.    <u>Support of Sale</u>.  Subject to the terms and conditions of this Agreement, the First Lien Agent and each of the Consenting First Lien Lenders, to the extent applicable, agrees that, until this Agreement has been terminated in accordance with Section 7 hereof, it shall (severally and not jointly):

      (1)    not object to, or support any action or proceeding or take any other action that would, or would reasonably be expected to, impede or delay, the consummation of any Asset Purchase Agreement or the Sale;

      (2)    not commence or support any action or proceeding to appoint a trustee, conservator, receiver or examiner for any of the Enduro Entities (or any of their respective Affiliates or subsidiaries), or to dismiss any of the Chapter 11 Cases, or to convert any of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code;

      (3)    upon the consummation of any Asset Purchase Agreement, (A) release or terminate any Liens on the applicable Assets sold pursuant to such Asset Purchase Agreement and (B) authorize the First Lien Agent to execute and deliver such lien releases, terminations and similar documents or instruments as the First Lien Agent deems necessary or appropriate in connection with such Asset Purchase Agreement and the release or termination of the Liens and obligations described herein; and

      (4)    not direct or instruct the First Lien Agent to take any action that is inconsistent with the terms and conditions of this Agreement, and, if the First Lien Agent or the counsel or advisors to the First Lien Agent takes or threatens to take any such action, to promptly take all commercially reasonable efforts to direct the First Lien Agent, or to cause the First Lien Agent or the counsel or advisors to the First Lien Agent to be directed, not to take such action; it being understood that no Party shall be required to give any such direction if doing so would require such Party to provide an indemnity to the First Lien Agent in connection therewith.

-10-

     d.    <u>Consent to Plan</u>.  The First Lien Agent and each of the Consenting First Lien Lenders hereby further consents to:

     (i) (A) subject to receipt of the Disclosure Statement, vote all of First Lien Lender Claims against the Enduro Entities now or hereafter owned by such Lender to accept the Plan in accordance with the applicable procedures set forth in the Disclosure Statement that meet the requirements of applicable law, including sections 1125 and 1126 of the Bankruptcy Code; (B) timely return a duly-executed ballot in connection therewith; and (C) not "opt out" of or object to any releases or exculpation provided under the Plan (and, to the extent required by such ballot, affirmatively "opt in" to such releases and exculpation) and otherwise support the releases and exculpation provided for in the Plan;

     (ii) not withdraw, amend, change, or revoke (or seek to withdraw, amend, change, or revoke) its tender, consent, or vote with respect to the Plan; *provided*, *however*, that the tender, consent, or votes of the First Lien Lenders shall be immediately revoked and deemed void *ab initio* upon the occurrence of the Termination Date;

     (iii) not (A) object to, delay, impede, or take any other action (including to instruct or direct the First Lien Agent) to interfere with the prompt consummation of the Sale, the Definitive Documents (including the entry by the Bankruptcy Court of an order approving the Disclosure Statement, Plan and, if applicable, the Cash Collateral Order); (B) object to, delay, impede, or take any other action (including to instruct or direct the First Lien Agent) to interfere with or seek to avoid payment of any KEIP Amounts in accordance with the terms of the KEIP Plans, including with respect to approval of any motion in connection therewith, or any other amounts under the bonus letters executed by the Company in connection with the sale process previously disclosed to the First Lien Agent or its advisors; (C) propose, file, support, or vote for any restructuring, workout, reorganization, liquidation, or chapter 11 plan or other Alternative Transaction for any of the Enduro Entities, other than the Sale and the Plan; or (D) encourage or support any other person or entity to do any of the foregoing; and

     (iv) not take any other action, including, without limitation, initiating or joining in any legal proceeding, that is inconsistent with its obligations under this Agreement.

The foregoing provisions of this Section 4 will not (a) prohibit any Consenting First Lien Lender from taking, or directing the First Lien Agent to take, any action relating to the maintenance, protection and preservation of the Collateral; (b) prohibit any Consenting First Lien Lender from objecting, or directing the First Lien Agent to object, to any motion or pleading filed with the Bankruptcy Court seeking approval to use Cash Collateral (other than any motion or pleading filed in respect of the consensual Cash Collateral use arrangement described in the Cash Collateral Order) or to obtain debtor-in-possession financing; (c) limit the First Lien Agent or any Consenting First Lien Lender's right to credit bid to the fullest extent provided for in Section 363(k) of the Bankruptcy Code, subject to such parties' express agreement to the contrary as set forth in any Definitive Document, or (d) limit the First Lien Agent's or any Consenting First Lien Lender's rights under the First Lien Credit Agreement, any other Loan Document and/or applicable law to appear and participate as a party in interest in any matter to be adjudicated in any case or proceeding under the Bankruptcy Code or other applicable law, so long as with

respect to the foregoing clauses (a)-(d) such action, appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and do not hinder, delay or prevent consummation of the Sale.

5.    <u>Company Obligations to Support the Sale and Plan</u>.

a.    <u>Generally</u>.   Subject to the provisions of Section 5(b) of this Agreement, the Company shall:

(1)    use its reasonable best efforts to support and promptly consummate the Sale and Plan in accordance with the Milestones;

(2)    do all things reasonable, necessary and appropriate in furtherance of the Sale, the Plan and all transactions set forth in this Agreement;

(3)    use its reasonable best efforts to obtain any and all required regulatory and/or third-party approvals for the Sale and Plan;

(4)    not take any action that is inconsistent with, or could reasonably be expected to interfere with or impede or delay consummation of, any portion of the Sale or Plan;

(5)    timely file a formal objection, in form and substance reasonably acceptable to the Consenting First Lien Lenders, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, (D) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable, or (E) directing the appointment of an official committee of equity interest holders; and

(6)    report to the First Lien Agent any instance of the Company's intentional or unintentional non-compliance with Agreement or the failure of any term or Milestone under this Agreement within one (1) Business Day of the Company's discovery of such non-compliance or failure.

b.    <u>Fiduciary Duties</u>.   Notwithstanding anything to the contrary herein, nothing in this Agreement shall prohibit the board of directors, board of managers, directors, managers, or officers or any other fiduciary of any Enduro Entity from taking any action, or from refraining from taking any action, to the extent such board of directors, board of managers, or such similar governing body determines, after receiving advice from counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

6.      <u>Agreement Effective Date</u>.    This Agreement, and the rights and obligations of the Parties hereunder, shall be effective on the date on which the following conditions have been satisfied (the "***Agreement Effective Date***"):

a.      The Company shall have executed and delivered to Davis Polk counterpart signature pages to this Agreement;

b.      First Lien Lenders that hold, in the aggregate, at least 66.7% of the then outstanding principal amount of the First Lien Loan Claims under the First Lien Credit Agreement shall have executed and delivered to the Company counterpart signature pages to this Agreement;

c.      all representations and warranties of the Parties contained herein shall be true and correct in all material respects as of the Agreement Effective Date;

d.      the Borrower shall have delivered payment in the amount of $4,000,000 (inclusive of any payment received after April 16, 2018, whether pursuant to a forbearance agreement or otherwise) to the First Lien Agent for the accounts of the respective Lenders, which payment shall be applied to the outstanding principal of the Committed Loans;

e.      Each of the Package 1 APAs and the Package 3 APA is in form and substance acceptable to the Consenting First Lien Lenders and has become effective in accordance with its terms or will become effective contemporaneously with the effectiveness of this Agreement;

f.      a copy of the Register (as defined in the First Lien Credit Agreement) dated as of the Agreement Effective Date shall have been furnished to the Company (the "***Register Notice***"); and

g.      the Company shall have paid the reasonable and documented fees and expenses of the professionals of the First Lien Agent and each Consenting First Lien Lender incurred and invoiced on or prior to the Agreement Effective Date.

7.      <u>Termination of Obligations</u>.

a.      This Agreement shall terminate, and all of the rights and obligations of the Parties hereunder shall be of no further force or effect, in the event that (i) the Required Supporting Lenders, the First Lien Agent and the Company agree to such termination in writing or (ii) this Agreement is terminated pursuant to the remaining paragraphs of this Section 7 (the occurrence of any such event shall be deemed a "***Termination Event***").

b.      The Company may terminate this Agreement as to all Parties upon three (3) Business Days written notice to the other Parties upon the occurrence of any of the following events:

(1)    the board of directors, board of managers, or equivalent governing body of any Enduro Entity determines, after receiving advice from counsel, that proceeding with the transactions contemplated by this Agreement would be inconsistent with the exercise of their respective fiduciary duties;

(2)    the Required Supporting Lenders terminate the obligations of the Required Supporting Lenders under and in accordance with this Agreement;

(3)    a material breach by the First Lien Agent or any Consenting First Lien Lender of its respective obligations hereunder that would have a material adverse impact on the Company or the prompt consummation of the Sale or confirmation or effectiveness of the Plan, which material breach is not cured on or within five (5) Business Days after the giving of written notice of such breach to the applicable breaching Consenting First Lien Lender; provided that, with respect to the Consenting First Lien Lenders, so long as the non-breaching Consenting First Lien Lenders constitute a majority of the outstanding First Lien Obligations of the Required Supporting Lenders, the termination shall only be effective as to the breaching Consenting First Lien Lender;

(4)    upon the termination of the use of any Collateral (including Cash Collateral) in accordance with the Cash Collateral Order; or

(5)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of an order or other decree, in each case, which has become final and non-appealable and which restrains, enjoins, or otherwise prohibits the implementation of a material portion of the applicable Asset Purchase Agreement, Sale or the Plan.

c.    The Required Supporting Lenders and the First Lien Agent shall have the right, but not the obligation, upon written notice to the other Parties, to terminate the obligations of the First Lien Agent and the Consenting First Lien Lenders under this Agreement upon the occurrence of any of the following events, unless waived, in writing, by the Required Supporting Lenders on a prospective or retroactive basis:

(1)    the failure of the Enduro Entities to meet any Milestone;

(2)    the Bankruptcy Court enters an order appointing a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(3)    any of the Definitive Documents, any amendment or modification to any Definitive Document, or any waiver of any term or condition of any Definitive Document is not reasonably acceptable to the

#90559476v21

Required Supporting Lenders in accordance with the terms of this Agreement;

(4)      any Asset Purchase Agreement (including the Package 1 APAs, the Package 2 APA(s), or the Package 3 APA) is terminated after it has become effective without the prior written consent of the Required Supporting Lenders;

(5)      any Enduro Entity materially breaches its obligations under this Agreement, which breach is not cured within five (5) Business Days after the giving of written notice of such breach;

(6)      either (i) any Enduro Entity files with the Bankruptcy Court a motion, application, or adversary proceeding (or any Enduro Entity supports any such motion, application, or adversary proceeding filed or commenced by any third party) challenging the validity, enforceability, or priority of, or seeking avoidance or subordination of, the First Lien Obligations (as defined in the Intercreditor Agreement) or liens securing such obligations or (ii) the Bankruptcy Court enters an order providing relief against the First Lien Agent or any Consenting First Lien Lender with respect to any of the foregoing causes of action or proceedings filed by any Enduro Entity;

(7)      if any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction shall have issued any order, injunction, or other decree or taken any other action, in each case, which (A) is inconsistent with this Agreement in any material respect or (B) would, or would reasonably be expected to, materially frustrate the consummation of the Sale or the Plan; _provided_, _however_, that the Company shall have five (5) Business Days after issuance of such order, injunction, or other decree or the taking of such action to seek relief that would allow consummation of the Sale and Plan in a manner that (i) does not prevent or diminish in any way compliance with the terms of this Agreement and (ii) is acceptable to the Required Supporting Lenders and the First Lien Agent;

(8)      any corporate action, legal proceeding or other procedure or step being taken, or application being made by a secured lender of the Company, (other than in respect of the Chapter 11 Cases contemplated hereunder) in relation to or resulting in the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager, provisional supervisor, insolvency resolution professional or other similar officer in respect of an Enduro Entity or any of its assets;

(9)      upon the occurrence of any of the events specified in Paragraph 8 of the Interim Cash Collateral Order and subject to the cure and other time periods set forth therein, regardless of whether notice of

-15-

such event or events be given under the Interim Cash Collateral Order (provided, for the avoidance of doubt, that such notice may be given solely with respect to this provision of Agreement and not the Interim Cash Collateral Order, at the election of the Required Consenting Lenders and First Lien Agent), unless waived in writing by the First Lien Agent and the Required Supporting Lenders;

(10)    any Enduro Entity terminates its obligations under and in accordance with this Agreement; or

(11)    if any Enduro Entity executes or files with the Bankruptcy Court—or publicly announces or informs the First Lien Agent or any First Lien Lender of its intention to execute or file with the Bankruptcy Court— any Definitive Document that is inconsistent with the requirements set forth in this Agreement without the consent of the Required Supporting Lenders.

d.    Any Consenting First Lien Lender may terminate this Agreement as to itself only, upon written notice to the other Parties, in the event that: (a) such First Lien Lender has transferred all (but not less than all) of its holdings of First Lien Obligations (as defined in the Intercreditor Agreement) in accordance with Section 14 of this Agreement (such termination shall be effective on the date on which such Consenting First Lien Lender has effected such transfer, satisfied the requirements of Section 14 and provided the written notice required above in this section 7); or (b) this Agreement is amended without its consent in such a way as to alter any of the material terms hereof in a manner that is disproportionately adverse to such Consenting First Lien Lender as compared to similarly situated Consenting First Lien Lenders, by giving ten (10) Business Days' written notice to the Enduro Entities and the other Consenting First Lien Lenders; *provided*, that such written notice shall be given by the applicable First Lien Lender within five (5) Business Days of such amendment. Termination pursuant to this Section 7(d) shall be an "**Individual Lender Termination**," and the terminating First Lien Lender an "**Individual Terminating Lender**."

8.    <u>Effect of Termination</u>. The earliest date on which termination of this Agreement as to a Party is effective in accordance with Section 7 of this Agreement shall be referred to, with respect to such Party, as a "***Termination Date***." Upon the occurrence of a Termination Date, (a) all Parties' obligations under this Agreement shall be terminated effective immediately (in the case of an Individual Terminating Lender, solely with respect to obligations of or in favor of the Individual Terminating Lender), (b) the Parties shall be released from all commitments, undertakings, and agreements hereunder (in the case of an Individual Lender Termination, solely with respect to obligations of or in favor of the Individual Terminating Lender), and (c) any votes tendered by the First Lien Lenders (or, in the case of an Individual Lender Termination, solely by the Individual Terminating Lender) in favor of the Plan and any associated elections, opt-ins or opt-outs shall be deemed rescinded and null and void and such First Lien Lenders (or Individual Terminating Lender, as applicable) shall be provided a reasonable opportunity to tender new votes on account of their First Lien Loan Claims to accept or reject the Plan and make any associated elections, opt-ins, or opt-outs; *provided*, *however*, that

each of the following shall survive any such termination: (x) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights with respect to such claims shall not be prejudiced in any way and (y) Sections 8, 11, 16, 18.a, 18.b, 18.c, 18.d, 18.e, 18.f, 18.g, 18.h, 18.i, 18.l, 18.m and 18.n hereof, including the definitions incorporated by reference into such sections pursuant to Sections 1 and 2 hereof. Notwithstanding any provision in this Agreement to the contrary, the right to terminate this Agreement under this Section 8 shall not be available to any Party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the occurrence of the applicable Termination Event.

9.      <u>Representations of the Company</u>.  Each Enduro Entity hereby represents and warrants to the First Lien Agent and each Consenting First Lien Lender as follows as of the date hereof:

a.      <u>Corporate Power and Authority</u>.  It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

b.      <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

c.      <u>No Conflicts</u>.  The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party, other than as a result of the commencement of the Chapter 11 Cases.

d.      <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body.

e.      <u>Binding Obligation</u>.  This Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

10.      <u>Representations of Each Consenting First Lien Lender</u>.  Each of the First Lien Agent and the Consenting First Lien Lenders party hereto severally (but not jointly) represents and warrants to the other Parties as follows with respect to itself only and as of the date hereof:

#90559476v21

a.      <u>Holdings by Consenting First Lien Lenders</u>.  Each Consenting First Lien Lender (i) either (A) is the sole legal and beneficial owner of the amount of First Lien Loan Claims appearing on the date hereof opposite its name on its signature page hereto and all related claims, rights and causes of action arising out of or in connection with or otherwise relating thereto (for each such Consenting First Lien Lender, the "***Consenting First Lien Lender Claims***"), in each case free and clear (other than pursuant to this Agreement), of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind, that would, or would reasonably be expected to, adversely affect in any material way such Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed, or (B) has investment or voting discretion with respect to such Consenting First Lien Lender Claims and has the power and authority to bind the beneficial owner(s) of such Consenting First Lien Lender Claims to the terms of this Agreement, and (ii) has full power and authority to consent to matters concerning such Consenting First Lien Lender Claims with respect to the Sale.

b.      <u>Sufficiency of Information Received</u>.  The First Lien Agent and each Consenting First Lien Lender has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, all information it deems necessary and appropriate for it to evaluate the financial risks inherent in the Sale.

c.      <u>Corporate Power and Authority</u>.  It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement.

d.      <u>Authorization</u>.  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

e.      <u>No Conflicts</u>.  The execution, delivery and performance by it of this Agreement do not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

f.      <u>Governmental Consents</u>.  The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body.

g.      <u>Binding Obligation</u>.  This Agreement is its legally valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance and

#90559476v21

other laws affecting creditors' rights, and by general limitations in the availability of equitable remedies.

11.    Release.

a.    Each of the Loan Parties (on behalf of itself and its Affiliates) for itself and for its successors in title, legal representatives and assignees and, to the extent the same is claimed by right of, through or under any of the Loan Parties, for its past, present and future employees, agents, representatives, officers, directors, shareholders, and trustees (each, a "**Releasing Party**" and collectively, the "**Releasing Parties**"), does hereby remise, release and discharge, and shall be deemed to have forever remised, released and discharged, the First Lien Agent and each of the Consenting First Lien Lenders, and the First Lien Agent's and each other Consenting First Lien Lenders' respective successors-in-title, legal representatives and assignees, past, present and future officers, directors, affiliates, shareholders, trustees, agents, employees, consultants, experts, advisors, attorneys and other professionals and all other persons and entities to whom the First Lien Agent, each of the Consenting First Lien Lenders or any of their respective successors-in-title, legal representatives and assignees, past, present and future officers, directors, affiliates, shareholders, trustees, agents, employees, consultants, experts, advisors, attorneys and other professionals would be liable if such persons or entities were found to be liable to any Releasing Party or any of them (collectively, hereinafter the "**Releasees**"), from any and all manner of action and actions, cause and causes of action, claims, charges, demands, counterclaims, crossclaims, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, rights of setoff and recoupment, controversies, damages, judgments, expenses, executions, liens, claims of liens, claims of costs, penalties, attorneys' fees, or any other compensation, recovery or relief on account of any liability, obligation, demand or cause of action of whatever nature, whether in law, equity or otherwise (including, without limitation, any claims relating to (i) the making or administration of the Committed Loans, including, without limitation, any such claims and defenses based on fraud, mistake, duress, usury or misrepresentation, or any other claim based on so-called "lender liability" theories, (ii) any covenants, agreements, duties or obligations set forth in the Loan Documents, (iii) increased financing costs, interest or other carrying costs, (iv) penalties, (v) lost profits or loss of business opportunity, (vi) legal, accounting and other administrative or professional fees and expenses and incidental, consequential and punitive damages payable to third parties, (vii) damages to business reputation, or (viii) any claims arising under 11 U.S.C. §§ 541-550 or any claims for avoidance or recovery under any other federal, state or foreign law equivalent), whether known or unknown, fixed or contingent, joint and/or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, contractual or tortious, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Releasees, whether held in a personal or representative capacity, and which are, in each case, based on any act, fact, event or omission or other matter, cause or thing occurring at any time prior to or on the date hereof in any way, directly or indirectly arising out of, connected with or relating to the First Lien Credit Agreement or any other Loan Document and the transactions contemplated thereby, and all other agreements, certificates, instruments and

other documents and statements (whether written or oral) related to any of the foregoing (each, an "**Applicable Claim**" and collectively, the "**Applicable Claims**"); provided, however, that the foregoing provision shall not apply, and the Applicable Claims shall not be deemed to include, any such claim, cause of action, or otherwise to the extent determined by a court of competent jurisdiction by final, nonappealable order to have resulted from the applicable Releasee's fraud, willful misconduct, or gross negligence. **Each Releasing Party further stipulates and agrees with respect to all Applicable Claims, that it hereby waives, to the fullest extent permitted by applicable law, any and all provisions, rights, and benefits conferred by any applicable U.S. federal or state law, or any principle of common law, that would otherwise limit a release or discharge of any unknown Applicable Claims pursuant to this Section 11.**

b.      Each of the Borrower and other Loan Parties, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Applicable Claim released, remised and discharged by the Borrower or any other Loan Party pursuant to Section 11(a) hereof.  If the Borrower, any other Loan Party or any of its successors, assigns or other legal representatives violates the foregoing covenant, the Borrower and other Loan Parties, each for itself and its successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

c.      In entering into this Agreement, each of the Loan Parties has consulted with and been represented by counsel and expressly disclaims any reliance on any representations, acts or omissions by the First Lien Agent, the Consenting First Lien Lenders or any of the First Lien Agent's or the Consenting First Lien Lenders' Affiliates and hereby agrees and acknowledges that the validity and effectiveness of the releases set forth above do not depend in any way on any such representations, acts and/or omissions or the accuracy, completeness or validity thereof.  The provisions of this Section 11 shall survive the termination of the First Lien Credit Agreement and payment in full of all amounts owing thereunder.

12.      No Solicitation.  This Agreement is not intended to be, and each signatory to this Agreement acknowledges that this Agreement is not, whether for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise, a solicitation for the acceptance or rejection of a chapter 11 plan for any of the Enduro Entities.  The Enduro Entities will not solicit acceptances of a Plan from any Consenting First Lien Lender until the Consenting First Lien Lenders have been sent copies of a disclosure statement (the "*Disclosure Statement*") in respect of the Plan.

13.      Claims and Interests.  This Agreement shall in no way be construed to preclude any Consenting First Lien Lender from acquiring or holding claims against, or interests in, any of the Enduro Entities (or any of its respective Affiliates or subsidiaries).  However, in the event any Consenting First Lien Lender shall acquire or hold any such claims and interests,

then such claims and interests shall, without further action of or notice to any Person, automatically be deemed to be subject to the terms and conditions of this Agreement.

14.    Transfer Restrictions.

a.      So long as this Agreement has not been terminated in accordance with its terms, no Consenting First Lien Lender shall (i) sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of any ownership (including any Beneficial Ownership) in First Lien Loan Claims in whole or in part (other than pledges, transfers or security interests that such Consenting First Lien Lender may have created (A) in favor of a prime broker under and in accordance with its prime brokerage agreement with such prime broker or (B) in favor of a financing counterparty in accordance with any ordinary course financing arrangements) or (ii) grant any proxies or deposit any of such Consenting First Lien Lender's interests in the First Lien Loan Claims into a voting trust, or enter into a voting agreement with respect to any such interest (collectively, the actions described in clauses (i) and (ii), a "Transfer"), unless it satisfies the following requirement (a transferee that satisfies such requirement, a "Permitted Transferee," and such Transfer, a "Permitted Transfer"): the intended transferee executes and delivers to counsel to the Company and counsel to the First Lien Agent, on a confidential basis, on the terms set forth in clauses (b) through (d) below an executed form of the Transfer Agreement before such Transfer is effective (it being understood that any Transfer shall not be effective, including, without limitation, for purposes of calculating Required Supporting Lenders, until notification of such Transfer and a copy of the executed Transfer Agreement is received by counsel to the Company and counsel to the First Lien Agent, in each case, on the terms set forth herein), in which event, from and after the delivery of such executed copy of such Transfer Agreement to counsel to the Company and counsel to the First Lien Agent (in accordance with the notice provisions set forth herein and prior to the effectiveness of such Transfer), the transferor shall be deemed to relinquish its rights, and be released from its obligations, under this Agreement, *provided* that any transferor Consenting First Lien Lender who Transfers less than all ownership (including any Beneficial Ownership) in the First Lien Loan Claims shall remain subject to this Agreement with respect to any portions of the First Lien Loan Claims not transferred, *provided further* that in no event shall any such Transfer relieve a Party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of delivery of such Transfer Agreement. Notwithstanding anything herein to the contrary, so long as this Agreement has not been terminated in accordance with its terms, each Consenting First Lien Lender may offer, sell, or otherwise transfer any or all of its holdings of First Lien Loan Claims to any entity that, as of the date of transfer, controls, is controlled by, or is under common control with such Consenting First Lien Lender; provided, however, that such entity shall automatically be subject to the terms of this Agreement and be a Consenting First Lien Lender hereunder, and shall execute a Transfer Agreement.

b.      (i) any Consenting First Lien Lender may Transfer, and execution of the Transfer Agreement shall not be required for Transfer of, First Lien Loan Claims to any other Consenting First Lien Lender, which transferee shall be automatically bound by this Agreement as to such First Lien Loan Claims upon such Transfer, (ii) a Qualified

Marketmaker that acquires any of the First Lien Loan Claims solely with the purpose and intent of acting as a Qualified Marketmaker for such First Lien Loan Claims, shall not be required to execute and deliver to counsel a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker actually transfers, within five (5) Business Days of receipt thereof, such First Lien Loan Claims (by purchase, sale, assignment, participation, or otherwise) to a Consenting First Lien Lender or Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement) and the Transfer otherwise is a Permitted Transfer, and (iii) to the extent any Party who has signed this Agreement is acting in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the First Lien Loan Claims that it acquires from a Holder that has not signed this Agreement to a transferee that has not signed this Agreement at the time of such Transfer without the requirement that such transferee be or become a signatory to this Agreement. Notwithstanding the foregoing, any transfer to a Qualified Marketmaker shall constitute a Permitted Transfer so long as the Qualified Marketmaker agrees, solely to the extent that it holds any First Lien Loan Claims from a Consenting First Lien Lender at the voting record date, to act in accordance with the Agreement with respect to any vote or consent required hereunder (including a vote on the Plan) with respect to such First Lien Loan Claims.

c.    This Agreement shall in no way be construed to preclude a Consenting First Lien Lender from acquiring additional First Lien Loan Claims or any other claim against any Enduro Entity; provided that (i) if any Consenting First Lien Lender acquires additional First Lien Loan Claims after the Agreement Effective Date, such Consenting First Lien Lender shall make commercially reasonable efforts to notify counsel to the Company and counsel to the First Lien Agent, on a confidential basis, within a reasonable period of time following such acquisition, of such acquisition, including the amount of such acquisition and (ii) such Consenting First Lien Lender hereby acknowledges and agrees that such First Lien Loan Claims shall automatically and immediately upon acquisition by a Consenting First Lien Lender be subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given in accordance herewith).

d.    Any Transfer made in violation of this Section 14 shall be void *ab initio*. Any Consenting First Lien Lender that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

15.    Exhibits, Annexes and Schedules Incorporated by Reference. Each of the exhibits, annexes and schedules attached hereto and each of the schedules and annexes to such exhibits (collectively, the "***Exhibits and Schedules***") is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules. In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern and control.

16.    Entire Agreement; Prior Negotiations.    This Agreement, including any exhibits, set forth in full the terms of agreement between and among the Parties with respect to the transactions contemplated herein and are intended as the full, complete and exclusive contract governing the relationship between and among the Parties with respect to the transactions contemplated herein, superseding all other discussions, promises, representations, warranties, agreements and understandings, whether written or oral, between or among the Parties with respect to the subject matter hereof; provided, that any confidentiality agreement between or among any of the Parties shall remain in full force and effect in accordance with its terms.  No representations, oral or written, other than those set forth herein, may be relied on by any Party in connection with the subject matter hereof.

17.    Amendment or Waiver.    No waiver, modification or amendment of any term or provision of this Agreement shall be valid unless such waiver, modification or amendment is in writing and has been signed by the Company, the First Lien Agent and the Required Supporting Lenders; provided, however, that any modification or amendment that alters any of the material terms hereof in a manner that is disproportionately adverse to any one Consenting First Lien Lender as compared to similarly situated Consenting First Lien Lenders shall be valid only if such waiver, modification or amendment is in writing and has been signed by the Company, the First Lien Agent and each of the Consenting First Lien Lenders.  No waiver of any of the provisions of this Agreement or the Asset Purchase Agreement(s) shall be deemed or constitute a waiver of any other provision of this Agreement or the Asset Purchase Agreement(s), whether or not similar, nor shall any waiver be deemed a continuing waiver.  Any modification of this Section 17 shall require the written consent of all Parties.

18.    Miscellaneous.

a.    Governing Law.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the District of Delaware, and by execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing, upon any commencement of the Chapter 11 Cases and until the effective date of a plan of reorganization or liquidation, each of the Parties agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

b.    Specific Performance.    It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (excluding monetary remedies) as its sole and exclusive remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of

-23-

competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

        c.   <u>Reservation of Rights</u>.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner, waive, limit, impair or restrict the ability of the First Lien Agent or each Consenting First Lien Lender to protect and preserve its rights, remedies and interests, including its claims, against the Company.  If the Sale contemplated herein or the Plan is not consummated in the manner set forth, and on the timeline set forth, in this Agreement or if this Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their respective rights and remedies.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms and provisions of this Agreement. This Agreement (including, for the avoidance of doubt, the Plan and other attachments hereto) and any related document shall in no event be construed as, or be deemed to be evidence of, an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

        d.   <u>Headings</u>.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

        e.   <u>Notice</u>.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by electronic transmission or mailed (first class postage prepaid) to the Parties at the following addresses or email addresses, as applicable:

        If to the First Lien Agent:

        Agency Management Services
        Bank of America, N.A.
        222 Broadway
        New York, NY 10038
        Mail code NY3-222-14-03
        Email: don.b.pinzon@baml.com
        Attn: Don Pinzon

        *with a copy (which shall not constitute notice) to*:

        Damian S. Schaible
        Aryeh Ethan Falk
        Davis Polk & Wardwell LLP
        450 Lexington Avenue
        New York, New York 10017
        Attn: Damian S. Schaible and Aryeh Ethan Falk

Email: damian.schaible@davispolk.com and aryeh.falk@davispolk.com

If to any other Consenting First Lien Lender:

To the address or electronic mail address specified on its respective signature page to this Agreement.

If to the Company:

Enduro Resource Holdings LLC
777 Main Street
Suite 800
Fort Worth, Texas 76102
Fax:  (817) 529-8450
Email: jsbrumley@endurores.com; kweimer@endurores.com
Attn: Jonny Brumley and Kim Weimer

*with a copy (which shall not constitute notice) to*:

Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Email: caroline.reckler@lw.com; matthew.warren@lw.com
Attn: Caroline A. Reckler and Matthew Warren

      f.    <u>Successors and Assigns, No Third-Party Beneficiaries</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other Person or entity shall, or shall be deemed to, be a third party beneficiary hereof.

      g.    <u>Severability</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

      h.    <u>Several Obligations</u>.  The agreements, representations and obligations of each Consenting First Lien Lender under this Agreement are several, and not joint, in all respects.  Any breach of this Agreement by a Party shall not result in liability for any other non-breaching Party (it being acknowledged and agreed by all parties that their sole and exclusive remedy for any breach of this Agreement shall be specific performance and injunctive or other equitable relief (excluding monetary remedies) as provided in Section 18(b) above).  It is understood and agreed that any Consenting First Lien Lender may trade in the First Lien Loan Claims or other debt securities of the Company without the consent of the Company or any other Consenting First Lien Lender, subject to applicable laws, if any, Sections 11 and 12 herein and

the First Lien Credit Agreement (as applicable). No Consenting First Lien Lender shall have any responsibility for any such trading by any other entity by virtue of this Agreement.

i.    <u>Counterparts</u>.    This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile or electronic mail which shall be deemed to be an original for the purposes of this Agreement.

j.    <u>Consideration</u>.    It is hereby acknowledged and agreed by the Parties that no consideration shall be due or paid to any Consenting First Lien Lender in exchange for their support of the Sale or the Plan in accordance with the terms and conditions of this Agreement, other than the obligations imposed upon the Parties pursuant to the terms of this Agreement.

k.    <u>Public Disclosure</u>.    At least two (2) Business Days prior to release or filing thereof, the Company will submit to Davis Polk any press release and/or public filing relating to this Agreement, the Asset Purchase Agreement(s), or the transactions contemplated hereby and thereby and any amendments thereof.

l.    <u>No Strict Construction</u>.    This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the Parties hereto or thereto. Neither the provisions of this Agreement or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any Party on the ground that such Party or such Party's counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction.

m.    <u>No Violation of Automatic Stay</u>. The Consenting First Lien Lenders and First Lien Agent are authorized to take any steps necessary to effectuate the termination of this Agreement, as applicable, including the sending of any applicable notices to the Company, notwithstanding section 362 of the Bankruptcy Code or any other applicable law (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice), and no cure period contained in this Agreement shall be extended pursuant to sections 108 or 365 of the Bankruptcy Code or any other applicable law without the prior written consent of the Required Supporting Lenders and First Lien Agent.

n.    <u>WAIVER OF JURY TRIAL</u>.    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

o.    <u>Time Periods</u>.    If any time period or other deadline provided in this Agreement expires on a day that is not a Business Day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding Business Day.

*[Remainder of page intentionally left blank; signature pages follow]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers, all as of the date and year first above written.

*ENDURO RESOURCE HOLDINGS LLC*
*ENDURO RESOURCE PARTNERS LLC*
*ENDURO OPERATING LLC*
*ENDURO MANAGEMENT COMPANY LLC*
*WASHAKIE PIPELINE COMPANY LLC*
*WASHAKIE MIDSTREAM SERVICES LLC*

By: Kimberly A. Weimer
Name: Vice President & Chief Financial Officer

[Signature Page to Sale and Plan Support Agreement]

[Lender Signature Pages Redacted]

## **Exhibit A**

<u>Plan</u>

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| ENDURO RESOURCE PARTNERS LLC, *et al.*, | ) Case No. 18-_____ (___) |
| | ) |
| Debtors.[1] | ) (Joint Administration Requested) |
| | ) |

---

### JOINT PLAN OF LIQUIDATION OF
### ENDURO RESOURCE PARTNERS LLC AND ITS DEBTOR AFFILIATES
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

**LATHAM & WATKINS LLP**
George A. Davis (*pro hac vice* pending)
Mitchell A. Seider (*pro hac vice* pending)
885 Third Avenue
New York, New York 10022
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:    george.davis@lw.com
    mitchell.seider@lw.com

- and -

Caroline A. Reckler (*pro hac vice* pending)
Matthew L. Warren (*pro hac vice* pending)
Jason B. Gott (*pro hac vice* pending)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:    caroline.reckler@lw.com
    matthew.warren@lw.com
    jason.gott@lw.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Email:    mnestor@ycst.com
    kcoyle@ycst.com

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated:    [ ● ], 2018

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's United States federal tax identification number, if applicable, or other applicable identification number, are:  Enduro Resource Partners LLC (6288); Enduro Resource Holdings LLC (5571); Enduro Operating LLC (7513); Enduro Management Company LLC (5932); Washakie Midstream Services LLC (7562); and Washakie Pipeline Company LLC (7798).  The debtors' mailing address is 777 Main Street, Suite 800, Fort Worth, Texas 76102.

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN.**

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND
        GOVERNING LAW ...............................................................................................................1
    A.    Defined Terms ...................................................................................................1
    B.    Rules of Interpretation ....................................................................................10
    C.    Computation of Time .......................................................................................11
    D.    Governing Law ................................................................................................11
    E.    Reference to Monetary Figures .......................................................................11

ARTICLE II. ADMINISTRATIVE CLAIMS, PRIORITY  CLAIMS AND INTERCOMPANY CLAIMS ............11
    A.    Administrative Claims .....................................................................................11
    B.    Priority Tax Claims .........................................................................................12
    C.    Other Priority Claims ......................................................................................12
    D.    Statutory Fees ..................................................................................................12

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................................13
    A.    Introduction .....................................................................................................13
    B.    Summary of Classification ...............................................................................13
    C.    Treatment of Claims and Interests ..................................................................13

ARTICLE IV. ACCEPTANCE REQUIREMENTS .........................................................................................16
    A.    Acceptance or Rejection of this Plan ..............................................................16
    B.    Confirmation of This Plan Pursuant to Section 1129(b) of the Bankruptcy Code ........16
    C.    Controversy Concerning Impairment ..............................................................16

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ...............................................................17
    A.    Transactions Effective as of the Effective Date ..............................................17
    B.    Closing of Sales and Uses of Cash .................................................................17
    C.    The Plan Administration Trust .........................................................................17
    D.    Certain Powers and Duties of the Plan Administration Trust and Plan Administrator ..........18
    E.    Federal Income Tax Treatment of the Plan Administration Trust for the Plan
          Administration Trust Assets; Tax Reporting and Tax Payment Obligations ....18
    F.    Authority to Pursue, Settle, or Abandon Retained Causes of Action ..............18
    G.    Cancellation of Documents ..............................................................................18
    H.    Filing of Monthly and Quarterly Reports and Payment of Statutory Fees ......19
    I.    Directors and Officers of the Debtors .............................................................19
    J.    Corporate Authorization ..................................................................................19
    K.    Director and Officer Liability Insurance .........................................................19
    L.    Effectuating Documents and Further Transactions .........................................20
    M.    Key Employee Incentive Plans ........................................................................20
    N.    Employee and Retiree Benefits ........................................................................20
    O.    Exemption from Certain Taxes and Fees .........................................................20

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................20
    A.    Treatment of Executory Contracts and Unexpired Leases ..............................20
    B.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases ...........21
    C.    Rejection Damages Claim ................................................................................21
    D.    Reservation of Rights ......................................................................................21
    E.    Nonoccurrence of Effective Date .....................................................................21

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS ...................................................................21
    A.    Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions ...........21
    B.    Disbursing Agent .............................................................................................22
    C.    Distributions on Account of Claims Allowed After the Effective Date ............22

(i)

D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions........................22
E.    Compliance with Tax Requirements/Allocations..............................................................23
F.    Surrender of Cancelled Instruments or Securities ...........................................................23
G.    Claims Paid or Payable by Third Parties..........................................................................23

ARTICLE VIII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS .........................................................................................................24
A.    Allowance and Disallowance of Claims ...........................................................................24
B.    Prosecution of Objections to Claims ................................................................................24
C.    Estimation of Claims ........................................................................................................24
D.    Amendments to Claims .....................................................................................................25
E.    Distributions After Allowance .........................................................................................25

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE
EFFECTIVE DATE ...........................................................................................................25
A.    Conditions Precedent to Confirmation .............................................................................25
B.    Conditions Precedent to the Effective Date .....................................................................26
C.    Waiver of Conditions ........................................................................................................27
D.    Effect of Nonoccurrence of Conditions ...........................................................................27

ARTICLE X. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS..................27
A.    Compromise and Settlement of Claims, Interests, and Controversies .............................27
B.    Releases by the Debtors ....................................................................................................27
C.    Releases by Holders of Claims and Interests ...................................................................28
D.    Exculpation .......................................................................................................................28
E.    Discharge of Claims and Termination of Interests........................**Error! Bookmark not defined.**
F.    Injunction ..........................................................................................................................28
G.    Setoffs ...............................................................................................................................29
H.    Release of Liens ................................................................................................................29
I.    Recoupment .......................................................................................................................29

ARTICLE XI. BINDING NATURE OF PLAN...................................................................................29

ARTICLE XII. RETENTION OF JURISDICTION.............................................................................30

ARTICLE XIII. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ................31
A.    Modifications and Amendments ........................................................................................31
B.    Effect of Confirmation on Modifications ..........................................................................31
C.    Revocation or Withdrawal of the Plan ..............................................................................32
D.    Substantial Consummation of the Plan .............................................................................32

ARTICLE XIV. MISCELLANEOUS PROVISIONS ..........................................................................32
A.    Successors and Assigns.....................................................................................................32
B.    Reservation of Rights ........................................................................................................32
C.    Further Assurances ............................................................................................................32
D.    Payment of Fees and Expenses .........................................................................................33
E.    Service of Documents .......................................................................................................33
F.    Dissolution of Committee .................................................................................................33
G.    Nonseverability of Plan Provisions ..................................................................................33
H.    Return of Security Deposits ..............................................................................................34
I.    Term of Injunctions or Stays ............................................................................................34
J.    Entire Agreement ..............................................................................................................34
K.    Exhibits .............................................................................................................................34
L.    Votes Solicited in Good Faith ..........................................................................................34
M.    Closing of Chapter 11 Cases ............................................................................................34

#90797984v11
US-DOCS\99785380.11#90797984v22

N.      Conflicts.............................................................................................................34
O.      Filing of Additional Documents.........................................................................35
P.      Tax Reporting and Compliance ..........................................................................35

(iii)

**INTRODUCTION**

Enduro Resource Partners LLC and certain of its affiliates and subsidiaries in the above-captioned Chapter 11 Cases respectfully propose the following joint plan of liquidation under chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan shall have the meanings ascribed to such terms in Article I hereof.

**ARTICLE I.**

**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW**

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Acceptable Package 2 Purchaser*" means a third party that shall acquire the Package 2 Assets pursuant to a Package 2 Asset Purchase Agreement that is in form and substance acceptable to the Debtors, the First Lien Agent and the Required Supporting Lenders.

2.    "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent, and/or unpaid fees and expenses (including, without limitation, success fees) for legal, financial advisory, accounting, and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a), or 331 of the Bankruptcy Code before the Effective Date by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid (regardless of whether a fee application has been Filed for any such amount). To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

3.    "*Administrative Claim*" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of the Judicial Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code to the extent such request is granted by the Bankruptcy Court.

4.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.    "*Allowed*" means, with reference to any Claim or Interest: (a) any Claim or Interest as to which no objection to allowance has been interposed (either in the Bankruptcy Court or in the ordinary course of business) on or before the applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order, either before or after the Effective Date, to the extent such objection is determined in favor of the respective Holder; (b) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, either before or after the Effective Date; (c) any Claim or Interest expressly deemed Allowed by the Plan; or (d) any Claim or Interest affirmatively Allowed by the Debtors, with the consent of the Required Supporting Lenders, or following the Effective Date, by the Plan Administrator.

6.    "*Avoidance Actions*" means any and all claims and Causes of Action which any of the Debtors, the Debtors in Possession, the Estates, or other appropriate party in interest has asserted or may assert under sections

1

502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

7.    "*Balloting Agent*" means Kurtzman Carson Consultants LLC, in its capacity as notice and balloting agent for the Debtors.

8.    "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims and Interests entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received by the Balloting Agent on or before the Voting Deadline.

9.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as applicable to the Chapter 11 Cases.

10.    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code, the United States District Court for the District of Delaware.

11.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, as each may be amended from time to time.

12.    "*Bidding Procedures Order*" means the order of the Bankruptcy Court approving bidding procedures for the Debtors' asset marketing and sale process.

13.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

14.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

15.    "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, debts, dues, sums of money, damages, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment and claims, controversies, covenants, promises, judgments, remedies, demands, setoffs, defenses, recoupments, cross claims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date and also includes, without limitation: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

16.    "*Certificate*" means any instrument evidencing an extinguished Claim or Interest.

17.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered and procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

18.    "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

19.    "*Claims Bar Date*" means the applicable deadline by which proofs of Claim must be filed under the Claims Bar Date Order.

20.    "*Claims Bar Date Order*" means the order of the Bankruptcy Court establishing the deadline by which proofs of Claim must be Filed, entered at [Docket No. _____].

21.    "*Claims Reserve Account*" means a segregated account to be established by the Debtors into which Cash in the amount of the Claims Reserve Cash Amount shall be deposited on or before the Effective Date, which account shall vest in the Plan Administration Trust as of the Effective Date.

22.    "*Claims Reserve Cash Amount*" means the sum of (a) the Other Secured Claims Reserve Amount, (b) the Priority Claims Reserve Amount, (c) the Unsecured Claims Reserve Amount and (d) the Second Lien Claims Reserve Amount.

23.    "*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

24.    "*Committee*" means any official committee of unsecured creditors (and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee may be reconstituted from time to time.

25.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A hereof having been:  (a) satisfied; or (b) waived pursuant to Article IX.B.1 hereof.

26.    "*Confirmation Date*" means the date upon which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

27.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation, as such hearing may be adjourned or continued from time to time in the Debtors' sole discretion.

28.    "*Confirmation Order*" means the order or orders of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

29.    "*Consenting First Lien Lenders*" has the meaning set for in the Sale and Plan Support Agreement.

30.    "*Consummation*" means the occurrence of the Effective Date.

31.    "*Creditor Matrix*" means the list of creditors and other parties in interest filed by the Debtors at [Docket No. [ ● ]].

32.    "*Cure Claim*" means a Claim based upon a monetary default, if any, by any Debtor on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

33.    "*D&O Tail Coverage*" means coverage under an applicable director, manager, and officer liability insurance policy that extends beyond the end of the policy period.

34.    "*Debtor*" or "*Debtor in Possession*" means one of the Persons in the above-captioned cases, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases under sections 1107 and 1108 of the Bankruptcy Code.

35.    "*Debtor Releases*" shall have the meaning set forth in Article X.B of the Plan.

36.    "*Disbursing Agent*" means the Debtors or the Entity or Entities chosen by the Debtors in their sole discretion to make or facilitate distributions pursuant to the Plan.

#90797984v11
US-DOCS\99785380.11#90797984v22

37.     "*Disclosure Statement*" means the *Disclosure Statement for Joint Plan of Liquidation of Enduro Resource Partners LLC and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated [ ● ], as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law.

38.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

39.     "*Distribution Record Date*" means the date on which the Confirmation Order is entered or such other date that is designated by the Debtors with the consent of the First Lien Agent.

40.     "*Effective Date*" means the date on which the Confirmation Order becomes a Final Order and all of the conditions specified in Article IX.B hereof have been satisfied or waived pursuant to Article IX.B.1 hereof.

41.     "*Enduro Equity Interest*" means a limited liability company membership interest or other equity interest, including warrants to acquire such interests, in Enduro Resource Holdings LLC.

42.     "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

43.     "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

44.     "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

45.     "*Exculpated Claim*" means any Claim related to any act or omission in connection with, relating to or arising out of the Debtors' in- or out-of-court restructuring efforts, the Debtors' Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other agreement; *provided, however*, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or fraud.

46.     "*Exculpated Party*" means each of the Debtors and their Affiliates, the First Lien Agent and its affiliates, and the Consenting First Lien Lenders and their Affiliates, and with respect to each of the foregoing, such Entity's current or former subsidiaries and Affiliates, and its and their managed accounts or funds, officers, directors, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals, in their capacity as such.

47.     "*Exculpation*" means the exculpation provision set forth in Article X.D hereof.

48.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

49.     "*Federal Judgment Rate*" means the federal judgment rate, which rate was in effect as of the Petition Date.

50.     "*Fee Claim*" means a Claim for Accrued Professional Compensation.

51.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or other court of competent jurisdiction in the Chapter 11 Cases.

52.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice, or as to which an appeal or motion for reargument or rehearing is pending, but no stay of the order is in effect.

53.    "*First Lien Agent*" means Bank of America, N.A., in its capacity as administrative agent under the First Lien Credit Agreement and any other applicable First Lien Credit Documents.

54.    "*First Lien Agent Advisor Fees*" means the reasonable and documented fees and expenses incurred by counsel to the First Lien Agent, Davis Polk & Wardwell LLP and Morris, Nichols, Arsht, & Tunnell LLP, and the financial advisor to the First Lien Agent, RPA Advisors, LLC.

55.    "*First Lien Cash*" means Cash in an amount equal to (a) the Net Sale Proceeds from all Sales plus (b) all other Cash held by the Debtors on the Effective Date less (c) amounts paid by the Debtors upon consummation of the applicable Asset Purchase Agreement(s) to the First Lien Agent for distribution to the First Lien Lenders pursuant to the Sale Order less (d) the Wind Down Budget Amount less (e) the Claims Reserve Cash Amount less (f) the Sale Reserve Cash Amount less (g) the amount of all Fee Claims paid pursuant to Article II.A.2 of the Plan less (h) any Cash constituting Newco Assets.

56.    "*First Lien Claim*" means any Claim arising under the First Lien Credit Documents (including, for the avoidance of doubt, any Swap Obligation).

57.    "*First Lien Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of August 1, 2013, by and among Enduro Resource Partners LLC, as borrower, Bank of America, N.A., as administrative agent, and the lenders and other parties thereto (as subsequently modified, amended, or supplemented from time to time).

58.    "*First Lien Credit Documents*" means the First Lien Credit Agreement and any related security, guaranty, or other documents.

59.    "*First Lien Credit Facility*" means the term loan facility provided for under the First Lien Credit Agreement.

60.    "*First Lien Deficiency Claim*" means the portion of any First Lien Claim that is not a First Lien Secured Claim.

61.    "*First Lien Secured Claim*" means the portion of any First Lien Claim that is a Secured Claim.

62.    "*General Unsecured Claim*" means any unsecured Claim against any of the Debtors that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a Fee Claim, an Intercompany Claim, a First Lien Deficiency Claim or a Second Lien Claim.

63.    "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

64.    "*Holder*" means any Person or Entity holding a Claim or an Interest.

65.    "*Impaired*" means any Claim or Interest in an Impaired Class.

66.    "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

67. "*Indemnification Provision*" means each of the indemnification provisions currently in place, whether in the bylaws, certificates of incorporation, or other formation documents in the case of a limited liability company, board resolutions, or employment or service contracts, for the current directors, managers, managing members, officers, members (including any *ex officio* members), and employees of the Debtors.

68. "*Indemnified Parties*" means, each of the Debtors' respective officers, directors, managers, managing members, and employees that served in any such capacity on or after the Petition Date, each in their respective capacities as such before or after the Petition Date.

69. "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

70. "*Intercompany Interest*" means an Equity Security in a Debtor held by another Debtor.

71. "*Interests*" means, collectively, the Enduro Equity Interests and Intercompany Interests.

72. "*Interim Compensation Order*" means that certain order entered by the Court establishing procedures for the compensation of Professionals.

73. "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

74. "*Key Employee Incentive Plans*" means (a) that certain *Key Employee Incentive Plan* and (b) that certain *Key Employee Incentive Plan for Executives*, as approved by the Bankruptcy Court at [Docket No. ___] and [Docket No. ___], respectively.

75. "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

76. "*Majority First Lien Lenders*" means lenders under the First Lien Credit Facility holding greater than fifty percent (50.0%) of the First Lien Claims held by all such lenders.

77. "*Net Sale Proceeds*" means all Cash actually received by the Debtors upon closing of a Sale.

78. "*Newco*" means an entity to be formed by or at the direction of the Majority First Lien Lenders for the purpose of acquiring the Newco Assets in the event that there is no Acceptable Package 2 Purchaser at the conclusion of the Sale Process.

79. "*Newco Assets*" means, in the event that there is no Acceptable Package 2 Purchaser at the conclusion of the Sale Process, the Package 2 Assets and cash in an amount to be determined by the Required Supporting Lenders; *provided*, that assets otherwise required for the consummation of the Plan, including Cash held in the Sale Reserve Account or the Claims Reserve Account, shall not be transferred to Newco.

80. "*Newco Equity*" means the equity interests in Newco, which shall be owned Pro Rata by the Holders of First Lien Claims from and after the Effective Date in the event that there is no Acceptable Package 2 Purchaser at the conclusion of the Sale Process.

81. "*Newco Purchase Agreement*" means the purchase and sale agreement, the form of which shall be included with the Plan Supplement, providing for the sale of the Newco Assets to Newco in exchange for a credit bid of First Lien Claims, in the event that the First Lien Agent, acting at the direction of the Majority First Lien Lenders, is the prevailing bidder in the Sale Process as to any assets of the Debtors.

82. "*Newco Shareholders Agreement*" shall mean, in the event that there is no Acceptable Package 2 Purchaser at the conclusion of the Sale Process, a shareholders agreement or limited liability company membership agreement, as applicable, with respect to the Newco Equity, substantially in the form to be included in the Plan Supplement.

6

83.    "*Ordinary Course Professionals Order*" means any order of the Bankruptcy Court permitting the Debtors to retain certain professionals in the ordinary course of their businesses.

84.    "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim or (b) a Priority Tax Claim.

85.    "*Other Secured Claim*" means a Claim that is Secured, but excluding any First Lien Claims or Second Lien Claims (if applicable).

86.    "*Other Secured Claims Reserve Amount*" means the aggregate face amount of all Claims, other than First Lien Claims or Second Lien Claims, that are either (a) identified in the Schedules as Secured or (b) asserted to be Secured in a proof of claim validly submitted on or before the Claims Bar Date, less the face amount of any such Claims identified by the Debtors in their reasonable discretion as duplicative of other such Claims; *provided* that the Debtors shall disclose the Other Secured Claims Reserve Amount in a document filed with the Bankruptcy Court no later than seven (7) days before the Confirmation Hearing.

87.    "*Package 1A Asset Purchase Agreement*" means that certain purchase agreement entered into by and among the applicable Purchaser and the Debtors for the Sale of the Package 1A Assets.

88.    "*Package 1B Asset Purchase Agreement*" means that certain purchase agreement entered into by and among the applicable Purchaser and the Debtors for the Sale of the Package 1B Assets.

89.    "*Package 1A Assets*" means certain of the Debtors' assets located in North Dakota.

90.    "*Package 1B Assets*" means certain of the Debtors' assets located in Wyoming.

91.    "*Package 2 Asset Purchase Agreement*" means that certain purchase agreement entered into by and among the applicable Purchaser and the Debtors for the Sale of Package 2 Assets, which, for the avoidance of doubt, may be the Newco Purchase Agreement.

92.    "*Package 2 Assets*" means those certain unconventional assets located in the Haynesville Cotton Valley which, for the avoidance of doubt, are comprised of substantially all oil and gas properties of the Debtors that are not Package 1A Assets, Package 1B Assets, or Package 3 Assets.

93.    "*Package 3 Asset Purchase Agreement*" means that certain purchase agreement entered into by and among the applicable Purchaser and the Debtors for the Sale of the Package 3 Assets.

94.    "*Package 3 Assets*" means certain properties underlying the Enduro Royalty Trust and the trust units in Enduro Royalty Trust owned by the Debtors.

95.    "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

96.    "*Petition Date*" means the date on which the Debtors File their petitions for relief commencing the Chapter 11 Cases.

97.    "*Plan*" means this *Joint Plan of Liquidation of Enduro Resource Partners LLC and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated [ ● ], as the same may be amended, supplemented, or modified from time to time, including, without limitation, any exhibits hereto, which are incorporated herein by reference.

98.    "*Plan Administration Process*" means the process for resolving and paying Claims described in [ ● ] of the Plan.

99.    "*Plan Administrator*" means that person selected by the Debtors with the consent of the First Lien Agent and Required Supporting Lenders to act as the administrator of the Plan Administration Process.

7

100.   "*Plan Supplement*" means the documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall include (a) the Plan Administration Trust Agreement, (b) the Schedule of Rejected Executory Contracts and Unexpired Leases, (c) the Schedule of Retained Causes of Action, (d) the Wind Down Budget, (e) the Newco Purchase Agreement, if applicable, (f) the organizational documents of Newco, if applicable, and (g) the Newco Shareholders Agreement, if applicable, each of which shall be in form and substance reasonably acceptable to the First Lien Agent and the Required Supporting Lenders, and which shall be filed no later than five (5) business days before the Voting Deadline.

101.   "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

102.   "*Priority Claims Reserve Amount*" means the aggregate face amount of all Claims, including Other Priority Claims and Priority Tax Claims, but excluding Administrative Claims, that are either (a) identified in the Schedules as entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, or (b) asserted to be entitled to such priority in a proof of claim validly submitted on or before the Claims Bar Date, less the face amount of any such Claims identified by the Debtors in their reasonable discretion as duplicative of other such Claims; *provided* that the Debtors shall disclose the Priority Claims Reserve Amount in a document filed with the Bankruptcy Court no later than seven (7) days before the Confirmation Hearing.

103.   "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interest under the Plan.

104.   "*Professional*" means a Person or Entity:  (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

105.   "*Purchase Agreements*" means the Package 1A Asset Purchase Agreement, the Package 1B Asset Purchase Agreement, the Package 2 Asset Purchase Agreement, and the Package 3 Asset Purchase Agreement.

106.   "*Purchaser*" means the applicable purchaser under the Purchase Agreements.

107.   "*Release Opt-Out*" means the election, to be made solely through validly-submitted Ballots, to opt-out of the release provisions set forth in Article X.C.

108.   "*Released Party*" means, collectively, and in each case in its capacity as such, (a) the Debtors, (b) the First Lien Agent, (c) each Holder of a First Lien Claim, (d) the Second Lien Agent, (e) each Holder of a Second Lien Claim, and (f) with respect to each of the foregoing Entities in clauses (a) through (e), such Entity's current or former subsidiaries and Affiliates, and its and their managed accounts or funds, directors, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals; *provided*, *however*, that (x) if a Holder of Second Lien Claim does not vote to approve the Plan or objects to confirmation of the Plan,  such Holder shall be excluded from clause (e) of this defined term and (y) if the Second Lien Agent objects to confirmation of the Plan, the Second Lien Agent and the Holders of Second Lien Claims shall not be Released Parties and clauses (d) and (e) shall read "[reserved]."

109.   "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors, (b) the First Lien Agent, (c) each Holder of a First Lien Claim, (d) the Second Lien Agent, (e) each Holder of a Second Lien Claim,  (f) each Holder of a Claim or Interest that accepts or is deemed to accept the Plan, (g) each other Holder of a Claim or Interest that is entitled to vote on the Plan and does not both (i) vote to reject the Plan or abstain from voting to accept or reject the Plan and (ii)  elect the Release Opt Out on its Ballot, and (h) with respect

8

to each of the foregoing Entities in clauses (a) through (g), such Entity's current or former subsidiaries and Affiliates, and its and their managed accounts or funds, officers, directors, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals.

110.    "*Required Supporting Lenders*" has the meaning set forth in the Sale and Plan Support Agreement.

111.    "*Sale*" means a sale of any of the Debtors' assets.

112.    "*Sale and Plan Support Agreement*" means that certain Sale and Plan Support Agreement, dated as of [ ● ], between the Debtors, the First Lien Agent, and the Consenting First Lien Lenders, attached as **Exhibit** [ ● ] to the Disclosure Statement.

113.    "*Sale Order*" means the order(s) approving the Sales.

114.    "*Sale Process*" means the process for the marketing and sale of all or substantially all of the Debtors' assets pursuant to the Bidding Procedures Order.

115.    "*Sale Reserve Account*" means a segregated account maintained by the Debtors into which Cash from the Net Sale Proceeds will be deposited on or prior to the Effective Date in an amount equal to the Sale Reserve Cash Amount plus the Wind Down Budget Cash Amount.

116.    "*Sale Reserve Cash Amount*" means (a) the aggregate amount of Cure Claims asserted by counterparties to Executory Contracts and Unexpired Leases to be assumed and assigned in connection with the Sales, to the extent any such Cure Claim is disputed by the Debtors; plus (b) the aggregate amount of accrued but unpaid administrative expenses (excluding Fee Claims) as of the Effective Date, including Claims arising under section 503(b)(9) of the Bankruptcy Code; in each case, solely to the extent such Claims or expenses are not assumed by a Purchaser.

117.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases that will be deemed rejected as of the Effective Date in accordance with the Plan, which schedule will be filed with the Plan Supplement.

118.    "*Schedule of Retained Causes of Action*" means the schedule of Causes of Action to be retained by the Estates and contributed to the Plan Administration Trust, which schedule will be filed with the Plan Supplement.

119.    "*Second Lien Agent*" means Wilmington Trust, National Association, in its capacity as administrative agent under the Second Lien Credit Agreement and any other applicable Second Lien Credit Documents.

120.    "*Second Lien Claim*" means any Claim arising under the Second Lien Credit Documents.

121.    "*Second Lien Claims Reserve Amount*" means $1,100,000 if holders of Second Lien Claims voting as a Class approve the Plan and $0 otherwise.

122.    "*Second Lien Credit Agreement*" means that certain Amended and Restated Second Lien Term Loan Agreement, dated as of March 4, 2016, by and among Enduro Resource Partners LLC, as borrower, Wilmington Trust, National Association, as administrative agent, and the lenders party thereto (as subsequently modified, amended, or supplemented from time to time).

123.    "*Second Lien Credit Documents*" means the Second Lien Credit Agreement and any related security, guaranty, or other documents.

124.    "*Second Lien Credit Facility*" means the term loan facility provided for under the Second Lien Credit Agreement.

125. "*Secured*" means: when referring to a Claim:  (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code; or (b) otherwise Allowed pursuant to this Plan as a Secured Claim.

126. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended.

127. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

128. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

129. "*Unimpaired Class*" means a Class that is Unimpaired.

130. "*Unsecured Claims Reserve Amount*" means $100,000 if holders of General Unsecured Claims voting as a Class approve the Plan and $0 otherwise.

131. "*U.S. Trustee*" means the United States Trustee for the District of Delaware.

132. "*Voting Class*" means Class 2 First Lien Secured Claims, Class 3 Unsecured Claims and/or Class 4 Second Lien Claims, as applicable.

133. "*Voting Deadline*" means 5:00 p.m. (prevailing Eastern Time) on [ ● ], 2018.

134. "*Voting Record Date*" means [ ● ], 2018.

135. "*Wind Down*" means the process of winding down the Debtors' businesses after closing of the Sales.

136. "*Wind Down Budget*" means the budget for the Wind Down from and after the Effective Date, which shall be included in the Plan Supplement.

137. "*Wind Down Budget Cash Amount*" means the net Cash expenditures reflected in the Wind Down Budget (as the same may be modified or amended from time to time before the Effective Date with the consent of the First Lien Agent and the Required Supporting Lenders), which in no event will exceed $[ ● ].

B.    *Rules of Interpretation*

For purposes of this Plan, unless otherwise provided herein: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) unless otherwise specified, any reference in this Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in this Plan to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Plan to Articles are references to Articles of this Plan or to this Plan; (6) the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (7) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) captions and headings to Articles are inserted for convenience of reference only and are

10

not intended to be a part of or to affect the interpretation of this Plan; (9) unless otherwise set forth in this Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form in this Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Plan Administrator in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.      Computation of Time

In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply.  If a payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act shall instead occur on the next succeeding Business Day, but shall be deemed to have occurred as of the required date.

D.      Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters relating to the Debtors not incorporated in Delaware shall be governed by the laws of the jurisdiction of incorporation of the applicable Debtor.

E.      Reference to Monetary Figures

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, PRIORITY
## CLAIMS AND INTERCOMPANY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Other Priority Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

A.      Administrative Claims

1.      General Administrative Claims

Except with respect to Administrative Claims that are Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment for such Holder's Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be paid in full in Cash on the latest of: (a) the Effective Date; (b) the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable.

11

2.    Fee Claims

On or immediately prior to the Effective Date, the Debtors shall pay all amounts owing to the Professionals for all unpaid Fee Claims relating to prior periods and for the period ending on the Effective Date. The Professionals shall estimate Fee Claims due for periods that have not been billed as of the Effective Date, which amounts, for the avoidance of doubt, shall be paid on or immediately prior to the Effective Date. On or prior to forty-five (45) days after the Effective Date, each Professional shall File with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date; *provided* that the Debtors may pay retained Professionals or other Entities in the ordinary course of business after the Effective Date, without further Bankruptcy Court order; and *provided, further*, that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation or reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. Objections to any Fee Claim must be Filed and served on the Debtors and the requesting party no later than twenty (20) days after such Fee Claim is Filed with the Bankruptcy Court. To the extent necessary, the Plan and the Confirmation Order shall amend and supersede any previously entered order regarding the payment of Fee Claims. Within ten (10) days after entry of a Final Order with respect to its final fee application, each Professional shall remit any overpayment to the Debtors and the Debtors shall pay any unpaid amounts to each Professional.

B.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtors agree to less favorable treatment for such Holder's Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will be paid in full in Cash from the Claims Reserve Account on the latest of: (a) the Effective Date; (b) the date such Priority Tax Claim is Allowed; and (c) the date such Allowed Priority Tax Claim becomes due and payable.

C.    *Other Priority Claims*

Each Holder of an Allowed Other Priority Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the Debtors, one of the following treatments: (1) Cash from the Claims Reserve Account in an amount equal to the amount of such Allowed Other Priority Claim or (2) such other treatment as may be agreed upon by such Holder and the Debtors or otherwise determined upon an order of the Bankruptcy Court.

D.    *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Plan Administrator shall pay any and all such fees when due and payable from the Claims Reserve Account. The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Plan Administrator shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Disbursing Agent during the applicable period, attested to by an authorized representative of the Disbursing Agent. Each and every one of the Debtors shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

#90797984v11
US-DOCS\99785380.11#90797984v22

# ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Introduction*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

This Plan, though proposed jointly, constitutes a separate plan proposed by each Debtor.  Therefore, the classifications set forth in Article III.B herein apply separately with respect to each Plan proposed by each Debtor.  If there are no Claims or Interests in a particular Class for a particular Debtor, then such Class of Claims or Interests shall not exist for all purposes of the Plan for that Debtor.

B.    *Summary of Classification*

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

### SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | First Lien Secured Claims | Impaired | Entitled to Vote |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Second Lien Claims | Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Enduro Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

C.    *Treatment of Claims and Interests*

1.    Class 1:    Other Secured Claims

(a)    *Classification*:  Each Class 1 Claim is an Other Secured Claim against the applicable Debtor.  With respect to each Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 1A, Class 1B, and so on), so that each Holder of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class.

13

(b)     *Treatment*:  Except to the extent a Holder of an Allowed Other Secured Claim has been paid by the Debtors prior to the Effective Date or the Holder of a Other Secured Claim and the Debtors agree to less favorable treatment of such Claim, each Holder of an Allowed Other Secured Claim (including any Claim for postpetition interest accrued until the Effective Date at the non-default rate provided in the applicable contract or, if there is no contract, then at the Federal Judgment Rate, to the extent permissible under section 506(a) of the Bankruptcy Code) shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Secured Claim, in the discretion of the Debtors, one of the following alternative treatments:

(i)     payment of the Allowed Class 1 Other Secured Claim in full in Cash from the Other Secured Claims Reserve Amount on the later of the Effective Date or as soon as practicable after a particular Claim becomes Allowed;

(ii)    delivery to the Holder of the Allowed Class 1 Other Secured Claim of the collateral securing such Allowed Class 1 Other Secured Claim; or

(iii)   such other treatment as may be agreed to by the applicable Debtor and the Holder.

(c)     *Voting*: Class 1 is Unimpaired.  Holders of Class 1 Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, Holders of such Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.   Class 2:    First Lien Secured Claims

(a)     *Classification*: Class 2 consists of all First Lien Claims.

(b)     *Allowance of First Lien Claims*:  First Lien Claims are deemed Allowed in the aggregate principal amount of [$__], plus any interest, fees, and expenses due and owing pursuant to the terms of the Loan Documents (as defined in the First Lien Credit Agreement) as of the Effective Date. The First Lien Agent and the Holders of First Lien Claims shall not be required to file proofs of Claim on account of any First Lien Claims.

(c)     *Treatment*:  Each Holder of a First Lien Claim shall receive: (i) on the Effective Date or as soon as reasonably practicable thereafter, a Pro Rata distribution of (x) the First Lien Cash (including, promptly upon the return or release of such amounts to the Debtors, any deposits held by third parties, any holdback amount pursuant to any Purchase Agreement, or any similar amounts) and (y) solely in the event that there is no Acceptable Package 2 Purchaser at the conclusion of the Sale Process, one hundred percent (100%) of the Newco Equity; (ii) a Pro Rata distribution of any Cash remaining in the Sale Reserve Account and all other assets remaining in the Plan Administration Trust reasonably promptly after completion of the Wind Down; and (iii) a Pro Rata distribution of any Cash remaining in the Claims Reserve Account reasonably promptly after the closing of the Chapter 11 Cases. The treatment received by each holder of First Lien Claims shall be on account of its entire First Lien Claim, including any First Lien Deficiency Claim, and the holders of First Lien Claims shall be deemed to waive all turnover provisions under the Intercreditor Agreement solely with respect to distributions from the Unsecured Claims Reserve Amount and the Second Lien Claims Reserve Account.

(d)     *Voting*: Class 2 is Impaired.  Holders of Class 2 First Lien Claims are entitled to vote to accept or reject the Plan.

3.    Class 3:    General Unsecured Claims

    (a)    *Classification*:  Class 3 consists of all General Unsecured Claims.

    (b)    *Treatment*: Each Holder of a Class 3 Unsecured Claim shall receive payment in Cash in accordance with the Plan Administration Process equal to (i) if holders of General Unsecured Claims voting as a Class approve the Plan, the lesser of (A) the amount of such Claim and (B) a Pro Rata distribution of Cash from the Unsecured Claims Reserve Amount or (ii) otherwise, $0.

    (c)    *Voting*:  Class 3 is Impaired.  Holders of Class 3 Unsecured Claims are entitled to vote to accept or reject the Plan.

4.    Class 4:    Second Lien Claims

    (a)    *Classification*:  Class 4 consists of all Second Lien Claims.

    (b)    *Allowance of Second Lien Claims*: Second Lien Claims are deemed Allowed in the aggregate principal amount of [$__], plus any interest, fees, and expenses due and owing pursuant to the terms of the Loan Documents (as defined in the Second Lien Credit Agreement) as of the Effective Date. The Second Lien Agent and the Holders of Second Lien Claims shall not be required to file proofs of Claim on account of any Second Lien Claims.

    (c)    *Treatment:* Subject to the Second Lien Credit Agreement, each Holder of a Class 4 Second Lien Claim shall receive a Pro Rata distribution of Cash in accordance with the Plan Administration Process from the Second Lien Claims Reserve Amount, which amount, for the avoidance of doubt, shall be $0 unless holders of a majority in amount of Second Lien Claims vote to approve the Plan.

    (d)    *Voting*:  Class 4 is Impaired.  Holders of Class 4 Second Lien Claims are entitled to vote to accept or reject the Plan.

5.    Class 5:    Intercompany Claims

    (a)    *Classification*:  Class 5 consists of all Intercompany Claims.

    (b)    *Treatment*:  Class 5 Intercompany Claims shall be cancelled and discharged, with the Holders of such Class 4 Intercompany Claims receiving no distribution on account of such Intercompany Claims.

    (c)    *Voting*:  Class 5 is Impaired.  Holders of Class 5 Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.    Class 6:    Intercompany Interests

    (a)    *Classification*.  Class 6 consists of all Intercompany Interests.

    (b)    *Treatment*:  Class 6 Intercompany Interests shall be cancelled and discharged, with the Holders of such Class 6 Intercompany Interests receiving no distribution on account of such Intercompany Interests.

(c)     *Voting*: Class 6 is Impaired.  Holders of Class 6 Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

7.   Class 7:      Enduro Equity Interests

(a)     *Classification*.  Class 7 consists of all Enduro Equity Interests.

(b)     *Treatment*:  Class 7 Enduro Equity Interests shall be cancelled and discharged, with the Holders of such Class 7 Enduro Equity Interests receiving no distribution on account of such Enduro Equity Interests.

(c)     *Voting*: Class 7 is Impaired.  Holders of Class 7 Enduro Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of Enduro Equity Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE IV.

## ACCEPTANCE REQUIREMENTS

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, (a) an impaired class of claims has accepted a chapter 11 plan if the holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in such class actually voting have voted to accept the plan and (b) an impaired class of interests has accepted the plan if the holders of at least two-thirds in amount of the allowed interests in such class actually voting have voted to accept the plan.

A.     *Acceptance or Rejection of this Plan*

1.     Voting Classes

Classes 2, 3 and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.     Presumed Acceptance of the Plan

Class 1 is Unimpaired under the Plan and is, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.     Deemed Rejection of the Plan

Classes 5, 6 and 7 are Impaired under the Plan and are not entitled to receive or retain any property on account of the Claims and Interests in Classes 5, 6 and 7.  Therefore, Classes 5, 6 and 7 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

B.     *Confirmation of This Plan Pursuant to Section 1129(b) of the Bankruptcy Code*

The Debtors intend to seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code.

C.     *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests (or any Class of Claims or Interests) are Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date.

16

# ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *Transactions Effective as of the Effective Date*

The transactions contemplated by the Plan shall be approved and effective as of the Effective Date, without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their board of directors, their stockholders, or any other person or entity.

On or before the Effective Date, the Debtors will have consummated the Sales pursuant to the terms and conditions of the Purchase Agreements, including, without limitation, selling the Assets free and clear of certain liens and encumbrances to the extent set forth in the Purchase Agreements, and assuming and assigning to the Purchasers certain contracts and unexpired leases.

B.      *Closing of Sales and Uses of Cash*

On or before the Effective Date, the Debtors and the Purchasers will have consummated the Sales, with the Debtors receiving the Net Cash Proceeds of the Sales and distributing or retaining the Net Cash Proceeds of the Sales in accordance with the Sale Order.  On the Effective Date, the Debtors shall fund from the Net Cash Proceeds the Sale Reserve Account with the Sale Reserve Cash Amount and the Wind Down Budget Cash Amount and fund the Claims Reserve Account with the Claims Reserve Cash Amount.  The balance of Net Cash Proceeds from any Sale shall be held by the Debtors and distributed in accordance with the Plan on the Effective Date.

For the avoidance of doubt, in the event that there is no Acceptable Package 2 Purchaser at the conclusion of the Sale Process, the Newco Assets will be transferred on or before the Effective Date to Newco pursuant to the Newco Purchase Agreement and the Plan.

C.      *Deemed Execution of Shareholders Agreement*

On the Effective Date, in the event that there is no Acceptable Package 2 Purchaser at the conclusion of the Sale Process, each Holder of a First Lien Claim that receives Newco Equity shall be deemed to have executed, without any further action by any party, the Newco Shareholders Agreement.

D.      *The Plan Administration Trust*

On the Effective Date, the Plan Administrator shall sign the Plan Administration Trust Agreement and cause the Plan Administration Trust to accept, on behalf of the beneficiaries thereof, (a) the Claims Reserve Account and the Cash therein, (b) the Sale Reserve Account and the Cash therein, (c) the Retained Causes of Action, and (d) all other assets of the Estates not subject to a Sale, *provided*, *however*, that the Plan Administration Trust, with the consent of the Plan Administrator, may abandon or otherwise not accept any assets that the Plan Administration Trust believes, in good faith, have no value to the Plan Administration Trust.  Any assets the Plan Administration Trust so abandons or otherwise does not accept shall not vest in the Plan Administration Trust.  As of the Effective Date, all assets vested in the Plan Administration Trust and all assets dealt with in the Plan shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

The Plan Administration Trust will be deemed created and effective without any further action by the Bankruptcy Court or any party.  The Plan Administration Trust shall be established for the primary purpose of liquidating its assets (as applicable) and for making Distributions in accordance with the Plan and the Plan Administration Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Administration Trust.

17

E.      *Certain Powers and Duties of the Plan Administration Trust and Plan Administrator*

The Plan Administrator shall be the exclusive trustee of the assets of the Plan Administration Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Plan Administrator shall be specified in the Plan Administration Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect trust assets; (b) pay taxes or other obligations incurred by the Plan Administration Trust; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution, and distribution of trust assets; (d) calculate and implement distributions of trust assets; (e) prosecute, compromise, and settle, in accordance with the specific terms of the Plan Administration Trust Agreement, Retained Causes of Action; (f) resolve issues involving Claims and Interests, other than First Lien Claims, pursuant to Article IX of the Plan; and (g) undertake all administrative functions of the Chapter 11 Cases, including the ultimate closing of the Chapter 11 Cases. The Plan Administration Trust is the successor to the Debtors, the Estates, and the Debtors' rights to books and records.

On the Effective Date, the Plan Administration Trust shall also have the power, right, and responsibility to conduct the Wind Down and to take possession of all books, records, and files of the Debtors and the Estates and provide for the retention and storage of such books, records, and files until such time as the Plan Administration Trust determines, in accordance with the Plan Administration Trust Agreement, that retention of same is no longer necessary or required.

All expenses incurred by the Plan Administration Trust and the Plan Administrator shall be the responsibility of and paid by the Plan Administration Trust, in accordance with the Plan Administration Trust Agreement.

In no event later than three (3) months after following the Effective Date and on a quarterly basis thereafter until all Cash in the Claims Reserve Account has been released or paid out in accordance with the Plan, the Plan Administrator shall file with the Bankruptcy Court a report setting forth the amounts, recipients, and dates of all Distributions made by the Plan Administrator under the Plan through each applicable reporting period.

F.      *Federal Income Tax Treatment of the Plan Administration Trust for the Plan Administration Trust Assets; Tax Reporting and Tax Payment Obligations*

[ ⬤ ].

G.      *Authority to Pursue, Settle, or Abandon Retained Causes of Action*

From and after the Effective Date, prosecution and settlement of all Retained Causes of Action shall be the sole responsibility of the Plan Administration Trust pursuant to the Plan and the Confirmation Order.  From and after the Effective Date, the Plan Administration Trust shall have exclusive rights, powers, and interests of the Estates to pursue, settle, or abandon such Retained Causes of Action as the sole representative of the estates pursuant to section 1123(b)(3) of the Bankruptcy Code.

All Retained Causes of Action are reserved and preserved and shall not be impacted or affected in any way by deemed consolidation of the estates.

H.      *Cancellation of Documents*

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, debentures, certificates and other documents evidencing Claims and Interests in a Debtor or the Debtors including, without limitation, the First Lien Credit Facility and the Second Lien Credit Facility, shall, with respect to the Debtors, be canceled and deemed rejected and terminated without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other person or entity, *provided*, *however*, that any such documents shall remain in force to the extent applicable with respect to distributions of any property under the Plan and the First Lien Credit Facility shall continue in effect as necessary to (i) enforce the rights, Claims and interests of the

18

Term Loan Agent and any predecessor thereof vis-a-vis the Secured Parties (as defined in the First Lien Credit Agreement) and any parties other than the Debtors and (ii), preserve any rights of the First Lien Agent and any predecessor thereof as against any money or property distributable to holders of First Lien Claims, including any priority in respect of payment and the right to exercise any charging lien.

Except for the foregoing, the First Lien Agent and its respective agents shall be relieved of all further duties and responsibilities related to the Loan Documents (as defined in the First Lien Credit Agreement) and the Plan, except with respect to such other rights of the First Lien Agent that, pursuant to the First Lien Credit Agreement, survive the termination of the Loan Documents. Subsequent to the performance by the First Lien Agent of its obligations pursuant to the Plan, the First Lien Agent and its agents shall be relieved of all further duties and responsibilities related to the Loan Documents.

Notwithstanding anything to the contrary herein, the indemnity obligations of the Debtors under the First Lien Credit Agreement that the First Lien Credit Agreement explicitly provides shall survive the termination thereof shall survive the Effective Date and shall not be discharged or released pursuant to the Plan or the Confirmation Order and on and after the Effective Date, the Plan Administration Trust shall be liable for such indemnity obligations.

I.      *Filing of Monthly and Quarterly Reports and Payment of Statutory Fees*

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator. All Statutory Fees with respect to the period prior to the Effective Date shall be paid by the Debtors in Cash on the Effective Date or other required payment date. With respect to the period after the Effective Date, the Plan Administrator shall be obligated to pay quarterly Statutory Fees from the Claims Reserve Account to the Office of the United States Trustee and such obligation shall continue until such time as a particular Chapter 11 Case is closed, dismissed, or converted.

J.      *Directors and Officers of the Debtors*

On and after the Effective Date, the board of managers or directors of each Debtor shall be terminated and all of the officers and directors of the Debtors, to the extent they have not already done so, shall be deemed to have resigned from their respective positions with the Debtors, as applicable.

Following the Confirmation Date and prior to the occurrence of the Effective Date, the then current officers and directors of each of the Debtors shall continue in their respective capacities and the Debtors shall execute such documents and take such other action as is necessary to effectuate the actions provided for in the Plan.

K.      *Corporate Authorization*

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders, directors, members, or managers of one or more of the Debtors shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to Section 303 of the DGCL or other applicable law of the states in which the Debtors are organized, without any requirement of further action by the stockholders, directors, members, or managers of the Debtors. After the Effective Date, to the extent necessary, the Plan Administrator shall have all authority to address any and all matters that would have required the approval of, and to act on behalf of, the stockholders, directors, members, or managers of one or more of the Debtors.

L.      *Director and Officer Liability Insurance*

Before the Petition Date, the Debtors obtained D&O Tail Coverage for the current and former directors, officers, and managers. After the Effective Date, all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, subject to and in accordance with the terms and conditions of such D&O Tail Coverage.

#90797984v11
US-DOCS\99785380.11#90797984v22

M.      *Effectuating Documents and Further Transactions*

Prior to the Effective Date, the Debtors shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan.  After the Effective Date, the Plan Administration Trust shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan.

N.      *Key Employee Incentive Plans*

On the Effective Date, to the extent not paid as such amounts become earned and payable at an earlier time in accordance with the terms thereof, the Debtors shall make all applicable payments under the Key Employee Incentive Plans, in accordance with the Bankruptcy Court's order authorizing the same.  Any earned and unpaid award under the Key Employee Incentive Plans shall be deemed due and payable on the Effective Date, and all such amounts shall constitute Allowed Administrative claims without the need for any participant in the Key Employee Incentive Plans to File or serve any request for payment of such amounts under the Plan or otherwise.

O.      *Employee and Retiree Benefits*

All employment, severance, retirement, indemnification, and other similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors' employees, including retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, as and to the extent set forth in the Debtors' *Motion of Debtors for Interim and Final Orders (A) Authorizing Payment of Certain Prepetition Workforce Obligations, (B) Authorizing Continuance of Workforce Programs, (C) Authorizing Payment of Withholding and Payroll-Related Taxes, and (D) Authorizing Payment of Prepetition Claims Owing to Workforce Program Administrators or Providers*, shall remain in full force and effect until the conclusion of the Wind Down and the resignation or termination of all employees of the Debtors.  The Debtors maintain no programs providing for retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code).

P.      *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan, including the transfer of some or all of the Newco Assets to Newco, if applicable, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate or personal property transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

## ARTICLE VI.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Treatment of Executory Contracts and Unexpired Leases*

As of the Effective Date, the Debtors shall be deemed to have rejected all Executory Contracts and Unexpired Leases that (1) have not been previously rejected, assumed, or assumed and assigned, including in connection with any Sale, and (2) have not expired under their own terms prior to the Effective Date.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the foregoing rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

B.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.  In particular, notwithstanding any nonbankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors, as applicable, from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

C.      *Rejection Damages Claim*

All Claims arising from the rejection of Executory Contracts or Unexpired Leases must be Filed with the clerk of the Bankruptcy Court and served upon the Plan Administrator and counsel for the Debtors within thirty (30) days of the occurrence of the Effective Date.  Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a Class 3 General Unsecured Claim.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within the time required by this section will be forever barred from assertion against the Debtors, the Estates, the property of the Debtors, or the Plan Administration Trust.**

D.      *Reservation of Rights*

Nothing contained in this Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of rejection, the Debtors shall have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

E.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions*

1.      Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Article VII.  Except as otherwise provided herein, Holders of Claims shall not be entitled to postpetition interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

2.      Entitlement to Distributions

On and after the Effective Date, the Disbursing Agent shall be authorized (but not directed) to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date.  Accordingly, the Disbursing Agent will have no obligation to recognize the transfer of, or the sale of any

21

participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute securities, property, notices, and other documents only to those Holders of Allowed Claims who are Holders of such Claims (or participants therein) as of the close of business on the Distribution Record Date. The First Lien Agent may, in its sole discretion, limit the further assignment of First Lien Claims to allow for the accurate recording of the holders of First Lien Claims as of the Distribution Record Date with respect to the First Lien Claims.

B.     *Disbursing Agent*

Except as otherwise provided herein, all distributions under the Plan shall be made by the Debtors as Disbursing Agent or such other Entity designated by the Debtors as a Disbursing Agent on the Effective Date.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  For purposes of the distribution on account of the First Lien Claims, the First Lien Agent shall be deemed to be the Holder of all First Lien Claims.  For purposes of distribution on account of the Second Lien Claims, the Second Lien Agent shall be deemed to be the Holder of all Second Lien Claims.  In accordance with the foregoing, the delivery of any applicable property to be distributed to Holders of First Lien Claims or Second Lien Claims to the First Lien Agent or the Second Lien Agent, respectively, shall satisfy all applicable distribution obligations under the Plan. All reasonable and documented fees and expenses of the First Lien Agent (including the reasonable and documented fees and expenses of its counsel and agents) incurred in connection with such distributions shall be paid by the Plan Administration Trust.

For the avoidance of doubt, the Plan Administrator shall be the Disbursing Agent as to and shall cause all distributions to be made to Holders of Claims other than First Lien Claims.  The Debtors' obligation to make any distribution to Holders of Claims other than First Lien Claims shall be satisfied upon the vesting of assets in the Plan Administration Trust as contemplated under the Plan.

C.     *Distributions on Account of Claims Allowed After the Effective Date*

1.     Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

2.     Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by the Plan Administrator, (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such Disputed Claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order.

D.     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.     Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution.

22

2.    Undeliverable Distributions and Unclaimed Property

(a)    Failure to Claim Undeliverable Distributions

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Plan Trust Administrator (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

(b)    Failure to Present Checks

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred and eighty (180) days after the issuance of such check shall have its Claim for such un-negotiated check discharged and shall be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the Plan Administration Trust.  In such cases, any Cash held for payment on account of such Claims shall be property of the Plan Administration Trust, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

E.    *Compliance with Tax Requirements/Allocations*

In connection with this Plan, to the extent applicable, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Disbursing Agent reserves the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

F.    *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the Certificates or other documentation underlying each such Claim, and all such surrendered Certificates and other documentations shall be deemed to be canceled pursuant to Article V.H hereto, except to the extent otherwise provided herein.

G.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

The Debtors or the Plan Administrator, as applicable, shall reduce a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized

23

Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor or the Plan Administrator, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the Distribution Date.

       2.     Claims Payable by Third Parties

No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

       3.     Applicability of Insurance Policies

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VIII.**

**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

A.     *Allowance and Disallowance of Claims*

Except as expressly provided herein or any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), the Plan Administration Trust after Consummation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date.

**Except as provided herein or otherwise agreed, any and all proofs of Claim Filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.**

B.     *Prosecution of Objections to Claims*

The Plan Administrator shall have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Plan Administrator may also resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

C.     *Estimation of Claims*

The Plan Administrator may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any

24

objection to any Claim, including during the pendency of any appeal related to any such objection.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

D.      *Amendments to Claims*

        On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Court and the Plan Administrator, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Court.

E.      *Distributions After Allowance*

        To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Plan Administrator shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

## ARTICLE IX.

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

A.      *Conditions Precedent to Confirmation*

        It shall be a condition to Confirmation hereof that all provisions, terms and conditions hereof are approved in the Confirmation Order.

#90797984v11
US-DOCS\99785380.11#90797984v22

1.  Each Sale pursuant to each of the Purchase Agreements (including, for the avoidance of doubt, the Sale of Package 2 Assets, whether pursuant to the Newco Purchase Agreement or another applicable Package 2 Asset Purchase Agreement) shall have been approved by the Bankruptcy Court prior to or contemporaneously with Confirmation.

2.  A Confirmation Order shall have been entered by the Bankruptcy Court, in form and substance acceptable to the Debtors, the First Lien Agent, and the Required Supporting Lenders.

3.  General Unsecured Claims that have been Allowed or filed on or prior to the Claims Bar Date and that are not (x) subject to any outstanding objection and (y) have not been disallowed by a Final Order do not exceed $10,000,000 in the aggregate.

4.  The Confirmation Order shall provide that, among other things, the Debtors and the Plan Administrator, as applicable, are authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing, and consummating the other contracts, instruments, and other agreements or documents created in connection with or described in this Plan.

5.  Unless otherwise agreed to in writing by the Required Supporting Lenders, as applicable, to the extent of their consent rights as provided in the Sale and Plan Support Agreement or this Plan, the Debtors shall not have submitted any amendment, modification, or filing seeking to amend or modify this Plan, the Disclosure Statement, or any documents, motions, or orders related to the foregoing.

B.  *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following provisions, terms, and conditions are satisfied (or waived pursuant to the provisions of Article IX.B.1 hereof), and the Effective Date shall occur on the date upon which the last of such conditions are so satisfied and/or waived.

1.  The Plan and all documents contemplated thereby, including any amendments, modifications, or supplements thereto, shall be acceptable to the Debtors, the First Lien Agent, and the Required Supporting Lenders, as applicable, to the extent of their consent rights as provided in the Plan, and pursuant to the terms of, and in accordance with, the Sale and Plan Support Agreement.

2.  The Debtors shall have funded with Cash the Sale Reserve Account and the Claims Reserve Account with all amounts contemplated under the Plan and shall have paid all Fee Claims as contemplated under the Plan.

3.  The First Lien Cash shall have been delivered to the First Lien Agent, for distribution to and for the benefit of Holders of First Lien Claims.

4.  Payment in full in Cash of any and all accrued but unpaid reasonable First Lien Agent Advisor Fees for which the Debtors have received invoices or estimates prior to the Effective Date shall have been made.

5.  The Confirmation Order shall be a Final Order in form and substance acceptable to the Debtors, the First Lien Agent, the Required Supporting Lenders, and the Plan Administrator, each in their respective sole discretion.  The Confirmation Order shall provide that, among other things, the Debtors and the Plan Administrator, as applicable, are authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, and other agreements or documents created in connection with or described in this Plan.

6.  The Plan Administration Trust Agreement shall have been executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

#90797984v11
US-DOCS\99785380.11#90797984v22

7.     All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

8.     Each Sale shall have closed pursuant to the applicable Purchase Agreement, including, for the avoidance of doubt, the Sale of Package 2 Assets, whether pursuant to the Newco Purchase Agreement or any applicable Package 2 Asset Purchase Agreement.

C.     *Waiver of Conditions*

Each of the conditions to Confirmation and to Consummation set forth in this Article IX may be waived with the consent of the Debtors and the Required Supporting Lenders without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate this Plan; *provided, however*, the consent of the Required Supporting Lenders to such waiver shall only be required as and to the extent set forth in the Sale and Plan Support Agreement.

D.     *Effect of Nonoccurrence of Conditions*

If the Consummation of this Plan does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders or any other Entity in any respect.

# ARTICLE X.

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.     *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Plan Administrator may compromise and settle Claims against them and Causes of Action against other Entities.

B.     *Releases by the Debtors*

**To the extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, the Released Parties shall be deemed released and discharged by the Debtors and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; *provided, however,* that the foregoing "*Debtor Releases*" shall not operate to waive or release any Causes of Action of any Debtor: (1) against a Released Party arising from any**

27

contractual obligations owed to the Debtors that are pursuant to an Executory Contract that is not otherwise rejected by the Debtors pursuant to section 365 of the Bankruptcy Code before, after, or as of the Effective Date; (2)  expressly set forth in and preserved by the Plan or related documents; or (3) arising from claims for fraud, gross negligence, willful misconduct, or criminal conduct.  Notwithstanding anything to the contrary in the foregoing, the "Debtor Releases" set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed in connection with the Plan with respect to the Debtors or the Estates.

C.    *Releases by Holders of Claims and Interests*

To  the  extent  permitted  by  applicable  law  and  approved  by  the  Bankruptcy  Court,  pursuant  to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and  valuable  consideration,  as  of  the  Effective  Date,  each  Releasing  Party  shall  be  deemed  to  have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtors and the  other  Released  Parties  from  any  and  all  Claims,  Interests,  obligations,  rights,  suits,  Causes  of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether  known  or  unknown,  foreseen  or  unforeseen,  existing  or  hereafter  arising,  in  law,  equity,  or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the  Effective  Date;  *provided,  however,*  that  the  foregoing  release  shall  not  operate  to  waive  or  release  any Causes  of  Action  of  any  Releasing  Party:  (1)  against  a  Released  Party  arising  from  any  contractual obligations  owed  to  the  Releasing  Party  that  are  wholly  unrelated  to  the  Debtors;  (2) expressly  set  forth  in and  preserved  by  the  Plan  or  related  documents;  or  (3)  arising  from  claims  for  fraud,  gross  negligence, willful misconduct, or criminal conduct.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed in connection with the Plan.

D.    *Exculpation*

To the fullest extent permitted by applicable law, except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from  any  Exculpated  Claim,  obligation,  Cause  of  Action  or  liability  for  any  Exculpated  Claim,  except  for those  that  are  determined  in  a  final  order  to  have  constituted  actual  fraud,  gross  negligence,  willful misconduct, or criminal conduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

E.    *Injunction*

Except as otherwise expressly provided in the Plan or related documents, or for obligations issued pursuant to the Plan, from and after the Effective Date, all Releasing Parties are permanently enjoined from taking  any  of  the  following  actions  against  the  Debtors  or  any  Released  Parties:    (1) commencing  or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or  means  any  judgment,  award,  decree,  or  order  against  such  Entities  on  account  of  or  in  connection  with  or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind  against  such  Entities  or  the  property  or  Estates  of  such  Entities  on  account  of  or  in  connection  with  or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account  of  or  in  connection  with  or  with  respect  to  any  such  Claims  or  Interests  unless  such  Holder  has  Filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or  with  respect  to  any  such  Claims  or  Interests  released  or  settled  pursuant  to  the  Plan.  Nothing  in  the  Plan or  the  Confirmation  Order  shall  preclude  any  Entity  from  pursuing  an  action  against  one  or  more  of  the Debtors  in  a  nominal  capacity  to  recover  insurance  proceeds  so  long  as  the  Debtors,  as  applicable,  and  any such Entity agree in writing that such Entity will:  (a) waive all Claims against the Debtors and the Estates

28

related to such action and (b) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

Unless otherwise provided herein, any injunction or stay arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise that is in existence on the Confirmation Date shall remain in full force and effect until the Chapter 11 Cases are closed.

F.      *Setoffs*

Except as otherwise expressly provided for in the Plan, each Debtor and the Plan Administrator (as applicable), pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any distribution is made on account of such Allowed Claim or Allowed Interest), any claims, rights and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Debtor of any such claims, rights and Causes of Action that such Debtor may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any claim, right or Cause of Action of the Debtor unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.

G.      *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

H.      *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date.

## ARTICLE XI.

## BINDING NATURE OF PLAN

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

#90797984v11
US-DOCS\99785380.11#90797984v22

## ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, and this Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.    ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.    adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.    adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions and other provisions contained in Article X and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VII;

30

13.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.    enter an order or final decree concluding or closing the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.    consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.    hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

22.    enforce all orders previously entered by the Bankruptcy Court; and

23.    adjudicate all other matters over with the Bankruptcy Court has jurisdiction;

*provided*, *however*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XIII.

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.    *Modifications and Amendments*

Subject to the limitations and rights contained in this Plan:  (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, and subject to the consent of the First Lien Agent and the Required Supporting Lenders, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

Subject to the Sale and Plan Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw this Plan subject to the terms hereof and the Sale and Plan Support Agreement, or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (x) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (y) prejudice in any manner the rights of the Debtors or any other Entity; or (z) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

D.      *Substantial Consummation of the Plan*

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

A.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

B.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

C.      *Consent Rights*

Notwithstanding anything in the Plan to the contrary, any and all consent rights of the First Lien Agent or the Required Supporting Lenders set forth in the Sale and Plan Support Agreement (irrespective of whether the Sale and Plan Support Agreement has been assumed by the Debtors) with respect to the form and substance of this Plan, the Plan Supplement, and any other documents contemplated under the Plan shall apply to the Plan as if stated in full herein until such time as the Sale and Plan Support Agreement is terminated in accordance with its terms.

D.      *Further Assurances*

For the avoidance of doubt, the Debtors and the Consenting First Lien Lenders shall not violate, and shall otherwise comply, with the Sale and Plan Support Agreement in all respects, including with respect to the implementation of the Plan and the Effective Date.  The Debtors, all Holders of Claims receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

E.      *Payment of Fees and Expenses*

Prior to or as of the Effective Date, the Debtors shall promptly pay in Cash in full Cash any and all accrued but unpaid reasonable First Lien Agent Advisor Fees for which the Debtors have received invoices or estimates prior to the Effective Date.

After the Effective Date, the Plan Administration Trust shall promptly pay in Cash in full Cash any and all accrued but unpaid reasonable First Lien Agent Advisor Fees.

F.      *Service of Documents*

Any pleading, notice, or other document required by this Plan to be served on or delivered to the Debtors shall be sent by overnight mail to:

Enduro Resource Holdings LLC
777 Main Street
Suite 800
Fort Worth, Texas 76102
Attn:    Kimberly A. Weimer
Phone:   (817) 744-8200
Email:   kweimer@endurores.com

**with copies to:**

Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Attn:    Caroline A. Reckler
         Matthew L. Warren
         Jason B. Gott
Phone:   (312) 876-7700
Fax:     (312) 993-9767
Email:   caroline.reckler@lw.com
         matthew.warren@lw.com
         jason.gott@lw.com

G.      *Dissolution of Committee*

On the Effective Date, the Committee(s), if any, shall dissolve automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except for purposes of filing applications for Professional compensation in accordance with Article II.A.2 of this Plan.

H.      *Nonseverability of Plan Provisions*

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided* that any such alteration or interpretation must be in form and substance acceptable to the Debtors, the First Lien Agent, and the Required Supporting Lenders; *provided, further,* that the Debtors may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial

33

determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

I.      *Return of Security Deposits*

Unless the Debtors have agreed otherwise in a written agreement or stipulation approved by the Bankruptcy Court, all security deposits provided by the Debtors to any Person or Entity at any time after the Petition Date shall be returned to the Debtors within twenty (20) days after the Effective Date, without deduction or offset of any kind. Upon receipt, the Debtors shall transfer such funds to the First Lien Agent for distribution to the First Lien Lenders in accordance with the Plan .

J.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

K.      *Entire Agreement*

Except as otherwise indicated herein and except for the terms and conditions of the Sale and Plan Support Agreement, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

L.      *Exhibits*

All exhibits hereto are incorporated into and are a part of the Plan as if set forth in full in the Plan. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

M.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

N.      *Closing of Chapter 11 Cases*

The Plan Administrator shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

O.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, the

#90797984v11
US-DOCS\99785380.11#90797984v22

Plan shall govern and control.  In the event of a conflict between any provision of the Plan and the Confirmation Order, the Confirmation Order shall govern and control.

P.      *Filing of Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

Q.      *Tax Reporting and Compliance*

The Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

*[Remainder of page intentionally left blank.]*

#90797984v11
US-DOCS\99785380.11#90797984v22

Dated:  [_____]

Respectfully submitted,


**ENDURO RESOURCE PARTNERS LLC,**
a Delaware limited liability company,
on behalf of itself and the other Debtors


By:    _____
       [Name]
       [Title]

#90797984v11
US-DOCS\99785380.11#90797984v22

**Exhibit B**

Interim Cash Collateral Order

Case 18-11174-KG    Doc 11    Filed 05/15/18    Page 128 of 197

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ENDURO RESOURCE PARTNERS LLC, *et al.*, | Case No. 18-_____ (____) |
| Debtors.[1] | (Joint Administration Requested) |

**INTERIM ORDER (A) AUTHORIZING**
**THE DEBTORS TO USE CASH COLLATERAL, (B) GRANTING**
**ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES,**
**(C) SCHEDULING A FINAL HEARING AND (D) GRANTING RELATED RELIEF**

Upon the Debtors' Motion[2] for entry of this interim order (this "***Interim Order***") and a final order (the "***Final Order***") pursuant to sections 105, 361, 362, 363, 503, 507, and 552 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014 and Local Rules 2002-1, 4001-2, and 9013-1, *inter alia*:

    i.    authorizing the Debtors' use of the Prepetition Collateral, including Cash Collateral (each as defined below), subject to and pursuant to the terms and conditions set forth in this Interim Order;

    ii.    authorizing the Debtors to provide adequate protection to the Prepetition Secured Parties (as defined below) solely to the extent of any diminution in value of the Prepetition Collateral (as defined below) (including the Cash Collateral) from and after the Petition Date under or in connection with (a) that certain Amended and Restated Credit Agreement dated as of August 1, 2013 (as amended, restated, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases and with all supplements and exhibits thereto, the "***First Lien Credit Agreement***" and, together with all related

---

[1] The debtors in the chapter 11 cases, along with the last four digits of each debtor's United States federal tax identification number, if applicable, or other applicable identification number, are: Enduro Resource Partners LLC (6288); Enduro Resource Holdings LLC (5571); Enduro Operating LLC (7513); Enduro Management Company LLC (5932); Washakie Midstream Services LLC (7562); and Washakie Pipeline Company LLC (7798). The debtors' mailing address is 777 Main Street, Suite 800, Fort Worth, Texas 76102.

[2] All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

agreements and documents executed by any of the Debtors in connection with the First Lien Credit Agreement, the "***First Lien Documents***"), by and among Enduro Resource Partners LLC ("***Enduro Partners***") as borrower, each of the other Debtors as guarantors (Enduro Partners and the other Debtors, in such capacities, the "***First Lien Obligors***"), Bank of America, N.A., as administrative agent and collateral agent (in such capacities, the "***First Lien Agent***"), Bank of America, N.A., as L/C Issuer (in such capacity, the "***L/C Issuer***") and each of the lenders party thereto (the "***First Lien Lenders***" and, together with the First Lien Agent and each co-agent or sub-agent appointed by the First Lien Agent from time to time pursuant to the First Lien Credit Agreement, the L/C Issuer and any Person that is owed Lender Swap Obligations or that is party to a Secured Cash Management Agreement (each as defined in the First Lien Credit Agreement), the "***First Lien Secured Parties***"); and (b) that certain Amended and Restated Second Lien Term Loan Agreement dated as of March 4, 2016 (as amended, restated, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases and with all supplements and exhibits thereto, the "***Second Lien Credit Agreement***" and, together with all related agreements and documents executed by any of the Debtors in connection with the Second Lien Credit Agreement, the "***Second Lien Documents***" and the First Lien Documents and the Second Lien Documents, collectively, the "***Credit Documents***"), by and among Enduro Partners as borrower, each of the other Debtors as guarantors (Enduro Partners and the other Debtors, in such capacities, the "***Second Lien Obligors***"), Wilmington Trust, National Association, as successor administrative and collateral agent (in such capacities, the "***Second Lien Agent***" and, together with the First Lien Agent, the "***Agents***"), and each of the lenders party thereto (the "***Second Lien Lenders***" and, together with the Second Lien Agent, the "***Second Lien Secured Parties***"; the First Lien Lenders and the Second Lien Lenders, collectively, the "***Prepetition Lenders***"; the First Lien Secured Parties and the Second Lien Secured Parties, collectively, the "***Prepetition Secured Parties***");

iii.   authorizing the Debtors to provide adequate protection to the Royalty Trust LC Secured Parties (as defined below);

iv.   approving certain stipulations by the Debtors with respect to the Credit Documents and the liens and security interests arising therefrom;

v.   subject solely to entry of the Final Order, waiving the Debtors' right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code, any "equities of the case" exception pursuant to section 552(b) of the Bankruptcy Code, and the equitable doctrine of

2

"marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral;

vi.    vacating and modifying the Automatic Stay (as defined herein) to the extent set forth herein;

vii.    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and as later applicable, the Final Order; and

viii.    scheduling a final hearing (the "**_Final Hearing_**") on the Motion no later than 30 days after the Petition Date to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

and the Court having reviewed the Motion and the First Day Declaration; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the _Amended Standing Order of Reference_ from the United States District Court for the District of Delaware dated as of February 29, 2012; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these proceedings and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided in accordance with the Bankruptcy Rules and the Local Rules, and that, except as otherwise ordered herein, no other or further notice is necessary; and objections (if any) to the Motion having been withdrawn, resolved or overruled on the merits; and a hearing having been held on [ ● ], 2018 (the "**_Interim Hearing_**") to consider the relief requested in the Motion and upon the record of the hearing and all of the proceedings had before

3

this Court; and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.  <u>Petition Date</u>.  On May 15, 2018 (the "***Petition Date***"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "***Court***").

B.  <u>Debtors in Possession</u>.  The Debtors are continuing in the management and operation of their business and properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 Cases.

C.  <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these proceedings and over the persons and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 as well as the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  Venue for the Chapter 11 Cases is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

D.  <u>Debtors' Stipulations</u>.  Subject to the limitations set forth in paragraph 12 below, the Debtors acknowledge, admit, agree, represent and stipulate to the following (paragraphs D(i) through D(vii) below are collectively referred to herein as the "***Debtors' Stipulations***"):

    i.  <u>First Lien Obligations</u>.  As of the Petition Date, the First Lien Obligors were truly and justly indebted and liable to the First Lien Secured Parties, without defense, counterclaim, recoupment or offset of any kind, (a) in the aggregate principal amount of not less than $208,707,926 outstanding pursuant to and in accordance with the terms of the First Lien Documents, plus (b) (1) accrued and unpaid interest thereon, (2) any additional fees,

4

costs and expenses (including, but not limited to, any attorneys', financial advisors', and other professionals' fees and expenses) that are chargeable or reimbursable under the First Lien Documents, and (3) all other charges, indemnities and other costs and obligations incurred therewith, including any Obligations (as defined in the First Lien Documents) of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever accrued, due, owing or chargeable in respect of any of the Debtors' obligations under the First Lien Documents (collectively, the "***First Lien Obligations***").

ii.  <u>Second Lien Obligations</u>.  As of the Petition Date, the Second Lien Obligors were truly and justly indebted and liable to the Second Lien Secured Parties, without defense, counterclaim, recoupment or offset of any kind, (i) in the aggregate principal amount of not less than $141,176,036 outstanding pursuant to and in accordance with the terms of the Second Lien Documents, plus (b) (1) accrued and unpaid interest thereon, (2) any additional fees, costs and expenses (including, but not limited to, any attorneys', financial advisors', and other professionals' fees and expenses) that are chargeable or reimbursable under the Second Lien Documents, and (3) all other charges, indemnities and other costs and obligations incurred therewith, including any Obligations (as defined in the Second Lien Documents) of any kind or nature, whether or not evidenced by any note, agreement or other instrument, whether or not contingent, whenever accrued, due, owing or chargeable in respect of any of the Debtors' obligations under the Second Lien Documents (collectively, the "***Second Lien Obligations***" and together with the First Lien Obligations, the "***Secured Obligations***").

iii.  <u>Prepetition First Lien Credit Facility Liens and Prepetition Collateral</u>.  The First Lien Obligations are secured by a perfected first-priority lien and security interest (the "***Prepetition First Lien Credit Facility Liens***") in, to, and against substantially all of the real and personal property (including substantially all of the oil and gas leases, rights of way and property interests, including wells, improvements and other property located on such oil and gas properties) of the Debtors, including, without limitation, Cash Collateral, the as-extracted collateral therefrom, the cash and noncash proceeds, receivables and rights in and to all imbalances, joint interest billings and payments from first party purchasers, and other rights arising from all prepetition collateral (collectively, the "***Prepetition Collateral***"), subject only to the Carve-Out (defined below), from and after entry of this Interim Order, and the Permitted Liens (defined below), including, for the avoidance of doubt, the Royalty Trust LC Lien (defined below).

iv.  <u>Prepetition Second Lien Term Loan Liens and Prepetition Collateral</u>.  The Second Lien Obligations are secured by a perfected second-priority lien and security interest (the "***Prepetition Second Lien Term Loan Liens***"

5

and together with the Prepetition First Lien Credit Facility Liens, the "*Prepetition Liens*") in, to, and against the Prepetition Collateral, subject to the Prepetition First Lien Credit Facility Liens, the Carve-Out, from and after entry of this Interim Order, and the Permitted Liens (defined below), including, for the avoidance of doubt, the Royalty Trust LC Lien.

v.    Validity of First Lien Obligations.  The First Lien Obligations constitute legal, valid, and binding obligations of the First Lien Obligors.  No offsets, defenses, or counterclaims to the First Lien Obligations exist.  No portion of the First Lien Obligations or any payments made to the First Lien Secured Parties or applied to or paid on account of the obligations owing under the First Lien Documents prior to the Petition Date is subject to any contest, avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), attachment, offset, counterclaim, crossclaim, defense, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment or any other challenge of any kind.  The First Lien Documents are valid and enforceable by each of the First Lien Secured Parties and the First Lien Agent, as applicable, for the benefit of the First Lien Secured Parties against each of the applicable Debtors.  The First Lien Obligations constitute allowed claims against the applicable Debtors' estates.  No claim of or cause of action held by the Debtors or their estates exists against any of the First Lien Secured Parties or their agents (in such capacity), whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the First Lien Documents (or the transactions contemplated thereunder), First Lien Obligations or Prepetition First Lien Credit Facility Liens, including without limitation, any right to assert any disgorgement or recovery.

vi.    Validity of Second Lien Obligations.  The Second Lien Obligations constitute legal, valid and binding obligations of the Second Lien Obligors.  No offsets, defenses or counterclaims to the Second Lien Obligations exist.  No portion of the Second Lien Obligations is subject to any contest, avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), attachment, offset, counterclaim, crossclaim, defense, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment or any other challenge of any kind.  The Second Lien Documents are valid and enforceable by each of the Second Lien Secured Parties and the Second Lien Agent, as applicable, for the benefit of the Second Lien Secured Parties against each of the applicable Debtors.  The Second Lien Obligations constitute allowed claims against the applicable Debtors' estates.  No claim of or cause of action held by the Debtors or their estates

6

exists against any of the Second Lien Secured Parties or their agents (in such capacity), whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Second Lien Documents (or the transactions contemplated thereunder), Second Lien Obligations or Prepetition Second Lien Term Loan Liens, including, without limitation, any right to assert any disgorgement or recovery.

vii.    Intercreditor Agreement.  The Prepetition Secured Parties, the Prepetition First Lien Credit Facility Liens and the Prepetition Second Lien Term Loan Liens are subject to the  Intercreditor Agreement, dated as of March 4, 2016, by and among Bank of America, N.A. as First Lien Collateral Agent, Wilmington Trust, National Association, as Second Lien Collateral Agent, Enduro Partners and the other Debtors (as amended, restated, supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases and with all supplements and exhibits thereto, the "***Intercreditor Agreement***").

viii.    Validity and Perfection of Prepetition First Lien Credit Facility Liens. The Prepetition First Lien Credit Facility Liens (a) secure the First Lien Obligations; (b) are valid, binding, perfected and enforceable liens on and security interests in the Prepetition Collateral (including the Cash Collateral); (c) are not subject, pursuant to the Bankruptcy Code or other applicable law, to any contest, avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), attachment, offset, counterclaim, crossclaim, defense, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment or any other challenge of any kind; and (d) are subject and subordinate only to (1) from and after the entry of this Interim Order, the Carve-Out and (2) the Permitted Liens (as defined below) including, for the avoidance of doubt, the Royalty Trust LC Lien, and the Debtors each irrevocably waive, for themselves and their subsidiaries and affiliates, any right to challenge or contest in any way the perfection, validation and enforceability of the Prepetition First Lien Credit Facility Liens or the validity or enforceability of the First Lien Obligations and the First Lien Documents.

ix.    Validity and Perfection of Prepetition Second Lien Term Loan Liens.  The Prepetition Second Lien Term Loan Liens (a) secure the Second Lien Obligations; (b) are valid, binding, perfected and enforceable liens on and security interests in the Prepetition Collateral (including the Cash Collateral); (c) are not subject, pursuant to the Bankruptcy Code or other applicable law, to any contest, avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual

7

or otherwise), attachment, offset, counterclaim, crossclaim, defense, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment or any other challenge of any kind; and (d) are subject and subordinate only to (1) the Carve-Out, (2) the Permitted Liens and (3) the Prepetition First Lien Credit Facility Liens, and the Debtors each irrevocably waive, for themselves and their subsidiaries and affiliates, any right to challenge or contest in any way the perfection, validation and enforceability of the Prepetition Second Lien Term Loan Liens or the validity or enforceability of the Second Lien Obligations and the Second Lien Documents.

x.    Cash Collateral.  All cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents held by the Debtors, including, without limitation, all proceeds of any Prepetition Collateral and all cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents held in any of the Debtors' banking, checking or other deposit accounts or securities accounts with financial institutions, including, without limitation, those certain accounts at Frost Bank, a Texas state bank, that are subject to that certain Control Account Agreement dated as of June 10, 2015, among Enduro Partners, Frost Bank and the Agents and the Royalty Trust LC Deposit Account, are "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code, whether received before, on or after the Petition Date (such cash, the "***Cash Collateral***").

xi.    Royalty Trust LC.  As of the Petition Date, Enduro Partners was truly and justly indebted and liable to the Royalty Trust LC Lenders (defined below) and Bank of America, N.A., as Administrative Agent and L/C Issuer (in such capacity, the "***Royalty Trust LC Issuer***") under that certain Standby Letter of Credit Agreement dated as of March 30, 2018 (the "***Royalty Trust LC Agreement***") among Enduro Partners, the Royalty Trust LC Issuer and the other Lenders party thereto (collectively, the "Royalty Trust LC Lenders" and, together with the Royalty Trust LC Issuer, the "***Royalty Trust LC Secured Parties***"), under which that certain Irrevocable Standby Letter of Credit, dated April 2, 2018 (the "***Royalty Trust LC***"), was issued for the benefit of The Bank of New York Mellon Trust Company, N.A. as Trustee of Enduro Royalty Trust, without defense, counterclaim, recoupment or offset of any kind (the "***Royalty Trust LC Indebtedness***") as defined in that certain Cash Collateral Agreement dated as of March 30, 2018 (the "***Royalty Trust LC Collateral Agreement***") between Enduro Partners and the Royalty Trust LC Issuer.  The Royalty Trust LC Indebtedness is secured by a perfected first-priority lien and security interest (the "***Royalty Trust LC Lien***") in, to, and against the cash held in the Deposit Account (the "***Royalty Trust LC Deposit Account***") as defined in the Royalty Trust LC Collateral Agreement. The Royalty Trust LC Indebtedness constitutes legal, valid, and binding obligations of Enduro

8

Partners.  No offsets, defenses, or counterclaims to the Royalty Trust LC Indebtedness exist.  No portion of the Royalty Trust LC Indebtedness or any payments made to the Royalty Trust LC Secured Parties or applied to or paid on account of the obligations owing under the Royalty Trust LC Agreement prior to the Petition Date is subject to any contest, avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual or otherwise), attachment, offset, counterclaim, crossclaim, defense, "claim" (as defined in the Bankruptcy Code) of any kind, cause of action, impairment or any other challenge of any kind.  The Royalty Trust LC Agreement and Royalty Trust Collateral Agreement are valid and enforceable by each of the Royalty Trust LC Secured Parties, as applicable, for the benefit of such parties against Enduro Partners.  The Royalty Trust LC Indebtedness constitutes allowed claims against Enduro Partners' estate.  No claim of or cause of action held by Enduro Partners or its estates exists against any of Royalty Trust LC Secured Parties, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with the Royalty Trust LC Agreement or the Royalty Trust Collateral Agreement (or the transactions contemplated thereunder), Royalty Trust LC Indebtedness or Royalty Trust LC Lien, including without limitation, any right to assert any disgorgement or recovery.

E.      <u>Releases by the Debtors</u>.   Subject to the challenge provisions described in paragraph 12 herein, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries and assigns (collectively, the "***Releasors***") to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the First Lien Secured Parties, the Second Lien Secured Parties, and the Royalty Trust LC Secured Parties and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "***Releasees***") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and

9

obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof relating to any of the Credit Documents or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under title 11 of the United States Code, (iii) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the liens or claims of the Prepetition Secured Parties and Royalty Trust LC Secured Parties and (iv) any actions taken in connection with alleged defaults under the Credit Documents, Royalty Trust LC Agreement or Royalty Trust LC Collateral Agreement prior to the date hereof and/or the negotiation or consummation of forbearance agreements related thereto, *provided, however*, that nothing herein shall operate as a release or waiver of any claims or causes of action against the Releasees solely on account of any act taken after the Petition Date.  The Debtors' acknowledgments, stipulations, and releases set forth in paragraph D and this paragraph E shall be binding on the Debtors and their respective representatives, successors and assigns, and on each of the Debtors' estates, and, subject to the challenge provisions contained in paragraph 12 herein, all creditors thereof and holders of interests therein and each of their respective representatives, successors and assigns, including, without limitation, any trustee or other representative appointed in these Chapter 11 Cases, whether such trustee or representative is appointed in chapter 11 or chapter 7; *provided, further*, that the Debtors' release of the Second Lien Secured Parties set forth in this paragraph

10

shall become effective only upon the effectiveness of a chapter 11 plan that is accepted by the First Lien Secured Parties voting as a class, and only with respect to each Second Lien Secured Party that has voted to accept such chapter 11 plan and has not objected to confirmation of such plan.

F.    <u>Approved Budget</u>.  Attached hereto as **<u>Exhibit 1</u>** is a 13-week cash flow forecast setting forth all projected cash receipts and cash disbursements on a weekly basis (the "***Initial Approved Budget***").  The Initial Approved Budget is an integral part of this Interim Order and has been relied upon by the First Lien Secured Parties in consenting to entry of this Interim Order and the Debtors' use of the Prepetition Collateral (including the Cash Collateral).  The Debtors represent and warrant to the First Lien Secured Parties and this Court that the Initial Approved Budget includes and contains the Debtors' good faith best estimate of all operational receipts and all operational disbursements, fees, costs, and other expenses that will be payable, incurred and/or accrued by any of the Debtors during the period covered by the Initial Approved Budget, *provided* that the Debtors make no representation with respect to professional fees and expenses, and payment of professional fees and expenses of any of the Prepetition Secured Parties shall be subject to provisions set forth in paragraph 4 of this Interim Order.  The Initial Approved Budget, including any variance permitted thereunder, is achievable and will allow the Debtors to operate in the Chapter 11 Cases and pay post-petition administrative expenses as they come due.  The Debtors shall be required to provide to the Agents and their professional advisors a Budget Variance Report (as defined below) in accordance with the provisions of paragraph 3 of this Interim Order.

G.    <u>Consent to Use of Cash Collateral</u>.  The First Lien Secured Parties, the Agents, and the Second Lien Secured Parties have consented, conditioned on the entry of this Interim

11

Order, to the Debtors' proposed use of the Prepetition Collateral, including the Cash Collateral, solely on the terms and conditions set forth in this Interim Order, and such consent is binding on such parties.

H.    Adequate Protection.    The adequate protection provided to the Prepetition Secured Parties, as set forth more fully in paragraph 4 of this Interim Order, for any diminution in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral (including the Cash Collateral) from and after the Petition Date for any reason provided for under the Bankruptcy Code, including, without limitation, from the use of any Prepetition Collateral (including the Cash Collateral), pursuant to the provision of this Interim Order, the use, sale, lease, or other diminution in value for any reason provided for under the Bankruptcy Code of the Prepetition Collateral (including the Cash Collateral) or the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "*Automatic Stay*"), or the grant of a lien under section 364 of the Bankruptcy Code (collectively, "*Diminution in Value*"), is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect the Prepetition Secured Parties' interests in the Prepetition Collateral (including the Cash Collateral) in accordance with sections 361, 362, 363, and 364 of the Bankruptcy Code.  The adequate protection provided herein and other benefits and privileges contained herein are necessary in order to (i) protect the Prepetition Secured Parties from Diminution in Value of their respective interests of their Prepetition Collateral (including the Cash Collateral), and (ii) obtain the consents and agreements contemplated herein.

I.    Good Cause Shown; Best Interest. An immediate and critical need exists for the Debtors to use the Cash Collateral, in accordance with this Interim Order, (i) for working capital purposes; (ii) other general corporate purposes of the Debtors; and (iii) the satisfaction of the

costs and expenses of administering the Chapter 11 Cases. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and the Local Rules.  Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.  This Court concludes that good cause has been shown and entry of this Interim Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for a successful reorganization.

J.      No Liability to Third Parties.  The Debtors stipulate and the Court finds that, in permitting the Debtors to use the Prepetition Collateral, including the Cash Collateral, on the terms and conditions set forth in this Interim Order, or in taking any other actions permitted by this Interim Order, none of the Prepetition Secured Parties shall (i) incur liability to any third party or be deemed to be in control of the operation of any of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any other Federal or state statute) or (ii) owe any fiduciary duty to any of the Debtors, their creditors or estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.

K.      Section 552(b).  Each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral.

13

L.    <u>Notice</u>.    Under the circumstances of these Chapter 11 Cases, proper, timely, adequate, and sufficient notice of the Motion and Interim Hearing has been provided in accordance with the Bankruptcy Code, Bankruptcy Rules, and the Local Rules, and no further notice of the Motion (except as set forth herein) or the Interim Hearing shall be required.

Based upon the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**ORDERED, ADJUDGED, AND DECREED THAT**:

1.    <u>Approval of Interim Order</u>.    The Motion is approved on an interim basis on the terms and conditions set forth in this Interim Order.  Any objections to the interim relief sought by the Motion that have not previously been withdrawn, waived, or resolved at or prior to the Interim Hearing are hereby overruled, and (except as set forth herein) all reservations of rights included therein with respect to interim relief on the Motion are hereby denied and overruled. The rights of all parties in interest to object to the entry of a Final Order on the Motion are reserved.

2.    <u>Authorization to Use Cash Collateral</u>.    Subject to the terms and conditions of this Interim Order, the Debtors are hereby authorized to use Cash Collateral on an interim basis during the period beginning with the Petition Date and ending on the Termination Date (as defined below) for (a) working capital purposes; (b) other general corporate purposes of the Debtors; and (c) the satisfaction of the costs and expenses of administering the Chapter 11 Cases; *provided* that the Debtors' use of Cash Collateral shall be in accordance with the Approved Budget (as defined below), subject to the variance provisions set forth in paragraph 3 herein, or as otherwise set forth in this Interim Order; *provided further*, that (x) the Prepetition Secured Parties and Royalty Trust LC Secured Parties are granted the adequate protection as set forth

14

herein and (y) except on the terms and conditions of this Interim Order, the Debtors shall be prohibited from using the Cash Collateral at any time following the revocation of consent of the First Lien Secured Parties without further order of the Court.

       3.    <u>Approved Budget; Budget Variance</u>.

    (a)    <u>Delivery of Proposed Budgets</u>. On the third Friday following the Petition Date and on every fourth Friday thereafter, the Debtors shall deliver a proposed updated budget for the 13-week period (such period, when covered by an Approved Budget, the "***Approved Budget Period***") beginning with the second Monday immediately following such Friday (or such other date as may be agreed to by the First Lien Agent), substantially in the form of the Initial Approved Budget (each a "***Proposed Budget***"), to the professional advisors to the First Lien Agent.

    (b)    <u>Approval of Proposed Budgets</u>. As of the entry of this Interim Order, the "Approved Budget" shall be the Initial Approved Budget. Each Proposed Budget provided to the First Lien Agent shall be of no force and effect unless and until it is approved by the First Lien Agent in writing (including by email) delivered to the address specified in paragraph 24 of this Interim Order and until such determination is made, the prior Approved Budget shall remain in effect. Any such Proposed Budget, upon the approval of the First Lien Agent, shall become the "Approved Budget" for the period of time covered thereby, and shall prospectively replace any prior Approved Budget.

    (c)    <u>Delivery of Variance Reports</u>. On the fourth business day of the first full week after the Petition Date and the fourth business day of each week thereafter, the Debtors shall deliver to the professional advisors to the First Lien Agent a weekly variance report, in form and detail reasonably satisfactory to the First Lien Agent, that sets forth and compares (a) for the previous week through Friday, the actual cash receipts and disbursements of the Debtors for such week with the budgeted receipts and disbursements in the Approved Budget for such week and (b) for the applicable Four Week Period (as defined below) (or any applicable shorter period for any report delivered prior to the fifth week of the then-current Approved Budget Period), the actual cash receipts and disbursements of the Debtors for such Four Week Period (or any applicable shorter period for the reports delivered prior to the fifth week of the then-current Approved Budget Period) with the budgeted receipts and disbursements in the Approved Budget(s) for such Four Week Period (or any applicable shorter period for the reports delivered prior to the fifth week of the then-current Four Week Period) (the "***Budget Variance Report***").

15

(d)     Variance Testing; Compliance with Approved Budget. The Debtors shall comply with the Approved Budget, subject to the variance provisions set forth in this paragraph. For purposes of this Interim Order, "**Four Week Period**" shall mean, as applicable, weeks one through four, weeks five through eight, and weeks nine through twelve of any Approved Budget Period.  The Debtors shall ensure that at no time shall the cumulative total actual cash disbursements of the Debtors in the aggregate for any Four Week Period be greater than 115% of the cumulative budgeted total cash disbursements of the Debtors for such Four Week Period as set forth in the Approved Budget, *provided*, that cash disbursements of the Debtors of professional fees and expenses of any of the Prepetition Secured Parties shall not be subject to such variance test and payment of such professional fees and expenses shall not be subject to the Approved Budget, *provided further*, that, solely in the event that the Debtors continue to operate under any Approved Budget beyond week four of such Approved Budget because a new Approved Budget for such period has not been approved, any variance below such 115% cap from the first Four Week Period under such Approved Budget may be carried forward.

4.     Prepetition Secured Parties' Adequate Protection.  Pursuant to sections 361, 363(c), and 364 of the Bankruptcy Code, the Debtors shall provide adequate protection for the interests of the Prepetition Secured Parties in the Prepetition Collateral (including the Cash Collateral) to the extent of any Diminution in Value of the Prepetition Secured Parties' interest in the Prepetition Collateral (including the Cash Collateral) from and after the Petition Date.  The Agents, on behalf of themselves and for the benefit of each of the Prepetition Secured Parties, are hereby granted, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral (including the Cash Collateral) from and after the Petition Date, the following (collectively, the "**Secured Party Adequate Protection Obligations**"):

(a)     First Lien Adequate Protection Liens.  Subject to the Carve-Out, the Permitted Liens, including, for the avoidance of doubt, the Royalty Trust LC Lien, and, solely to the extent required under the Bankruptcy Code, that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) in all respects, pursuant to section 361 and 363(e) of the Bankruptcy Code, and as a condition of the consensual use of Cash Collateral set forth herein, as adequate protection against actual Diminution in Value of their interests in the Prepetition Collateral, including the Cash Collateral, effective as of the Petition Date and

16

perfected without the need for execution by the Debtors or recordation or filing of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the First Lien Agent of any of the Adequate Protection Collateral (as defined below), the First Lien Agent is hereby granted, for the ratable benefit of the First Lien Secured Parties, valid, binding, continuing, enforceable, fully perfected, security interests in and liens (the "*First Lien Adequate Protection Liens*") on any and all tangible and intangible pre- and post-petition property of the Debtors, whether existing before, on or after the Petition Date, together with any proceeds thereof, including, without limitation, any and all cash and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds (*provided, however*, that solely to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event there shall only be a lien on the economic value of, proceeds of sale or other disposition of, and any other proceeds and products of such leasehold interests unless the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code), real property, deposit accounts (except for any account created to hold an adequate assurance deposit for utility providers, pursuant to separate order of this Court), securities accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents, accession and profits of the foregoing (collectively, the "*Adequate Protection Collateral*").

(b)　　Second Lien Term Loan Adequate Protection Liens.  Subject to the Carve-Out, the Permitted Liens, including, for the avoidance of doubt, the Royalty Trust LC Lien, the Prepetition First Lien Credit Facility Liens, the First Lien Adequate Protection Liens, and, solely to the extent required under the Bankruptcy Code, that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) in all respects, pursuant to section 361 and 363(e) of the Bankruptcy Code, and as a condition of the consensual use of Cash Collateral set forth herein, as adequate protection against actual Diminution in Value of their interests in the Prepetition Collateral, including the Cash Collateral, effective as of the Petition Date and perfected without the need for execution by the Debtors or recordation or filings of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the Second Lien Agent of any of the Adequate Protection Collateral, the Second Lien Agent is hereby granted, for the ratable benefit of the Second Lien Secured Parties, valid, binding, continuing, enforceable, fully perfected, security interests in and

17

liens (the "***Second Lien Adequate Protection Liens***" and together with the First Lien Adequate Protection Liens, the "***Adequate Protection Liens***") on the Adequate Protection Collateral.

(c)    <u>Avoidance Actions and Avoidance Action Proceeds</u>.    The Adequate Protection Collateral shall not include any claims or causes of action of the Debtors arising under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code (collectively, the "***Avoidance Actions***") of the Debtors; *provided, however*, the Adequate Protection Collateral shall include, subject to and effective upon entry of the Final Order, the proceeds of Avoidance Actions (the "***Avoidance Actions Proceeds***").

(d)    <u>First Lien Adequate Protection Superpriority Claims</u>.    The Secured Party Adequate Protection Obligations due to the First Lien Secured Parties shall constitute allowed superpriority administrative expense claims pursuant to sections 503(b) and 507(b) of the Bankruptcy Code of each of the First Lien Secured Parties (such claims, the "***First Lien Adequate Protection Superpriority Claims***"). The First Lien Adequate Protection Superpriority Claims shall be subject only to the Carve-Out, and shall be allowed claims against each of the Debtors (jointly and severally) with, to the fullest extent permitted under the Bankruptcy Code, priority over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. The First Lien Adequate Protection Superpriority Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors including, subject to entry of the Final Order, the proceeds of any Avoidance Actions.

(e)    <u>Second Lien Adequate Protection Superpriority Claims</u>.    The Secured Party Adequate Protection Obligations due to the Second Lien Secured Parties shall constitute allowed superpriority administrative expense claims pursuant to sections 503(b) and 507(b) of the Bankruptcy Code junior to the First Lien Adequate Protection Superpriority Claims by each of the Second Lien Secured Parties (such claims, the "***Second Lien Adequate Protection Superpriority Claims***" and together with the First Lien Adequate Protection Superpriority Claims, the "***Adequate Protection Superpriority Claims***").    The Second Lien Adequate Protection Superpriority Claims shall be subject only to the Carve-Out and the First Lien Adequate Protection Superpriority Claims, and shall be allowed claims against each of the Debtors (jointly and severally) with, to the fullest extent permitted under the Bankruptcy Code, priority over any and

18

all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, provided, that the Second Lien Secured Parties shall be deemed to waive, pursuant to the Intercreditor Agreement, the right to receive payment in cash of the Second Lien Adequate Protection Superpriority Claims until and unless the First Lien Obligations are paid in full in cash or holders of a majority of First Lien Obligations otherwise agree in writing. The Second Lien Adequate Protection Superpriority Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors including, subject to entry of the Final Order, the proceeds of any Avoidance Actions.

(f)   <u>Priority of Adequate Protection Liens and Superpriority Claims</u>.  The First Lien Adequate Protection Liens have priority over and are senior in all respects to the Second Lien Adequate Protection Liens with respect to the Adequate Protection Collateral. The Prepetition First Lien Credit Facility Liens have priority over and are senior in all respects to the Second Lien Adequate Protection Liens with respect to the Prepetition Collateral. The Adequate Protection Liens shall be junior only to (i) the Carve-Out, (ii) solely with respect to the Second Lien Adequate Protection Liens, the First Lien Adequate Protection Liens and the Prepetition First Lien Credit Facility Liens and (iii) any other valid, enforceable, unavoidable and properly perfected liens on the Adequate Protection Collateral existing on the Petition Date with priority over the Prepetition Secured Parties' liens on the Adequate Protection Collateral, including, for the avoidance of doubt, the Royalty Trust LC Lien (the "***Permitted Liens***"). Other than the Carve-Out, and subject to the entry of the Final Order, no cost or expense of administration under sections 105, 503, or 507 of the Bankruptcy Code or otherwise, including any such cost or expense resulting from or arising after the conversion of any of these Chapter 11 Cases under section 1112 of the shall be senior to, or *pari passu* with, the Adequate Protection Superpriority Claims.

(g)   <u>Cash Payments</u>.  As additional adequate protection, the First Lien Secured Parties shall receive from the Debtors cash payments in an amount equal to (i) immediate payment of all cash interest, fees and other amounts accrued and unpaid under the terms of the First Lien Credit Agreement prior the Petition Date and (ii) current payment of interest at the Base Rate under the First Lien Credit Agreement plus 2.50% on the first Business Day of each calendar month.

19

(h)    <u>Professional Fees and Expenses</u>.  As additional adequate protection, the First Lien Secured Parties shall receive from the Debtors, as applicable, current payment of all outstanding prepetition and all post-petition reasonable and documented fees and expenses incurred by the First Lien Agent, including the reasonable and documented fees and expenses incurred by Davis Polk & Wardwell LLP and Morris, Nichols, Arsht & Tunnell LLP, as counsel to the First Lien Agent, and RPA Advisors, LLC, as financial advisors to the First Lien Agent, subject to the procedures set forth in paragraph 6 hereof.  Immediately upon entry of this Interim Order, the Debtors shall pay in cash the reasonable and documented fees and expense and other disbursements payable to Davis Polk & Wardwell LLP and Morris, Nichols, Arsht & Tunnell LLP, as counsel to the First Lien Agent, and RPA Advisors, LLC, as financial advisors to the First Lien Agent, that have accrued as of the Petition Date.

5.    <u>Royalty Trust Secured Parties Adequate Protection</u>.  As adequate protection, the Royalty Trust LC Secured Parties shall receive from the Debtors, as applicable, current payment of all outstanding prepetition and all post-petition reasonable and documented fees and expenses incurred by the Royalty Trust LC Issuer, including the reasonable and documented fees and expenses incurred by Davis Polk & Wardwell LLP and Morris, Nichols, Arsht & Tunnell LLP, as counsel to the Royalty Trust LC Issuer, and RPA Advisors, LLC, as financial advisors to the Royalty Trust LC Issuer, subject to the procedures set forth in paragraph 6 hereof.

6.    <u>Adequate Protection Professional Fee Procedures</u>. Payment of professional fees of the advisors to the First Lien Agent and the Royalty Trust LC Issuer shall not be subject to allowance by the Court. Notwithstanding the foregoing, at the same time that invoices therefor are delivered to the Debtors, such professionals shall deliver of copy of such invoices to the U.S. Trustee (with notice copies also provided to any statutory committee appointed in these cases).  None of such invoices shall be required to comply with the U.S. Trustee fee guidelines, to be filed with any fee applications with the Court or to contain individual time detail (other than summary data regarding hours worked by each individual timekeeper for the applicable professionals and a summary statement of the nature of the tasks performed and expense detail)

20

and may be redacted to protect privileged, confidential or proprietary information. The provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine and invoices provided to the U.S. Trustee shall be subject to and protected under section 107(c)(3)(B) of the Bankruptcy Code. The Debtors, the U.S. Trustee, and any statutory committee shall have 10 days following their receipt of such invoices to file objections with the Court with respect to the reasonableness of the fees and expenses included therein. If an objection is not filed with the Court pursuant to this paragraph, the Debtors shall pay the fees, expenses and disbursements set forth in this paragraph within ten (10) days following receipt of the applicable invoice (which time period may be extended by the applicable professional in its discretion). If any such objection is filed and not resolved within ten (10) days after such objection is interposed, a hearing with respect thereto shall be conducted at a regularly scheduled omnibus hearing in the Chapter 11 Cases, *provided, however* that if any party files any such objection, the Debtors shall pay (i) any undisputed portion of such fees, costs and expenses within ten (10) days of their receipt of such invoice and (ii) the disputed portion of such fees, costs and expenses promptly following the resolution of such dispute as described in this paragraph.

7.    <u>Reporting; Access to Records</u>.    The Debtors shall comply with the reporting requirements set forth in the First Lien Documents. In addition to, and without limiting, whatever rights to access the First Lien Secured Parties have under the First Lien Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents and employees of the First Lien Agent (a) to have access to and inspect the Debtors' properties, (b) to examine the Debtors' books and records, and (c) to discuss the Debtors' affairs, finances and condition with the Debtors' officers and financial advisors.

US-DOCS\100382323.7#90745224v21
#90745224v26

8.      _Termination of Cash Collateral Authorization_.  Unless otherwise ordered by the Court or agreed to in writing by the First Lien Agent and Majority Lenders (as defined in the First Lien Credit Agreement), the Debtors' right to use Cash Collateral under the terms of this Interim Order shall terminate without further order of the Court upon the occurrence of the "***Termination Date***" (notice of which shall promptly be provided to the Debtors, counsel to the Debtors, the U.S. Trustee and any statutory committee appointed in these cases), which shall occur two business days following written notice (including via email) from the First Lien Agent (acting at the direction of Majority Lenders) to the Debtors of the occurrence of any of the following events, *provided* that the Termination Date shall occur immediately upon the occurrence of any event set forth in subsections 6(a), 6(h), 6(j), 6(k), 6(l), 6(m), or 6(o) below, and notice of termination of the Plan Support Agreement in accordance with the terms thereof shall be sufficient notice of the occurrence of the event set forth in subsection 6(b) hereof:

(a)      the occurrence of the effective date of the Plan (as defined in the Plan Support Agreement);

(b)      the Plan Support Agreement (as may be hereafter modified or amended in accordance with the terms thereof) shall have terminated as to all parties thereto in accordance with its terms;

(c)      the failure of the Enduro Entities to meet any milestone set forth in Exhibit C to the Plan Support Agreement (as may be hereafter modified or amended in accordance with the terms thereof);

(d)      the failure of the Debtors to distribute the Net Cash Proceeds (as defined in the Plan Support Agreement) of any asset sale to the First Lien Agent in in accordance with the Plan Support Agreement, irrespective of whether such agreement has been assumed by the Debtors or has been terminated;

(e)      any Debtor files or publicly announces that it will file (or fails to timely object to) or joins in or supports any plan (or disclosure statement related thereto) in the Chapter 11 Cases other than with respect to the Plan or with the prior written consent of the First Lien Agent and Majority Lenders;

22

(f)     any Debtor seeks approval or publicly announces that it will seek approval of any Sale in the Chapter 11 Cases without the prior written consent of the First Lien Agent and Majority Lenders;

(g)     any Debtor's failure to comply with any of the material terms or conditions of this Interim Order, including, but not limited to, failure to comply with the Approved Budget (subject to the variance provisions described in paragraph 3), failure to deliver a Proposed Budget or any Budget Variance Report as and when provided in paragraph 3 of this Interim Order or granting or offering to grant to any person any lien of the type specified in paragraph 21 of this Interim Order;

(h)     any Debtor shall grant, create, incur or suffer to exist any post-petition liens or security interests other than (i) those granted pursuant to this Interim Order, (ii) carriers' mechanics', operator's, warehousemen's, repairmen's or other similar liens arising in the ordinary course of business, (iii) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation arising in the ordinary course of business, and (iv) deposits to secure the performance of any post-petition statutory obligations and other obligations of a like nature incurred in the ordinary course of business, *provided* that the Debtor(s) shall have 10 business days from receipt of notice thereof to cure any of the foregoing which were involuntarily imposed or created;

(i)     any Debtor shall create, incur or suffer to exist any other claim that is *pari passu* with or senior to the Adequate Protection Superpriority Claims;

(j)     the failure of the Debtors to make any payment provided for under this Interim Order to the First Lien Secured Parties or Royalty Trust LC Secured Parties within five business days of the date such payment is due, unless otherwise agreed with the First Lien Agent and Majority Lenders (as defined in the First Lien Credit Agreement);

(k)     this Interim Order or the Final Order (if entered) ceases, for any reason (other than with the express written agreement of the First Lien Agent and Majority Lenders in their sole discretion), to be in full force and effect in any material respect, or any Debtor so asserts in writing, or the Adequate Protection Liens or Adequate Protection Superpriority Claims created by this Interim Order or the Final Order (if entered) cease in any material respect to be enforceable and of the same effect and priority purported to be created hereby or any Debtor so asserts in writing;

(l)     the Court shall have entered an order amending, supplementing or otherwise modifying this Interim Order (other than non-substantive

23

amendments, supplementations or modifications) without the consent of the First Lien Agent and Majority Lenders;

(m)     any Debtor supports or takes any steps in furtherance of an action commenced by any other person against any of the Prepetition Secured Parties or Royalty Trust LC Secured Parties, with respect to any of the Credit Documents, the Royalty Trust LC Agreement or Royalty Trust LC Collateral Agreement, including, without limitation, any action to avoid or subordinate any obligations under any of the Credit Documents, the Royalty Trust LC Agreement or Royalty Trust LC Collateral Agreement, *provided* that compliance with discovery requests brought by third parties in connection with any of the foregoing shall not constitute a Termination Event under this paragraph;

(n)     the Court shall have entered an order appointing a chapter 11 trustee, responsible officer or any examiner with enlarged powers relating to the operation of the businesses in these Chapter 11 Cases;

(o)     the Court shall have entered an order granting relief from the Automatic Stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any of the Debtors' assets which have an aggregate value in excess of $100,000;

(p)     the Court shall have entered an order avoiding, disallowing, subordinating or recharacterizing any claim, lien or interest held by any Prepetition Secured Party or Royalty Trust LC Secured Party; and

(q)     an order shall have been entered dismissing any of these Chapter 11 Cases or converting any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code.

9.      <u>Remedies upon the Occurrence of the Termination Date</u>.  Upon the occurrence of

the Termination Date, (a) consensual use of Cash Collateral shall terminate immediately; (b) the

First Lien Adequate Protection Superpriority Claims, if any, shall become due and payable;  and

(c) the First Lien Agent may, upon five business days' written notice to counsel to the Debtors,

the U.S. Trustee and any statutory committee appointed in these cases, (i) set off amounts in any

account of the Debtors maintained with the First Lien Agent or with respect to which the First

Lien Agent exercises control pursuant to a deposit account control agreement to the extent

necessary for payment of the Secured Party Adequate Protection Obligations due to the First

24

Lien Secured Parties and/or (ii) exercise any other rights and remedies available under the Credit Documents, this Interim Order or applicable law.  Remedies shall be cumulative and non-exclusive.  The Automatic Stay is hereby deemed modified and vacated to the extent necessary to permit such actions upon the occurrence of the Termination Date and pursuant to the terms set forth herein.  Notwithstanding anything to the contrary herein or the occurrence of the Termination Date, all of the rights, remedies, benefits and protections provided to the Agents under this Interim Order shall survive the occurrence of the Termination Date.  The Debtors and all parties in interest shall be entitled to seek an emergency hearing before this Court to contest whether the Termination Date has occurred under paragraph 8 of this Interim Order and at which hearing the Debtors shall reserve the right to seek Court approval of a new order approving the use of Cash Collateral, *provided* that pending such hearing, the Debtors may only use Cash Collateral to make necessary ordinary course operating expenditures.

10.  Carve-Out.

(a) For purposes of this Interim Order, the "*Carve-Out*" means an amount equal to the sum of (i) all fees required to be paid to the clerk of the Court and all statutory fees payable to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code, plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below), none of which shall be subject to any budget; (ii) all reasonable fees and expenses of up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); and (iii) all allowed unpaid fees, costs and expenses (the "*Professional Fees*") incurred by persons or firms retained by the Debtors pursuant to sections 327 or 328 of the Bankruptcy Code (the "*Debtor Professionals*") or any statutory committee appointed in the Chapter 11 Cases (each, a "*Committee*") pursuant to section 328 or 1103 of the Bankruptcy Code (the "*Committee Professionals*"), whose retention is approved by a final order of the Court (which order has not been reversed, vacated, stayed or appealed) that are incurred (A) at any time before the occurrence of the Termination Date and delivery by the First Lien Agent of written notice thereof (the "*Carve-Out Trigger Notice*") to the Debtors and the Debtors' advisors (which may be by email), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, in an

25

aggregate amount in accordance with and solely to the extent set forth in the Approved Budget in effect prior to the date of delivery of a Carve-Out Trigger Notice (and subject to any further limits imposed by this Interim Order or the Final Order or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigations of Challenges against any Prepetition Secured Parties or any Royalty Trust LC Secured Party), and (B) after the occurrence of the Termination Date and delivery of a Carve-Out Trigger Notice, in an aggregate amount not to exceed $500,000, to the extent such Professional Fees are allowed at any time (the amount set forth in this clause (iii)(B) being the "***Post-EoD Carve-Out Amount***"); *provided* that the Post-EoD Carve-Out Amount shall be reduced on a dollar-for-dollar basis by any payments made on or after the date of delivery of a Carve-Out Trigger Notice of Professional Fees incurred on or after such date; *provided, further*, that nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clause (i), (ii) or (iii) above, on any grounds.

(b)     Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (i) the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (A) against any of the Prepetition Secured Parties or Royalty Trust LC Secured Parties or (B) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under, as applicable, the Credit Documents, Royalty Trust LC Agreement or Royalty Trust LC Collateral Agreement, including, without limitation, for lender liability or, other than as set forth in paragraphs 12 and 13 of this Interim Order or similar provisions of the Final Order, as applicable, pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (ii) attempts to modify any of the rights granted to any of the Prepetition Secured Parties or Royalty Trust LC Secured Parties hereunder; or (iii) paying any amount on account of any claims arising before the commencement of these Chapter 11 Cases unless such payments are approved by an order of the Court; *provided, however*, that nothing herein shall exclude from the Carve-Out any reasonable fees and expenses incurred (w) in opposing any of the foregoing actions, (x) in responding to formal discovery requests brought by third parties in connection with any of the foregoing; (y) in seeking, in good faith, a determination regarding whether the Termination Date occurred or (z) in seeking, in good faith, an order authorizing the Debtors' non-consensual use of Cash Collateral by showing that the Prepetition Secured Parties and Royalty Trust LC Secured Parties are adequately protected.

(c) Notwithstanding anything to the contrary herein, the Carve-Out shall be senior to all liens and claims granted under this Interim Order, including, without limitation, the Adequate Protection Liens and the Adequate Protection Superpriority Claims, and any and all other liens or claims securing any of the First Lien Obligations or obligations under the Second Lien Credit Agreement. For the avoidance of doubt, the Carve Out shall not be senior to the Royalty Trust LC Lien.

11.     <u>Right to Seek Additional Adequate Protection</u>.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties or Royalty Trust LC Secured Parties to request additional forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.

12.     <u>Effect of Stipulations on Third Parties</u>. The releases, stipulations and admissions contained in this Interim Order, including, without limitation, in paragraphs D and E of this Interim Order, shall be binding upon the Debtors and their affiliates and any of their respective successors in all circumstances.  The releases, stipulations, and admissions contained in this Interim Order, including, without limitation, in paragraphs D and E of this Interim Order, shall be binding upon all other parties in interest, including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for the Debtor (a "***Trustee***"), any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases and any other person or entity acting on behalf of the Debtors' estate, or otherwise, unless and except to the extent that, with respect to any particular party in interest, (a) such party in interest has filed an adversary proceeding or contested matter (subject to the limitations contained in this Interim Order) by no later than the date that is the earlier of (A) with respect to any statutory committee in these cases, 60 days after the formation of such committee, and with respect to all other parties in interest 75 days from the date of entry of this Interim Order, and (B) if a plan of the Debtors is confirmed,

US-DOCS\100382323.7#90745224v21
#90745224v26

the date on which objections to confirmation of such plan were due (the "***Challenge Termination Date***"), objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Secured Obligations or otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses, including, to the extent released by the Debtors under paragraphs D and E against any of the Prepetition Secured Parties or the Royalty Trust LC Secured Parties or their respective affiliates, representatives, attorneys or advisors in connection with matters related to the Credit Documents or the Royalty Trust LC Agreement or Royalty Trust LC Collateral Agreement or the Prepetition Collateral (including the Cash Collateral) (collectively, "***Challenges***") (each such adversary proceeding or contested matter filed on or before the Challenge Termination Date, a "***Challenge Proceeding***"), and (b) there is a final order in favor of the plaintiff sustaining any such challenge or claim in any Challenge Proceeding; *provided* that any challenge or claim shall set forth with specificity the basis for such challenge or claim, any and all challenges or claims not so specified in a Challenge Proceeding prior to the expiration of the Challenge Termination Date shall be forever deemed waived, released and barred upon the Challenge Termination Date; *provided further*, that (x) if the Chapter 11 Cases are converted to chapter 7 or a Chapter 11 Trustee is appointed prior to the Challenge Termination Date, any such estate representative or Trustee shall receive the full benefit of any remaining time until the Challenge Termination Date (which Challenge Termination Date shall be subject to extension as may be specified by this Court for cause shown by such estate representative), subject to the limitations described herein and (y) if the Chapter 11 Cases are converted to chapter 7 after the Challenge Termination Date and, prior to such conversion, a statutory committee with requisite standing had timely filed an adversary

28

proceeding or contested matter prior to the Challenge Termination Date, the chapter 7 trustee shall be deemed to be the successor to such adversary proceeding or contested matter. For the avoidance of doubt, any informal discovery or examination conducted pursuant to Bankruptcy Rule 2004 relating to the foregoing matters or claims shall not be deemed or construed to be a Challenge Proceeding. If no such Challenge Proceeding is filed by the Challenge Termination Date, (1) the Secured Obligations and Royalty Trust LC Indebtedness shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense or avoidance, for all purposes in these Chapter 11 Cases and any subsequent chapter 7 case(s), (2) the liens and security interests securing the Secured Obligations and Royalty Trust LC Indebtedness shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to recharacterization, subordination or avoidance, and (3) the Secured Obligations, the liens and security interests securing the Secured Obligations, the Royalty Trust LC Indebtedness, the Royalty Trust LC Lien, the Prepetition Secured Parties and Royalty Trust LC Secured Parties shall not be subject to any other or further challenge by any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, or any party in interest seeking to exercise the rights of any Debtor's estate, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or 11 trustee appointed or elected for any Debtor).  If a Challenge Proceeding is filed, the releases, stipulations and admissions contained in paragraphs D and E of this Interim Order shall nonetheless remain binding and preclusive on any person or entity, except to the extent that such findings and admissions were expressly challenged and set forth with specificity in a Challenge Proceeding by such person or entity; *provided* that this provision shall not limit other persons or entities from benefitting from any successful Challenge Proceeding of any statutory committee or chapter 7 or

29

11 trustee.  Nothing in this Interim Order vests or confers on any Entity (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any Challenges with respect to the Credit Documents or the Secured Obligations, and a motion for an order of the Court conferring such standing on a party-in-interest must be filed prior to or concurrently with a Challenge Proceeding by a party-in-interest.

13.    <u>Limitation on Use of Collateral.</u>  Notwithstanding anything herein or in any other order by this Court to the contrary, no Cash Collateral, Prepetition Collateral, Adequate Protection Collateral, proceeds of any of the foregoing or the Carve-Out may be used for any of the following: (a) to pay professional fees, disbursements, costs or expenses incurred by any party in connection with any litigation or threatened litigation (whether by contested matter, adversary proceeding or otherwise, including, other than the Investigation Amount (defined below), for any investigation in connection with litigation or threatened litigation) against any of the Prepetition Secured Parties or Royalty Trust LC Secured Parties or for the purpose of objecting to or challenging the validity, perfection, enforceability, extent or priority of any claim, lien or security interest held or asserted by any of the Prepetition Secured Parties or Royalty Trust LC Secured Parties or the validity or enforceability of this Interim Order or asserting any defense, claim, cause of action, counterclaim, or offset with respect to the Secured Obligations or Royalty Trust LC Indebtedness (including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise) or the Prepetition Liens or Royalty Trust LC Liens against any of the Prepetition Secured Parties or Royalty Trust LC Secured Parties or each of their respective

30

representatives; (b) to object to, contest, interfere with, prevent, hinder or otherwise delay any of

the First Lien Secured Parties' assertion, enforcement or realization on the Prepetition Collateral

(including the Cash Collateral), including the exercise of rights or remedies with respect thereto

after the Termination Date, in accordance with the Credit Documents or this Interim Order other

than to seek a determination that the Termination Date has not occurred; (c) to seek to modify

any of the rights granted to the Prepetition Secured Parties under this Interim Order or the Credit

Documents; (d) to pay any amount on account of any claims arising prior to the Petition Date

unless such payments are approved by an order of this Court that is in form and substance

reasonably satisfactory to the First Lien Agent; (e) to object to, contest, delay, prevent or

interfere with in any way the exercise of rights or remedies by any First Lien Secured Party with

respect to any Prepetition Collateral (including the Cash Collateral) after the occurrence of the

Termination Date (other than to the extent expressly permitted by the final provisos contained in

paragraph 8 and this paragraph 13 of this Interim Order); or (f) to pursue any financing, security

issuance, business combination, reorganization or restructuring transaction or any purchase, sale,

or other disposition of a Debtor's business or assets, except for the sale of assets in the ordinary

course of business, other than as expressly permitted under the Plan or with the prior written

consent of the First Lien Agent and Majority Lenders; *provided*, *however*, that fees and expenses

of up to $25,000 that are permitted to be incurred in connection with permitted investigations

(but not prosecution or any litigation) of the obligations and the liens and security interests

granted under, as applicable, the Credit Documents, Royalty Trust LC Agreement, or Royalty

Trust LC Collateral Agreement (the "***Investigation Amount***") may be paid from Cash Collateral;

*provided*, *further*, that nothing herein shall preclude the use of Cash Collateral, otherwise in a

manner consistent with this Interim Order, to pay any reasonable fees and expenses incurred (w)

31

in opposing any of the foregoing actions, (x) in responding to formal discovery requests brought by third parties in connection with any of the foregoing; (y) in seeking, in good faith, a determination regarding whether the Termination Date occurred or (z) in seeking, in good faith, an order authorizing the Debtors' non-consensual use of Cash Collateral by showing that the Prepetition Secured Parties and Royalty Trust LC Secured Parties are adequately protected.

14.    <u>No Waiver of Secured Parties' Rights; Reservation of Rights</u>.  Notwithstanding any provision in this Interim Order to the contrary and subject in all respects to the Intercreditor Agreement, this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, any of the Prepetition Secured Parties' or Royalty Trust LC Secured Parties' rights with respect to any person or entity other than the Debtors or with respect to any other collateral owned or held by any person or entity other than the Debtors.  The rights of the Prepetition Secured Parties and Royalty Trust LC Secured Parties are expressly reserved and entry of this Interim Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, of the following:

(a)    the Prepetition Secured Parties' rights under the Credit Documents and the Royalty Trust LC Secured Parties' rights under the Royalty Trust LC Agreement and Royalty Trust LC Collateral Agreement;

(b)    the Prepetition Secured Parties' and Royalty Trust LC Secured Parties' rights to seek any other or supplemental relief in respect of the Debtors;

(c)    the Prepetition Secured Parties' and Royalty Trust LC Secured Parties' rights to seek modification of the grant of adequate protection provided under this Interim Order so as to provide different or additional adequate protection at any time;

(d)    any of the First Lien Secured Parties' or Royalty Trust LC Secured Parties' rights under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to: (i) request modification of the Automatic Stay; (ii) request dismissal of these Chapter 11 Cases, conversion of any of these Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with extended powers; or

32

(iii) propose, subject to section 1121 of the Bankruptcy Code, a chapter 11 plan or plans;

(e)     any of the First Lien Secured Parties' right to credit bid to the fullest extent provided for in section 363(k) of the Bankruptcy Code up to the full amount of any remaining First Lien Obligations in the sale of any Prepetition Collateral, or pursuant to (i) section 363 of the Bankruptcy Code; (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code; or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code;

(f)     the purchase right of the Second Lien Secured Parties, as set forth in Section 5.7 of the Intercreditor Agreement, and, in combination with the exercise of such purchase right, the right of the Second Lien Secured Parties to credit bid to the fullest extent provided for in section 363(k) of the Bankruptcy Code up to the full amount of remaining First Lien Obligations and Second Lien Obligations in the sale of any Prepetition Collateral, or pursuant to (i) section 363 of the Bankruptcy Code; (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code; or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code; or

(g)     any other rights, claims, or privileges (whether legal, equitable or otherwise) of the Prepetition Secured Parties and Royalty Trust LC Secured Parties.

15.     No Waiver Under the Intercreditor Agreement.  Nothing herein shall be considered a waiver of any rights of any party under the Intercreditor Agreement.

16.     Modification of Automatic Stay.  The Debtors are authorized and directed to perform all acts and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby.  The Automatic Stay is hereby modified to permit the Debtors and each of the Prepetition Secured Parties to accomplish each of the transactions contemplated by this Interim Order.  The Automatic Stay is hereby further modified to permit the Royalty Trust LC Issuer to apply funds from the Royalty Trust LC Deposit Account against the Royalty Trust

33

LC Indebtedness solely to the extent permitted under the Royalty Trust LC Agreement and Royalty Trust LC Collateral Agreement.

17. <u>506(c) Waiver</u>. Subject to entry of the Final Order, all rights to surcharge any Prepetition Secured Party, any of the Secured Obligations, any of their respective claims or the Prepetition Collateral (including Cash Collateral) pursuant to sections 506(c) or 105(a) of the Bankruptcy Code, or any other applicable principal in equity or law, shall be and are hereby finally and irrevocably waived, and such waiver shall be binding upon the Debtors and all parties in interest in these Chapter 11 Cases, and no costs or expenses of administration which have been or may be incurred in any of these Chapter 11 Cases at any time shall be charged against any of the foregoing without the prior written consent of the First Lien Agent and no such consent shall be implied from any other action, inaction, or acquiescence by any of the Prepetition Secured Parties or their respective representatives or from the Prepetition Secured Parties' consent to the Approved Budget or any provision of this Interim Order or the Final Order; *provided*, for the avoidance of doubt, subject in all respects to the Intercreditor Agreement, that the consent of the First Lien Agent to any surcharge shall in no way affect any right of any Second Lien Secured Party to object to such surcharge.

18. <u>Payments Free and Clear</u>. Any and all payments or proceeds remitted to the Prepetition Secured Parties pursuant to the provisions of the Interim Order or any subsequent order of the Court shall be irrevocable (subject to paragraphs 12 and 14 of this Interim Order), received free and clear of any claim, charge, assessment or other liability, including, without limitation, subject to entry of the Final Order, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b) of the Bankruptcy Code, and solely in the case of payments made or

34

proceeds remitted after the delivery of a Carve-Out Trigger Notice, subject to the Carve-Out in all respects.

19.    <u>Bankruptcy Code Section 552(b)</u>.  The Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral, subject to paragraph 12 of this Interim Order.

20.    <u>No Marshaling/Application of Proceeds</u>.  Subject to entry of the Final Order, the Agents shall be entitled to apply the payments or proceeds of the Prepetition Collateral (including the Cash Collateral) in accordance with the provisions of the Credit Documents, and, subject to the Carve-Out, and in no event shall any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral (including the Cash Collateral) for the benefit of any non-Prepetition Secured Party.

21.    <u>Restrictions on Granting Post-Petition Claims and Liens</u>.  Except as expressly provided in this Interim Order, it shall be an event of default with respect to the consensual use of Cash Collateral for the Debtors to offer or grant to any person other than the Prepetition Secured Parties any claim or lien that is *pari passu* with or senior to the claims and liens of any of the Prepetition Secured Parties or the Royalty Trust LC Lien and the Debtors' right to use Cash Collateral under the terms of this Interim Order shall terminate without further order of the Court immediately upon such event of default.

35

22.      <u>Automatic Effectiveness of Liens</u>.  The Adequate Protection Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable (subject to the provisions of paragraph 4(i) of this Interim Order) and effective by operation of law as of the Petition Date, having the priority set forth in paragraph 4 of this Interim Order, without any further action by the Debtors or the Prepetition Secured Parties and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office, the U.S. Copyright Office or the Library of Congress or other documents or the taking of any other actions.  If the First Lien Agent hereafter requests that the Debtors execute and deliver to it financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by the First Lien Agent to be reasonably necessary or desirable to further evidence the perfection of the Adequate Protection Liens, as applicable, the Debtors are hereby directed to execute and deliver such financing statements, security agreements, mortgages collateral assignments, instruments and documents, and the First Lien Agent is hereby authorized to file or record such documents in their discretion without seeking modification of the Automatic Stay, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

23.      <u>Binding Effect</u>.  Subject to paragraph 12 of this Interim Order, the provisions of this Interim Order shall be binding upon and inure to the benefit of the Prepetition Secured Parties to the extent and as set forth herein, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the

36

property of the estate of any of the Debtors).  To the extent permitted by applicable law, this Interim Order shall bind any trustee hereafter appointed or elected for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of these Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

24.    <u>Notices and Documents and Communications pursuant to this Interim Order; Invoices.</u>  All notices, documents and other communications provided for herein (including the delivery of the Proposed Budgets under paragraph 3 of this Interim Order) shall be in writing (including by email) and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, or email as follows,

a)    if to the Debtors,

Enduro Resource Partners LLC
777 Main Street, Suite 800
Fort Worth, TX 76102
Attn:
Kimberly A. Weimer, Vice President and Chief Financial Officer
    (kweimer@endurores.com)

*with a courtesy copy (that does not constitute notice) to:*

Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Attn:
Caroline A. Reckler (caroline.reckler@lw.com)
Matthew L. Warren (matthew.warren@lw.com)

b)    if to the First Lien Agent,

Agency Management Services
Bank of America, N.A.
222 Broadway
New York, NY 10038
Mail code NY3-222-14-03
Attn:

37

Don Pinzon  (don.b.pinzon@baml.com)

*with a copy to:*

Damian S. Schaible
Aryeh Ethan Falk
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn:
Damian S. Schaible (damian.schaible@davispolk.com)
Aryeh Ethan Falk (aryeh.falk@davispolk.com)

and

Robert J. Dehney
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Flr.
        P.O. Box 1347
        Wilmington, DE  19899-1347
        RDehney@MNAT.com

c)        if to the Royalty Trust LC Issuer,

Agency Management Services
Bank of America, N.A.
222 Broadway
New York, NY 10038
Mail code NY3-222-14-03
Attn:
Don Pinzon  (don.b.pinzon@baml.com)

*with a copy to:*

Damian S. Schaible
Aryeh Ethan Falk
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn:
Damian S. Schaible (damian.schaible@davispolk.com)
Aryeh Ethan Falk (aryeh.falk@davispolk.com)

and

Robert J. Dehney

38

Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Flr.
      P.O. Box 1347
      Wilmington, DE  19899-1347
      RDehney@MNAT.com

d)      if to the Second Lien Agent,

Wilmington Trust, National Association
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attn:  Enduro Resource Partners LLC Administrator
Email: jjames@wilmingtontrust.com
      loanagency@wilmingtontrust.com

*with a copy to:*

Alice Belisle Eaton
Samuel E. Lovett
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:
Alice Belisle Eaton (aeaton@paulweiss.com)
Samuel E. Lovett (slovett@paulweiss.com)

All invoices for the adequate protection payments under paragraph 4 of this Interim Order shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by email to the Debtors as follows:

Enduro Resource Partners LLC
777 Main Street, Suite 800
Fort Worth, TX 76102
Attn:
Kimberly A. Weimer, Vice President and Chief Financial Officer
(kweimer@endurores.com)

*with a courtesy copy (that does not constitute notice) to:*

Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Attn:

39

Caroline A. Reckler (caroline.reckler@lw.com)
Matthew L. Warren (matthew.warren@lw.com)

and each such invoice shall be paid by the Debtors pursuant to the terms of paragraph 4 of this Interim Order.

25.     <u>Survival</u>.  The provisions of this Interim Order, except as otherwise superseded by the provisions of the Final Order, and any actions taken pursuant hereto shall survive the entry of any order:  (a) confirming any plan of reorganization in any of these Chapter 11 Cases; (b) converting any of these Chapter 11 Cases to a chapter 7 case, or (c) dismissing any of these Chapter 11 Cases, and, with respect to the entry of any order as set forth in clause (b) or (c) of this paragraph 25, the terms and provisions of this Interim Order, except as otherwise superseded by the provisions of the Final Order, as well as the Adequate Protection Liens and the Adequate Protection Superpriority Claims shall continue in full force and effect notwithstanding the entry of any such order.

26.     <u>Effect of Dismissal of Chapter 11 Cases</u>.  If any of these Chapter 11 Cases is dismissed, converted, or substantively consolidated, such dismissal, conversion, or substantive consolidation of these Chapter 11 Cases shall not affect the rights of the Prepetition Secured Parties or the Royalty Trust LC Secured Parties under this Interim Order, and all of their rights and remedies thereunder shall remain in full force and effect as if these Chapter 11 Cases had not been dismissed, converted or substantively consolidated.  If an order dismissing any of these Chapter 11 Cases is at any time entered, such order shall provide or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that:  (a) subject to paragraph 12 of this Interim Order, the Prepetition Liens, Adequate Protection Liens, and Adequate Protection Superpriority Claims granted to and conferred upon the Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim

40

Order (and that such Adequate Protection Superpriority Claims shall, notwithstanding such dismissal, remain binding on all interested parties) and (b) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the Prepetition Liens, Adequate Protection Liens, and Adequate Protection Superpriority Claims referred to in this Interim Order.

27.    <u>Cash Management</u>.    The Debtors shall maintain their cash management arrangements in a manner substantially consistent with that described in the *Motion of Debtors for Interim and Final Orders (A) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (B) Authorizing Continuation of Existing Deposit Practices, (C) Authorizing Continuation of Intercompany Transactions, and (D) Granting Superpriority Status to Postpetition Intercompany Claims* (the "***Cash Management Motion***"), as modified by any order entered on the Cash Management Motion.

28.    <u>Headings</u>.  The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of the Interim Order.

29.    <u>Order Effective</u>.   This Interim Order shall be effective as of the date of the signature by the Court.

30.    <u>Proofs of Claim</u>.  None of the Prepetition Secured Parties shall be required to file proofs of claim in any of the Chapter 11 Cases for any Secured Obligation or any Adequate Protection Superpriority Claim, and the Debtors' stipulations in paragraph D herein shall be deemed to constitute a timely filed proof of claim.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date, the First Lien Agent, on behalf of itself and the First Lien Secured Parties and the Second Lien Agent, on behalf of itself and the Second Lien

41

Secured Parties, as applicable, are each hereby authorized and entitled, in their sole and absolute discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Cases for any such claims; for avoidance of doubt, any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the applicable Debtors, rather than as separate proofs of claim against each such Debtor.  Any proof of claim filed by the First Lien Agent or the Second Lien Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the respective Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including, without limitation, administrative claims) in any of these Chapter 11 Cases shall not apply to the Prepetition Secured Parties with respect to the Secured Obligations.  None of the Royalty Trust LC Secured Parties shall be required to file proofs of claim in any of the Chapter 11 Cases for any Royalty Trust LC Indebtedness, and the Debtors' stipulations in paragraph D herein shall be deemed to constitute a timely filed proof of claim.

31.     <u>Controlling Effect of Interim Order</u>.  To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion or any prepetition agreement, the provisions of this Interim Order shall control to the extent of such conflict.

32.     <u>Service of Notice of Interim Order</u>.  Within two business days of the entry of this Interim Order, the Debtors shall service a copy of the same, with a notice of the hearing for entry of a Final Order in accordance with Local Rule 9013-1(m), which service shall include the following parties: all known parties asserting liens against or security interest in, any of the collateral addressed by this Interim Order, the top 30 unsecured creditors as identified in the Debtors' chapter 11 petitions, any statutory committee (if and when it is appointed), the Internal

Revenue Service, any federal or state regulatory authorities governing the Debtors' industry, the U.S. Attorney's Office, the Delaware Attorney General, and the Office of the U.S. Trustee, and any party who has filed a request for notice under Bankruptcy Rule 2002.

33.    _Final Hearing_.  A hearing to consider entry of an order granting the Motion on a final basis (the "***Final Hearing***") shall be held on _____, 2018, at __:____ _.m. (prevailing Eastern time).  Any objections or responses to the entry of such an order must be filed on or before 4:00 p.m. (prevailing Eastern time) on _____, 2018, and served on (a) proposed counsel to the Debtors, (i) Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, Attn:  Caroline Reckler, Matthew Warren and Jason Gott (caroline.reckler@lw.com, matthew.warren@lw.com, and jason.gott@lw.com); and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 King Street, Wilmington, Delaware 19801, Attn:  Mike Nestor and Kara Hammond Coyle (mnestor@ycst.com and kcoyle@ycst.com); (b) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn:  Linda Casey (linda.casey@usdoj.gov); (c) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn:  Damian S. Schaible and Aryeh Ethan Falk (damian.schaible@davispolk.com and aryeh.falk@davispolk.com) and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Flr., Wilmington, DE  19899-1347, Attn: Robert J. Dehney as counsel to the First Lien Agent (rdehney@mnat.com); and (d) Paul, Weiss, Rifkind, Wharton & Garrison, 1285 Avenue of the Americas, New York, New York 10019, Attn: Alice Belisle Eaton and Samuel E. Lovett, as counsel to Merrill Lynch Credit Products, LLC (aeaton@paulweiss.com and slovett@paulweiss.com).  If no objections are timely filed, this Court may enter the Final Order without further notice or a hearing.

Dated: _____, 2018
       Wilmington, Delaware

_____
United States Bankruptcy Judge

US-DOCS\100382323.7#90745224v21
#90745224v26

**Exhibit 1**

**Initial Approved Budget**

**Project Edge**
**Weekly Cash Flow**
*($ in thousands)*

| Week ending: | 5/18/18 | 5/25/18 | 6/1/18 | 6/8/18 | 6/15/18 | 6/22/18 | 6/29/18 | 7/6/18 | 7/13/18 | 7/20/18 | 7/27/18 | 8/3/18 | 8/10/18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast week: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Post-petition week: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Total Cash Receipts | $ 2,139 | $ 7,040 | $ 1,103 | $ 304 | $ 385 | $ 8,262 | $ 1,523 | $ 273 | $ 316 | $ 8,969 | $ 1,533 | $ 727 | $ 344 |
| **Operating Cash Disbursements** | | | | | | | | | | | | | |
| LOE / Capex / Land Lease / Firm Transport | - | - | - | - | (1,030) | (3,789) | (1,260) | (1,296) | (1,296) | (1,296) | (5,566) | (990) | (990) |
| Revenue Disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - |
| G&A & Other | (478) | - | (568) | - | (420) | (51) | (420) | (258) | (427) | (58) | (427) | (246) | (47) |
| Production and Ad Valorem Taxes | - | - | - | - | - | - | - | - | - | - | (202) | - | - |
| Interest and LC Fees | - | - | - | - | - | - | - | - | - | - | - | (14) | - |
| NDRO Trust NPI Distribution | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Cash Disbursements | $ (478) | $ - | $ (568) | $ - | $ (1,450) | $ (3,840) | $ (1,680) | $ (1,553) | $ (1,722) | $ (1,354) | $ (6,194) | $ (1,250) | $ (1,037) |
| **Operating Cash Flow** | **$ 1,660** | **$ 7,040** | **$ 535** | **$ 304** | **$ (1,064)** | **$ 4,422** | **$ (157)** | **$ (1,280)** | **$ (1,407)** | **$ 7,614** | **$ (4,662)** | **$ (524)** | **$ (693)** |
| **Restructuring Disbursements** | | | | | | | | | | | | | |
| FDM Relief: | | | | | | | | | | | | | |
| Lienholder | (1,811) | (2,008) | (1,030) | (1,030) | - | - | - | - | - | - | - | - | - |
| Royalty / Working Interest | - | - | - | (1,494) | (1,565) | - | - | - | (3,234) | - | - | - | (2,852) |
| Tax | - | (192) | - | - | - | (204) | - | - | - | - | - | - | - |
| Wages | - | - | (187) | - | - | - | - | - | - | - | - | - | - |
| Utilities | - | (187) | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | (2,334) | - | - | - | - | (329) | - | - | - | (1,600) | (280) | - | - |
| KEIP | (286) | - | - | - | - | - | - | - | - | - | - | - | - |
| Adequate Assurance | (621) | - | (662) | - | - | - | (1,258) | - | - | - | - | (1,300) | - |
| Total Restructuring Disbursements | $ (5,051) | $ (2,387) | $ (1,879) | $ (2,524) | $ (1,565) | $ (532) | $ (1,258) | $ - | $ (3,234) | $ (1,600) | $ (280) | $ (1,300) | $ (2,852) |
| **Net Cash Flow** | **$ (3,390)** | **$ 4,653** | **$ (1,344)** | **$ (2,220)** | **$ (2,629)** | **$ 3,890** | **$ (1,416)** | **$ (1,280)** | **$ (4,640)** | **$ 6,015** | **$ (4,942)** | **$ (1,824)** | **$ (3,546)** |
| **Available Cash Balance** [1] | | | | | | | | | | | | | |
| Beginning Balance | 26,196 | 22,805 | 27,458 | 26,114 | 23,893 | 21,264 | 25,154 | 23,738 | 22,458 | 17,818 | 23,833 | 18,891 | 17,067 |
| Change +/- | (3,390) | 4,653 | (1,344) | (2,220) | (2,629) | 3,890 | (1,416) | (1,280) | (4,640) | 6,015 | (4,942) | (1,824) | (3,546) |
| **Available Ending Cash Balance** | **$ 22,805** | **$ 27,458** | **$ 26,114** | **$ 23,893** | **$ 21,264** | **$ 25,154** | **$ 23,738** | **$ 22,458** | **$ 17,818** | **$ 23,833** | **$ 18,891** | **$ 17,067** | **$ 13,521** |

(1) Excludes $3.4 million in surety guarantor restricted cash and $750 thousand in NDRO Trust indemnity escrow funds.

**<u>Exhibit C</u>**

<u>Bidding Procedures</u>

#90559476v21

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| ENDURO RESOURCE PARTNERS LLC, *et al.*, | ) | Case No. 18-_____ (___) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | |

### BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS

On [ ● ], 2018, the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered the *Order (I) Approving Bidding Procedures in Connection with Sale of Assets of the Debtors, (II) Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief* [Docket No. __] (the "**Bidding Procedures Order**"),[2] by which the Court approved the following procedures (the "**Bidding Procedures**"). These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of substantially all of the Debtors' assets in one or more packages (each, an "**Asset Package**," and, collectively, the "**Assets**") to be determined with the consent of the Majority First Lien Lenders (as defined below), which shall initially consist of:

- the North Dakota Package;

- the Wyoming Package;

- the North Louisiana Package; and

- the Trust Related Assets Package.

For the avoidance of doubt, interested parties may bid on any Asset Packages individually or in any combination, including all of the Assets.

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's United States federal tax identification number, if applicable, or other applicable identification number, are: Enduro Resource Partners LLC (6288); Enduro Resource Holdings LLC (5571); Enduro Operating LLC (7513); Enduro Management Company LLC (5932); Washakie Midstream Services LLC (7562); and Washakie Pipeline Company LLC (7798). The debtors' mailing address is 777 Main Street, Suite 800, Fort Worth, Texas 76102.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

**1.      Submissions to the Debtors**.

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided (collectively, the "***Notice Parties***"):

A.      **Debtors**. Enduro Resource Partners, 777 Main Street, Suite 800, Fort Worth, Texas 76102, Attn:  Jonny Brumley (jsbrumley@endurores.com) and Kim Weimer (kweimer@endurores.com).

B.      **Debtors' Proposed Counsel**.  Proposed Counsel to the Debtors, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, Attn:    Caroline Reckler (caroline.reckler@lw.com) and Matthew Warren (matthew.warren@lw.com); and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael Nestor (mnestor@ycst.com) and Kara Coyle (kcoyle@ycst.com).

C.      **Debtors' Proposed Financial Advisors**.  Proposed financial advisors to the Debtors, Evercore Group L.L.C. ("***Evercore***"), 55 East 52nd Street, New York, New York 10055, Attn:  Stephen Hannan (hannan@evercore.com) and Matthew Moss (matthew.moss@evercore.com); and Alvarez & Marsal North America, LLC ("***A&M***"), 2100 Ross Avenue, Dallas, Texas 75201, Attn:   Jim Grady (jgrady@alvarezandmarsal.com)          and          Taylor          Atwood (tatwood@alvarezandmarsal.com).

D.      **Counsel to First Lien Agent**. Counsel to the agent under the Debtors' first lien credit facility (the "***First Lien Agent***," and the lenders holding more than 50 percent of the outstanding loans under such credit facility, the "***Majority First Lien Lenders***"), Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn:   Damian S. Schaible and Aryeh Ethan Falk (enduro.auction@davispolk.com).

E.      **Financial Advisors to First Lien Agent**. Financial advisors to the First Lien Agent, RPA Advisors, LLC, One Rockefeller Plaza, Tenth Floor, New York, New York 10020, Attn:  Barry Kesler (bkesler@rpaadvisors.com).

**2.      Potential Bidders**.

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity (other than any Stalking Horse Bidder) interested in consummating a Sale (a "***Potential Bidder***") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion:

(i)      an executed confidentiality agreement on terms acceptable to the Debtors (a "***Confidentiality Agreement***"), to the extent not already executed; and

(ii)      the most current audited and latest unaudited financial statements (the "***Financials***") of the Potential Bidder (or, if the Potential Bidder is an

2

entity formed for the purpose of acquiring the Assets (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors and the Majority First Lien Lenders, and (y) a written commitment acceptable to the Debtors and their advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale).

3.    **Stalking Horse Bidders.**

The Debtors have entered into agreements (each, a "***Stalking Horse Agreement***") with parties (each, a "***Stalking Horse Bidder***") who will act as stalking horse for the North Dakota Package, the Wyoming Package, and the Trust Related Assets Package.  The Debtors, with the consent of the Majority First Lien Lenders, may (a) select one or more parties to act as a Stalking Horse Bidder for the North Louisiana Package, (b) negotiate the terms of and enter into one or more Stalking Horse Agreements with any such Stalking Horse Bidder for the North Louisiana Package (subject to higher or better bids as contemplated herein), and (c) agree to provide Bid Protections to such Stalking Horse Bidder, subject to approval of the Court after notice and an opportunity to object as set forth below; *provided* that no insider or affiliate of the Debtors shall be entitled to any Bid Protections.

Parties that are interested in serving as a Stalking Horse Bidder with respect to the North Louisiana Package are requested to submit proposed Stalking Horse Agreements by [June 15, 2018] (the "***Proposed Stalking Horse Agreement Submission Deadline***").   If, under the proposed Stalking Horse Agreement selected by the Debtors with the consent of the Majority First Lien Lenders, the proposed Stalking Horse Bidder will be entitled to Bid Protections in the aggregate worth four percent (4%) or less of the purchase price thereunder, the Debtors shall file a notice of entry into any Stalking Horse Agreement(s) with respect to the North Louisiana Package (a "***Stalking Horse Notice***") with the Court on or before June 19, 2018 (the "***Stalking Horse Notice Deadline***"), which notice(s) shall include any applicable proposed Stalking Horse Agreement(s) and set forth the terms of the Bid Protections proposed to be given to any such Stalking Horse Bidder(s) for the North Louisiana Package.  The Stalking Horse Notice shall be served (a) counsel to the First Lien Agent; (b) counsel to the Debtors' second lien lenders; (c) counsel to any statutory committee appointed in the Debtors' chapter 11 cases; and (d) the Office of the United States Trustee for the District of Delaware (collectively, the "***Stalking Horse Notice Parties***"), with no further notice being required.  The Stalking Horse Notice Parties shall have until seven (7) calendar days from the filing of a Stalking Horse Notice (the "***Bid Protections Objection Deadline***") to file an objection solely as to any proposed Bid Protections related thereto and serve such objection upon the Stalking Horse Notice Parties.  Once the Bid Protections Objection Deadline has passed, (a) if no objection has been timely filed, the Stalking Horse Agreement and the Bid Protections shall be deemed approved under the Bidding Procedures Order; or (b) if an objection has been timely filed, the Court may enter an order (the "***Stalking Horse Approval Order***") approving the Debtors' entry into the proposed Stalking Horse Agreement(s), and the Bid Protections related thereto, (x) upon certification of counsel if such objection has been resolved, or (y) after an emergency hearing.

3

The Debtors shall have the right to extend the Proposed Stalking Horse Agreement Submission Deadline and the Stalking Horse Notice Deadline, in each case with the consent of the Majority First Lien Lenders.

**4.    Qualified Bidders.**

(a)    A "***Qualified Bidder***" is a Potential Bidder whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, whose Bid is a Qualified Bid, and that the Debtors, with the consent of the Majority First Lien Lenders,[3] determine should be considered a Qualified Bidder. Within two business days after the Bid Deadline, the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder with respect to a particular Asset Package and shall provide to the Stalking Horse Bidder for such Asset Package (if any) a copy of each Qualified Bid submitted by a Qualified Bidder relating to such Asset Package.  Each Stalking Horse Bidder shall be deemed a Qualified Bidder at all times and for all purposes with respect to the Asset Package to which its Bid (each, a "***Stalking Horse Bid***") relates, and notwithstanding anything in these Bidding Procedures, each Stalking Horse Bid shall be deemed a Qualified Bid for all purposes.

(b)    If any Potential Bidder is determined by the Debtors and the Majority First Lien Lenders not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit and all accumulated interest thereon on or within five business days after the Bid Deadline.

(c)    Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Except as otherwise set forth in an applicable Stalking Horse Agreement, without the written consent of the Debtors and the Majority First Lien Lenders, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided that* any Qualified Bid may be improved at the Auction as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

**5.    Due Diligence**.

Only Potential Bidders that, upon submission of a Qualified Bid, will be Qualified Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors. **No**

---

[3]    In each instance in these Bidding Procedures where the consent of the Majority First Lien Lenders is required, an email or, solely during the Auction, verbal confirmation, from counsel to the First Lien Agent to proposed counsel to the Debtors shall be sufficient to confirm such consent.

**Qualified Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement.** The Debtors will provide to each Qualified Bidder reasonable due diligence information, as requested by such Qualified Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any Qualified Bidder to the Debtors' electronic data room. For all Qualified Bidders other than the Stalking Horse Bidders, the due diligence period will end on the Bid Deadline, and subsequent to the expiration of the due diligence period, the Debtors shall have no obligation to furnish any due diligence information. Each Stalking Horse Bidder's due diligence period has expired or will expire in accordance with the applicable Stalking Horse Agreement.

The Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or the Sale to any person except to a Qualified Bidder or to such Qualified Bidder's duly authorized representatives to the extent expressly permitted by the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Qualified Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to Qualified Bidders who, at such time and in the Debtors' reasonable business judgment after consultation with the First Lien Agent, have not established, or who have raised doubt, that such Qualified Bidder intends in good faith to, or has the capacity to, consummate the applicable Sale.

The Debtors also reserve the right, subject to the terms of any Stalking Horse Agreement, to withhold any diligence materials that the Debtors determine are sensitive after notifying the Qualified Bidder requesting such materials of such determination. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Qualified Bidder in accordance with these Bidding Procedures.

**All due diligence requests must be directed to Evercore Group L.L.C., 55 East 52nd Street, New York, New York 10055, Attention: Matthew Moss; Phone number: (646) 264-2384; Email: matthew.moss@evercore.com.**

(a)    **Communications with Qualified Bidders**.

Notwithstanding anything to the contrary in these Bidding Procedures, all direct communications between and amongst Qualified Bidders regarding the Debtors or their Assets shall involve the Debtors and the Debtors' advisors. No Potential Bidder shall communicate with any other Potential Bidder absent prior written consent from the Debtors.

(b)    **Due Diligence from Qualified Bidders**.

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Qualified Bidder to consummate the applicable Sale. Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine, with the consent of the Majority First Lien Lenders, that such bidder is no longer a Qualified Bidder or that a bid made by such Qualified Bidder is not a Qualified Bid.

The Debtors, the First Lien Agent, the First Lien Lenders (as defined below), and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable Confidentiality Agreement or the confidentiality provisions under the First Lien Credit Agreement, if applicable, except as otherwise set forth in this section of these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or otherwise in connection with the chapter 11 cases or in accordance with the terms of any applicable Confidentiality Agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (i) with the prior written consent of such bidder; (ii) to the bidder disclosing the confidential information; and (iii) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

**6.**     **Bid Requirements**.

A proposal, solicitation, or offer (each, a "***Bid***") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (the "***Bid Requirements***") as determined by the Debtors, in their reasonable business judgment, and with the consent of the Majority First Lien Lenders, shall constitute a "***Qualified Bid***"). Each Stalking Horse Agreement will be deemed a Qualified Bid for all purposes.

**(a)**     **Assets**. Each Bid must clearly state which assets and liabilities of the Debtors that the Qualified Bidders are agreeing to purchase and assume.

**(b)**     **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid for the applicable Asset Package, including and identifying separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids (the "***Purchase Price***"). Each Bid must also specify how the Purchase Price is allocated among the Assets within the applicable Asset Package and, if the Bid is for assets in more than one Asset Package, how the Purchase Price is allocated among the applicable Asset Packages.

**(c)**     **Minimum Bid**. The aggregate consideration proposed by each Bid must equal or exceed the sum of (the "***Minimum Bid***"):

- $47,800,000 in cash for the North Dakota Package;

- $5,675,000 in cash for the Wyoming Package;

- $14,000,000 in cash for the North Louisiana Package; and

- $29,100,000 in cash for the Trust Related Assets Package.

**(d)**     **Deposit**. Each Bid, other than a Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate cash and non-cash Purchase Price

of the Bid, to be held in a segregated account to be identified and established by the Debtors (the "**_Deposit_**").  Except with respect to a Stalking Horse Bid, the Debtors reserve the right, with the consent of the Majority First Lien Lenders, to increase the percentage of the Purchase Price to be included in the Deposit.

(e)      **Assumption of Obligations**.  Each Bid must expressly assume all of the obligations contemplated to be assumed by, and on terms no less favorable to the Debtors than, the applicable Stalking Horse Agreement (if any), as determined in the Debtors' business judgment, and after consultation with the Majority First Lien Lenders.  If no Stalking Horse Agreement exists as to the Asset Package subject to such Bid, the Bid must expressly state all the obligations to be assumed by the Bidder pursuant to such Bid.  Other than the obligations to be assumed, the Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "**_Encumbrances_**"), and any Encumbrances shall attach to the net proceeds of the Sales after payment of any applicable Bid Protections.

(f)      **The Same or Better Terms**. In addition to the Purchase Price meeting or exceeding the applicable Minimum Bid, each Bid must be on terms that are not more burdensome or conditional, in the Debtors' business judgment and after consultation with the First Lien Agent, than the terms of the applicable Stalking Horse Agreement (if any). Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid.  If a Stalking Horse Agreement exists as to the Asset Package subject to the Bid, each Bid must be based on the form of the applicable Stalking Horse Agreement and must include a copy of the applicable Stalking Horse Agreement clearly marked to show all changes requested by the Qualified Bidder, including those relating to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid (the "**_Qualified Bid Documents_**").

(g)      **Committed Financing**.  To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtors and the Majority First Lien Lenders that demonstrates that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions.  Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have only those covenants and conditions acceptable to the Debtors and the Majority First Lien Lenders.

(h)      **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtors' business judgment, and after consultation with the First Lien Agent, than those set forth in the applicable Stalking Horse Agreement (if any).

**(i)  Identity**.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Qualified Bidder if such Qualified Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific persons and counsel whom Evercore and Latham & Watkins LLP should contact regarding such Bid.

**(j)  Demonstrated Financial Capacity**.  A Qualified Bidder must have, in the Debtors' business judgment, with the consent of the Majority First Lien Lenders, the necessary financial capacity to consummate the proposed transactions required by its Bid (including, if necessary, to obtain transfer of any of the Debtors' permits and to obtain any necessary surety bonds or other financial assurances) and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

**(k)  Time Frame for Closing**.  Closing of the Sale as to any Asset Package related to a Bid by a Qualified Bidder (a "*Closing*") must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors and the Majority First Lien Lenders.

**(l)  Binding and Irrevocable**.  Except as provided herein, a Qualified Bidder's Bid for a particular Asset Package shall be irrevocable unless and until the Debtors accept a higher Bid for such Asset Package and such Qualified Bidder is not selected as the Backup Bidder for such Asset Package.  If selected as Backup Bidder, such Bid shall be irrevocable until the Closing of a Successful Bid for such Asset Package.

**(m)  Expenses; Disclaimer of Fees**.  Each Bid (other than a Stalking Horse Bid) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidders) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

**(n)  Authorization**.  Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors and the Majority First Lien Lenders) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

**(o)  As-Is, Where-Is**.  Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations,

promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid.

(p)     **Adherence to Bid Procedures**.  By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

(q)     **Regulatory Approvals and Covenants**.  A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the applicable Sale, if any, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible) and any undertakings that will be required by the Debtors in connection with such regulatory and third party approvals.

(r)     **Consent to Jurisdiction**.  The Qualified Bidder must submit to the jurisdiction of and entry of final orders by the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the transaction documents related to the Sale, and the Closing, as applicable.

(s)     **Bid Deadline.** Each Bid must be transmitted via email (in .pdf or similar format) so as to be ***actually received*** on or before 5:00 p.m. (prevailing Eastern Time) on July 11, 2018 (the "***Bid Deadline***") by:

    (i)     The Debtors, Enduro Resource Partners, 777 Main Street, Suite 800, Fort Worth, Texas 76102, Attn:  Jonny Brumley (jsbrumley@endurores.com) and Kim Weimer (kweimer@endurores.com);

    (ii)    Proposed counsel to the Debtors, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, Attn:  Caroline Reckler (caroline.reckler@lw.com) and Matthew Warren (matthew.warren@lw.com);

    (iii)   Proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn:  Michael Nestor (mnestor@ycst.com) and Kara Coyle (kcoyle@ycst.com);

    (iv)    Proposed financial advisors to the Debtors, Evercore, 55 East 52nd Street, New York, New York 10055, Attn:  Stephen Hannan (hannan@evercore.com) and Matthew Moss (matthew.moss@evercore.com);

    (v)     Counsel to the applicable Stalking Horse Bidder, if any;

<ol type="i" start="6">
<li>Counsel to the First Lien Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Damian S. Schaible and Aryeh Ethan Falk (enduro.auction@davispolk.com); and</li>
</ol>

<ol type="i" start="7">
<li>Financial advisors to the First Lien Agent, RPA Advisors, LLC, One Rockefeller Plaza, Tenth Floor, New York, New York 10020, Attn: Barry Kesler (bkesler@rpaadvisors.com).</li>
</ol>

**7.    Right to Credit Bid.**

For purposes hereof, should the First Lien Agent and/or the lenders under the First Lien Credit Agreement[4] (the "***First Lien Lenders***") submit a credit bid, the First Lien Agent and/or First Lien Lenders shall be deemed to be a Qualified Bidder, and any such credit bid shall be considered a Qualified Bid and may be submitted at any time prior to or at the Auction provided that it otherwise complies with the requirements for a Qualified Bid as set forth above, provided, that, (a) in the case of a credit bid by the First Lien Agent, the First Lien Agent shall have provided the Debtors with copies of any direction by the Lenders under the First Lien Credit Agreement to authorize the submission of such credit bid by the First Lien Agent, and (b) notwithstanding anything to the contrary in these Bidding Procedures, from and after the submission of such credit bid, the Debtors shall not be required to consult with the First Lien Agent or First Lien Lenders or obtain the consent of the First Lien Agent or Majority First Lien Lenders in connection with the sale of the Asset Package subject to such credit bid unless and until such credit bid is withdrawn in writing by the First Lien Agent and/or First Lien Lenders, as applicable; *provided* that neither the First Lien Agent nor the First Lien Lenders shall be entitled to any Bid Protections (as defined in these Bidding Procedures). Credit bids, if any, by the First Lien Agent and/or First Lien Lenders will not impair or otherwise affect the Stalking Horse Bidders' entitlement to the Bid Protections granted under the Bidding Procedures Order; *provided* that the First Lien Lenders shall not be entitled to make such a credit bid as to any Asset Package which is subject to a Stalking Horse Agreement which exceeds the Stalking Horse Bid as to that Asset Package.

**8.    Auction**.

If the Debtors receive a Qualified Bid for a given Asset Package, other than the applicable Stalking Horse Bid for such Asset Package, if any, the Debtors will conduct the Auction to determine the Successful Bidders with respect to such Asset Package.  If the Debtors do not receive a Qualified Bid for a given Asset Package (other than the Stalking Horse Bid for such Asset Package, if applicable), the Debtors will not conduct the Auction as to such Asset Package and shall designate the Stalking Horse Bidder's Bid for such Asset Package, if any, as the Successful Bid for such Asset Package.

---

[4]    "***First Lien Credit Agreement***" means that certain Amended and Restated Credit Agreement, dated as of August 1, 2013, by and among Enduro Resource Partners LLC, as borrower, Bank of America, N.A., as administrative agent, and the lenders and other parties thereto (as subsequently modified, amended, or supplemented from time to time).

US-DOCS\99990149.13

No later than 2 calendar days after the Bid Deadline, by 5:00 p.m. (prevailing Eastern time), the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid for the Asset Package for which such Qualified Bidder submitted a Bid, as determined in the Debtors' reasonable business judgment, with the consent of the Majority First Lien Lenders (the "***Baseline Bid***"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid for each Asset Package and which Qualified Bid constitutes the Successful Bid for each Asset Package shall take into account any factors the Debtors, after consultation with the First Lien Agent, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the number, type, and nature of any changes to the applicable Stalking Horse Agreement, if any, requested by the Qualified Bidder, including the type and amount of Assets sought and obligations to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the tax consequences of such Qualified Bid (collectively, the "***Bid Assessment Criteria***").

If an Asset Package is subject to a Stalking Horse Agreement, and if a Qualified Bid by a bidder other than a Stalking Horse Bidder is selected as to the Baseline Bid for that Asset Package, then the Stalking Horse Bidder may elect to match any such Baseline Bid and the bid by the Stalking Horse Bidder shall therefore be considered the Baseline Bid for purposes of any Auction relating to that Asset Package. In matching any such Baseline Bid, the Stalking Horse Bidder shall be entitled to a credit against the amount of any such matching bid equal to the amount of the Stalking Horse Bidder's Bid Protections pursuant to the Applicable Stalking Horse Agreement to take into account that, if the Stalking Horse is the Successful Bidder (as defined below), no payment of the Stalking Horse's Bid Protections will be required. Conversely, if a Bidder other than the Stalking Horse Bidder is the Successful Bidder as to any Asset Package subject to a Stalking Horse Agreement, the net proceeds available to the Selling Debtor will be reduced by the amount of the applicable Bid Protections payable to the Stalking Horse Bidder.

The Auction shall take place at 10:00 a.m. (prevailing Central time) on July 16, 2018, at the offices of Latham & Watkins LLP, 811 South Main Street, Suite 3700, Houston, Texas 77002, or such later date and time as selected by the Debtors with the consent of the Majority First Lien Lenders. The Debtors shall file a notice of the date and time for the Auction no later than 5:00 p.m. (prevailing Eastern time) on July 13, 2018. The Auction shall be conducted in a timely fashion according to the following procedures:

(a)    **The Debtors Shall Conduct the Auction**.

The Debtors and their advisors shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid for each Asset Package. All incremental Bids made thereafter for a given Asset Package shall be Overbids (defined below) for such Asset Package and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on such Asset Package. The Debtors shall maintain a written transcript of all Bids made and

announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only the Debtors, the Qualified Bidders, the First Lien Agent, any First Lien Lender, and each such parties' respective legal and financial advisors shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to bid at the Auction.

**(b)** **Terms of Overbids**.

"*Overbid*" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid and accepted by the Debtors as a higher or otherwise better bid. Each applicable Overbid must comply with the following conditions:

    (i)    **Minimum Overbid Increment**. The initial Overbid for a given Asset Package, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid for such Asset Package, giving effect to the credit for the Bid Protections for any Stalking Horse Bid that is a Baseline Bid (as described below), by an incremental amount that is not less than:

- $100,000 for the North Dakota Package;

- $500,000 for the Wyoming Package;

- $500,000 for the North Louisiana Package; and

- $500,000 for the Trust Related Assets Package (each, a "***Minimum Overbid Increment***"), with any Overbid for multiple Asset Packages incorporating an aggregate incremental amount equal to the sum of each applicable Minimum Overbid Increment;

(such initial Overbid, the "***Initial Minimum Overbid***"); and each successive applicable Overbid for a given Asset Package shall exceed the then-existing Overbid for such Asset Package by an incremental amount that is not less than the Minimum Overbid Increment, with any Overbid for multiple Asset Packages incorporating an aggregate incremental amount equal to the sum of each applicable Minimum Overbid Increment. Except as otherwise provided in any Stalking Horse Agreement, the Debtors reserve the right, after consultation with the First Lien Agent, to announce reductions in the Minimum Overbid Increment for a given Asset Package at any time during the Auction, other than with respect to the Initial Minimum Overbid. For the avoidance of doubt, if any Overbid is made as to any Asset Package for which there is a Stalking Horse Agreement, the Stalking Horse Bidder shall be entitled to a dollar-for-dollar credit against the amount of any such Overbid equal to the amount

12

of the Stalking Horse Bidder's Bid Protections pursuant to the Applicable Stalking Horse Agreement to take into account that, if the Stalking Horse is the Successful Bidder (as defined below), no payment of the Stalking Horse's Bid Protections will be required. Conversely, if a Bidder other than the Stalking Horse Bidder is the Successful Bidder as to any Asset Package subject to a Stalking Horse Agreement, the net proceeds available to the Selling Debtor will be reduced by the amount of the applicable Bid Protections of the Stalking Horse Bidder.

(ii)    **Consideration**. Additional consideration in excess of the amount set forth in the respective Baseline Bid may include: (a) cash and/or noncash consideration; *provided*, *however*, that the value for such noncash consideration shall be determined by the Debtors in their reasonable business judgment, with the consent of the Majority First Lien Lenders; (b) in the case of a Bid by the First Lien Agent or the First Lien Lenders, subject to Section 6 of these Bid Procedures, a credit bid of up to the full amount of the First Lien Lenders' allowed secured claims, *provided*, *however*, that nothing herein shall impact any parties' rights with respect to either (I) challenges to the liens or claims of the First Lien Agent or the First Lien Lenders, including any challenges under section 363(k) of the Bankruptcy Code, or (II) assertions under section 506(c) of the Bankruptcy Code or the effects that such challenges or assertions have, if any, on the ability of the First Lien Agent or the First Lien Lenders to credit bid; and (c) in the case of a Bid by the Stalking Horse Bidder, a credit against the Bid equal to the full amount of the Stalking Horse Bidder's Bid Protections under the applicable Stalking Horse Agreement.

(iii)    **Conclusion of Each Overbid Round**. Upon the solicitation of each round of applicable Overbids, the Debtors, with the consent of the Majority First Lien Lenders, may announce a deadline (as the Debtors may, in their business judgment, and with the consent of the Majority First Lien Lenders, extend from time to time, the "*Overbid Round Deadline*") by which time any Overbids must be submitted to the Debtors.

(iv)    **Overbid Alterations**. An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, and after consultation with the First Lien Agent, but shall otherwise comply with the terms of these Bidding Procedures.

(v)    **Announcing Highest Bid**. Subject to the rights of any Stalking Horse Bidder, subsequent to each Overbid Round Deadline, the Debtors, with the consent of the Majority First Lien Lenders, shall announce for each Asset Package whether the Debtors have identified in the initial applicable Overbid round, an Overbid as being higher or otherwise better than the Initial Minimum Overbid for such Asset Package, or in subsequent rounds,

13

the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for a given Asset Package (for each Asset Package, the "***Prevailing Highest Bid***").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

(c)     **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment, and with the consent of the Majority First Lien Lenders, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Debtors and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, and with the consent of the Majority First Lien Lenders, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

(d)     **Closing the Auction**.

(i)     The Auction shall continue until there is only one Bid for each Asset Package that the Debtors determine, in their reasonable business judgment, with the consent of the Majority First Lien Lenders, to be the highest or otherwise best Bid for such Asset Package.  Such Bid shall be declared the "***Successful Bid***," for such Asset Package and such Qualified Bidder, the "***Successful Bidder***" for such Asset Package at which point the Auction will be closed as to that Asset Package.  The Auction shall not close with respect to any Asset Package unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

(ii)    For the avoidance of doubt, but without limiting the Bid Protections or the provisions of any Stalking Horse Agreement, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under applicable law.

(iii)   The Debtors shall have no obligation to consider any Bids or Overbids submitted after the conclusion of the Auction, and may not consider any such Bid if a Stalking Horse Bidder has made the Successful Bid or the Backup Bid, and any such Bids or Overbids shall be deemed untimely and shall not constitute a Qualified Bid unless the Debtors, with the consent of the Majority First Lien Lenders, permit such Bid or Overbid.

US-DOCS\99990149.13

(iv)    As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for each Successful Bid and Backup Bid to be filed with the Court.

**(e)    No Collusion; Good-Faith *Bona Fide* Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction on the terms of its Qualified Bid if selected as the Successful Bidder.

**9.    Backup Bidder**.

(a)    Notwithstanding anything in these Bidding Procedures to the contrary, but subject to the terms of any Stalking Horse Agreement, if an Auction is conducted for a given Asset Package, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Asset Package, as determined by the Debtors in the exercise of their reasonable business judgment, and with the consent of the Majority First Lien Lenders (the "***Backup Bid***"), shall be required to serve as a backup bidder (the "***Backup Bidder***") for such Asset Package, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

(b)    The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, subject to the terms of any Stalking Horse Agreement, until the closing of the transaction with the applicable Successful Bidder; *provided* that nothing shall diminish the rights of a Stalking Horse Bidder under any Stalking Horse Agreement. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder or as may otherwise be provided in any Stalking Horse Agreement.

(c)    If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may, with the consent of the Majority First Lien Lenders, select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes, subject to the terms of any Stalking Horse Agreement. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. Subject to the terms of any applicable Stalking Horse Agreement, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including specific performance.

15

10.     **Highest or Otherwise Best Bid**.

When determining the highest or otherwise best Bid for a given Asset Package, as compared to other Bids for such Asset Package, the Debtors may consider the Bid Assessment Criteria in addition to any other factors that the Debtors, and after consultation with the Majority First Lien Lenders, deem appropriate; *provided* that the fact a Bid, if any, is comprised of a credit bid shall not be a factor considered by the Debtors in their determination of the highest or otherwise best Bid.

11.     **Reservation of Rights**.

Subject to the rights of the Stalking Horse Bidders under the terms of their respective Stalking Horse Agreements, the Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, and with the consent of the Majority First Lien Lenders, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) cancelling the Auction; and (e) rejecting any or all bids or Bids; *provided*, *however*, that no such modification may alter, impair, or reduce the rights or protections of any Stalking Horse Bidder under these Bidding Procedures or under the applicable Stalking Horse Agreement.

12.     **Consent to Jurisdiction**.

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of and entry of final orders by the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Qualified Bid Documents, as applicable.

13.     **Sale Hearing**.

A hearing to consider approval of each Sale of the Assets to the Successful Bidders (or to approve the Stalking Horse Agreement(s), as applicable, if no Auction is held) (the "***Sale Hearing***") is currently scheduled to take place at 10:00 a.m. (prevailing Eastern time) on July 19, 2018, or as soon thereafter as the Debtors may be heard, before the Honorable [____], at the Court, 824 North Market Street, [____], Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors, with the consent of the Majority First Lien Lenders, by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

At the Sale Hearing, the Debtors shall present the Successful Bids to the Court for approval.

14.     **Stalking Horse Rights**.

To provide an incentive and to compensate the Stalking Horse Bidders for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have, with the consent of the Majority First Lien Lenders, agreed to pay the respective Stalking Horse Bidders, under the conditions and in the amount set forth in the Bidding Procedures Order, (a) a break-up fee in the amount of:

- $1,350,000 for the North Dakota Package;

- $100,000 for the Wyoming Package; and

- $825,000 for the Trust Related Assets Package;

(each, a "***Break-Up Fee***"), payable pursuant to the terms of each Stalking Horse Agreement in the event that a Stalking Horse Agreement is terminated due to the Debtors entering into an alternative transaction or in other circumstances set forth in the applicable Stalking Horse Agreement, and (b) a reasonable expense reimbursement equal to:

- up to $450,000 for the North Dakota Package;

- up to $75,000 for the Wyoming Package; and

- up to $275,000 for the Trust Related Assets Package;

(each, an "***Expense Reimbursement***" and together with each applicable Breakup Fee, the "***Bid Protections***"), payable pursuant to the terms of each Stalking Horse Agreement in the event that a Stalking Horse Agreement is terminated due to the Debtors entering into an alternative transaction or in other circumstances set forth in the applicable Stalking Horse Agreement. The Bid Protections will be an allowed administrative expense priority claim in accordance with the terms of each Stalking Horse Agreement; *provided*, *however*, that such claim shall in no circumstances be *pari passu* with or senior to the claims granted to the First Lien Agent and/or the First Lien Lenders under any order of the Court granting such parties adequate protection, except that the Bid Protections shall be paid with first priority out of the proceeds of or as a precondition of the Successful Bid.  In the event a Stalking Horse Bidder is not the Successful Bidder, such Stalking Horse Bidder shall deliver to the Debtors any diligence reports prepared in connection with its Bid within two (2) business days following the conclusion of the Sale Hearing.

A Stalking Horse Bidder shall have standing to appear and be heard on all issues related to the Auction, the Sale, and related matters, including the right to object to the sale of the Assets or any portion thereof (including the conduct of the Auction and interpretation of these Bidding Procedures).

15.    **No Modification of Bidding Procedures**.

Except as provided by Section 10 hereof, these Bidding Procedures may not be modified except with the express written consent of the Debtors and the Majority First Lien Lenders.

16.    **Return of Deposit; Remedies**.

The Deposit of the Successful Bidder shall be applied to the respective Purchase Price of such transaction at closing. Subject to the terms of any applicable Stalking Horse Agreement, the Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder, and the Backup Bidder) on or within three business days after the Auction. Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon.

Except as otherwise set forth in the Stalking Horse Agreement with respect to an applicable Stalking Horse Bidder, if a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court, *provided* that nothing herein shall prohibit any party from seeking an additional hearing or order of the Court.

Notwithstanding anything to the contrary contained herein, in the event of a conflict between the remedies set forth in these Bidding Procedures as they relate to a Stalking Horse Bidder, and the remedies set forth in the applicable Stalking Horse Agreement, the remedies set forth in the Stalking Horse Agreement will control.

17.    **Fiduciary Out**.

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of a Debtors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law; *provided* that in the event of any such action, all rights and remedies of any Stalking Horse Bidder in these Bidding Procedures or any Stalking Horse Agreement shall be preserved.

18.    **Contract Procedures**

Within five (5) business days from the entry of the Bidding Procedures Order, the Debtors shall file and serve on all counterparties (the "***Counterparties***") to their executory contracts and unexpired leases (the "***Contracts***") a notice (the "***Cure Notice***") of (a) the potential assumption by the Debtors and assignment to the Successful Bidder(s) of the Contracts, and (b) the proposed amount necessary, under section 365(b)(1) of the Bankruptcy Code, to cure any

18

outstanding monetary defaults and compensate the Counterparties for any pecuniary losses in connection with such assumption and assignment (the "***Proposed Cure Costs***").

If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts Schedule but was not (any such Contract, a "***Previously Omitted Contract***"), the Debtors shall, promptly following discovery thereof (but in no event later than five (5) Business Days following discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted Contract notifying such counterparties of the Debtors' intention to assume and assign such Previously Omitted Contract to the Successful Bidder, including the proposed Cure Costs relating thereto (the "***Previously Omitted Contract Notice***").

Each Counterparty shall have until the earlier to occur of (x) 5:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable), and (y) the Sale Hearing (the "***Contract Objection Deadline***") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, the amount of the Proposed Cure Costs, but excluding any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code or on the basis of the identity of the Successful Bidder.  Any such objection must be filed and served on the Debtors and their proposed co-counsel, the First Lien Agent and its counsel, and the applicable Stalking Horse Bidder (if any) and its counsel, so as to be actually received by the Contract Objection Deadline. Any unresolved such objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.  If any objections to the amount of Proposed Cure Costs remain unresolved as of the date of the Closing of the Sale of any Asset Package, the Debtors may deposit the disputed amount of Proposed Cure Costs relating to such Asset Package in a segregated account to hold pending resolution of such objections.

Each Counterparty may raise objections as to adequate assurance of future performance or on the basis of the identity of the Successful Bidder until the earlier to occur of (x) 5:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of a notice identifying the applicable Successful Bidder, which, for the avoidance of doubt, may be provided with the Cure Notice or the Previously Omitted Contract Notice or at any time thereafter with respect to the Stalking Horse Bidders, and (y) the Sale Hearing (the "***Buyer Specific Objection Deadline***").  Any such objection must be filed and served on the Debtors and their proposed co-counsel, the First Lien Agent and its counsel, and the applicable Successful Bidder or Stalking Horse Bidder (if any), as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline.  Any unresolved such objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

*[Remainder of page intentionally left blank.]*

Dated: _____

    Wilmington, Delaware

_____

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:       mnestor@ycst.com
            kcoyle@ycst.com

- and -

George A. Davis (pro hac vice pending)
Mitchell A. Seider (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone:    (212) 906-1200
Facsimile:    (212) 751-4864
Email:       george.davis@lw.com
            mitchell.seider@lw.com

- and -

Caroline A. Reckler (*pro hac vice* pending)
Matthew L. Warren (*pro hac vice* pending)
Jason B. Gott (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:    (312) 876-7700
Facsimile:    (312) 993-9767
Email:       caroline.reckler@lw.com
            matthew.warren@lw.com
            jason.gott@lw.com

*Proposed Counsel for Debtors and Debtors in Possession*

20

**Exhibit D**

Milestones

1. Chapter 11 proceedings in respect of the Enduro Entities shall have been commenced by no later than May 15, 2018.

2. The Company shall have filed the Plan and Disclosure Statement by no later than three Business Days after the Petition Date.

3. The Company shall have filed a motion seeking approval of the Bidding Procedures by no later than one Business Day after the Petition Date.

4. The Company shall have filed a motion seeking approval of the Cash Collateral Orders by no later than one Business Day after the Petition Date.

5. The Bankruptcy Court shall have entered an order approving the Interim Cash Collateral Order by no later than 3 Business Days after the Petition Date.

6. The Bankruptcy Court shall have entered an order approving the Bidding Procedures by no later than 35 calendar days after the Petition Date.

7. The Bankruptcy Court shall have entered an order approving the Final Cash Collateral Order by no later than 35 calendar days after the Petition Date.

8. The Bankruptcy Court shall have entered an order approving the Disclosure Statement by no later than 42 calendar days after the Petition Date.

9. An auction shall have been held pursuant to the Bidding Procedures by no later than 65 calendar days after the Petition Date.

10. The Bankruptcy Court shall have entered the Sale Order by no later than 72 calendar days after the Petition Date with respect to the Package 1 Assets and Package 3 Assets.

11. The Bankruptcy Court shall have entered the Confirmation Order by no later than 90 calendar days after the Petition Date.

12. The sale of the Package 1 Assets and Package 3 Assets shall have closed by no later than 98 calendar days after the Petition Date.

13. The Plan shall have become effective in accordance with the terms thereof by no later than 98 calendar days after the Petition Date.

**Exhibit E**

Form of Transfer Agreement

Reference is hereby made to that certain Sale and Plan Support Agreement, dated [ ● ], 2018 (as such agreement may be amended, modified or supplemented from time to time, the "***Sale and Plan Support Agreement***") by and among the Enduro Resource Holdings LLC, Enduro Resource Partners LLC, Enduro Operating LLC, Enduro Management Company LLC, Washakie Pipeline Company LLC, Washakie Midstream Services LLC and each of the first lien lenders party thereto. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Sale and Plan Support Agreement.

As a condition precedent to becoming the beneficial holder or owner of [_____] dollars ($_____) of First Lien Loan Claims, the undersigned transferee (the "***Transferee***") hereby agrees to become bound by all of the terms, conditions and obligations of the undersigned transferor (the "***Transferor***") set forth in or contemplated by the Sale and Plan Support Agreement with respect to not only the above referenced First Lien Loan Claims to be transferred by the Transferor but also any other First Lien Loan Claims owned by such Transferee prior to the date hereof. The Transferee acknowledges and agrees that (i) it has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, the Sale and Plan Support Agreement and (ii) all representations and warranties set forth in Section 10 of the Sale and Plan Support Agreement are true and correct in all material respects as of the date hereof with respect to such Transferee.

This Transfer Agreement shall take effect and shall become an integral part of the Sale and Plan Support Agreement immediately upon its execution and the Transferee shall be deemed to be bound by all of the terms, conditions and obligations of the Sale and Plan Support Agreement as of the date hereof with respect to not only the above referenced First Lien Loan Claims to be transferred by the Transferor, but also any other First Lien Loan Claims owned by such Transferee prior to the date hereof.

IN WITNESS WHEREOF, this Transfer Agreement has been duly executed by the undersigned Transferee as of the date specified below.

Date: _____, 201_

|  | |
|---|---|
|  | _____<br>Name of Transferee<br><br>_____<br>Authorized Signatory of Transferee<br><br><br>_____<br>(Type or Print Name and Title of Authorized Signatory)<br><br>Address of Sale Support Party:<br><br>_____<br>_____<br>_____<br>Attn:_____<br>Tel:_____<br>Fax:_____<br>Email:_____ |

*[Signature Page to Second Lien Transfer Agreement]*