## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ENDURO RESOURCE PARTNERS LLC, *et al.*, | Case No. 18-11174 (KG) |
| Debtors.[1] | (Joint Administration Requested) |

## DEBTORS' MOTION FOR ENTRY OF (A) ORDER
## (I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH
## SALE OF ASSETS OF THE DEBTORS AND RELATED BID PROTECTIONS,
## (II) APPROVING FORM AND MANNER OF NOTICE, (III) SCHEDULING AUCTION
## AND SALE HEARING, (IV) AUTHORIZING PROCEDURES GOVERNING
## ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND UNEXPIRED
## LEASES, AND (V) GRANTING RELATED RELIEF; AND (B) ORDER (I) APPROVING
## PURCHASE AGREEMENTS, AND (II) AUTHORIZING SALE FREE AND CLEAR OF
## ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS

The above-captioned debtors and debtors-in-possession (together, the "***Debtors***") hereby apply to this Court (the "***Motion***") for entry of:

### PRELIMINARY STATEMENT

1.     The sale of substantially all of their assets is the lynchpin of the value-maximizing course the Debtors have charted for these chapter 11 cases—that is, to conduct a robust re-marketing process to solicit bids for their assets, consummate one or more sales, and distribute the proceeds to their creditors, all in an optimally efficient and responsible manner.  To that end, the Debtors divided their assets into four packages and executed three stalking horse purchase agreements prepetition that will set a baseline for the re-marketing process, send a strong signal

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's United States federal tax identification number, if applicable, or other applicable identification number, are:  Enduro Resource Partners LLC (6288); Enduro Resource Holdings LLC (5571); Enduro Operating LLC (7513); Enduro Management Company LLC (5932); Washakie Midstream Services LLC (7562); and Washakie Pipeline Company LLC (7798).  The debtors' mailing address is 777 Main Street, Suite 800, Fort Worth, Texas 76102.

to the marketplace, and (the Debtors hope) encourage interested parties to place qualifying bids and participate at an auction to occur in the coming weeks.  Shortly after filing this Motion, the Debtors intend to immediately reengage the marketplace and distribute new marketing materials to begin their in-court marketing efforts formally.  As the next step in this process, the Debtors seek approval of bidding procedures and bid protections in favor of the stalking horse bidders—as well as the authority to enter into a fourth stalking horse agreement—all of which are designed to allow for and entice participation while acknowledging the risks and costs borne by the stalking horse bidders.

2.       While the Debtors believe that a sale will maximize value, they did not arrive at that conclusion lightly, or without seeking input from their secured lenders.  The Debtors spent the better part of two years, beginning in early 2016, working to address a capital structure that was greatly over-levered after commodity prices fell dramatically in 2014 and never fully recovered.  Despite implementing an out-of-court restructuring transaction that resulted in new capital and reduced cash interest expense, the Debtors were not able to position themselves to repay or refinance their first lien credit facility before its March 30, 2018 maturity date. Recognizing their situation, the Debtors initiated discussions with their first lien administrative agent and lenders in late 2017 around potential paths forward.  The Debtors evaluated several options and, with the input of their first lien creditors, determined that a sale process was the best avenue to achieving the greatest returns for their stakeholders.

3.       Working collaboratively with these first lien creditors as well as their second lien lenders, the Debtors and their advisors planned a comprehensive marketing and sale strategy, which is detailed further below.  In total, the Debtors contacted more than 900 parties, had substantive discussions with more than 100, and signed confidentiality agreements with

approximately 50.  This extensive marketing and broad dialogue with dozens of bidders resulted in eight conforming bids received on or before the Debtors' stated bid deadline, as well as other bids that were non-conforming or received after the bid deadline.  After receiving these bids, the Debtors reviewed their options with their advisors, the board of managers, and their first lien lenders and ultimately narrowed the field to the three stalking horse bidders.  While the Debtors engaged in extensive negotiations prior to the commencement of these chapter 11 cases with potential stalking horse bidders for the second asset package, namely the North Louisiana Package (as defined below), the Debtors and such bidders were unable to come to agreement on the terms of a stalking horse bid prior to the date hereof.  As such, the Bidding Procedures contemplate a "reserve price" for the North Louisiana Package by virtue of a minimum required bid of $14,000,000.  In the event the Debtors fail to receive such a bid, or otherwise fail to reach an acceptable purchase agreement with a third party purchaser of the North Louisiana Package, such assets will be acquired by the Debtors' first lien lenders pursuant to a separate purchase agreement and the terms of the chapter 11 plan of liquidation.

4.    With stalking horse bids in hand for three of the four asset packages, the Debtors now seek to take the next steps down the path to maximizing the value they obtain for their assets.  After obtaining this Court's approval of bidding procedures and an order scheduling for an auction and sale hearing, the Debtors will advance toward final approval and consummation of their sale process and, in turn, completion of their liquidation and wind down pursuant to a chapter 11 plan of liquidation.

## RELIEF REQUESTED

5.    By this Motion, the Debtors request entry of:  (a) an order, substantially in the form attached hereto as **Exhibit A** (the "*Bidding Procedures Order*"), (i) approving bidding procedures, substantially in the form attached as Annex 1 to the Bidding Procedures Order (the

"*Bidding Procedures*"), to govern the marketing and sale of substantially all of the Debtors' assets (the "*Assets*"), and approving bid protections in connection therewith as superpriority administrative expenses, (ii) authorizing the Debtors to schedule an auction to sell the Assets (the "*Auction*") and scheduling the hearing to approve a sale of the Assets (the "*Sale Hearing*") for a date that is on or before July 19, 2018, (iii) approving the form and manner of notice of the proposed sale transactions, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines, (iv) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (the "*Assumed Contracts*") to the prevailing bidder(s) acquiring the Debtors' assets (each, a "*Successful Bidder*"), and (v) granting related relief; and (b) one or more orders (collectively, the "*Sale Order*") (i) approving the applicable form(s) of purchase agreement between the Debtors and the Stalking Horse Bidders (as defined below) or any other Successful Bidder(s), and (ii) authorizing the sale(s) (collectively, the "*Sale*") of the Assets and the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidders or such other Successful Bidder free and clear of all liens, claims, encumbrances, and other interests (collectively, "*Liens*"), other than any permitted Liens as set forth in the applicable form(s) of purchase agreement.

## JURISDICTION

6.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b), and, under Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or

judgments in connection herewith consistent with Article III of the United States Constitution. Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code (as defined below), rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Local Rule 6004-1.

## BACKGROUND

7.      On May 15, 2018 (the "***Petition Date***"), the Debtors filed voluntary petitions in this Court commencing cases (the "***Chapter 11 Cases***") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "***Bankruptcy Code***").   The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have been appointed.

8.      The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the *Declaration of Kimberly A. Weimer, Vice President and Chief Financial Officer of Enduro Resource Partners LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***") [D.I. 11] filed on the Petition Date, which is fully incorporated herein by reference.

## THE DEBTORS' PREPETITION MARKETING PROCESS

9.      After diligently considering a number of restructuring alternatives and after discussions with their first lien creditors, the Debtors determined to undertake a comprehensive marketing process.  They compiled a broad buyer list that ultimately included more than 900 parties and developed a smaller, selective list of approximately 60 potential bidders for targeted

follow up action.   They prepared an extensive virtual data room and detailed marketing materials.   They developed a generous but efficient timeline that gave interested parties approximately six weeks to conduct preliminary diligence in the data room before the bid deadline and allowed for more than four weeks after the bid deadline to finalize purchase agreement negotiations.  And, on January 12, 2018, they sent a sale teaser to the entire buyer list to launch the marketing process.

10.     More than 130 potential buyers responded to the teaser distribution, and 49 executed confidentiality agreements to receive more information and were given access to the Debtors' virtual data room in order to conduct due diligence regarding the Assets.  Following substantial due diligence efforts and extensive discussions, the Debtors received eight conforming bids.  Over the ensuing weeks, the Debtors conducted good faith, arms' length negotiations with a number of these bidders simultaneously, ultimately reaching agreement on stalking horse purchase agreements for three out of four of their asset packages, which are detailed further below.  After reviewing all of the bid proposals, the Debtors, in consultation with their advisors, determined that the offers from the Stalking Horse Bidders (as defined below) were the most attractive, in view of the consideration offered thereby and deficiencies in other bids.

11.     Accordingly, with a stalking horse bidding floor in place (the key terms of which have already been subject to a robust market test), the Debtors now seek to promptly effectuate the sale transactions to the Stalking Horse Bidders, subject to a competitive bidding process that is consistent with both the timing of the Chapter 11 Cases and the Debtors' fiduciary duties to maximize value for their estates, stakeholders, and parties in interest.  Upon the Court's entry of the Bidding Procedures Order, the Debtors intend to provide notice of the Bidding Procedures,

the Auction date, the deadline to object to the proposed Sale of the Debtors' assets, and the Sale
Hearing to all potential purchasers of the Assets that have contacted or been contacted by the
Debtors or their advisors during the marketing process to date.

### THE ASSETS AND THE STALKING HORSE AGREEMENTS

12.    The Debtors' Assets are comprised primarily of the Debtors' oil and gas
properties, principally located in North Dakota, Wyoming, Louisiana, Texas, and New Mexico.
The Assets were divided into three asset packages for purposes of the marketing process the
Debtors conducted prepetition, with one of those packages later divided into two packages as a
result of bidding activity.  Ultimately, the Debtors entered into purchase and sale agreements
with the Stalking Horse Bidders for three of the four packages.  Each asset package is described
below.

**A.    Package 1A:  The North Dakota Package**

13.    The first asset package, referred to as "***Package 1A***" or the "***North Dakota
Package***," is comprise of long-lived conventional waterflood oil properties located in the
Willison and Big Horn Basins in North Dakota.  On May 14, 2018, Debtor Enduro Operating
LLC ("***Enduro Operating***") and Cobra Oil & Gas Corporation ("***Cobra***") entered into that
certain Purchase and Sale Agreement (the "***North Dakota Stalking Horse Agreement***"), a copy
of which is attached hereto as **Exhibit B-1**, pursuant to which Cobra agreed to purchase the
North Dakota Package.

**B.    Package 1B:  The Wyoming Package**

14.    The second asset package, referred to as "***Package 1B***" or the "***Wyoming
Package***," is comprised of long-lived conventional waterflood oil properties located in the
Willison and Big Horn Basins in Wyoming.  The Wyoming Package also contains a sour gas
plant and oil pipeline.  When the Debtors first launched their marketing process in January 2018,

the North Dakota Package and the Wyoming Package were marketed together as a single package, but the Debtors determined in discussions with bidders that value would be maximized by dividing the single package in two.

15.     On May 14, 2018, Enduro Operating and Mid-Con Energy Properties, LLC ("*Mid-Con*") entered into that certain Purchase and Sale Agreement (the "*Wyoming Stalking Horse Agreement*"), a copy of which is attached hereto as **Exhibit B-2** pursuant to which Mid-Con agreed to purchase the Wyoming Package.

### C.    Package 2:  The North Louisiana Package

16.     The third asset package, referred to as "*Package 2*" or the "*North Louisiana Package*," is comprised of oil and natural gas properties in the Cotton Valley Play and the Haynesville Play in Caddo and DeSoto Parishes, Louisiana.  Despite negotiations prior to the Petition Date with several interested parties, the Debtors have not entered into a stalking horse agreement with respect to Package 2, but request the authority to do so and grant bid protections worth up to four percent (4%) of the purchase price, subject to (a) filing and providing notice to counsel to the First Lien Agent, counsel to the second lien lenders, the Office of the United States Trustee, and any statutory committee appointed in the Chapter 11 Cases of the proposed terms of such stalking horse agreement and (b) a seven-day objection period from the provision of such notice for such parties.  In the event of an objection by any of such parties, the Debtors will seek a further order of this Court with respect thereto.

17.     As set forth in the Bidding Procedures, any party seeking to be the stalking horse as to the North Louisiana Package would be required to submit its stalking horse proposal by June 15, 2018, and the Debtors would provide the notice described above by June 19, 2018, in each case subject to extension with the consent of a majority of the First Lien Lenders.  In the event the Debtors do not reach agreement on a stalking horse agreement with respect to Package

2, the Debtors will proceed to the Auction with a minimum "reserve price" of $14,000,000 on Package 2 as set forth in the Bidding Procedures.

**D.    Package 3:  The Trust Related Assets Package**

18.    The fourth asset package, referred to as "***Package 3***" or the "***Trust Related Assets Package***," is comprised of the Debtors' working interests in oil and gas properties in Texas, Louisiana, and New Mexico that are burdened by the "net profits interest" in favor of Enduro Royalty Trust, plus the publicly traded units in Enduro Royalty Trust owned by Enduro Resource Partners LLC.  On May 14, 2018, Enduro Operating and Evolution Petroleum Corporation ("***Evolution***," and together with Cobra and Mid-Con, the "***Stalking Horse Bidders***") entered into that certain Purchase and Sale Agreement (the "***Trust Related Stalking Horse Agreement***" and together with the North Dakota Stalking Horse Agreement and the Wyoming Stalking Horse Agreement, the "***Stalking Horse Agreements***"), a copy of which is attached hereto as **Exhibit B-3**, pursuant to which Evolution agreed to purchase the Trust Related Assets Package.

**E.    The Stalking Horse Agreements**

19.    The following table sets forth a summary of the material terms and conditions of the Stalking Horse Agreements, including required disclosures under Local Rule 6004-1(b)(iv).[2]

| Term<br>(Agreement Citation) | Detail |
|---|---|
| Seller | Enduro Operating LLC ("***Seller***") |
| **Stalking Horse Bidders (Recitals)**<br><br>**Local Bankr. R. 6004-1(b)(iv)(A)** | • Cobra Oil & Gas Corporation<br>• Mid-Con Energy Properties, LLC<br>• Evolution Petroleum Corporation<br>None of the Stalking Horse Bidders are insiders, as defined in section 101(31) of the Bankruptcy Code. |

---

[2]    If there are any inconsistencies between the summary set forth herein and the Stalking Horse Agreements, the terms and conditions of the Stalking Horse Agreements shall govern.

| Term (Agreement Citation) | Detail |
|---|---|
| **Consideration (Art. 3)**<br><br>**Local Bankr. R. 6004-1(b)(iv)(N)** | Purchase Price:  (a) for the North Dakota Package, $45,000,000; (b) for the Wyoming Package, $5,000,000; and (c) for the Trust Related Assets Package, $27,500,000; in each case, subject to customary adjustments.<br><br>Credit Bidding:  The Stalking Horse Agreements do not contemplate credit bidding under section 363(k) of the Bankruptcy Code.  Subject to certain express restrictions, however, the proposed Bidding Procedures preserve secured creditors' right to credit bid. |
| **Agreements with Management**<br><br>**Local Bankr. R. 6004-1(b)(iv)(B)** | None. |
| **Releases**<br><br>**Local Bankr. R. 6004-1(b)(iv)(C)** | None of the Stalking Horse Agreements contemplate any releases in favor of any party other than the Seller. |
| **Private Sale/No Competitive Bidding**<br><br>**Local Bankr. R. 6004-1(b)(iv)(D)** | No.  The Debtors are proposing, and the Stalking Horse Agreements contemplate, an open marketing and auction process. |
| **Closing Deadlines (§ 14.1)**<br><br>**Local Bankr. R. 6004-1(b)(iv)(E)** | Each Stalking Horse Agreement may be terminated by the applicable Stalking Horse Bidder if (a) the Bidding Procedures Order is not entered within 45 days of the Petition Date, (b) the Sale Order is not entered within 75 days of the Petition Date, and (c) the Sale of the applicable Asset Package does not close (i) as to the North Dakota Stalking Horse Agreement, within 120 days of the Petition Date; (ii) as to the Wyoming Stalking Horse Agreement, by September 17, 2018; and (iii) as to the Trust Related Stalking Horse Agreement, by September 12, 2018 |
| **Good Faith Deposit (§ 3.2)**<br><br>**Local Bankr. R. 6004-1(b)(iv)(F)** | Each Stalking Horse Bidder has agreed to deposit 10 percent (10%) of the purchase price under its Stalking Horse Agreement, which deposit generally is subject to forfeit if all the Stalking Horse Bidder's closing conditions have been met or waived and the sale does not close due to such Stalking Horse Bidder's breach of the Stalking Horse Agreement. |
| **Interim Arrangements**<br><br>**Local Bankr. R. 6004-1(b)(iv)(G)** | None. |
| **Use of Proceeds**<br><br>**Local Bankr. R.** | In accordance with the Debtors' Sale and Plan Support Agreement with certain of their first lien creditors, the Debtors intend that the proposed form(s) of Sale Order will provide for the proceeds of the Sale to be |

| Term (Agreement Citation) | Detail |
|---|---|
| 6004-1(b)(iv)(H) | applied to outstanding claims under the first lien credit agreement, subject to certain reserves and payment of certain other claims and expenses. |
| Tax Exemptions<br><br>Local Bankr. R. 6004-1(b)(iv)(I) | None of the Stalking Horse Agreements contemplate application of any tax exemptions under section 1146 of the Bankruptcy Code. |
| Record Retention (§ 9)<br><br>Local Bankr. R. 6004-1(b)(iv)(J) | The Stalking Horse Bidders will retain the Seller's books and records and provide the Debtors with access to them during normal business hours for review and copying at the Debtors' expense. |
| Sale of Avoidance Actions (§ 1)<br><br>Local Bankr. R. 6004-1(b)(iv)(K) | Not applicable. |
| No Successor Liability<br><br>Local Bankr. R. 6004-1(b)(iv)(L) | The Stalking Horse Agreements generally provide for the applicable Assets to be transferred to the applicable Stalking Horse Bidder free and clear of all liens, claims, interests, and liabilities, including successor liability, other than Assumed Obligations and Permitted Encumbrances. |
| Free and Clear of Unexpired Leases or Other Rights<br><br>Local Bankr. R. 6004-1(b)(iv)(M) | The Stalking Horse Agreements do not contemplate the sale of any property free and clear of any possessory leasehold interest, license, or other right. |
| Relief from Bankruptcy Rule 6004(h) (§ 9.6(c))<br><br>Local Bankr. R. 6004-1(b)(iv)(O) | To maximize the value received for the Assets, the Debtors are seeking the ability to close the Sale contemplated by the Stalking Horse Agreements as soon as possible after the Sale Hearing. The Debtors, therefore, have requested a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). |

## THE PROPOSED SALE TIMELINE AND BIDDING PROCEDURES

20.    To ensure that the highest or otherwise best offer is received for the Assets, the Debtors crafted the proposed Bidding Procedures to govern the submission of competing bids at an Auction, all of which is contemplated and expressly permitted under the Stalking Horse

Agreements.  Accordingly, the Debtors seek the Court's approval of the Bidding Procedures set forth as **Annex 1** to the Bidding Procedures Order and incorporated herein in their entirety by this reference.

21.    The Debtors' proposed timeline with respect to the Bidding Procedures, the Auction, the Sale Hearing, and the Sale is as follows:[3]

| Event | Date |
|---|---|
| Hearing to Consider Approval of Bidding Procedures | June 11, 2018 |
| Service of Sale Notice (as defined below) | June 15, 2018 |
| Deadline for Submission of Stalking Horse Proposals as to Package 2 | June 15, 2018 |
| Deadline for Filing and Service of Notice of Selection of Stalking Horse as to Package 2 | June 19, 2018 |
| Sale Objection Deadline (as defined below) | 14 days after service of Sale Notice |
| Bid Deadline | July 11, 2018 |
| Auction | July 16, 2018 |
| Sale Hearing | July 19, 2018 (or such later time as the Debtors may be heard) |

22.    The Debtors propose the following notice and objection timeline as it relates to the Sale, the Auction, and the Sale Hearing (the "***Sale Notice Procedures***") and request notice of the Sale, the Auction, the Sale Hearing, and the Bidding Procedures Order be deemed adequate and sufficient if:

(a)    No later than one (1) business day after the entry of the Bidding Procedures Order, the Debtors (or its agent) serve by first class mail, postage prepaid, copies of (i) the Bidding Procedures Order, (ii) the Bidding Procedures, and (iii) a notice regarding the Sale (the "***Sale Notice***"), substantially in the form attached hereto as **Exhibit D**,[4] on the following entities (collectively, the "***Notice Parties***") and those entities and individuals appearing on the Debtors' creditor matrix:

---

[3]    The dates in this timeline are subject to the terms of the Bidding Procedures Order and the Bidding Procedures.

[4]    In accordance with Bankruptcy Rule 2002(c)(1), the Sale Notice will include, among other things: (a) a description of how the Auction will be scheduled and the date, time, and place of the Sale Hearing; (b) a

(1)     the United States Trustee;

(2)     the creditors listed on the Consolidated List of Creditors Holding 30 Largest Unsecured Claims appended to the Debtors' chapter 11 petitions;

(3)     counsel to the First Lien Agent;

(4)     counsel to the Debtors' second lien lenders;

(5)     counsel to the Debtors' majority equity owner;

(6)     counsel to the Stalking Horse Bidders;

(7)     counsel for any statutory committee appointed in the Chapter 11 Cases;

(8)     the United States Attorney for the District of Delaware;

(9)     the attorneys general for each of the states in which the Debtors conduct a substantial amount of business operations;

(10)    the Internal Revenue Service;

(11)    all known taxing authorities for the jurisdictions to which the Debtors are subject;

(12)    the United States Department of Justice;

(13)    all entities known or reasonably believed to have asserted a Lien on any of the Assets;

(14)    all creditors who are known to have or have asserted in writing secured claims;

(15)    counterparties to the Debtors' executory contracts and unexpired leases;

(16)    all persons that have expressed to the Debtors an interest in a transaction with respect to the Assets during the past six (6) months; and

---

summary of certain of the terms and conditions of the Sale; (c) the time fixed for filing objections to the Sale; and (d) a description that the Sale of the Assets is free and clear of all Liens other than (a) any Permitted Encumbrances as set forth in the Stalking Horse Agreements or (b) any permitted Liens as set forth in the purchase agreement with the Successful Purchaser.  The Sale Notice and Publication Notice (as defined below) also will direct parties to access the website of the Debtors' claims and noticing agent, Kurtzman Carson Consultants LLC.  The Sale Notice and Publication Notice will provide that any party that wishes to obtain a copy of this Motion (and any related documents) may make such a request in writing to Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611(Attn: Caroline Reckler, Matthew Warren, and Jason Gott).

(17)     those parties who have formally filed a request for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

(b)     No later than ten (10) business days after the entry of the Bidding Procedures Order, the Debtors also will publish a notice (the "***Publication Notice***"), substantially similar to the Sale Notice, in the *Wall Street Journal* and the *Fort Worth Star-Telegram*.

23.     In addition, the Debtors request the establishment of an objection deadline prior to the Sale Hearing such that any objections related to the proposed Sale be served upon (so as to be **<u>actually received</u>** by) the following parties (the "***Objection Notice Parties***") on or before 5:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after service of the Sale Notice (the "***Sale Objection Deadline***"):

(a)     counsel to the Debtors, (i)  Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611 (Attn: Caroline Reckler, Matthew Warren, and Jason Gott), and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 (Attn: Michael R. Nestor and Kara Hammond Coyle);

(b)     the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Linda Casey);

(c)     counsel to the First Lien Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn:  Damian Schaible (damian.schaible@davispolk.com) and Aryeh Falk (aryeh.falk@davispolk.com);

(d)     counsel to the Stalking Horse Bidders, (i) with respect to the North Dakota Asset Package, Sherill & Gibson PLLC, 3711 Maplewood Avenue, Suite 200, Wichita Falls, Texas 76308, Attn: R. Caven Crosnoe (ccrosnoe@sgpllc.law) and D. Todd Davenport (tdavenport@sgpllc.law), (ii) with respect to the Wyoming Asset Package, Conner & Winters, LLP, 4000 One Williams Center, Tulsa, OK 74172, Attn.:  J. Ryan Sacra (rsacra@cwlaw.com), and (iii) with respect to the Trust Related Assets Package, Locke Lord LLP, JPMorgan Chase Tower, 600 Travis, Suite 2800 Houston, Texas 77002, Attn.:  David Patton (dpatton@lockelord.com) and Philip Eisenberg (peisenberg@lockelord.com);

(e)     counsel to the statutory committee appointed in the Chapter 11 Cases, if one is appointed; and

(f)     those parties who have formally filed requests for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

24.     Certain of the key terms of the Bidding Procedures are highlighted below, in accordance with Local Rule 6004-1(c)[5]:

| Term | Detail |
|------|--------|
| **Assets to be Sold** | The Auction shall consist of substantially all of the assets owned by the Debtors in four packages, including:<br><br>• the North Dakota Package<br><br>• the Wyoming Package<br><br>• the North Louisiana Package; and<br><br>• the Trust Related Assets Package.<br><br>For the avoidance of doubt, interested parties may bid on any Asset Package, individually or in any combination, including all of the Assets. |
| **Qualification of Bidders**<br><br>**Local Bankr. R. 6004-1(c)(i)(A)** | To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity (other than any Stalking Horse Bidder) interested in consummating a Sale (a "***Potential Bidder***") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion:<br><br>• an executed confidentiality agreement on terms acceptable to the Debtors to the extent not already executed; and<br><br>• the most current audited and latest unaudited financial statements (the "***Financials***") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors and the Majority First Lien Lenders, and (y) a written commitment acceptable to the Debtors and their advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale).<br><br>A "***Qualified Bidder***" is a Potential Bidder whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, whose Bid (as defined below) is a Qualified Bid (as defined below), and that the Debtors, with the consent of the lenders holding more than 50 percent of the |

---

[5]     If there are any inconsistencies between the summary set forth herein and the Bidding Procedures, the terms and conditions of the Bidding Procedures shall govern.  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures.

| Term | Detail |
|------|--------|
| | outstanding loans under the Debtors' first lien credit facility (the "***Majority First Lien Lenders***"), determine should be considered a Qualified Bidder.<br><br>Each Stalking Horse Bidder shall be deemed a Qualified Bidder. |
| **Qualification of Bids**<br><br>**Local Bankr. R. 6004-1(c)(i)(B)** | A proposal, solicitation, or offer (each, a "***Bid***") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements as determined by the Debtors, in their reasonable business judgment, and after consultation with the Counsel to the agent under the Debtors' first lien credit facility (the "***First Lien Agent***") shall constitute a "***Qualified Bid***". Each Stalking Horse Agreement will be deemed a Qualified Bid for all purposes.<br><br>(a) **Assets**. Each Bid must clearly state which assets and liabilities of the Debtors that the Qualified Bidders are agreeing to purchase and assume.<br><br>(b) **Purchase Price**. Each Bid must clearly set forth the purchase price to be paid for the applicable asset package, including and identifying separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids (the "***Purchase Price***").<br><br>(c) **Minimum Bid**. The aggregate consideration proposed by each Bid must equal or exceed the sum of:<br><br>• $47,800,000 in cash for the North Dakota Package;<br><br>• $5,675,000 in cash for the Wyoming Package;<br><br>• For the North Louisiana Package, a cash reserve price of $14,000,000; and<br><br>• $29,100,000 in cash for the Trust Related Assets Package.<br><br>(d) **Deposit**. Each Bid, other than a Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to 10 percent (10%) of the aggregate cash and non-cash Purchase Price of the Bid, to be held in a segregated account to be identified and established by the Debtors (the "***Deposit***"). Except with respect to a Stalking Horse Bid, the Debtors reserve the right, with the consent of the Majority First Lien Lenders, to increase the percentage of the Purchase Price to be included in the Deposit.<br><br>(e) **Assumption of Obligation**. Each Bid must expressly assume all of the obligations contemplated to be assumed by, and on terms no less favorable to the Debtors than, the applicable Stalking Horse Agreement (if any), as determined in the Debtors' business judgment, and after consultation with the Majority First Lien Lenders. If no Stalking Horse Agreement exists as to the Asset |

01:23208339.1

US-DOCS\100298810.10

| Term | Detail |
|------|--------|
| | Package subject to such Bid, the Bid must expressly state all the obligations to be assumed by the Bidder pursuant to such Bid. Other than the obligations to be assumed, the Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "***Encumbrances***"), and any Encumbrances shall attach to the net proceeds of the Sales after payment of any applicable Bid Protections. |
| | (f) **The Same or Better Terms**.  In addition to the Purchase Price meeting or exceeding the applicable Minimum Bid, each Bid must be on terms that are not more burdensome or conditional, in the Debtors' business judgment and after consultation with the First Lien Agent, than the terms of the applicable Stalking Horse Agreement (if any).  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid.  If a Stalking Horse Agreement exists as to the Asset Package subject to the Bid, each Bid must be based on the form of the applicable Stalking Horse Agreement and must include a copy of the applicable Stalking Horse Agreement clearly marked to show all changes requested by the Qualified Bidder, including those relating to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid (the "***Qualified Bid Documents***"). |
| | (g) **Committed Financing**.  To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtors and the Majority First Lien Lenders that demonstrates that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions.  Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have only those covenants and conditions acceptable to the Debtors and the Majority First Lien Lenders. |
| | (h) **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the |

| Term | Detail |
|------|--------|
| | closing of specified conditions, which shall not be more burdensome, in the Debtors' business judgment, and after consultation with the First Lien Agent, than those set forth in the applicable Stalking Horse Agreement (if any).  Notwithstanding anything to the contrary herein, while a Bid may not be conditioned upon further due diligence, a Bid may contain a mechanism to adjust the Purchase Price before Closing based on completion of title and environmental diligence. |
| | (i) **Identity**.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Qualified Bidder if such Qualified Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation.   Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific persons and counsel whom Evercore and Latham & Watkins LLP should contact regarding such Bid. |
| | (j) **Demonstrated Financial Capacity**.  A Qualified Bidder must have, in the Debtors' business judgment, with the consent of the Majority First Lien Lenders, the necessary financial capacity to consummate the proposed transactions required by its Bid (including, if necessary, to obtain transfer of any of the Debtors' permits and to obtain any necessary surety bonds or other financial assurances) and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid. |
| | (k) **Time Frame for Closing**.  Closing of the Sale as to any Asset Package related to a Bid by a Qualified Bidder (a "***Closing***") must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors and the Majority First Lien Lenders. |
| | (l) **Binding and Irrevocable**.  Except as provided herein, a Qualified Bidder's Bid for a particular Asset Package shall be irrevocable unless and until the Debtors accept a higher Bid for such Asset Package and such Qualified Bidder is not selected as the Backup Bidder for such Asset Package.  If selected as Backup Bidder, such Bid shall be irrevocable until the Closing of a Successful Bid for such Asset Package. |
| | (m) **Expenses; Disclaimer of Fees**.  Each Bid (other than a Stalking Horse Bid) must disclaim any right to receive a fee analogous to a |

| Term | Detail |
|------|--------|
| | break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidders) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code. |
| | (n) **Authorization**.  Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors and the Majority First Lien Lenders) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid. |
| | (o) **As-Is, Where-Is**.    Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid. |
| | (p) **Adherence to Bid Procedures**.   By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction. |
| | (q) **Regulatory Approvals and Covenants**.   A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the applicable Sale, if any, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible) and any undertakings that will be required by the Debtors in connection with such regulatory and third party approvals. |
| | (r) **Consent to Jurisdiction**.  The Qualified Bidder must submit to the |

01:23208339.1

US-DOCS\100298810.10

| Term | Detail |
|------|--------|
| | jurisdiction of and entry of final orders by the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the transaction documents related to the Sale, and the Closing, as applicable. |
| | (s) **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be ***actually received*** on or before 5:00 p.m. (prevailing Eastern Time) on July 11, 2018 (the "***Bid Deadline***") by: |
| |     (i) The Debtors, Enduro Resource Partners, 777 Main Street, Suite 800, Fort Worth, Texas 76102, Attn:  Jonny Brumley (jsbrumley@endurores.com) and Kim Weimer (kweimer@endurores.com); |
| |     (ii) Proposed counsel to the Debtors, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, Attn:  Caroline Reckler (caroline.reckler@lw.com) and Matthew Warren (matthew.warren@lw.com); |
| |     (iii) Proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn:  Michael R. Nestor (mnestor@ycst.com) and Kara Hammond Coyle (kcoyle@ycst.com); |
| |     (iv) Proposed financial advisors to the Debtors, Evercore, 55 East 52nd Street, New York, New York 10055, Attn: Stephen Hannan (hannan@evercore.com) and Matthew Moss (matthew.moss@evercore.com); |
| |     (v) Counsel to the applicable Stalking Horse Bidder (if any), (i) with respect to the North Dakota Asset Package, Sherill & Gibson PLLC, 3711 Maplewood Avenue, Suite 200, Wichita Falls, Texas 76308, Attn: R. Caven Crosnoe (ccrosnoe@sgpllc.law) and D. Todd Davenport (tdavenport@sgpllc.law), (ii) with respect to the Wyoming Asset Package, Conner & Winters, LLP, 4000 One Williams Center, Tulsa, OK 74172, Attn.:  J. Ryan Sacra (rsacra@cwlaw.com), and (iii) with respect to the Trust Related Assets Package, Locke Lord LLP, JPMorgan Chase Tower, 600 Travis, Suite 2800 Houston, Texas 77002, Attn.:  David Patton (dpatton@lockelord.com) and Philip Eisenberg (peisenberg@lockelord.com); |
| |     (vi) Counsel to the First Lien Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn:  Damian Schaible (damian.schaible@davispolk.com) |

01:23208339.1

US-DOCS\100298810.10

| Term | Detail |
|---|---|
| | and Aryeh Falk (aryeh.falk@davispolk.com); and |
| | (vii)   Financial advisors to the First Lien Agent, RPA Advisors, LLC, One Rockefeller Plaza, Tenth Floor, New York, New York 10020, Attn: Barry Kesler (bkesler@rpaadvisors.com). |
| | No later than two (2) calendar days after the Bid Deadline, by 5:00 p.m. (prevailing Eastern time), the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid for the Asset Package for which such Qualified Bidder submitted a Bid, as determined in the Debtors' reasonable business judgment, with the consent of the Majority First Lien Lenders (the "**Baseline Bid**"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder. |
| **No-Shop or No-Solicitation Provisions**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(1)** | None. |
| **Breakup Fee and Expense Reimbursement**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(2)** | The Stalking Horse Agreements contemplate the following fees payable to the applicable Stalking Horse Bidder in the event that a Stalking Horse Agreement is terminated due to the Debtors entering into an alternative transaction or in other circumstances set forth in the applicable Stalking Horse Agreement:<br><br>• $1,350,000 for the North Dakota Package;<br><br>• $100,000 for the Wyoming Package; and<br><br>• $825,000 for the Trust Related Assets Package;<br><br>(each, a "**Break-Up Fee**").<br><br>The Stalking Horse Agreements also contemplate that the Stalking Horse Bidders will be reimbursed for their expenses in the event that a Stalking Horse Agreement is terminated due to the Debtors entering into an alternative transaction or in other circumstances set forth in the applicable Stalking Horse Agreement, subject to the following caps:<br><br>• up to $450,000 for the North Dakota Package;<br><br>• up to $75,000 for the Wyoming Package; and<br><br>• up to $275,000 for the Trust Related Assets Package;<br><br>(each, an "**Expense Reimbursement**" and together with each applicable Breakup Fee, the "**Bid Protections**").<br><br>In addition, in the event a Stalking Horse Bidder is selected as to the North Louisiana Package in accordance with the Bidding Procedures, |

01:23208339.1

US-DOCS\100298810.10

| Term | Detail |
|---|---|
| | such Stalking Horse Bidder may be entitled to Bid Protections. |
| **Bidding Increments**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(3)** | The initial Overbid for a given Asset Package, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than:<br><br>• $100,000 for the North Dakota Package;<br><br>• $500,000 for the Wyoming Package;<br><br>• $500,000 for the North Louisiana Package; and<br><br>• $500,000 for the Trust Related Assets Package (each, a "***Minimum Overbid Increment***"), with any Overbid for multiple Asset Packages incorporating an aggregate incremental amount equal to the sum of each applicable Minimum Overbid Increment;<br><br>(such initial Overbid, the "***Initial Minimum Overbid***"); and each successive applicable Overbid for a given Asset Package shall exceed the then-existing Overbid for such Asset Package by an incremental amount that is not less than the Minimum Overbid Increment, with any Overbid for multiple Asset Packages incorporating an aggregate incremental amount equal to the sum of each applicable Minimum Overbid Increment. |
| **Treatment of Break-Up and Topping Fees and Expense Reimbursement at Auction**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(4)** | If any Overbid is made as to any Asset Package for which there is a Stalking Horse Agreement, the Stalking Horse Bidder shall be entitled to a dollar-for-dollar credit against the amount of any such Overbid equal to the amount of the Stalking Horse Bidder's Bid Protections pursuant to the Applicable Stalking Horse Agreement to take into account that, if the Stalking Horse is the Successful Bidder (as defined below), no payment of the Stalking Horse's Bid Protections will be required. |
| **Modifications of Bidding Procedures**<br><br>**Local Bankr. R. 6004-1(c)(i)(D)** | Subject to the rights of the Stalking Horse Bidders under the terms of their respective Stalking Horse Agreements, the Debtors reserve their rights to modify the Bidding Procedures in their reasonable business judgment, and with the consent of the Majority First Lien Lenders, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in the Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) cancelling the Auction; and (e) rejecting any or all bids or Bids; *provided*, *however*, that no such modification may alter, impair, or reduce the rights or protections |

| Term | Detail |
|---|---|
| | of any Stalking Horse Bidder under the Bidding Procedures or under the applicable Stalking Horse Agreement. |
| **Back-Up Bidder**<br><br>**Local Bankr. R. 6004-1(c)(i)(E)** | Notwithstanding anything in the Bidding Procedures to the contrary, but subject to the terms of any Stalking Horse Agreement, if an Auction is conducted for a given Asset Package, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such asset package, as determined by the Debtors in the exercise of their reasonable business judgment, and after consultation with the First Lien Agent (the "***Backup Bid***"), shall be required to serve as a backup bidder (the "***Backup Bidder***") for such asset package, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.<br><br>The identity of the Backup Bidder and the amount and material terms of the backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.  The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, subject to the terms of any Stalking Horse Agreement, until the closing of the transaction with the applicable Successful Bidder; *provided* that nothing shall diminish the rights of a Stalking Horse Bidder under any Stalking Horse Agreement.  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder or as may otherwise be provided in any Stalking Horse Agreement.<br><br>If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may, after consultation with the First Lien Agent, select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes, subject to the terms of any Stalking Horse Agreement.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.  In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including specific performance. |

## **THE PROPOSED ASSUMPTION PROCEDURES**

25.     To facilitate and effect the Sale of the Assets, the Debtors seek authority to

assume and assign certain of the Debtors' contracts and unexpired leases (collectively, the

"*Assumed Contracts*"), consistent with the procedures established in the Bidding Procedures Order and the Stalking Horse Agreements (the "*Assumption Procedures*").   The Debtors propose that the Assumption Procedures apply whether the Stalking Horse Bidders or any other party or parties are the Successful Bidders.

26.     The proposed Assumption Procedures are as follows:

(a)     **Notice**.   Within five (5) business days after entry of the Bidding Procedures Order, the Debtors will serve a notice, substantially in the form attached hereto as **Exhibit C** (the "*Cure Notice*"), on all non-Debtor counterparties (the "*Counterparties*") to all of the Debtors' executory contracts and unexpired leases (the "*Contracts*").

(b)     **Content of the Cure Notice**.   The Cure Notice will include the following information: (a) the potential assumption by the Debtors and assignment to the Successful Bidder(s) of the Contracts, and (b) the proposed amount necessary, under section 365(b)(1) of the Bankruptcy Code, to cure any outstanding monetary defaults and compensate the Counterparties for any pecuniary losses in connection with such assumption and assignment (the "*Proposed Cure Costs*").

(c)     **Previously Omitted Contracts**.   If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts Schedule but was not (any such Contract, a "*Previously Omitted Contract*"), the Debtors shall, promptly following discovery thereof (but in no event later than five (5) Business Days following discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted Contract notifying such counterparties of the Debtors' intention to assume and assign such Previously Omitted Contract to the Successful Bidder, including the proposed Cure Costs relating thereto (the "*Previously Omitted Contract Notice*").

(d)     **Objections**.   Each Counterparty shall have until the earlier to occur of (x) 5:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable), and (y) the Sale Hearing (the "*Contract Objection Deadline*") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, the amount of the Proposed Cure Costs, but excluding any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code or on the basis of the identity of the Successful Bidder.   Any such objection must be filed and served on the Debtors and their proposed co-counsel, the First Lien Agent and its counsel, and the applicable Stalking Horse Bidder (if any) and its counsel, so as to be actually received by the Contract Objection Deadline.   Any unresolved such objections shall be heard at the Sale Hearing, unless otherwise agreed by the

parties.    If any objections to the amount of Proposed Cure Costs remain unresolved as of the date of the Closing of the Sale of any Asset Package, the Debtors may deposit the disputed amount of Proposed Cure Costs relating to such Asset Package in a segregated account to hold pending resolution of such objections.

Each Counterparty may raise objections as to adequate assurance of future performance or on the basis of the identity of the Successful Bidder until the earlier to occur of (x) 5:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of a notice identifying the applicable Successful Bidder, which, for the avoidance of doubt, may be provided with the Cure Notice or the Previously Omitted Contract Notice or at any time thereafter with respect to the Stalking Horse Bidders, and (y) the Sale Hearing (the "***Buyer Specific Objection Deadline***"). Any such objection must be filed and served on the Debtors and their proposed co-counsel, the First Lien Agent and its counsel, and the applicable Successful Bidder or Stalking Horse Bidder (if any), as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline.  Any unresolved such objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

(e)    **Notice of Assumption and Assignment**.  Promptly following consummation of any Sale and subject to the resolution of any objections filed in accordance with the Assumption Procedures, the Debtors will notify any Counterparty to an Assumed Contract of the assumption and assignment of such Assumed Contract to the applicable Successful Bidder.

## BASIS FOR RELIEF

## I.    THE SALE OF THE ASSETS REFLECTS A SOUND EXERCISE OF THE DEBTORS' BUSINESS JUDGMENT.

27.    Selling the Assets as proposed herein is critical to maximizing value in the Chapter 11 Cases and, therefore, should be approved as reflecting a sound exercise of the Debtors' business judgment.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate" after notice and a hearing.  11 U.S.C. § 363(b)(1).  Generally, the debtor is only required to "show that a sound business purpose" justifies the proposed use of property.  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring "good business reason" for use

under section 363(b) of the Bankruptcy Code).  This standard prohibits other parties from second-guessing the debtor's business judgment if the debtor has shown that the proposed use will benefit the debtor's estate.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

28.    The Debtors determined to undertake a sale of substantially all of their assets after careful consideration of all potential alternatives, consultation with their board of managers, and coordination with their secured lenders.  Of the available restructuring paths, the Sale was and remains the most efficient means to obtaining the greatest value for the Assets and distributing that value to the Debtors' stakeholders in accordance with their legal priorities.  The Debtors already have floor-setting Stalking Horse Bids and now seek to start another marketing process with the added benefits of the section 363 sale process available to interested bidders.  After this market check, the Debtors, their creditors, and other parties in interest can be confident that the Debtors will have obtained the highest and best value for the Assets.  And importantly, beyond the consideration the Debtors and their estates will receive in the Sale, the Successful Bidders likely will be assuming liabilities that otherwise would dilute any recoveries that may be available to unsecured creditors.

II.    **APPROVAL OF THE SALE NOTICE PROCEDURES AND BIDDING PROCEDURES IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATE.**

   A.    **The Proposed Notice of Sale, Bidding Procedures, Auction and Sale Hearing, and the Sale Objection Deadline are Appropriate.**

   29.    As described above, the Debtors submit that the Sale Notice Procedures and the Sale Objection Deadline comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction, the Sale Hearing, and the Sale to the Debtors' creditors and other parties in interest, and, if the Debtors believe that additional entities have a legitimate interest, then also to those who have expressed an interest, or may express an interest, in bidding on the Assets.    Based upon the foregoing, the Debtors respectfully request that this Court approve the Sale Notice Procedures and the Sale Objection Deadline proposed above.

   B.    **The Bidding Procedures are Appropriate and Will Maximize Value Received in Sale of Assets.**

   30.    Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate.    *See, e.g.*, *In re Efoora, Inc.*, 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012) ("A trustee has considerable discretion when it comes to the sale of estate assets, and that discretion is entitled to great judicial deference as long as a sound business reason is given.") (internal quotations and citations omitted).

   31.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.    *See, e.g.*, *Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 765 (7th Cir. 2004) (in a bankruptcy sale, the "governing principle . . . is to secure the highest price for the benefit of the estate and creditors").

   32.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate

and, therefore, are appropriate in the context of bankruptcy sales. *See, e.g.*, *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets.").

33.    The Debtors believe that the Bidding Procedures will establish sound parameters by which the proffered sale price of the Assets under the Stalking Horse Agreements may be tested at the Auction, as well as the ensuing Sale Hearing, and evaluated as described herein. Such procedures will increase the likelihood that the Debtors will receive the greatest possible consideration for the Assets in a sale because they will ensure a competitive and fair bidding process. The Bidding Procedures will also allow the Debtors to undertake the Auction process in an orderly fashion, which the Debtors believe is essential to maintaining and maximizing the value of its estate.

34.    The Debtors believe that the Auction and proposed Bidding Procedures promote active bidding from seriously interested parties and will dispel any doubt as to the best or otherwise highest offer reasonably available at this time for the purchase of the Assets. Moreover, the proposed Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtors believe that the Bidding Procedures will encourage bidding for the Assets, are consistent with other procedures previously approved by courts in this and other circuits, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

35.    Thus, the proposed Bidding Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because they will serve to maximize the value that the Debtors will obtain on account of the Sale of the Assets.

### III.    THE    INITIAL    AND    SUBSEQUENT    OVERBID    AMOUNTS    ARE APPROPRIATE.

36.    The Debtors submit that the proposed requirements for a valid Overbid are appropriate and should be approved.  Courts frequently authorize debtors to require bidders to submit minimum initial bids to ensure that the debtors receive the highest and best offers possible in asset sales.  *See, e.g.*, *In re Grede Foundries, Inc.*, Case No. 09-14337 (RDM) (Bankr. W.D. Wis. Nov. 25, 2009) (authorizing minimum initial bid of $500,000, or .47% of purchase price, plus break-up fees and certain other costs and expenses of approximately $1.95 million).

37.    In addition, the Debtors intend to conduct the Auction such that each bid at the Auction is higher or otherwise better than the previous bid.  To this end, incorporating the concept of overbids in the Bidding Procedures is reasonable under the circumstances and will enable the Debtors to maximize the value for the sale of their assets while limiting any chilling effect on the Sale process.

### IV.    THE BID PROTECTIONS HAVE A SOUND BUSINESS PURPOSE AND SHOULD BE APPROVED.

38.    The Debtors submit that the proposed Bid Protections for the Stalking Horse Bidders are appropriate in the circumstances of the Chapter 11 Cases and consistent with market practice and should be approved as superpriority administrative obligations of the Debtors' estates.  The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by

"establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value."

*Official Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).  As a result, stalking horse bidders typically require break-up fees and, in many cases, other forms of bid protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement."  *Id.* (internal citations omitted).

39.    Thus, the use of bid protections has become an established practice in chapter 11 cases, and break-up fees and other forms of bid protections are a normal and, in many cases, necessary component of sale processes conducted under section 363 of the Bankruptcy Code. *See In re Integrated Res., Inc.*, 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value.").  Courts generally recognize that bid protections may be necessary to convince a bidder to make a public bid and set a floor, in that they provide compensation for the risks that the bidder is undertaking.  *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

40.    After the extensive prepetition marketing process the Debtors undertook, the bidders with the highest and best proposals ultimately insisted that they receive the Bid Protections as contemplated by the Stalking Horse Agreements, including their entitlement to superpriority administrative expense status, if they were going to provide a floor for the Debtors'

postpetition auction.  Without the promise of Bid Protections and the security of superpriority administrative expense status, the Stalking Horse Bidders' participation in the diligence, bidding, and negotiation processes would likely have been significantly reduced and could have left the Debtors without the benefit of stalking horse bids.

41.     Thus, the Bid Protections enabled the Debtors to secure an adequate floor for the Assets, thereby ensuring that competing bids will be materially higher or otherwise better than consideration provided for in the Stalking Horse Agreements—a clear benefit to the Debtors' estates.  Without the Stalking Horse Bidders, the bids received at the Auction for the Assets could be substantially lower than each Stalking Horse Bidders' offer, especially if no (or few) other Qualified Bidders appear at the Auction.  In addition, payment of the Bid Protections will not diminish the Debtors' estates to the extent the Bid Protections become payable as a result of the Debtors' consummation of a competing bid, as the Bidding Procedures require that any initial Qualified Bid exceed the bid of the applicable Stalking Horse Bidder by an amount in excess of the Bid Protections.

42.     The Stalking Horse Bidders require the Bid Protections as a precondition to entering into the Stalking Horse Agreement, and the Debtors believe offering the Bid Protections to the Stalking Horse Bidders will likely maximize the realizable value of the Assets for the benefit of the Debtors' estate, their creditors, and other parties in interest.  Accordingly, the Debtors believe that the Bid Protections are fair and appropriate under the circumstances and should be approved.

43.     Importantly, this logic applies equally to any Stalking Horse Bidder chosen for the North Louisiana Package postpetition.  The Debtors believe just as firmly that locking in a Stalking Horse Bidder for that package will maximize value by setting a public floor for third

parties to consider in making their own valuation assessments of the North Louisiana Package.

Likewise, if a bidder is willing to take on the risks associated with being a stalking horse, that

bidder should be compensated appropriately with bid protections.   Moreover, the Debtors

propose to make any bid protections that might be offered to such a bidder subject to review and

objection, as set forth in the Bidding Procedures.   The Debtors therefore submit that it is

appropriate that they be authorized to arrange for a bidder to serve as the Stalking Horse Bidder

for the North Louisiana Package, subject to the requirements in the Bidding Procedures.

## V.       THE PROPOSED ASSUMPTION PROCEDURES ARE APPROPRIATE.

44.     In connection with the Sale, the Debtors believe it is necessary to establish a

process by which:  (a) the Debtors and Counterparties can reconcile the Proposed Cure Costs, if

any, in accordance with section 365 of the Bankruptcy Code; and (b) the Counterparties can

object to the assumption and assignment of the Contracts and/or related Proposed Cure Costs.

As described above, the proposed Assumption Procedures comply with Bankruptcy Rule 2002

and provide all Counterparties with due and adequate notice of the potential assumption and

assignment of their Contracts, the Contract Objection Deadline and the Buyer Specific Objection

Deadline, and the time and place for the Sale Hearing.  Accordingly, the Debtors request that the

Assumption Procedures be approved.

## VI.      APPROVAL OF THE PROPOSED SALE TRANSACTION IS APPROPRIATE AND IN BEST INTEREST OF THE DEBTORS' ESTATES.

45.     In accordance with Bankruptcy Rule 6004(f)(1), sales of property rights outside

the ordinary course of business may be by private sale or public auction.   The Debtors

determined that a public Auction of the Assets will enable the Debtors to obtain the highest or

otherwise best offer in a sale of their assets at this time and is in the best interests of the Debtors,

their estate, and their creditors.

**A.    The Sale of Assets and Assumed Contracts Free and Clear of Liens is Authorized by Section 363(f) of the Bankruptcy Code.**

46.    The Debtors further submit that it is appropriate to sell the Assets and to assign the Assumed Contracts free and clear of all Liens, other than (a) any Permitted Encumbrances as set forth in the Stalking Horse Agreements or (b) any permitted Liens as set forth in the purchase agreement with the Successful Bidder(s) pursuant to section 363(f) of the Bankruptcy Code, with any such Liens attaching to the net sale proceeds of the Assets, as and to the extent applicable.

47.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in *bona fide* dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

48.    The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Assets and the assignment of the Assumed Contracts pursuant to the Stalking Horse Agreements or an applicable purchase agreement of another Successful Bidder.  In particular, the Debtors believe that at least section 363(f)(2) of the Bankruptcy Code will be met in connection with the transactions proposed under the Stalking Horse Agreements because the Debtors expect that their prepetition secured lenders and any other party asserting a Lien over the Assets will consent to the Sale, or, absent any objection to this Motion, will be deemed to have consented to, the Sale.

**B.**     **If the Debtors Consummate the Sale of the Assets, Such Assets Should be Sold or Assumed Free and Clear of Successor Liability.**

49.     The purchaser(s) of the Assets is unlikely to be liable for any of the Debtors' liabilities as a successor to the Debtors' business or otherwise, unless the purchaser(s) expressly assumes such liabilities.  Extensive case law exists providing that claims against the winning bidder are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a buyer.

**C.**     **The Stalking Horse Bidders are Good Faith Purchasers and are Entitled to the Full Protections of the Bankruptcy Code.**

50.     The Debtors believe that the Stalking Horse Agreements have been submitted in good faith and has been, and will continue to be, negotiated in good faith and at arm's-length. Thus, the Stalking Horse Bidders are entitled to the full protections of section 363(m) of Bankruptcy Code, which provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

51.     While the Bankruptcy Code does not define "good faith," several Circuit Courts have determined that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (quoting *In re Rock Indus.*

*Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Abbotts Dairies of Pa., Inc.*, 788

F.2d 143, 147 (3d Cir. 1986).  There has been no fraud, improper insider dealing, or collusion in connection with the negotiation or submission of the Stalking Horse Agreements.

52.     The Stalking Horse Bidder(s) or other Successful Bidder(s) should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code. Accordingly, the Debtors request that the Court make a finding at the Sale Hearing and in the Sale Order that the purchase agreement reached with the Stalking Horse Bidders or any other Successful Bidder(s) was at arm's-length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

> **D.     Credit Bidding Should be Authorized Under Section 363(k) of the Bankruptcy Code.**

53.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.

54.     As set forth in the Bidding Procedures, the Debtors' first lien creditors have agreed not to credit bid on any Assets that are subject to a Stalking Horse Agreement as of the date hereof.  Other than this voluntary waiver, the Bidding Procedures preserve secured creditors' right to credit bid as required under section 363(k) of the Bankruptcy Code, and this aspect of the Bidding Procedures should therefore be approved.

E.    **Assumption and Assignment of the Assumed Contracts is Authorized by the Bankruptcy Code.**

55.    Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor-in-possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

56.    The standard applied by courts to determine whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See ReGen Capital I, Inc. v. UAL Corp. (In re UAL Corp.)*, 635 F.3d 312, 319 (7th Cir. 2011) ("The bankruptcy court reviews the debtor's business judgment with respect to the proposed assumption to determine if it would be beneficial or burdensome to assume the executory contract by evaluating whether assumption would serve the reorganization or whether it would take away funds available to other creditors.") (citing *Orion Pictures Corp. v. Showtime*

*Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993)); *In re Network Access Sols., Corp*., 330 B.R. 67, 75 (Bankr. D. Del. 2005).

57.    To assist in the assumption, assignment, and sale of the Assumed Contracts, the Debtors also request that the Sale Order provide that anti-assignment provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

## BANKRUPTCY RULE 6004 SHOULD BE WAIVED

58.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a), to the extent not satisfied, and of the fourteen-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is immediately necessary for the Debtors to be able to continue to operate their businesses and preserve the value of their estates.  The Debtors thus submit that the requested waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is appropriate.

## RESERVATION OF RIGHTS

59.    Nothing in this Motion shall be deemed:  (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the

Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.  If the Court enters any order granting the relief sought herein, any payment made pursuant to such order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

60.    Notice of this Motion will be given to: (a) the U.S. Trustee; (b) counsel to the agent for the Debtors' prepetition first lien credit facility; (c) counsel to the lenders under the Debtors' prepetition second lien credit facility; (d) counsel to the Debtors' prepetition majority equity owner; (e) counsel to the Stalking Horse Bidders; (f) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors; (g) the United States Attorney's Office for the District of Delaware; (h) the attorneys general for the states in which the Debtors conduct business; (i) counsel to Enduro Royalty Trust; and (j) all parties who have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

61.    In addition, copies of the Sale Notice, the Bidding Procedures, and the Bidding Procedures Order will be served on the Notice Parties promptly after entry of the Bidding Procedures Order by this Court.  A copy of the Motion also is available on the website of the Debtors' notice and claims agent, Kurtzman Carson Consultants LLC at www.kccllc.net/Enduro. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Debtors respectfully request that the Court enter the Bidding Procedures Order, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: May 16, 2018
        Wilmington, Delaware

*/s/ Kara Hammond Coyle*
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:      (302) 571-6600
Facsimile:      (302) 571-1253
Email:           mnestor@ycst.com
                 kcoyle@ycst.com

- and -

George A. Davis (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone:      (212) 906-1200
Facsimile:      (212) 751-4864
Email:           george.davis@lw.com

- and -

Caroline A. Reckler (*pro hac vice* pending)
Matthew L. Warren (*pro hac vice* pending)
Jason B. Gott (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:      (312) 876-7700
Facsimile:      (312) 993-9767
Email:           caroline.reckler@lw.com
                 matthew.warren@lw.com
                 jason.gott@lw.com

*Proposed Counsel for Debtors and Debtors in Possession*