## EXHIBIT B-2

**Wyoming Stalking Horse Agreement**

*Execution Version*

**PURCHASE AND SALE AGREEMENT**

**BETWEEN**

**ENDURO OPERATING LLC**

**AS SELLER**

**AND**

**MID-CON ENERGY PROPERTIES, LLC**

**AS BUYER**

**Effective Time: 12:01 a.m. Central Time on January 1, 2018**
**Execution Date:  May 14, 2018**

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND INTERPRETATION ................................................1
    1.1     Defined Terms .......................................................................1
    1.2     References and Rules of Construction .......................................15

ARTICLE II PURCHASE AND SALE ......................................................................16
    2.1     Purchase and Sale .................................................................16
    2.2     Excluded Assets ...................................................................16
    2.3     Revenues and Expenses .........................................................16

ARTICLE III PURCHASE PRICE ...........................................................................17
    3.1     Purchase Price ......................................................................17
    3.2     Deposit ...............................................................................17
    3.3     Adjustments to Purchase Price .................................................17
    3.4     Preliminary Settlement Statement ............................................19
    3.5     Final Settlement Statement .....................................................20
    3.6     Disputes .............................................................................20
    3.7     Allocation of Purchase Price / Allocated Values .........................20
    3.8     Allocation of Consideration for Tax Purposes .............................21
    3.9     Holdback for Final Price .........................................................21

ARTICLE IV ACCESS/DISCLAIMERS .....................................................................22
    4.1     Access ................................................................................22
    4.2     Confidentiality .....................................................................23
    4.3     Disclaimers .........................................................................24

ARTICLE V TITLE MATTERS; CASUALTY; TRANSFER RESTRICTIONS ....................25
    5.1     Seller's Title ........................................................................25
    5.2     Notice of Title Defects; Defect Adjustments ..............................26
    5.3     Casualty Loss ......................................................................30
    5.4     Preferential Purchase Rights and Consents to Assign ...................30

ARTICLE VI ENVIRONMENTAL MATTERS .............................................................32
    6.1     Notice of Environmental Defects .............................................32
    6.2     NORM, Wastes and Other Substances .......................................34

ARTICLE VII REPRESENTATIONS AND WARRANTIES OF SELLER .............................34
    7.1     Organization, Existence and Qualification ..................................34
    7.2     Authority, Approval and Enforceability ......................................35
    7.3     No Conflicts ........................................................................35
    7.4     Consents .............................................................................35
    7.5     Foreign Person .....................................................................35
    7.6     Litigation ............................................................................35
    7.7     No Violation of Laws .............................................................36

US-DOCS\99440892.19

7.8     Preferential Rights ...................................................................................36
7.9     Royalties ..................................................................................................36
7.10    Imbalances ...............................................................................................36
7.11    Property Taxes .........................................................................................36
7.12    Brokers' Fees ...........................................................................................36
7.13    Suspense Funds ........................................................................................36
7.14    Notices.. ...................................................................................................36
7.15    Mechanical Integrity ................................................................................37
7.16    Material Contracts ...................................................................................37

ARTICLE VIII BUYER'S REPRESENTATIONS AND WARRANTIES ...............................37
8.1     Organization, Existence and Qualification ..............................................37
8.2     Authority, Approval and Enforceability ..................................................37
8.3     No Conflicts .............................................................................................37
8.4     Consents ...................................................................................................38
8.5     Bankruptcy ...............................................................................................38
8.6     Litigation ..................................................................................................38
8.7     Financing ..................................................................................................38
8.8     Regulatory ................................................................................................38
8.9     Independent Evaluation ...........................................................................38
8.10    No Knowledge of Breach .........................................................................39
8.11    No Knowledge of Defects ........................................................................39
8.12    Brokers' Fees ...........................................................................................39
8.13    Accredited Investor ..................................................................................39

ARTICLE IX CERTAIN AGREEMENTS ...............................................................................39
9.1     Conduct of Business .................................................................................39
9.2     Governmental Bonds ................................................................................40
9.3     Record Retention ......................................................................................41
9.4     Notifications .............................................................................................41
9.5     Amendment of Schedules .........................................................................41
9.6     Bankruptcy Court Approval .....................................................................41
9.7     Bankruptcy Filings ...................................................................................42
9.8     Bidding Procedures ..................................................................................42
9.9     Employees ................................................................................................42

ARTICLE X BUYER'S CONDITIONS TO CLOSING ..........................................................43
10.1    Representations .........................................................................................43
10.2    Performance ..............................................................................................43
10.3    No Legal Proceedings ..............................................................................43
10.4    Title Defects and Environmental Defects ................................................43
10.5    Closing Deliverables ................................................................................43
10.6    Sale Order.  The Sale Order shall have become a Final Order. ...............43

ARTICLE XI SELLER'S CONDITIONS TO CLOSING .......................................................44
11.1    Representations .........................................................................................44
11.2    Performance ..............................................................................................44

ii

| 11.3 | No Legal Proceedings | 44 |
| 11.4 | Title Defects and Environmental Defects | 44 |
| 11.5 | Replacement Bonds | 44 |
| 11.6 | Closing Deliverables | 44 |
| 11.7 | Sale Order | 44 |

ARTICLE XII CLOSING .................................................................................. 44
| 12.1 | Date of Closing | 44 |
| 12.2 | Place of Closing | 45 |
| 12.3 | Closing Obligations | 45 |
| 12.4 | Records | 45 |

ARTICLE XIII ASSUMPTION; INDEMNIFICATION; SURVIVAL ................ 46
| 13.1 | Assumption by Buyer | 46 |
| 13.2 | Indemnities of Seller | 46 |
| 13.3 | Indemnities of Buyer | 47 |
| 13.4 | Limitation on Liability | 47 |
| 13.5 | Express Negligence | 47 |
| 13.6 | Exclusive Remedy | 48 |
| 13.7 | Indemnification Procedures | 48 |
| 13.8 | Survival | 50 |
| 13.9 | Waiver of Right to Rescission | 50 |
| 13.10 | Insurance, Taxes | 50 |
| 13.11 | Non-Compensatory Damages | 50 |
| 13.12 | Treatment of Certain Payments | 50 |
| 13.13 | Treatment of Applicable Contracts, Cure Costs | 51 |

ARTICLE XIV TERMINATION, DEFAULT AND REMEDIES ..................... 52
| 14.1 | Right of Termination | 52 |
| 14.2 | Effect of Termination | 53 |
| 14.3 | Return of Documentation and Confidentiality | 53 |

ARTICLE XV MISCELLANEOUS ................................................................. 54
| 15.1 | Exhibits and Schedules | 54 |
| 15.2 | Expenses and Taxes | 54 |
| 15.3 | Assignment | 55 |
| 15.4 | Preparation of Agreement | 56 |
| 15.5 | Publicity | 56 |
| 15.6 | Notices | 56 |
| 15.7 | Further Cooperation | 57 |
| 15.8 | Filings, Notices and Certain Governmental Approvals | 57 |
| 15.9 | Entire Agreement; Conflicts | 58 |
| 15.10 | Parties in Interest | 58 |
| 15.11 | Amendment | 58 |
| 15.12 | Waiver; Rights Cumulative | 58 |
| 15.13 | Governing Law; Jurisdiction; Venue; Jury Waiver | 59 |
| 15.14 | Severability | 59 |

iii

15.15    Removal of Name ......................................................................................59
15.16    Time is of the Essence ...........................................................................59
15.17    Counterparts ...........................................................................................60
15.18    Certain Midstream Assets .......................................................................60

iv

## LIST OF EXHIBITS AND SCHEDULES

### EXHIBITS:

| | | |
|---|---|---|
| Exhibit A | — | Leases |
| Exhibit A-1 | — | Wells, Units and Allocated Values |
| Exhibit A-2 | — | Midstream Assets |
| Exhibit B | — | Excluded Assets |
| Exhibit C | — | Applicable Contracts |
| Exhibit D | — | Form of Assignment and Bill of Sale |
| Exhibit E | — | Form of Non-Foreign Affidavit |
| Exhibit F-1 | — | Form of Seller Closing Certificate |
| Exhibit F-2 | — | Form of Buyer Closing Certificate |
| Exhibit G | — | Form of Bidding Procedures |

### SCHEDULES:

| | | |
|---|---|---|
| Schedule 3.3 | — | Pre-Effective Time Capital Expenditures |
| Schedule 7.4 | — | Consents |
| Schedule 7.6 | — | Litigation |
| Schedule 7.7 | — | Violation of Laws |
| Schedule 7.8 | — | Preferential Rights |
| Schedule 7.9 | — | Royalties, Expenses, Etc. |
| Schedule 7.10 | — | Imbalances |
| Schedule 7.11 | — | Property Taxes |
| Schedule 7.13 | — | Suspense Funds |
| Schedule 7.14 | — | Notices |
| Schedule 7.15 | — | Mechanical Integrity |
| Schedule 7.16 | — | Material Contracts |
| Schedule 9.1 | — | Ongoing Operations |
| Schedule 9.2 | — | Governmental Bonds |

US-DOCS\99440892.19

# PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "***Agreement***") is executed as of this 14th day of May, 2018 ("***Execution Date***"), by and between Enduro Operating LLC, a Delaware limited liability company ("***Seller***"), on the one hand, and Mid-Con Energy Properties, LLC, a Delaware limited liability company ("***Buyer***"), on the other hand.  Each of Seller and Buyer may be referred to herein individually as a "***Party***" and collectively as the "***Parties***".

## RECITALS

Seller desires to sell and assign, and Buyer desires to purchase and pay for the Assets (as hereinafter defined).

**NOW, THEREFORE**, for and in consideration of the mutual promises contained herein, the benefits to be derived by each Party hereunder, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

***1.1***    ***Defined Terms.***  Capitalized terms used herein shall have the meanings set forth in this *Section 1.1*, unless the context otherwise requires.

"***Accounting Arbitrator***" shall have the meaning set forth in *Section 3.6*.

"***Adjusted Purchase Price***" shall have the meaning set forth in *Section 3.3*.

"***Affiliate***" shall mean any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, another Person.  The term "control" and its derivatives with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"***Agreement***" shall have the meaning set forth in the introductory paragraph herein.

"***Allocable Amount***" shall have the meaning set forth in *Section 3.8*.

"***Allocated Value***" shall have the meaning set forth in *Section 3.7*.

"***Allocation Schedule***" shall have the meaning set forth in *Section 3.8*.

"***Applicable Contracts***" shall mean all Contracts to which Seller is a party (directly or as a successor in interest to another Person) and by which any of the Assets are bound that will be binding on Buyer after the Closing but only to the extent relating to the Assets and exclusive of any Excluded Assets, including those Contracts set forth in *Exhibit C*.

"***Assets***" shall mean, collectively, all of Seller's right, title and interest in and to the following, less and except, from each of the following, the Excluded Assets:

(a)     the oil and gas leases described in *Exhibit A* (collectively, the "***Leases***");

(b)     the wells located on the Leases or on any other lease or lands with which any Lease has been pooled or unitized, including oil and/or gas wells, condensate wells, water wells and injection or disposal wells, whether or not currently producing, shut-in, plugged or abandoned, including those set forth in *Exhibit A-1* (collectively, the "***Wells***"), and in all Hydrocarbons produced therefrom or allocated thereto;

(c)     all unitization and pooling agreements in effect with respect to any of the Leases or Wells and the units created thereby (collectively, the "***Units***");

(d)     all Applicable Contracts;

(e)     all Rights-of-Way that are used in connection with the ownership or operation of any of the Leases, Wells, Units, Midstream Assets or other Assets;

(f)     all equipment, machinery, fixtures and other personal and mixed property, operational and nonoperational, known or unknown, that are solely used in connection with any of the Leases, Wells, Units, Midstream Assets or other Assets, including, pipelines, gathering systems, well equipment, casing, tubing, pumps, motors, fixtures, machinery, compression equipment, flow lines, processing and separation facilities, structures, materials and other items solely used in the operation thereof (collectively, the "***Personal Property***");

(g)     all Imbalances relating to the Assets;

(h)     the easements, surface leases and rights-of-way more particularly described on *Exhibit A-2*, together with the gas processing plant, related pipelines and/or disposal or injection wells located thereon and/or described on *Exhibit A-2* (the "***Midstream Assets***");

(i)     copies of all of the files, records, information and data, whether written or electronically stored, relating to the Assets in Seller's or its Affiliates' possession, including: (i) land and title records; (ii) Applicable Contract files; (iii) correspondence; (iv) operations, environmental, production, accounting and Property Tax records, and (v) facility and well records (collectively, the "***Records***"); and

(j)     geophysical, seismic and related technical data and information relating to the Assets and any interpretations thereof, but only to the extent the same may be transferred without payment of money.

"***Assigned Rights***" shall have the meaning set forth in *Section 15.2(d)*.

"***Assignment and Bill of Sale***" shall mean the Assignment and Bill of Sale from Seller to Buyer pertaining to the Assets and substantially in the form of *Exhibit D*.

"***Assumed Obligations***" shall have the meaning set forth in *Section 13.1*.

"***Auction***" shall mean an auction for the sale of the Assets, if any, to be conducted in accordance with the Bidding Procedures.

"***Available Employees***" shall have the meaning set forth in *Section 9.9*.

"***Backup Bidder***" shall mean the bidder with the next-highest or otherwise second-best bid as determined in accordance with the Bidding Procedures.

"***Bankruptcy Code***" shall mean title 11 of the United States Code.

"***Bankruptcy Court***" shall mean the United States Bankruptcy Court for the District of Delaware.

"***Bidding Procedures***" shall mean the *Bidding Procedures* attached hereto as *Exhibit G*, which may be modified or amended from time to time by agreement of the Parties.

"***Bidding Procedures Order***" shall mean an order of the Bankruptcy Code in form and substance reasonably acceptable to the Parties approving the Bidding Procedures, among other things.

"***Break-Up Fee***" shall mean a fee payable as set forth in this Agreement in an amount equal to two percent (2%) of the Purchase Price, which shall constitute an administrative expense of Seller in the Chapter 11 Case under section 364(c)(1) of the Bankruptcy Code.

"***Business Day***" shall mean a day (other than a Saturday or Sunday) on which commercial banks in Texas are generally open for business.

"***Buyer***" shall have the meaning set forth in the introductory paragraph herein.

"***Buyer Indemnified Parties***" shall have the meaning set forth in *Section 13.2*.

"***Buyer's Representatives***" shall have the meaning set forth in *Section 4.1(a)*.

"***Chapter 11 Case***" shall mean the voluntary case to be commenced by Seller in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

"***Claim***" shall have the meaning set forth in *Section 13.7(b)*.

"***Claim Notice***" shall have the meaning set forth in *Section 13.7(b)*.

"***Closing***" shall have the meaning set forth in *Section 12.1*.

"***Closing Date***" shall have the meaning set forth in *Section 12.1*.

"***Code***" shall mean the Internal Revenue Code of 1986, as amended.

"***Confidentiality Agreement***" shall mean that certain Confidentiality Agreement dated January 18, 2018, between Seller and Mid-Con Energy Operating, LLC.

"***Contract***" shall mean any written or oral contract, agreement, agreement regarding indebtedness, indenture, debenture, note, bond, loan, collective bargaining agreement, lease, mortgage, franchise, license agreement, purchase order, binding bid, commitment, letter of credit or any other legally binding arrangement, including farmin and farmout agreements; participation, exploration and development agreements, crude oil, condensate and natural gas purchase and sale, gathering, transportation and marketing agreements; operating agreements; balancing agreements; unitization agreements; processing agreements; facilities or equipment leases; production handling agreements; and other similar contracts, but excluding, however, any Lease, Right-of-Way or other instrument creating or evidencing an interest in the Assets or any real property used in connection with the operations of any Assets.

"***Cure Costs***" shall mean all monetary amounts required to be paid to counterparties to the Applicable Contracts pursuant to the Sale Order and section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Applicable Contracts.

"***Cure Period***" shall have the meaning set forth in *Section 5.2(c)*.

"***Cure Schedule***" shall have the meaning set forth in *Section 13.13(a)*.

"***Customary Post-Closing Consents***" shall mean the consents and approvals from Governmental Authorities for the assignment of the Assets to Buyer that are customarily obtained after such assignment of properties similar to the Assets.

"***De Minimis Amount***" shall mean $50,000.00.

"***Debt Contract***" shall mean any indenture, debenture, deed of trust, mortgage, bond, loan, credit or sale-leaseback or similar agreement entered into by Seller or its Affiliates creating indebtedness on the part of Seller or its Affiliates for borrowed money or the deferred purchase price of property acquired by Seller or its Affiliates.

"***Defect Claim Date***" shall have the meaning set forth in *Section 5.2(a)*.

"***Defensible Title***" shall mean such title of Seller that, as of the Effective Time and subject to Permitted Encumbrances:

      (a)      with respect to each Well (as to the currently producing interval of such Well) or Unit (as to the currently producing interval of the currently producing Wells in such Unit), entitles Seller to receive not less than the Net Revenue Interest set forth in *Exhibit A-1* for such Well or Unit, except for (i) decreases in connection with those operations in which Seller or its successors or assigns may from and after the Effective Time be a non-consenting co-owner, (ii) decreases resulting from the establishment or amendment from and after the Effective Time of pools or units, (iii) decreases required to allow other Working Interest owners to make up past underproduction or pipelines to make up past under deliveries and (iv) as otherwise set forth in *Exhibit A-1*;

      (b)      with respect to each Well (as to the currently producing interval of such Well) or Unit (as to the currently producing interval of the currently producing Wells in such Unit), obligates Seller to bear not more than the Working Interest set forth in

*Exhibit A-1* for such Well or Unit, except (i) increases resulting from contribution requirements with respect to defaulting co-owners under applicable operating agreements, (ii) increases to the extent that they are accompanied by a proportionate increase in Seller's Net Revenue Interest in such Well or Unit and (iii) as otherwise set forth in *Exhibit A-1*; and

(d)    with respect to each Asset, is free and clear of all Encumbrances.

"***Deposit***" shall have the meaning set forth in *Section 3.2*.

"***Dispute Notice***" shall have the meaning set forth in *Section 3.5*.

"***Effective Time***" shall mean 12:01 a.m. Central Time on January 1, 2018.

"***Encumbrance***" shall mean any lien, security interest, pledge, charge or similar encumbrance.

"***Environmental Arbitrator***" shall have the meaning set forth in *Section 6.1(f)*.

"***Environmental Condition***" shall mean a condition existing on the Execution Date with respect to the air, soil, subsurface, surface waters, ground waters and/or sediments that causes an Asset not to be in compliance with any Environmental Law for which Buyer would be responsible if not cured prior to Closing.  For the avoidance of doubt, (i) the fact that a Well is no longer capable of producing sufficient quantities of oil or gas to continue to be classified as a "producing well" or that such a Well should be temporarily abandoned or permanently plugged and abandoned shall, in each case, not form the basis of an Environmental Condition, (ii) the fact that a pipe is temporarily not in use shall not form the basis of an Environmental Condition and (iii) except with respect to equipment (A) that causes or has caused contamination of soil, surface water or groundwater in violation of Environmental Law or (B) the use or condition of which is a violation of Environmental Law, the physical condition of any surface or subsurface production equipment, including water or oil tanks, separators or other ancillary equipment, shall not form the basis of an Environmental Condition.

"***Environmental Deductible***" shall mean 3% of the Purchase Price.

"***Environmental Defect***" shall mean, subject to *Section 6.2*, an Environmental Condition with respect to an Asset.

"***Environmental Defect Notice***" shall have the meaning set forth in *Section 6.1(a)*.

"***Environmental Defect Property***" shall have the meaning set forth in *Section 6.1(a)*.

"***Environmental Laws***" shall mean all applicable Laws in effect as of the Execution Date, including common Law, relating to the protection of the public health, welfare and the environment, including those Laws relating to the storage, handling and use of chemicals and other Hazardous Substances, and those Laws relating to the generation, processing, treatment, storage, transportation, disposal or other management thereof.  The term "*Environmental Laws*" does not

include good or desirable operating practices or standards that may be employed or adopted by other oil and gas well operators or recommended by a Governmental Authority.

"*Escrow Account*" means the account maintained by the Escrow Agent in connection with the Escrow Agreement.

"*Escrow Agent*" shall mean Wells Fargo Bank, N.A.

"*Escrow Agreement*" means that certain Escrow Agreement, dated as of the Execution Date, by and among Buyer, Seller and Escrow Agent.

"*Exchange*" shall have the meaning set forth in *Section 15.2(d)*.

"*Excluded Assets*" shall mean (a) all of Seller's corporate minute books, financial records and other business records that relate to Seller's business generally (including the ownership and operation of the Assets); (b) all trade credits, all accounts, receivables and all other proceeds, income or revenues attributable to the Assets with respect to any period of time prior to the Effective Time; (c) all rights, claims and causes of action of Seller relating to the Assets that are attributable to periods of time prior to the Effective Time (including claims for adjustments or refunds, including claims for adjustments or refunds of overpayment of royalties); (d) subject to *Section 5.3*, all rights and interests relating to the Assets (i) under any existing policy or agreement of insurance, (ii) under any bond or (iii) to any insurance or condemnation proceeds or awards arising, in each case, from acts, omissions or events, or damage to or destruction of property; (e) all Hydrocarbons produced and sold from the Assets with respect to all periods prior to the Effective Time; (f) all claims of Seller for refunds of or loss carry forwards with respect to (i) Property Taxes or any other Taxes attributable to any period (or portion thereof) prior to the Effective Time, (ii) Income or Franchise Taxes or (iii) any Taxes attributable to the Excluded Assets; (g) all personal computers and associated peripherals and all radio and telephone equipment, including SCADA servers and software; (h) all of Seller's proprietary computer software, patents, trade secrets, copyrights, names, trademarks, logos and other intellectual property; (i) all documents and instruments of Seller protected by an attorney-client privilege; (j) all data that cannot be disclosed to Buyer as a result of confidentiality arrangements under agreements with Third Parties; (k) all audit rights arising under any of the Applicable Contracts or otherwise with respect to any period prior to the Effective Time or to any of the Excluded Assets, except for any Imbalances; (l) all geophysical, seismic and related technical data and information relating to the Assets and any interpretations thereof to the extent the same may not be transferred without payment of money; (m) documents prepared or received by Seller or its Affiliates with respect to (i) lists of prospective purchasers for the Assets, (ii) bids submitted by other prospective purchasers of the Assets, (iii) analyses by Seller or its Affiliates of any bids submitted by any prospective purchaser, (iv) correspondence between or among Seller, its representatives and any prospective purchaser other than Buyer and (v) correspondence between Seller or any of its representatives with respect to any of the bids, the prospective purchasers or the transactions contemplated by this Agreement; (n) all personnel files; (o) all deposits, letters of credit and other collateral posted by Seller in connection with the ownership or operation of any Assets; (p) all of Seller's reserve analyses, including all interpretations of such reserves and decline curves; and (q) the property set forth on *Exhibit B*.

"***Execution Date***" shall have the meaning set forth in the introductory paragraph.

"***Expense Reimbursement***" shall mean an amount equal to the reasonable, documented, out-of-pocket costs and expenses of Buyer (including the reasonable, documented expenses of counsel, investment bankers, and other outside advisors) related to negotiating this Agreement and investigating Seller and the Assets, up to a maximum amount of $75,000, which amount, upon entry of the Bidding Procedures Order, shall constitute an administrative expense of Seller in the Chapter 11 Case under section 364(c)(1) of the Bankruptcy Code.

"***Final Order***" shall mean an action or order issued by the applicable Governmental Authority as to which: (a) no request for stay of such action or order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (b) no petition for rehearing or reconsideration of such action or order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (c) the Governmental Authority does not have such action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (d) such action or order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"***Final Payment Date***" shall have the meaning set forth in *Section 3.5*.

"***Final Price***" shall have the meaning set forth in *Section 3.5*.

"***Final Settlement Statement***" shall have the meaning set forth in *Section 3.5*.

"***Franchise Taxes***" shall mean any Tax imposed by a state on Seller's or any of its Affiliates' gross or net income and/or capital for the privilege of engaging in business in that state that was or is attributable to Seller's ownership or disposition of the Assets.

"***Fundamental Representations***" means Seller's representations and warranties in *Sections 7.1, 7.2, 7.3, 7.5* and *7.12*.

"***GAAP***" shall mean generally accepted accounting principles in the United States, consistently applied.

"***Governmental Authority***" shall mean any federal, state, local, municipal, tribal or other government; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory or Taxing Authority or power, and any court or governmental tribunal, including any tribal authority having or asserting jurisdiction.

"***Hazardous Substances***" shall mean any pollutants, contaminants, toxics or hazardous or extremely hazardous substances, materials, wastes, constituents, compounds or chemicals that are regulated by, or may form the basis of liability under, any Environmental Laws, including NORM and other substances referenced in *Section 6.2*.

US-DOCS\99440892.19

"*Holdback*" shall have the meaning set forth in *Section 3.9(a)*.

"*Holdback Period*" shall have the meaning set forth in *Section 3.9(b)*.

"*Hydrocarbons*" shall mean oil and gas and other hydrocarbons produced or processed in association therewith.

"*Imbalances*" shall mean all Well Imbalances and Pipeline Imbalances.

"*Income Taxes*" shall mean any federal, state or local income Tax measured by or imposed on the net income of Seller that was or is attributable to Seller's ownership or disposition of the Assets.

"*Indemnified Party*" shall have the meaning set forth in *Section 13.7(a)*.

"*Indemnifying Party*" shall have the meaning set forth in *Section 13.7(a)*.

"*Indemnity Deductible*" shall mean 3% of the Purchase Price.

"*Individual Environmental Defect Threshold*" shall mean $50,000.00.

"*Individual Title Defect Threshold*" shall mean $50,000.00.

"*Knowledge*" shall mean (whether or not capitalized) with respect to Seller, the actual knowledge (without any duty of inquiry or investigation) of the following Persons:  Bill Pardue, H.C. Lee, Kim Weimer, Kevin Smith, Carmel Helsley and Jonny Brumley.

"*Law*" shall mean any applicable statute, law, rule, regulation, ordinance, order, code, ruling, writ, injunction, decree or other official act of or by any Governmental Authority.

"*Leases*" shall have the meaning set forth in the definition of "*Assets*."

"*Liabilities*" shall mean any and all claims, causes of action, payments, charges, judgments, assessments, liabilities, losses, damages, penalties, fines and costs and expenses, including any attorneys' fees, legal or other expenses incurred in connection therewith and including liabilities, costs, losses and damages for personal injury or death of any person or property damage or environmental damage or remediation.

"*Material Adverse Effect*" shall mean an event or circumstance that, individually or in the aggregate, results in a material adverse effect on the (i) ownership or operation of the Assets, taken as a whole and as currently operated as of the Execution Date or (ii) ability of Seller to consummate the transactions contemplated by this Agreement and perform its obligations hereunder; provided, however, that a Material Adverse Effect shall not include any material adverse effects resulting from:  (a) entering into this Agreement or the announcement of the transactions contemplated by this Agreement; (b) changes in general market, economic, financial or political conditions (including changes in commodity prices, fuel supply or transportation markets, interest or rates) in the area in which the Assets are located, the United States or worldwide; (c) changes in conditions or developments generally applicable to the oil and gas industry; (d) casualty losses and acts of

God, including storms or meteorological events; (e) acts or failures to act of Governmental Authorities; (f) civil unrest or similar disorder, the outbreak of hostilities, terrorist acts or war; (g) matters that are cured or no longer exist by the earlier of the Closing and the termination of this Agreement, without cost to Buyer; (h) a change in Laws from and after the Execution Date; (i) reclassification or recalculation of reserves in the ordinary course of business; (j) changes in the prices of Hydrocarbons; (k) natural declines in well performance; and (l) changes to the Assets due to Seller's conduct of business in compliance with *Section 9.1*.

"*Material Contracts*" means the following: (a) any Contract that can reasonably be expected to result in aggregate payments by or revenues to Seller or Buyer (assuming such Contract is assumed by Buyer as an Applicable Contract) of more than $50,000 during the current or any subsequent fiscal year; (b) Hydrocarbon purchase and sale, exchange, marketing, compression, gathering, transportation, processing, refining, or similar Contracts (in each case) to which Seller is a party (or to which Seller's assets or properties are subject) with respect to Hydrocarbons that is not terminable without penalty on 60 days or less notice; (c) any Contract binding upon Seller to sell, lease, farmout, or otherwise dispose of or encumber any interest in any of the Assets (other than Hydrocarbons) after the date hereof; (d) any Contracts that would obligate Buyer to drill additional wells or conduct other material development operations after the Closing; (e) any Contract that constitutes a non-competition agreement or any agreement that purports to restrict, limit, or prohibit the manner in which, or the locations in which, Seller conducts business, including areas of mutual interest; (f) any Applicable Contracts providing for any call upon, option to purchase, or similar rights with respect to the Assets or to the production therefrom or the processing thereof, or is a dedication of production or otherwise requires production to be transported, processed, or sold in a particular fashion; (g) any Contract that constitutes a joint or unit operating agreement; (h) any Contract that constitutes a farmout agreement, partnership agreement, participation agreement, joint venture agreement, or similar Contract, and (i) any Contract between Seller and any Affiliate of another Seller.

"*MUI Provisions*" shall mean the maintenance of uniform interests provisions contained in the Applicable Contracts.

"*Net Revenue Interest*" shall mean, with respect to any well, unit, lease or mineral interest, the interest in and to all Hydrocarbons produced, saved and sold from or allocated to such well, unit, lease or mineral interest, after giving effect to all royalties, overriding royalties, production payments, carried interests, net profits interests, reversionary interests and other burdens upon, measured by or payable out of production therefrom.

"*NORM*" shall mean naturally occurring radioactive material.

"*Outside Date*" shall have the meaning set forth in *Section 14.1(g)*.

"*Party*" and "*Parties*" shall have the meaning set forth in the introductory paragraph herein.

"*Permitted Encumbrances*" shall mean:

(a)    the terms and conditions of all Leases and all royalties, non-participating royalties, overriding royalties, reversionary interests and similar burdens upon, measured by or

US-DOCS\99440892.19

payable out of production if the net cumulative effect of such Leases and burdens does not (i) operate to reduce the Net Revenue Interest of Seller in any Well or Unit to an amount less than the Net Revenue Interest set forth in *Exhibit A-1* for such Well or Unit, or (ii) obligate Seller to bear a Working Interest with respect to any Well or Unit in any amount greater than the Working Interest set forth in *Exhibit A-1* for such Well or Unit (unless the Net Revenue Interest for such Well or Unit is greater than the Net Revenue Interest set forth in *Exhibit A-1* in the same proportion as any increase in such Working Interest);

(b)    the terms and conditions of the Rights-of-Way included in the Assets;

(c)    all preferential purchase rights, consents to assignment and other similar rights and agreements;

(d)    liens for Taxes or assessments not yet due or delinquent;

(e)    Customary Post-Closing Consents;

(f)    all applicable Laws, and all rights reserved to or vested in any Governmental Authority (i) to control or regulate any Asset in any manner, (ii) by the terms of any right, power, franchise, grant, license or permit, or by any provision of Law, to terminate such right, power, franchise grant, license or permit or to purchase, condemn, expropriate or recapture or to designate a purchaser of any of the Assets, (iii) to use such property in a manner which does not materially impair the use of such property for the purposes for which it is currently owned and operated or (iv) to enforce any obligations or duties affecting the Assets to any Governmental Authority, with respect to any franchise, grant, license or permit;

(g)    all force pooling and similar orders if the effect of the same do not (i) reduce the Net Revenue Interest of Seller in any Well or Unit to an amount less than the Net Revenue Interest set forth in *Exhibit A-1* for such Well or Unit, or (ii) obligate Seller to bear a Working Interest in any Well or Unit in any amount greater than the Working Interest set forth in *Exhibit A-1* for such Well or Unit (unless the Net Revenue Interest for such Well or Unit is greater than the Net Revenue Interest set forth in *Exhibit A-1* in the same proportion as any increase in such Working Interest);

(h)    rights of a common owner of any interest in any of the Rights-of-Way relating to the Assets held by Seller and such common owner as tenants in common or through common ownership;

(i)    Rights-of-Way, on, over or under the Assets for the purpose of operations, facilities, pipelines, transmission lines, transportation lines, distribution lines and other like purposes;

(j)    vendors, carriers, warehousemen's, repairmen's, mechanics', workmen's, materialmen's, construction or other like liens arising by operation of Law in the ordinary course of business or incident to the construction or improvement of any property in respect of obligations which are not yet due or delinquent or, if delinquent, that are being contested in good faith in the normal course of business, provided that the matters identified in this item (j) shall not be

US-DOCS\99440892.19

considered to be Permitted Encumbrances that are being substantively assumed for purposes of the Sale Order;

(k)      any Encumbrance affecting the Assets that is discharged by Seller at or prior to the Closing;

(l)      the terms and conditions of the Applicable Contracts if the net cumulative effect of such terms and conditions does not (i) operate to reduce the Net Revenue Interest of Seller in any Well or Unit to an amount less than the Net Revenue Interest set forth in *Exhibit A-1* for such Well or Unit or (ii) obligate Seller to bear a Working Interest with respect to any Well or Unit in any amount greater than the Working Interest set forth in *Exhibit A-1* for such Well or Unit (unless the Net Revenue Interest for such Well or Unit is greater than the Net Revenue Interest set forth in *Exhibit A-1* in the same proportion as any increase in such Working Interest); and

(o)      any matters referenced on the face of any Exhibit or Schedule attached hereto.

"***Person***" shall mean any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, Governmental Authority or any other entity.

"***Personal Property***" shall have the meaning set forth in the definition of "*Assets*."

"***Pipeline Imbalance***" shall mean any marketing imbalance between the quantity of Hydrocarbons attributable to the Assets required to be delivered by Seller under any Contract relating to the purchase and sale, gathering, transportation, storage, processing or marketing of such Hydrocarbons and the quantity of Hydrocarbons attributable to the Assets actually delivered by Seller pursuant to the relevant Contract, together with any appurtenant rights and obligations concerning production balancing at the delivery point into the relevant sale, gathering, transportation, storage or processing facility.

"***Pre-Closing Tax Return***" shall have the meaning set forth in *Section 15.2(c)*.

"***Preferential Purchase Right***" shall have the meaning set forth in *Section 5.4(a)*.

"***Preliminary Settlement Statement***" shall have the meaning set forth in *Section 3.4*.

"***Property Expenses***" shall have the meaning set forth in *Section 2.3*.

"***Property Taxes***" shall mean ad valorem, property, excise, severance, production or similar Taxes (including any interest, fine, penalty or additions to Tax imposed by a Governmental Authority in connection with such Taxes) based upon operation or ownership of the Assets or the production of Hydrocarbons therefrom but excluding, for the avoidance of doubt, (a) Income Taxes, Franchise Taxes and similar Taxes, and (b) Transfer Taxes.

"***Purchase Price***" shall have the meaning set forth in *Section 3.1*.

"***Records***" shall have the meaning set forth in the definition of "*Assets*."

US-DOCS\99440892.19

"*Remediation*" shall mean, with respect to an Environmental Condition, the implementation and completion of any remedial, removal, response, construction, closure, disposal or other corrective actions required under Environmental Laws to correct or remove such Environmental Condition.

"*Remediation Amount*" shall mean, with respect to an Environmental Condition, the cost (net to Seller's interest) of the most cost effective Remediation of such Environmental Condition; *provided*, however, that "Remediation Amount" shall not include (a) the costs of Buyer's and/or its Affiliates' employees, or, if Seller is conducting the Remediation, Buyer's project manager(s) or attorneys, (b) expenses for matters that are ordinary costs of doing business regardless of the presence of an Environmental Condition (e.g., those costs that would ordinarily be incurred in the day-to-day operations of the Assets or in connection with permit renewal/amendment activities), (c) overhead costs of Buyer and/or its Affiliates, or (d) any costs or expenses relating to the assessment, remediation, removal, abatement, transportation and disposal of any asbestos, asbestos-containing materials or NORM unless required to address a violation of Environmental Law.  The lowest cost Remediation may include taking no action, leaving the condition unaddressed, periodic monitoring or the recording of notices in lieu of remediation, if such responses are allowed under Environmental Laws.

"*Rights-of-Way*" shall mean all permits (to the extent transferrable), licenses, servitudes, easements, fee surface, surface leases and rights-of-way.

"*Sale Motion*" shall mean a motion to be filed by Seller in the Chapter 11 Case seeking entry of the Bidding Procedures Order and the Sale Order, which motion shall be in form and substance acceptable to Seller and reasonably acceptable to Buyer.

"*Sale Order*" shall mean an order in form and substance acceptable to the Parties, each in their respective sole discretion, approving this Agreement and all of the terms and conditions hereof, approving the sale and assignment to Buyer of all of the Assets, and approving and authorizing Seller to consummate the transactions contemplated hereby.

"*Seller*" shall have the meaning set forth in the introductory paragraph of this Agreement.

"*Seller Indemnified Parties*" shall have the meaning set forth in *Section 13.3*.

"*Straddle Period*" shall mean any Tax period beginning before and ending after the Effective Time.

"*Successful Bidder*" shall mean the bidder with the highest or otherwise best bid as determined in accordance with the Bidding Procedures.

"*Superior Proposal*" shall mean any bona fide proposal or offer to or from a Person other than Buyer or its representatives with respect to (a) any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests or restructuring involving the Assets, or (b) any other direct or indirect acquisition involving the Assets, that, in each case, the board of managers of Enduro Resource Holdings LLC has determined in good faith, after consultation with its outside financial advisors and outside legal counsel, would, if

consummated, result in a transaction superior to Seller than the transactions contemplated hereunder, taking into account all terms thereof, including (x) the likelihood and timing of consummation (as compared to the transactions contemplated hereunder) and (y) all material legal, financial (including the financing terms of any such proposal), conditionality, regulatory and other aspects of such proposal.

"*Tax*" or "*Taxes*" shall mean all taxes, assessments, duties, levies, imposts or other similar charges imposed by a Governmental Authority, including all income, franchise, profits, capital gains, capital stock, transfer, gross receipts, sales, use, transfer, service, occupation, ad valorem, property, excise, severance, production, windfall profit, premium, stamp, license, payroll, employment, social security, unemployment, disability, environmental (including taxes under Code Section 59A), alternative minimum, add-on, value-added, withholding (including backup withholding) and other taxes, assessments, duties, levies, imposts or other similar charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), and all estimated taxes, deficiency assessments, additions to tax, additional amounts imposed by any Governmental Authority, penalties and interest.

"*Tax Return*" shall mean any report, return, election, document, estimated tax filing, declaration or other filing provided to any Taxing Authority, including any amendments thereto.

"*Taxing Authority*" shall mean, with respect to any Tax, the Governmental Authority that imposes such Tax, and the Governmental Authority (if any) charged with the collection of such Tax, including any Governmental Authority that imposes, or is charged with collecting, social security or similar charges or premiums.

"*Third Party*" shall mean any Person other than a Party to this Agreement or an Affiliate of a Party to this Agreement.

"*Title Arbitrator*" shall have the meaning set forth in *Section 5.2(j)*.

"*Title Benefit*" shall mean any right, circumstance or condition that operates to (a) increase the Net Revenue Interest of Seller in any Well or Unit above that shown for such Well or Unit in *Exhibit A-1* to the extent the same does not cause a greater than proportionate increase in Seller's Working Interest therein above that shown in *Exhibit A-1*, or (b) decrease the Working Interest of Seller in any Well or Unit below that shown for such Well or Unit in *Exhibit A-1* to the extent the same causes a decrease in Seller's Working Interest that is proportionately greater than the decrease in Seller's Net Revenue Interest therein below that shown in *Exhibit A-1*.

"*Title Benefit Amount*" shall have the meaning set forth in *Section 5.2(e)*.

"*Title Benefit Notice*" shall have the meaning set forth in *Section 5.2(b)*.

"*Title Deductible*" shall mean 3% of the Purchase Price.

"*Title Defect*" shall mean any Encumbrance, defect or other matter that causes Seller not to have Defensible Title, provided that the following shall not be considered Title Defects:

US-DOCS\99440892.19

(a)      defects arising out of lack of corporate or other entity authorization unless Buyer provides affirmative evidence that such corporate or other entity action was not authorized and results in another Person's superior claim of title to the relevant Asset;

(b)      defects based on a gap in Seller's chain of title in the applicable county records existing prior to 1980 and, unless such gap is affirmatively shown to exist in such records by an abstract of title, title opinion or landman's title chain, which documents shall be included in a Title Defect Notice, all other defects based on a gap in Seller's chain of title in the applicable county records;

(c)      defects based upon the failure to record any state or federal Leases or Rights-of-Way included in the Assets or any assignments of interests in such Leases or Rights-of-Way included in the Assets in any applicable state or federal records (so long as such Lease, Right-of-Way or assignment is filed in the applicable county records) or in any applicable county records (so long as such Lease, Right-of-Way or assignment is filed in the applicable state or federal records);

(d)      any Encumbrance, defect or loss of title resulting from Seller's conduct of business in compliance with *Section 9.1*;

(e)      defects based upon the exercise of any preferential rights;

(f)      Encumbrances or other defects created under deeds of trust, mortgages and similar instruments by the lessor under a Lease covering the lessor's surface and mineral interests in the land covered thereby;

(g)      failure to obtain any ratification of pooling, unitization or communitization by any non-participating or non-executive mineral interest owner;

(h)      Encumbrances or other defects created under deeds of trust, mortgages and similar instruments by the grantor under a Right-of-Way;

(i)      defects that have been cured by the passage of time including applicable Laws of limitations or prescription;

(j)      any defect or irregularity that would customarily be waived by a reasonable owner of oil and gas properties;

(l)      any defect or irregularity arising out of the lack of a survey;

(n)      any defect or irregularity that arises out of the failure to recite marital status in a document or the omission of (i) affidavits or similar instruments reflecting heirships or (ii) estate proceedings;

(o)      any defects arising from any prior oil and gas lease relating to the lands covered by the Leases or Units not being surrendered of record;

(q)     any defects based on a lack of records, documents or other information in Seller's or any of its Affiliate's possession; and

(q)     any defect or irregularity arising out of the application of MUI Provisions contained within joint operating or similar agreements.

"***Title Defect Amount***" shall have the meaning set forth in *Section 5.2(g)*.

"***Title Defect Notice***" shall have the meaning set forth in *Section 5.2(a)*.

"***Title Defect Property***" shall have the meaning set forth in *Section 5.2(a)*.

"***Transaction Documents***" shall mean those documents executed and delivered pursuant to or in connection with this Agreement.

"***Transfer Taxes***" shall have the meaning set forth in *Section 15.2(b)*.

"***Treasury Regulations***" shall mean the regulations promulgated by the United States Department of the Treasury pursuant to and in respect of provisions of the Code.  All references herein to sections of the Treasury Regulations shall include any corresponding provision or provisions of succeeding, similar, substitute, proposed or final Treasury Regulations.

"***Units***" shall have the meaning set forth in the definition of "*Assets*."

"***Well Imbalance***" shall mean any imbalance at the wellhead between the amount of Hydrocarbons produced from a Well and allocable to the interests of Seller therein and the shares of production from the relevant Well to which Seller is entitled, together with any appurtenant rights and obligations concerning future in kind and/or cash balancing at the wellhead.

"***Wells***" shall have the meaning set forth in the definition of "*Assets*."

"***Working Interest***" shall mean, with respect to any well, unit lease or mineral interest, the interest in and to such well, unit, lease or mineral interest that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such well, unit, lease or mineral interest, but without regard to the effect of any royalties, overriding royalties, production payments, net profits interests and other similar burdens upon, measured by or payable out of production therefrom.

*1.2     References and Rules of Construction.*  All references in this Agreement to Exhibits, Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Schedules, Articles, Sections, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise.  Titles appearing at the beginning of any Articles, Sections, subsections and other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof.  The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular Article, Section, subsection or other subdivision unless expressly so limited.  The words "this Article," "this Section" and "this subsection," and words of similar import, refer only to Article, Section or

US-DOCS\99440892.19

subsection hereof in which such words occur.  Wherever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limiting the foregoing in any respect." All references to "$" or "dollars" shall be deemed references to United States dollars.  Each accounting term not defined herein will have the meaning given to it under GAAP as interpreted as of the Execution Date.  Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.  The Exhibits and Schedules referred to herein are attached to and by this reference incorporated herein for all purposes.  Notwithstanding anything herein to the contrary, the Parties acknowledge and agree that any deadline under this Agreement that occurs on a federal holiday, Saturday or Sunday shall automatically be extended to the following Business Day, unless expressly stated otherwise or agreed to by the Parties in writing.

## ARTICLE II
## PURCHASE AND SALE

*2.1*     ***Purchase and Sale.***  Subject to the terms and conditions of this Agreement, Seller agrees to sell, and Buyer agrees to purchase and pay for the Assets.

*2.2*     ***Excluded Assets.***  Seller shall reserve and retain all of the Excluded Assets.

*2.3*     ***Revenues and Expenses.***     Subject to the provisions hereof (including *Section 3.3(a)(v)*), Seller shall be entitled to all of the rights of ownership attributable to the Assets (including the right to all production, proceeds of production and other proceeds) and shall remain responsible for all Property Expenses, in each case, attributable to the period of time prior to the Effective Time.  Subject to the provisions hereof, and subject to the occurrence of the Closing, Buyer shall be entitled to all of the rights of ownership attributable to the Assets (including the right to all production, proceeds of production and other proceeds), and shall be responsible for all Property Expenses, in each case, from and after the Effective Time.  "***Property Expenses***" means all operating expenses (including costs of insurance, but excluding any Taxes) and capital expenditures incurred in the ownership and operation of the Assets in the ordinary course of business and, where applicable, in accordance with the relevant operating or unit agreement, if any, and overhead costs charged to the Assets under the relevant operating agreement or unit agreement, if any, but excluding Liabilities attributable to (i) personal injury, illness or death of any person, property damage, violation of any Law or breach of Contract, (ii) obligations to plug wells and dismantle or decommission facilities, (iii) environmental matters or Environmental Conditions, including obligations to remediate any contamination of water or personal property under applicable Environmental Laws, (iv) obligations with respect to Imbalances or (v) obligations to pay Working Interests, royalties, overriding royalties or other interest owners' revenues or proceeds attributable to sales of Hydrocarbons relating to the Assets, including those held in suspense.  After the Closing, each Party shall be entitled to participate in all joint interest audits and other audits of Property Expenses for which such Party is entirely or in part responsible under the terms of this *Section 2.3*.

## ARTICLE III
## PURCHASE PRICE

**3.1    *Purchase Price.*** The aggregate purchase price for the Assets shall be $5,000,000.00 (the "***Purchase Price***"), adjusted in accordance with this Agreement and payable by Buyer to Seller at the Closing by wire transfer in same day funds to a bank account of Seller (the details of which shall be provided by Seller to Buyer by notice given at least one Business Day prior to the Closing Date).

**3.2    *Deposit.*** Concurrently with the execution of this Agreement Buyer has deposited with Escrow Agent by wire transfer in same day funds the sum of $500,000.00, representing 10% of the Purchase Price (such amount, together with any interest earned thereon, the "***Deposit***"), to be held, invested and disbursed in accordance with the terms of this Agreement and the Escrow Agreement. If the Closing occurs, the Deposit shall be applied toward the Purchase Price at the Closing.

(a)    If (i) all conditions precedent to the obligations of Buyer set forth in *Article X* (other than those actions or deliveries to occur at the Closing) have been met or waived by Buyer, and (ii) the transactions contemplated by this Agreement are not consummated because of: (A) the failure of Buyer to materially perform any of its obligations hereunder or (B) the failure of any of Buyer's representations or warranties hereunder to be true and correct in all respects as of the Execution Date and the Closing, then, in such event, Seller shall have the option to: (1) terminate this Agreement, in which event the Parties shall execute such joint instruction or other instrument as is necessary to cause Escrow Agent to distribute the Deposit to Seller as liquidated damages (the Parties agree that the foregoing liquidated damages are reasonable considering all of the circumstances existing as of the Execution Date, shall not serve as a penalty and constitute the Parties' good faith estimate of the actual damages reasonably expected to result from such termination of this Agreement by Seller) or (2) seek the specific performance of Buyer. Nothing herein shall be construed to prohibit Seller from first seeking specific performance, but thereafter terminating this Agreement and retaining the Deposit as liquidated damages in lieu of fully prosecuting its claim for specific performance. Each Party acknowledges that the remedies at law of Seller for a breach or threatened breach of this Agreement by Buyer as contemplated herein may be inadequate and, in recognition of this fact, Seller, in addition to all other remedies that may be available, shall be entitled to seek equitable relief in the form of specific performance.

(b)    If this Agreement is terminated by the mutual written agreement of Buyer and Seller, or if the Closing does not occur for any reason other than as set forth in *Section 3.2(a)*, then Buyer shall be entitled to the delivery of the Deposit free of any claims by Seller with respect thereto, and the Parties shall execute such joint instruction or other instrument as is necessary to cause Escrow Agent to distribute the Deposit to Buyer. Buyer and Seller shall thereupon have the rights and obligations set forth in *Section 14.2*.

**3.3    *Adjustments to Purchase Price.*** The Purchase Price shall be adjusted as follows, and the resulting amount shall be herein called the "***Adjusted Purchase Price***":

(a)    The Purchase Price shall be adjusted upward by the following amounts (without duplication):

(i)    an amount equal to the value of all Hydrocarbons attributable to the Assets in storage (to be calculated as all oil in storage above the pipeline connection) or existing in pipelines (including linefill) and/or plants (including inventory) and above the pipeline connection or upstream of the sales meter as of the Effective Time, the value to be based upon the contract price in effect as of the Effective Time (or the most recent sales price by Seller for similar Hydrocarbons in the same area if there is no contract price in effect as of the Effective Time), less amounts payable as royalties, overriding royalties and other burdens upon, measured by or payable out of such production;

(ii)    an amount equal to all Property Expenses and all other costs and expenses paid by Seller or its Affiliates that are attributable to the Assets from and after the Effective Time (whether paid before or after the Effective Time), including (A) bond and insurance premiums paid by or on behalf of Seller with respect to the period of time from and after the Effective Time, (B) royalties or other burdens upon, measured by or payable out of proceeds of production and (C) rentals and other lease maintenance payments;

(iii)    Title Benefit Amounts as a result of those Title Benefits for which the Title Benefit Amounts have been determined prior to the Closing;

(iv)    the amount of all Property Taxes prorated to Buyer in accordance with *Section 15.2(b)* but paid or payable by Seller;

(v)    the aggregate amount of any and all capital expenditures set forth on *Schedule 3.3* paid by Seller, whether such amount is incurred prior to, on or after the Effective Time;

(vi)    to the extent that Seller is underproduced with respect to Well Imbalances as of the Effective Time, an amount equal to the sum of (A) the product of (I) the underproduced volumes of gaseous Hydrocarbons times (II) a price of $2.18 per Mcf, and (B) the product of (I) the underproduced volumes of liquid Hydrocarbons times (II) a price of $49.35 per Bbl;

(vii)    to the extent that Seller is overdelivered with respect to Pipeline Imbalances as of the Effective Time, an amount equal to the sum of (A) the product of (I) the overdelivered volumes of gaseous Hydrocarbons times (II) a price of $2.18 per Mcf, and (B) the product of (I) the overdelivered volumes of liquid Hydrocarbons times (II) a price of $49.35 per Bbl;

(viii)    overhead charges in an amount equal to $15,000 per month (prorated for any partial month) for the period from the Effective Time up to Closing, provided, however, for the avoidance of doubt, the overhead charges paid by Buyer pursuant to this *Section 3.3(a)(viii)* shall be in lieu of any and all other overhead related charges that may be charged by Seller (or its Affiliates) pursuant to this Agreement or any joint operating or other agreement to Seller (or its Affiliates) with respect to Seller's interest in the Assets; and

(ix)    any other amount provided for elsewhere in this Agreement or otherwise agreed upon by Seller and Buyer.

(b)     The Purchase Price shall be adjusted downward by the following amounts (without duplication):

(i)     an amount equal to all proceeds received by Seller or its Affiliates attributable to the ownership or operation of the Assets from and after the Effective Time up to the Closing, including the sale of Hydrocarbons produced from the Assets or allocable thereto, net of expenses (other than Property Expenses and other expenses taken into account pursuant to *Section 3.3(a)* and Taxes) directly incurred in earning or receiving such proceeds;

(ii)     if Seller makes the election under *Section 5.2(d)(i)* with respect to a Title Defect, the Title Defect Amount with respect to such Title Defect if the Title Defect Amount has been determined prior to the Closing;

(iii)     if Seller makes the election under *Section 6.1(b)(i)* with respect to an Environmental Defect, the Remediation Amount with respect to such Environmental Defect if the Remediation Amount has been determined prior to the Closing;

(iv)     the Allocated Value of the Assets excluded from the transactions contemplated hereby pursuant to *Section 5.2(d)(i)*, *Section 5.4* or *Section 6.1(b)(ii)*;

(v)     the amount of all Property Taxes prorated to Seller in accordance with *Section 15.2(b)* but paid or payable by Buyer;

(vi)     an amount equal to all proceeds from sales of Hydrocarbons relating to the Assets and payable to owners of Working Interests, royalties, overriding royalties and other similar interests (in each case) that are held by Seller in suspense as of the Closing Date;

(vii)     to the extent that Seller is overproduced with respect to Well Imbalances as of the Effective Time, an amount equal to the sum of (A) the product of (I) the overproduced volumes of gaseous Hydrocarbons times (II) a price of \$2.18 per Mcf, and (B) the product of (I) the overproduced volumes of liquid Hydrocarbons times (II) a price of \$49.35 per Bbl;

(viii)     to the extent that Seller is underdelivered with respect to Pipeline Imbalances as of the Effective Time, an amount equal to the sum of (A) the product of (I) the underdelivered volumes of gaseous Hydrocarbons times (II) a price of \$ per Mcf, and (B) the product of (I) the underdelivered volumes of liquid Hydrocarbons times (II) a price of \$49.35 per Bbl; and

(ix)     any other amount provided for elsewhere in this Agreement or otherwise agreed upon by Seller and Buyer.

**3.4     Preliminary Settlement Statement.**    Not less than four Business Days prior to the Closing, Seller shall prepare and submit to Buyer for review a draft settlement statement (the "***Preliminary Settlement Statement***") that shall set forth the Adjusted Purchase Price, reflecting each adjustment made in accordance with this Agreement as of the date of preparation of such Preliminary Settlement Statement and the calculation of the adjustments used to determine such amount, together with the designation of Seller's account for the wire transfer of funds as set forth

in *Section 12.3(d)*.  Within two Business Days of receipt of the Preliminary Settlement Statement, Buyer will deliver to Seller a written report containing all changes with the explanation therefor that Buyer proposes to be made to the Preliminary Settlement Statement.  In the event that Buyer fails to deliver such report to Seller then the Preliminary Settlement Statement submitted by Seller shall be deemed to have been mutually agreed to by the Parties.  The Preliminary Settlement Statement, as agreed upon by the Parties, will be used to adjust the Purchase Price at the Closing; provided that if the Parties do not agree upon an adjustment set forth in the Preliminary Settlement Statement, then the amount of such adjustment used to adjust the Purchase Price at the Closing shall be that amount set forth in the draft Preliminary Settlement Statement delivered by Seller to Buyer pursuant to this *Section 3.4*.

      *3.5*     ***Final Settlement Statement.***  On or before 120 days after the Closing, a final settlement statement (the "***Final Settlement Statement***") will be prepared by Seller based on actual income and expenses during the period from and after the Effective Time until the Closing and which takes into account all final adjustments made to the Purchase Price and shows the resulting final Purchase Price (the "***Final Price***").  The Final Settlement Statement shall set forth the actual proration of the amounts required by this Agreement.  As soon as practicable, and in any event within 30 days after receipt of the Final Settlement Statement, Buyer shall return to Seller a written report containing any proposed changes to the Final Settlement Statement and an explanation of any such changes and the reasons therefor (the "***Dispute Notice***").  If the Final Price set forth in the Final Settlement Statement is mutually agreed upon by Seller and Buyer, the Final Settlement Statement and the Final Price shall be final and binding on the Parties hereto.  Any difference in the Adjusted Purchase Price as paid at the Closing pursuant to the Preliminary Settlement Statement and the Final Price shall be paid by the owing Party within ten days to the owed Party.  All amounts paid pursuant to this *Section 3.5* shall be delivered in United States currency by wire transfer of immediately available funds to the account specified in writing by the relevant Party.  The date upon which any such final payment is made pursuant to this *Section 3.5* shall be referred to herein as the "***Final Payment Date***".

      *3.6*     ***Disputes.***  If Seller and Buyer are unable to resolve the matters addressed in the Dispute Notice, each of Buyer and Seller shall, within ten Business Days after the delivery of such Dispute Notice, summarize its position with regard to such dispute in a written document and submit such summaries to the Fort Worth, Texas office of any nationally-recognized accounting firm mutually agreed by the Parties (the "***Accounting Arbitrator***"), together with the Dispute Notice, the Final Settlement Statement and any other documentation such Party may desire to submit; provided that if the Parties cannot agree on the identity of the Accounting Arbitrator within 10 Business Days after the referral of the dispute to this *Section 3.6*, then the Accounting Arbitrator shall be selected by the Dallas, Texas office of the American Arbitration Association.  Within 20 Business Days after receiving the Parties' respective submissions, the Accounting Arbitrator shall render a decision choosing either Seller's position or Buyer's position with respect to each matter addressed in any Dispute Notice, based on the materials described above.  Any decision rendered by the Accounting Arbitrator pursuant hereto shall be final, conclusive and binding on Seller and Buyer and will be enforceable against any of the Parties in any court of competent jurisdiction.  The costs of such Accounting Arbitrator shall be borne one-half by Buyer and one-half by Seller.

      *3.7*     ***Allocation of Purchase Price / Allocated Values.***  The "***Allocated Value***" for any Asset equals the portion of the unadjusted Purchase Price allocated to the Wells and Units in

US-DOCS\99440892.19

*Exhibit A-1* and such Allocated Value shall be used in calculating any applicable adjustments to the Purchase Price as provided herein. Buyer and Seller also agree (a) that the Allocated Values, as adjusted, shall be used by Seller and Buyer as the basis for reporting asset values and other items for purposes of *Section 3.8* and (b) that neither they nor their Affiliates will take positions inconsistent with such Allocated Values in notices to Governmental Authorities, in audit or other proceedings with respect to Taxes, in notices to Preferential Purchase Right holders or in other documents or notices relating to the transactions contemplated by this Agreement.

       **3.8**     *Allocation of Consideration for Tax Purposes.* Seller and Buyer agree that the portion of the Purchase Price, as adjusted, attributable to the Assets and the Assumed Obligations with respect to the Assets and other amounts treated for Tax purposes as consideration for a sale transaction (to the extent shown at such time) (collectively, the "*Allocable Amount*") shall be allocated among the various Assets for Tax purposes. The initial draft of such allocations shall be prepared by Seller in a manner consistent with the Allocated Values and shall be provided to Buyer no later than 120 days after the Closing. Seller and Buyer shall then cooperate to prepare a final schedule of the Allocable Amount among the Assets, which shall also be materially consistent with the Allocated Values (as adjusted, the "*Allocation Schedule*"). The Allocation Schedule shall be updated to reflect any adjustments to the Allocable Amount. The allocation of the Allocable Amount shall be reflected on a completed Internal Revenue Service Form 8594 (Asset Acquisition Statement under Section 1060 of the Code), which Form 8594 will be timely filed separately by Seller and Buyer with the Internal Revenue Service pursuant to the requirements of Section 1060(b) of the Code. Seller and Buyer agree not to take any position inconsistent with the allocations set forth in the Allocation Schedule unless required by applicable Law or with the consent of the other Parties. The Parties further agree that the allocations set forth on the Allocation Schedule will represent reasonable estimates of the fair market values of the Assets described therein.

       **3.9**     *Holdback for Final Price.*

       (a)     On the Closing Date, Escrow Agent shall retain the Deposit in the Escrow Account, with said sum constituting the "*Holdback*" for the purpose of securing the satisfaction and discharge of indemnity claims of Buyers against Seller under this Agreement, and the payment of any amounts owed by Seller to Buyer pursuant to *Section 3.5*. The Holdback shall be governed by the provisions of this *Section 3.9* and the Escrow Agreement. The joint, written authorization of representatives of Buyer and Seller pursuant to the Escrow Agreement shall be required for the disbursement of any portion of the Holdback.

       (b)     With respect to each claim for indemnification asserted by Buyer against Seller pursuant to *Section 13.2* during the period from and after the Closing Date up to six months after the Closing Date (the "*Holdback Period*"), upon final resolution or determination of such an indemnity or warranty claim by the Parties or in accordance with *Section 13.7*, as applicable, resolving the claim in favor of Buyer, Buyer and Seller shall jointly instruct the Escrow Agent to disburse to Buyer the amount set forth in such joint written instruction, which will be that portion of the Holdback being held in the Escrow Account as would satisfy such finally resolved or determined indemnity or warranty claim. Further, to the extent Seller is obligated to pay Buyer any amounts pursuant to *Section 3.5* in respect of the Final Price, Buyer and Seller shall jointly instruct the Escrow Agent to disburse to Buyer such amount set forth in such joint written

instruction, which will be that portion of the Holdback being held in the Escrow Account as would satisfy such payment obligation.

(c)    Buyer and Seller shall jointly instruct the Escrow Agent to release to Seller any amounts then remaining in the Escrow Account on the first Business Day after the expiration of the Holdback Period, except for the aggregate amount of all outstanding claims for indemnification or warranty which Buyer has provided to Seller in accordance with *Section 13.7* that have not been previously satisfied (which monies shall remain part of the Escrow Account until final resolution of such outstanding indemnity and/or warranty claims).  If Buyer and Seller fail to deliver a joint written instruction to the Escrow Agent in accordance with the foregoing sentence, then the Escrow Agent shall, upon delivery by Buyer or Seller to the Escrow Agent of a written court order from a court of competent jurisdiction directing payment to Seller, pay to Seller the amounts set forth in such court order, together with all interest or income on or with respect to the Holdback.

**ARTICLE IV**
**ACCESS/DISCLAIMERS**

*4.1    Access*.

(a)    From and after the date hereof and up to and including the Closing Date (or earlier termination of this Agreement) but subject to the other provisions of this *Section 4.1* and obtaining any required consents of Third Parties, including Third Party operators of the Assets, Seller shall afford to Buyer and its officers, employees, agents, accountants, attorneys, investment bankers and other authorized representatives ("***Buyer's Representatives***") reasonable access, during normal business hours, to the properties underlying the Assets and all Records in Seller's or any of its Affiliates' possession, except for any Records subject to confidentiality or similar restrictions or that would otherwise fall within the definition of Excluded Assets.  All investigations and due diligence conducted by Buyer or any Buyer's Representative shall be conducted at Buyer's sole cost, risk and expense and any conclusions made from any examination done by Buyer or any Buyer's Representative shall result from Buyer's own independent review and judgment.

(b)    Buyer shall be entitled to conduct a Phase I environmental property assessment with respect to the Assets.  Buyer shall have no right to conduct any sampling, boring, drilling or other invasive investigation activities with respect to any of the Assets, without the prior written consent of Seller.

(c)    Seller or its designee shall have the right to accompany Buyer and Buyer's Representatives whenever they are on site on the properties underlying the Assets. Notwithstanding anything herein to the contrary, Buyer shall not have access to, and shall not be permitted to conduct, any environmental or other due diligence or activity (including any Phase I environmental property assessments) with respect to the Assets where Seller does not have the authority to grant access for such due diligence or activity.

(d)    Buyer shall coordinate its environmental property assessments and physical inspections of the Assets with Seller and all Third Party operators to minimize any inconvenience

to or interruption of the conduct of business by Seller or such Third Party operators.  Buyer shall abide by Seller's, and any Third Party operator's, safety rules, regulations and operating policies while conducting its due diligence evaluation of the Assets, including any environmental or other inspection or assessment of the Assets.  Buyer hereby releases, defends, indemnifies and holds harmless each of the operators of the Assets and each Seller Indemnified Parties from and against any and all Liabilities arising out of, resulting from or relating to any field visit, environmental property assessment, or other due diligence activity conducted by Buyer or any Buyer's Representative with respect to the Assets and the properties underlying the Assets, **EVEN IF SUCH LIABILITIES ARISE OUT OF OR RESULT FROM, SOLELY OR IN PART, THE SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR VIOLATION OF LAW OF OR BY A MEMBER OF THE SELLER INDEMNIFIED PARTIES, EXCEPTING ONLY LIABILITIES ACTUALLY RESULTING ON THE ACCOUNT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A MEMBER OF THE SELLER INDEMNIFIED PARTIES.**

(e)    Upon completion of Buyer's due diligence, Buyer shall at its sole cost and expense and without any cost or expense to Seller or its Affiliates, (i) repair all damage done to the properties comprising the Assets in connection with Buyer's due diligence, (ii) restore the properties comprising the Assets to the approximate same or better condition than they were prior to commencement of Buyer's due diligence and (iii) remove all equipment, tools or other property brought onto the properties comprising the Assets in connection with Buyer's due diligence.  Any disturbance to the properties comprising the Assets (including the leasehold associated therewith) resulting from Buyer's due diligence will be promptly corrected by Buyer.

(f)    During all periods that Buyer and/or any of Buyer's Representatives are on the properties comprising the Assets, Buyer shall maintain, at its sole expense and with insurers reasonably satisfactory to Seller, policies of insurance of the types and in the amounts reasonably requested by Seller.  Coverage under all insurance required to be carried by Buyer hereunder will (i) be primary insurance, (ii) list Seller Indemnified Parties as additional insureds, (iii) waive subrogation against Seller Indemnified Parties and (iv) provide for five days prior notice to Seller in the event of cancellation or modification of the policy or reduction in coverage.  Upon request by Seller, Buyer shall provide evidence of such insurance to Seller prior to entering the properties comprising the Assets.

*4.2*    *Confidentiality.*  Buyer acknowledges that, pursuant to its right of access to the Records and the Assets, Buyer will become privy to confidential, proprietary and other information of Seller and that such information shall be held confidential by Buyer and Buyer's Representatives in accordance with the terms of the Confidentiality Agreement.  If the Closing should occur, the foregoing confidentiality restriction on Buyer, including the Confidentiality Agreement, shall terminate (except as to (a) such portion of the Assets that are not conveyed to Buyer pursuant to the provisions of this Agreement, (b) the Excluded Assets and (c) information related to assets other than the Assets).

4.3    *Disclaimers*.

(a)    EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN *ARTICLE VII* OF THIS AGREEMENT AND THE SPECIAL WARRANTY OF TITLE IN THE ASSIGNMENT, (I) SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, AND (II) SELLER EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING, ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF SELLER OR ANY OF ITS AFFILIATES).

(b)    EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED OTHERWISE IN *ARTICLE VII* OF THIS AGREEMENT AND THE SPECIAL WARRANTY OF TITLE IN THE ASSIGNMENT AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLER EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (I) TITLE TO ANY OF THE ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSETS, (IV) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (V) THE PRODUCTION OF HYDROCARBONS FROM THE ASSETS, (VI) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS OR THE PROPERTIES UNDERLYING THE ASSETS, (VII) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY SELLER OR THIRD PARTIES WITH RESPECT TO THE ASSETS, (VIII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO AND (IX) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT. EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED OTHERWISE IN *ARTICLE VII* OF THIS AGREEMENT AND THE SPECIAL WARRANTY OF TITLE IN THE ASSIGNMENT OF THIS AGREEMENT, SELLER FURTHER DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, OF MERCHANTABILITY, FREEDOM FROM LATENT VICES OR DEFECTS, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY OF THE ASSETS, RIGHTS OF A PURCHASER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE

PRICE, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT BUYER SHALL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS OR DEFECTS (KNOWN OR UNKNOWN, LATENT, DISCOVERABLE OR UNDISCOVERABLE), AND THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS OF THE ASSETS AS BUYER DEEMS APPROPRIATE. FOR THE AVOIDANCE OF DOUBT, BUYER ACKNOWLEDGES AND AGREES THAT BUYER CANNOT RELY ON OR FORM ANY CONCLUSIONS FROM SELLERS' METHODOLOGIES FOR THE DETERMINATION AND REPORTING OF ANY ASSET TAXES THAT WERE UTILIZED FOR ANY TAX PERIOD (OR PORTION THEREOF) BEGINNING PRIOR TO THE CLOSING DATE FOR PURPOSES OF CALCULATING AND REPORTING ASSET TAXES ATTRIBUTABLE TO ANY TAX PERIOD (OR PORTION THEREOF) BEGINNING AFTER THE CLOSING DATE, IT BEING UNDERSTOOD THAT BUYER MUST MAKE ITS OWN DETERMINATION AS TO THE PROPER METHODOLOGIES THAT CAN OR SHOULD BE USED FOR ANY SUCH LATER TAX RETURN.

(c)    SELLER HAS NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO (I) TITLE TO THE ASSETS OR (II) ENVIRONMENTAL LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT OR THE PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT, OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSETS OR THE PROPERTIES UNDERLYING THE ASSETS, AND NOTHING IN THIS AGREEMENT OR OTHERWISE SHALL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY, AND BUYER SHALL BE DEEMED TO BE OBTAINING THE ASSETS "AS IS" AND "WHERE IS" WITH ALL FAULTS FOR PURPOSES OF THEIR ENVIRONMENTAL CONDITION AND THAT BUYER HAS MADE OR CAUSED TO BE MADE OR WILL MAKE OR CAUSE TO BE MADE SUCH TITLE AND ENVIRONMENTAL INSPECTIONS OF THE ASSETS AS BUYER DEEMS APPROPRIATE.

(d)    SELLER AND BUYER AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS *SECTION 4.3* ARE "*CONSPICUOUS*" DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LAW.

## ARTICLE V
## TITLE MATTERS; CASUALTY; TRANSFER RESTRICTIONS

5.1    *Seller's Title*.

(a)    General Disclaimer of Title Warranties and Representations.  Except for the special warranty of title contained in the Assignment and Bill of Sale, and without limiting Buyer's remedies for Title Defects set forth in this *Article V*, Seller makes no warranty or representation, express, implied, statutory or otherwise, with respect to Seller's title to any of the Assets and Buyer

acknowledges and agrees that Buyer's sole remedy for any defect of title, including any Title Defect, with respect to any of the Assets (i) before the Closing, shall be as set forth in *Section 5.2* and (ii) after the Closing, shall be pursuant to the special warranty of title contained in the Assignment and Bill of Sale.

(b)      Special Warranty of Title.  The Assignment and Bill of Sale delivered at the Closing will contain a special warranty of title by Seller by, through or under Seller, but not otherwise, subject, however, to the Permitted Encumbrances.   Said special warranty of title contained in the Assignment and Bill of Sale shall be subject to the further limitations and provisions of this *Article V*.

(c)      Recovery on Special Warranties.

(i)      Buyer's Assertion of Title Warranty Breaches.  Buyer shall furnish Seller a Title Defect Notice meeting the requirements of *Section 5.2(a)* setting forth any matters which Buyer intends to assert as a breach of the special warranty of title contained in the Assignment and Bill of Sale.  Seller shall have a reasonable opportunity, but not the obligation, to cure any breach asserted by Buyer pursuant to this *Section 5.1(c)(i)*.  Buyer agrees to reasonably cooperate with any attempt by Seller to cure any such breach.

(ii)      Limitations on Special Warranty.   For purposes of the special warranty of title contained in the Assignment and Bill of Sale, which such special warranty of title shall terminate on the last day of the Holdback Period, the value of the Assets set forth in Exhibit *A-1* shall be deemed to be the Allocated Value thereof, as adjusted herein.  Recovery on the special warranty of title contained in the Assignment and Bill of Sale shall be limited to an amount (without any interest accruing thereon) equal to the reduction in the Purchase Price to which Buyer would have been entitled had Buyer asserted the defect of title giving rise to such breach of the special warranty of title contained in the Assignment and Bill of Sale, as applicable, as a Title Defect prior to the Closing pursuant to *Section 5.2*, in each case taking into account the Individual Title Defect Threshold and the Title Deductible.  Seller shall be entitled to offset any amount owed by Seller for breach of the special warranty of title contained in the Assignment and Bill of Sale with respect to any Asset by the amount of any Title Benefits with respect to such Asset as to which Seller gives Buyer notice after the Defect Claim Date.

**5.2      *Notice of Title Defects; Defect Adjustments*.**

(a)      Title Defect Notices.  Buyer must deliver, on or before 5:00 p.m. Central Time on June 11, 2018 (the "***Defect Claim Date***"), claim notices to Seller meeting the requirements of this *Section 5.2(a)* (collectively the "***Title Defect Notices***" and individually a "***Title Defect Notice***") setting forth any matters which, in Buyer's reasonable opinion, constitute Title Defects and which Buyer intends to assert as a Title Defect pursuant to this *Section 5.2*.  For all purposes of this Agreement and notwithstanding anything herein to the contrary (except for the special warranty of title contained in the Assignment and Bill of Sale as limited by *Section 5.1(c)*), Buyer shall be deemed to have waived, and Seller shall have no liability for, any Title Defect or other defect, failure, irregularity or Encumbrance affecting title to the Assets that Buyer fails to assert as a Title Defect by a Title Defect Notice received by Seller on or before the Defect Claim Date. To be effective, each Title Defect Notice shall be in writing, and shall include (i) a description of

the alleged Title Defect and the Asset affected by such Title Defect (each a "***Title Defect Property***"), (ii) the Allocated Value of each Title Defect Property, (iii) supporting documents reasonably necessary for Seller to verify the existence of such Title Defect and (iv) the amount by which Buyer reasonably believes the Allocated Value of each Title Defect Property is reduced by such Title Defect and the computations upon which Buyer's belief is based.  To give Seller an opportunity to commence reviewing and curing Title Defects, Buyer agrees to use reasonable efforts to give Seller, on or before the end of each calendar week prior to the Defect Claim Date, written notice of all Title Defects discovered by Buyer during the preceding calendar week, which notice may be preliminary in nature and supplemented prior to the Defect Claim Date.  Buyer shall also promptly furnish Seller with written notice of any Title Benefit which is discovered by any of Buyer's or any of its Affiliate's employees, title attorneys, landmen or other title examiners while conducting Buyer's due diligence with respect to the Assets prior to the Defect Claim Date.

(b)      Title Benefit Notices.  Seller shall have the right, but not the obligation, to deliver to Buyer on or before the Defect Claim Date with respect to each Title Benefit a notice (a "***Title Benefit Notice***") including (i) a description of the Title Benefit and the Assets affected by the Title Benefit and (ii) the amount by which Seller reasonably believes the Allocated Value of such Assets is increased by the Title Benefit and the computations upon which Seller's belief is based.

(c)      Seller's Right to Cure.  Seller shall have the right, but not the obligation, to attempt, at its sole cost, to cure at any time prior to the Closing (the "***Cure Period***") any Title Defects of which it has been advised by Buyer.  In addition, and notwithstanding anything herein the contrary, in the event a Title Defect Property is excluded from the transactions contemplated hereby pursuant to *Section 5.2(d)* below, then Seller shall have the continuing right, but not the obligation, to attempt, at its sole cost, to cure the Title Defect affecting such Title Defect Property at any time within 120 days after Closing, and in the event Seller cures such Title Defect affecting such Title Defect Property, then Buyer shall purchase such Title Defect Property for its Allocated Value as of the Effective Time, subject to the other provisions of this Agreement.

(d)      Remedies for Title Defects.  Subject to Seller's continuing right to dispute the existence of a Title Defect and/or the Title Defect Amount asserted with respect thereto and subject to the rights of the Parties pursuant to *Section 14.1(c)*, in the event that any Title Defect timely asserted by Buyer in accordance with *Section 5.2(a)* is not waived by Buyer or cured on or before the Closing, then, subject to the Individual Title Defect Threshold and the Title Deductible, Seller shall, at its sole option, elect to:

(i)      reduce the Purchase Price by the Title Defect Amount determined pursuant to *Section 5.2(g)* or *Section 5.2(j)*;

(ii)      retain the entirety of the Title Defect Property that is subject to such Title Defect, together with all associated Assets, in which event the Purchase Price shall be reduced by an amount equal to the Allocated Value of such Title Defect Property and such associated Assets; or

(iii)      if applicable, terminate this Agreement pursuant to *Section 14.1(c)*.

(e)     Remedies for Title Benefits.  With respect to each Well or Unit affected by Title Benefits reported under *Section 5.2(b)*, the Purchase Price shall be increased by an amount (the "***Title Benefit Amount***") equal to the increase in the Allocated Value for such Asset caused by such Title Benefits, as determined pursuant to *Section 5.2(h)*, but only to the extent to offset any reductions to the Purchase Price pursuant to *Section 5.2(d)(i)*.

(f)     Exclusive Remedy.  Except for Buyer's (i) rights under the special warranty of title contained in the Assignment and Bill of Sale and (ii) right to terminate this Agreement pursuant to *Section 14.1(c),* the provisions set forth in *Section 5.2(d)* shall be the exclusive right and remedy of Buyer with respect to Seller's failure to have Defensible Title or any other title matter with respect to any Asset.

(g)     Title Defect Amount.  The amount by which the Allocated Value of the affected Title Defect Property is reduced as a result of the existence of a Title Defect shall be the "***Title Defect Amount***" and shall be determined in accordance with the following terms and conditions:

(i)     if Buyer and Seller agree on the Title Defect Amount, then that amount shall be the Title Defect Amount;

(ii)     if the Title Defect is an Encumbrance that is undisputed and liquidated in amount, then the Title Defect Amount shall be the amount necessary to be paid to remove the Title Defect from the Title Defect Property;

(iii)     if the Title Defect represents a discrepancy between (A) Seller's Net Revenue Interest for any Well or Unit and (B) Seller's Net Revenue Interest set forth in *Exhibit A-1*, then the Title Defect Amount shall be the product of the Allocated Value of such Title Defect Property multiplied by a fraction, the numerator of which is the Net Revenue Interest decrease and the denominator of which is the Net Revenue Interest set forth in *Exhibit A-1*;

(iv)     if the Title Defect represents an obligation, Encumbrance upon or other defect in title to the Title Defect Property of a type not described above, then the Title Defect Amount shall be determined by taking into account the Allocated Value of the Title Defect Property, the portion of the Title Defect Property affected by the Title Defect, the legal effect of the Title Defect, the potential economic effect of the Title Defect over the life of the Title Defect Property, the values placed upon the Title Defect by Buyer and Seller and such other reasonable factors as are necessary to make a proper evaluation; provided, however, that if such Title Defect is reasonably capable of being cured, the Title Defect Amount shall not be greater than the reasonable cost and expense of curing such Title Defect;

(v)     the Title Defect Amount with respect to a Title Defect Property shall be determined without duplication of any costs or losses included in another Title Defect Amount hereunder;

(vi)     notwithstanding anything to the contrary in this *Article V*, the aggregate Title Defect Amounts attributable to the effects of all Title Defects upon any Title Defect Property shall not exceed the Allocated Value of the Title Defect Property; and

(vii)    no Title Defects shall be aggregated hereunder.

(h)    <u>Title Benefit Amount</u>.  The Title Benefit Amount resulting from a Title Benefit shall be determined in accordance with the following methodology, terms and conditions:

(i)    if Buyer and Seller agree on the Title Benefit Amount, then that amount shall be the Title Benefit Amount;

(ii)    if the Title Benefit represents a discrepancy between (A) Seller's Net Revenue Interest for any Well or Unit and (B) Seller's Net Revenue Interest set forth in *Exhibit A-1* for such Well or Unit, then the Title Benefit Amount shall be the product of the Allocated Value of the affected Well or Unit multiplied by a fraction, the numerator of which is the Net Revenue Interest increase and the denominator of which is the Net Revenue Interest set forth in *Exhibit A-1*; and

(iii)    if the Title Benefit is of a type not described above, then the Title Benefit Amounts shall be determined by taking into account the Allocated Value of the Asset affected by such Title Benefit, the portion of such Asset affected by such Title Benefit, the legal effect of the Title Benefit, the potential economic effect of the Title Benefit over the life of such Asset, the values placed upon the Title Benefit by Buyer and Seller and such other reasonable factors as are necessary to make a proper evaluation.

(i)    <u>Title Deductibles</u>.  Notwithstanding anything to the contrary, (i) in no event shall there be any adjustments to the Purchase Price or any other remedies provided by Seller for any individual uncured Title Defect for which the Title Defect Amount does not exceed the Individual Title Defect Threshold; and (ii) in no event shall there be any adjustments to the Purchase Price or other remedies provided by Seller for any uncured Title Defect for which the Title Defect Amount exceeds the Individual Title Defect Threshold unless (A) the sum of the Title Defect Amounts of all such Title Defects that exceed the Individual Title Defect Threshold, in the aggregate, excluding any Title Defects cured by Seller, *exceeds* (B) the Title Deductible, after which point Buyer shall be entitled to adjustments to the Purchase Price and/or other remedies only with respect to such Title Defect Amounts in excess of such Title Deductible.

(j)    <u>Title Dispute Resolution</u>.  Seller and Buyer shall attempt to agree on all Title Defects, Title Benefits, Title Defect Amounts and Title Benefit Amounts prior to the Closing. If Seller and Buyer are unable to agree by the Closing, the Title Defect Amounts and Title Benefit Amounts in dispute shall be exclusively and finally resolved pursuant to this *Section 5.2(j)*. There shall be a single arbitrator, who shall be a title attorney with at least fifteen years' experience in oil and gas title work, as selected by mutual agreement of Buyer and Seller within 15 days after the end of the Cure Period (the "***Title Arbitrator***").  If the Parties are unable to mutually agree upon the Title Arbitrator within such time period, then each Party will nominate a candidate to be the Title Arbitrator, and such candidates so nominated by the Parties shall together determine the Title Arbitrator. The arbitration proceeding shall be held in Fort Worth, Texas. The Title Arbitrator's determination shall be made within 20 days after submission of the matters in dispute and shall be final and binding upon both Parties, without right of appeal. In making his determination, the Title Arbitrator shall be bound by the rules set forth in *Section 5.2(g)* and *Section 5.2(h)* and, subject to the foregoing, may consider such other matters as in the opinion of

the Title Arbitrator are necessary to make a proper determination. The Title Arbitrator, however, may not award the Buyer a greater Title Defect Amount than the Title Defect Amount claimed by Buyer in its applicable Title Defect Notice.  The Title Arbitrator shall act as an expert for the limited purpose of determining the specific disputed Title Defect, Title Benefit, Title Defect Amounts and/or Title Benefit Amounts submitted by either Party and may not award damages, interest or penalties to either Party with respect to any matter. Seller and Buyer shall each bear their own legal fees and other costs of presenting its case.  Each of Seller and Buyer shall bear one-half of the costs and expenses of the Title Arbitrator.  To the extent that the award of the Title Arbitrator with respect to any Title Defect Amount or Title Benefit Amount is not taken into account as an adjustment to the Purchase Price pursuant to *Section 3.4* or *Section 3.5*, then within ten days after the Title Arbitrator delivers written notice to Buyer and Seller of his award with respect to a Title Defect Amount or a Title Benefit Amount and subject to *Section 5.2(i)*, (i) Buyer shall pay to Seller the amount, if any, so awarded by the Title Arbitrator to Seller and (ii) Seller shall pay to Buyer the amount, if any, so awarded by the Title Arbitrator to Buyer.  Nothing herein shall operate to cause the Closing to be delayed on account of any arbitration hereunder and to the extent any adjustments are not agreed upon by the Parties as of the Closing, the Purchase Price shall not be adjusted therefor as of the Closing and subsequent adjustments thereto, if any, will be made pursuant to *Section  3.6* or this *Section 5.2*.

### 5.3    *Casualty Loss*.

(a)    Notwithstanding anything herein to the contrary from and after the Effective Time, if the Closing occurs, Buyer shall assume all risk of loss with respect to production of Hydrocarbons through normal depletion (including watering out of any Well, collapsed casing or sand infiltration of any Well) and the depreciation of Personal Property due to ordinary wear and tear, in each case, with respect to the Assets.

(b)    If, after the Execution Date but prior to the Closing Date, any portion of the Assets is destroyed by fire or other casualty, Buyer shall nevertheless be required to close and Seller, at the Closing, shall pay to Buyer all sums paid to Seller by Third Parties by reason of such casualty insofar as with respect to the Assets and shall assign, transfer and set over to Buyer or subrogate Buyer to all of Seller's right, title and interest (if any) in insurance claims, unpaid awards and other rights against Third Parties (excluding any Liabilities, other than insurance claims, of or against any Seller Indemnified Parties) arising out of such casualty insofar as with respect to the Assets; provided, however, that Seller shall reserve and retain (and Buyer shall assign to Seller) all rights, title, interests and claims against Third Parties for the recovery of Seller's costs and expenses incurred in pursuing or asserting any such insurance claims or other rights against Third Parties.

### 5.4    *Preferential Purchase Rights and Consents to Assign*.

(a)    With respect to each preferential purchase right, right of first refusal or similar right (each, a "***Preferential Purchase Right***") pertaining to the sale of an Asset and the transactions contemplated hereby set forth in *Schedule 7.8*, Seller, prior to the Closing, shall send to the holder of each such Preferential Purchase Right a notice, in material compliance with the contractual provisions applicable to such right.  In addition, prior to the Closing, Seller shall send to each holder of a right to consent to assignment pertaining to the Assets and the transactions

contemplated hereby set forth in *Schedule 7.4* a notice seeking such holder's consent to the transactions contemplated hereby.

(b)     If, prior to the Closing, any holder of a Preferential Purchase Right notifies Seller that it intends to consummate the purchase of the Asset to which its Preferential Purchase Right applies or if the time for exercising such Preferential Purchase Right has not expired, then that Asset shall be excluded from the Assets to be acquired by Buyer to the extent of the interest affected by the Preferential Purchase Right, and the Purchase Price shall be reduced by the Allocated Value of the relevant Asset. Seller shall be entitled to all proceeds paid by a Person exercising a Preferential Purchase Right prior to the Closing. If such holder of such Preferential Purchase Right thereafter fails to consummate the purchase of the Asset covered by such Preferential Purchase Right on or before 60 days following the Closing Date or the time for exercising such Preferential Purchase Right expires without exercise by the holders thereof, then Seller shall so notify Buyer, and Buyer shall purchase, on or before ten days following receipt of such notice, such Asset from Seller, under the terms of this Agreement for a price equal to the portion of the Purchase Price previously allocated to it.

(c)     All Assets for which any Preferential Purchase Right has been waived or as to which the period to exercise such right has expired prior to the Closing shall (in each case) be sold (directly or indirectly) to Buyer at the Closing pursuant to the provisions of this Agreement.

(d)     If Seller fails to obtain a required consent set forth in *Schedule 7.4* prior to the Closing and the failure to obtain such consent would cause (i) the assignment (directly or indirectly, as applicable) of the Assets affected thereby to Buyer to be void or (ii) the termination of a Lease or Right-of-Way under the express terms thereof, then, in each case, that portion of such Asset shall be excluded from the Assets to be acquired by Buyer and the Purchase Price shall be reduced by the Allocated Value of that portion of such Assets. In the event that a required consent (with respect to an Asset excluded pursuant to this *Section 5.4(d)*) that was not obtained prior to the Closing is obtained within 180 days following Closing, then, within ten days after such consent is obtained, Buyer shall purchase such portion of such Asset that was so excluded and pay to Seller the amount by which the Purchase Price was reduced with respect to such portion of such Asset, and Seller shall assign to Buyer such portion of such Asset pursuant to an assignment in form substantially similar to the Assignment and Bill of Sale.

(e)     If (i) Seller fails to obtain a required consent set forth in *Schedule 7.4*, prior to the Closing and the failure to obtain such consent would not cause (A) the assignment of the Asset affected thereby to Buyer to be void or (B) the termination of a Lease or Right-of-Way under the express terms thereof or (ii) a consent requested by Seller is not denied in writing, then the portion of the Asset subject to such failed consent shall be acquired by Buyer at the Closing as part of the Assets and Buyer shall have no claim against, and Seller shall have no Liability for, the failure to obtain such consent.

US-DOCS\99440892.19

## ARTICLE VI
## ENVIRONMENTAL MATTERS

*6.1*    *Notice of Environmental Defects*.

(a)    <u>Environmental Defect Notices</u>.  If Buyer discovers any Environmental Condition which, in its reasonable opinion, it believes constitutes an Environmental Defect, Buyer shall promptly notify Seller within three Business Days of such discovery and, in any event, on or before 5:00 p.m. Central Time on the Defect Claim Date.  To be effective, notice of an Environmental Defect (an "***Environmental Defect Notice***") shall be in writing and shall include (i) a description of the Environmental Condition constituting the alleged Environmental Defect(s), including the location of such Environmental Condition, (ii) the Asset(s) (or portions thereof) affected by the asserted Environmental Defect (each, an "***Environmental Defect Property***"), (iii) all documentation in Buyer's, its Affiliates' or Buyer's Representative's possession reasonably necessary to verify the existence of the asserted Environmental Defect(s), (iv) the Allocated Value of each Environmental Defect Property, (v) the Remediation Amount (itemized in reasonable detail) that Buyer asserts is attributable to such Environmental Defect and the computations and information upon which Buyer's belief is based (including a reasonable description of the proposed Remediation), and (vi) the specific Environmental Law that has been violated by the asserted Environmental Defect.  For all purposes of this Agreement, Buyer shall be deemed to have waived, and Seller shall have no liability for, any Environmental Defect which Buyer fails to assert as an Environmental Defect by an Environmental Defect Notice received by Seller on or before the Defect Claim Date.  Seller shall have the right, but not the obligation, to cure any asserted Environmental Defect on or before the Closing.

(b)    <u>Remedies for Environmental Defects</u>.  Subject to Seller's continuing right to dispute the existence of an Environmental Defect and/or the Remediation Amount asserted with respect thereto, and subject to the rights of the Parties pursuant to *Section 14.1(c)*, in the event that any Environmental Defect timely asserted by Buyer in accordance with *Section 6.1(a)* is not waived in writing by Buyer or cured on or before the Closing, then, subject to the Individual Environmental Defect Threshold and the Environmental Deductible, Seller shall, at its sole option, elect to:

(i)    reduce the Purchase Price by the Remediation Amount;

(ii)    retain the entirety of the Environmental Defect Property that is subject to such Environmental Defect, together with all associated Assets, in which event the Purchase Price shall be reduced by an amount equal to the Allocated Value of such Environmental Defect Property and such associated Assets; or

(iii)    if applicable, terminate this Agreement pursuant to *Section 14.1(c)*.

If Seller elects the option set forth in clause (i) above, Buyer shall be deemed to have assumed responsibility for all of the costs and expenses attributable to the Remediation of the Environmental Condition attributable to such Environmental Defect and all of the Liabilities with respect thereto and such responsibility of Buyer shall be deemed to constitute part of the Assumed Obligations hereunder.  Notwithstanding anything to the contrary in this *Article VI*, the aggregate

Remediation Amounts attributable to the effects of all Environmental Defects upon any Environmental Defect Property shall not exceed the Allocated Value of the Environmental Defect Property.

(c)    Exclusive Remedy.  Except for Buyer's rights to terminate this Agreement pursuant to *Section 14.1(c)*, the provisions set forth in *Section 6.1(b)* shall be the exclusive right and remedy of Buyer with respect to any Environmental Defect or other environmental matter with respect to any Asset.

(d)    No Representations or Warranties as to Environmental Matters. Notwithstanding anything in this Agreement to the contrary, except as provided in *Sections 7.7* and *7.14*, the warranties and representations of Seller in this Agreement (including without limitation all of Seller's representations and warranties in *Article VII* other than as provided in *Sections 7.7* and *7.14*) do not extend to environmental matters, regulatory matters, regulatory permits, compliance with Environmental Laws, Environmental Conditions or environmental claims arising from or related to the ownership or operation of the Assets.

(e)    Environmental Deductibles.  Notwithstanding anything to the contrary, (i) in no event shall there be any adjustments to the Purchase Price or any other remedies provided by Seller for any individual uncured Environmental Defect for which the Remediation Amount does not exceed the Individual Environmental Defect Threshold; and (ii) in no event shall there be any adjustments to the Purchase Price or other remedies provided by Seller for any uncured Environmental Defect for which the Remediation Amount exceeds the Individual Environmental Defect Threshold unless (A) the sum of the Remediation Amounts of all such Environmental Defects that exceed the Individual Environmental Defect Threshold, in the aggregate, *exceeds* (B) the Environmental Deductible, after which point Buyer shall be entitled to adjustments to the Purchase Price and/or other remedies only with respect to such Remediation Amounts in excess of such Environmental Deductible.

(f)    Environmental Dispute Resolution.  Seller and Buyer shall attempt to agree on all Environmental Defects and Remediation Amounts prior to the Closing.  If Seller and Buyer are unable to agree by the Closing, the Environmental Defects and/or Remediation Amounts in dispute shall be exclusively and finally resolved by arbitration pursuant to this *Section 6.1(f)*. There shall be a single arbitrator, who shall be an environmental attorney with at least fifteen years' experience in environmental matters, as selected by mutual agreement of Buyer and Seller within 15 days after the Closing Date (the "***Environmental Arbitrator***").  In the event the Parties are unable to mutually agree upon the Environmental Arbitrator within such time period, then each Party will nominate a candidate to be the Environmental Arbitrator, and such candidates so nominated by the Parties shall together determine the Environmental Arbitrator.  The arbitration proceeding shall be held in Fort Worth, Texas.  The Environmental Arbitrator's determination shall be made within 20 days after submission of the matters in dispute and shall be final and binding upon both Parties, without right of appeal.  In making his determination, the Environmental Arbitrator shall be bound by the rules set forth in this *Section 6.1* and, subject to the foregoing, may consider such other matters as in the opinion of the Environmental Arbitrator are necessary or helpful to make a proper determination.  The Environmental Arbitrator, however, may not award Buyer its share of any Remediation Amount greater than the Remediation Amount claimed by Buyer in its applicable Environmental Defect Notice.  The Environmental Arbitrator

shall act as an expert for the limited purpose of determining the specific disputed Environmental Defects and/or Remediation Amounts submitted by either Party and may not award damages, interest or penalties to either Party with respect to any matter.  Seller and Buyer shall each bear their own legal fees and other costs of presenting its case.  Each of Seller and Buyer shall bear one-half of the costs and expenses of the Environmental Arbitrator.  To the extent that the award of the Environmental Arbitrator with respect to any Remediation Amount is not taken into account as an adjustment to the Purchase Price pursuant to *Section 3.4* or *Section 3.5*, then within ten days after the Environmental Arbitrator delivers written notice to Buyer and Seller of his award with respect to a Remediation Amount, and subject to *Section 6.1(c)*, (i) Buyer shall pay to Seller the amount, if any, so awarded by the Environmental Arbitrator to Seller and (ii) Seller shall pay to Buyer the amount, if any, so awarded by the Environmental Arbitrator to Buyer.  Nothing herein shall operate to cause the Closing to be delayed on account of any arbitration hereunder and to the extent any adjustments are not agreed upon by the Parties as of the Closing, the Purchase Price shall not be adjusted therefor as of the Closing and subsequent adjustments thereto, if any, will be made pursuant to *Section 3.6* or this *Section 6.1*.

  *6.2 NORM, Wastes and Other Substances.*  BUYER ACKNOWLEDGES THAT THE ASSETS HAVE BEEN USED FOR EXPLORATION, DEVELOPMENT, PRODUCTION, GATHERING AND TRANSPORTATION OF OIL AND GAS AND THERE MAY BE PETROLEUM, PRODUCED WATER, WASTES OR OTHER SUBSTANCES OR MATERIALS LOCATED IN, ON OR UNDER THE ASSETS OR ASSOCIATED WITH THE ASSETS.  EQUIPMENT AND SITES INCLUDED IN THE ASSETS MAY CONTAIN ASBESTOS, NORM OR OTHER HAZARDOUS SUBSTANCES.  NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, PIPELINES, MATERIALS AND EQUIPMENT AS SCALE, OR IN OTHER FORMS.  THE WELLS, MATERIALS AND EQUIPMENT LOCATED ON THE ASSETS OR INCLUDED IN THE ASSETS MAY CONTAIN NORM AND OTHER WASTES OR HAZARDOUS SUBSTANCES.  NORM CONTAINING MATERIAL AND/OR OTHER WASTES OR HAZARDOUS SUBSTANCES MAY HAVE COME IN CONTACT WITH VARIOUS ENVIRONMENTAL MEDIA, INCLUDING, WATER, SOILS OR SEDIMENT.  SPECIAL PROCEDURES MAY BE REQUIRED FOR THE ASSESSMENT, REMEDIATION, REMOVAL, TRANSPORTATION OR DISPOSAL OF ENVIRONMENTAL MEDIA, WASTES, ASBESTOS, NORM AND OTHER HAZARDOUS SUBSTANCES FROM THE ASSETS.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO ENVIRONMENTAL CONDITION INVOLVING NORM SHALL CONSTITUTE THE BASIS OF ANY ENVIRONMENTAL DEFECT THAT MAY BE ASSERTED BY BUYER PURSUANT TO THIS AGREEMENT.

### ARTICLE VII
### REPRESENTATIONS AND WARRANTIES OF SELLER

  Subject to the matters disclosed in the Schedules to this Agreement (as added, supplemented or amended pursuant to *Section 9.5*), Seller represents and warrants to Buyer the following:

  *7.1 Organization, Existence and Qualification.*  Seller is a duly formed limited liability company and validly existing under the Laws of the State of Delaware.  Seller has all requisite power and authority to own and operate its property (including its interests in the Assets)

and to carry on its business as now conducted. Seller is duly licensed or qualified to do business as a corporation in all jurisdictions in which it carries on business or owns assets and such qualification is required by Law, except where the failure to be so qualified would not have a Material Adverse Effect.

**7.2     _Authority, Approval and Enforceability._** Seller has full power and authority to enter into and perform this Agreement and the Transaction Documents to which it is a party and the transactions contemplated herein and therein. The execution, delivery and performance by such Seller of this Agreement have been duly and validly authorized and approved by all necessary action on the part of Seller. This Agreement is, and the Transaction Documents to which such Seller is a party when executed and delivered by such Seller will be, the valid and binding obligation of Seller and enforceable against Seller in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar Laws, as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at Law).

**7.3     _No Conflicts._** Assuming the receipt of all consents and approvals from Third Parties in connection with the transactions contemplated hereby and the waiver of, or compliance with, all Preferential Purchase Rights applicable to the transactions contemplated hereby; the execution, delivery and performance by Seller and the consummation of the transactions contemplated herein will not (i) conflict with or result in a breach of any provisions of the organizational or other governing documents of Seller, (ii) except in connection with MUI Provisions, result in a default or the creation of any Encumbrance or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any Lease, Applicable Contract, note, bond, mortgage, indenture, license or other material agreement to which Seller is a party or by which Seller or the Assets may be bound or (iii) violate any Law applicable to Seller or any of the Assets, except in the case of clauses (ii) and (iii) where such default, Encumbrance, termination, cancellation, acceleration or violation would not have a Material Adverse Effect.

**7.4     _Consents._** Except (a) as set forth in _Schedule 7.4_, (b) for Customary Post-Closing Consents, (c) under Contracts that are terminable upon 60 days or less notice without payment of any fee, (d) for Preferential Purchase Rights and (e) MUI Provisions, there are no restrictions on assignment, including requirements for consents from Third Parties to any assignment, (in each case) that Seller is required to obtain in connection with the transfer of the Assets by Seller to Buyer or the consummation of the transactions contemplated by this Agreement by Seller.

**7.5     _Foreign Person._** Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

**7.6     _Litigation._** Except as set forth in _Schedule 7.6_, as of the Execution Date, there is no suit, action or litigation by any Person by or before any Governmental Authority, and no arbitration proceedings, (in each case) pending (and served on Seller or its Affiliates), or to Seller's Knowledge, threatened in writing, against Seller (with respect to the Assets).

***7.7    No Violation of Laws.*** To Seller's Knowledge, except as set forth in *Schedule 7.7*, as of the Execution Date, Seller is not in material violation of any applicable Laws with respect to the ownership or operation of the Assets.

***7.8    Preferential Rights.*** Except as set forth in *Schedule 7.8*, to Seller's Knowledge, there are no Preferential Purchase Rights that are applicable to the transfer of the Assets by Seller to Buyer.

***7.9    Royalties.*** Except for such items that are being held in suspense for which the Purchase Price is adjusted pursuant to *Section 3.3(b)(vi)* and except as set forth on *Schedule 7.9*, to Seller's Knowledge, Seller has paid, or caused to be paid, in all material respects, all royalties, overriding royalties and other burdens on production due by Seller with respect to the Assets, or if not paid, is contesting such royalties and other burdens in good faith in the normal course of business.

***7.10    Imbalances.*** To Seller's Knowledge, except as disclosed on *Schedule 7.10*, there are no Imbalances associated with the Assets as of the Effective Time.

***7.11    Property Taxes***. Except as disclosed in *Schedule 7.11*:

(a)    all Property Taxes that have become due and payable by Seller have been properly paid;

(b)    all returns with respect to Property Taxes that are required to be filed by Seller have been filed;

(c)    there are no Encumbrances for Taxes (including any interest, fine, penalty or additions to Tax imposed by a Taxing Authority in connection with such Taxes) on the Assets that have become due and payable by Seller, other than Taxes not yet due or delinquent or, if delinquent, that are being contested in good faith in the normal course of business;

(d)    Seller has not received written notice of any pending claim against it (which remains outstanding) from any applicable Taxing Authority for assessment of Property Taxes and, to Seller's Knowledge, no such claim has been threatened; and

(e)    no audit, administrative, judicial or other proceeding with respect to Property Taxes that have become due and payable by Seller have been commenced or is presently pending.

***7.12    Brokers' Fees.*** Seller has incurred no liability, contingent or otherwise, for brokers' or finders' fees relating to the transactions contemplated by this Agreement for which Buyer or any Affiliate of Buyer shall have any responsibility.

***7.13    Suspense Funds.*** *Schedule 7.13* lists all funds held in suspense by Seller as of the Effective Time hereof that are attributable to the Assets.

***7.14    Notices.*** Except as set forth on *Schedule 7.14*, to Seller's Knowledge, (a) Seller's operation of the Assets is not the subject of any pending material regulatory compliance or

enforcement action by any Governmental Authority, and (b) Seller has not received any outstanding written notice with respect to Seller's operation of the Assets, which (i) has not heretofore been complied with, in all material respects, (ii) relates to a material violation of applicable laws, rules or regulations of any Governmental Authority with jurisdiction where the Assets are located, and (iii) that remains uncured, and that would, individually or in the aggregate, have a material adverse effect on the Assets (taken as a whole).

*7.15    Mechanical Integrity.*  To Seller's Knowledge, as of the Execution Date, except as set forth on *Schedule 7.15*, no disposal or injection wells have failed in any material respect any mechanical integrity test mandated by regulations, which have not been properly remediated.

*7.16    Material Contracts.*  To Seller's Knowledge, (a) *Exhibit C* lists all Material Contracts in effect as of the Effective Time, and (b) except as set forth on *Schedule 7.16*, (i) all Material Contracts are in full force and effect, except (A) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity and (B) as would not, individually or in the aggregate, have a Material Adverse Effect, and (ii) except for the Bankruptcy Case, no default or breach (or event that, with notice or lapse of time, or both, would become a default or Breach) of any such Material Contracts is continuing on the part of Seller.

## ARTICLE VIII
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller the following:

*8.1    Organization, Existence and Qualification.*  Buyer is a limited liability company duly formed and validly existing under the Laws of the jurisdiction of its formation and Buyer has all requisite power and authority to own and operate its property and to carry on its business as now conducted.  Buyer is duly licensed or qualified to do business as a foreign entity in all jurisdictions in which it carries on business or owns assets and such qualification is required by Law except where the failure to be so qualified would not have a material adverse effect upon the ability of Buyer to consummate the transactions contemplated by this Agreement.  Buyer is duly licensed or qualified to do business in North Dakota.

*8.2    Authority, Approval and Enforceability.*  Buyer has full power and authority to enter into and perform this Agreement and the Transaction Documents to which it is a party and the transactions contemplated herein and therein.  The execution, delivery and performance by Buyer of this Agreement have been duly and validly authorized and approved by all necessary action on the part of Buyer.  This Agreement is, and the Transaction Documents to which Buyer is a party when executed and delivered by Buyer will be, the valid and binding obligation of Buyer and enforceable against Buyer in accordance with their respective terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium and similar Laws, as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at Law).

*8.3    No Conflicts.*  Assuming receipt of all consents and approvals from Third Parties in connection with the transactions contemplated by this Agreement, the execution, delivery and

performance by Buyer of this Agreement and the consummation of the transactions contemplated herein will not (a) conflict with or result in a breach of any provisions of the organizational or other governing documents of Buyer, (b) result in a default or the creation of any Encumbrance or give rise to any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license or other agreement to which Buyer is a party or by which Buyer or any of its property may be bound or (c) violate any Law applicable to Buyer or any of its property, except in the case of clauses (b) and (c) where such default, Encumbrance, termination, cancellation, acceleration or violation would not have a material adverse effect upon the ability of Buyer to consummate the transactions contemplated by this Agreement or perform its obligations hereunder.

8.4    **Consents.**    There are no consents or other restrictions on assignment, including requirements for consents from Third Parties to any assignment (in each case) that Buyer is required to obtain in connection with the transfer of the Assets from Seller to Buyer or the consummation of the transactions contemplated by this Agreement by Buyer.

8.5    **Bankruptcy.**    There are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to Buyer's Knowledge, threatened in writing against Buyer or any Affiliates of Buyer.

8.6    **Litigation.**    There is no suit, action or litigation by any Person by or before any Governmental Authority, and no arbitration proceedings, (in each case) pending, or to Buyer's Knowledge, threatened in writing, against Buyer, that would have a material adverse effect upon the ability of Buyer to consummate the transactions contemplated by this Agreement or perform its obligations hereunder.

8.7    **Financing.**    Buyer has, and Buyer shall have as of the Closing, sufficient cash in immediately available funds with which to pay the Purchase Price, consummate the transactions contemplated by this Agreement and perform its obligations under this Agreement and the Transaction Documents.

8.8    **Regulatory.**    Buyer is now, and hereafter shall continue to be, qualified to own state oil, gas and mineral leases in all jurisdictions where the Assets are located, and the consummation of the transactions contemplated by this Agreement will not cause Buyer to be disqualified as such an owner.  To the extent required by any applicable Laws, Buyer currently has, and will hereafter continue to maintain, lease bonds and any other surety or similar bonds as may be required by, and in accordance with, all applicable Laws governing the ownership of the Assets and Buyer has filed any and all required reports necessary for such ownership with all Governmental Authorities having jurisdiction over such ownership.

8.9    **Independent Evaluation.**    Buyer is sophisticated in the evaluation, purchase, ownership and operation of oil and gas properties and related facilities.  In making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer (a) has relied or shall rely solely on its own independent investigation and evaluation of the Assets and the advice of its own legal, Tax, economic, environmental, engineering, geological and geophysical advisors and the express provisions of this Agreement and not on any comments, statements, projections or other materials made or given by any representatives or consultants or

advisors of Seller and (b) has satisfied or shall satisfy itself through its own due diligence as to the environmental and physical condition of and contractual arrangements and other matters affecting the Assets.

*8.10**    **No Knowledge of Breach.*    As of the date hereof, Buyer has no knowledge of any breach by Seller of a representation or warranty made by Seller hereunder.

*8.11**    **No Knowledge of Defects*.    To Buyer's knowledge, there are no (a) Title Defects and (b) Environmental Defects.

*8.12**    **Brokers' Fees.*    Buyer has incurred no liability, contingent or otherwise, for brokers' or finders' fees relating to the transactions contemplated by this Agreement for which Seller or Seller's Affiliates shall have any responsibility.

*8.13**    **Accredited Investor.*    Buyer is an "accredited investor," as such term is defined in Regulation D of the Securities Act of 1933, as amended, and will acquire the Assets for its own account and not with a view to a sale or distribution thereof in violation of the Securities Act of 1933, as amended, and the rules and regulations thereunder, any applicable state blue sky Laws or any other applicable securities Laws.

## ARTICLE IX
## CERTAIN AGREEMENTS

*9.1**    **Conduct of Business.*

(a)    Except for the operations (i) covered by any existing authorities for expenditure, (ii) described on *Schedule 9.1* or (iii) as expressly contemplated by this Agreement or as expressly consented to in writing by Buyer (which consent shall not be unreasonably delayed, withheld or conditioned), Seller shall, from and after the date hereof until the Closing:

(i)    own and operate the Assets in the usual, regular and ordinary course consistent with past practices, including, without limitation, use commercially reasonable efforts to maintain (A) the aggregate production of Hydrocarbons from the Assets (subject to ordinary declines in production) and (B) the Leases in full force and effect;

(ii)    not plug or abandon any Well located on the properties included in the Assets without Buyer's prior written consent, unless required to do so by applicable law, an authorized regulatory agency or court;

(iii)    maintain insurance coverage on the Assets presently furnished by nonaffiliated Third Parties in the amounts and of the types presently in force;

(iv)    provide prompt written notice to Buyer if Seller receives any written notice of breach of any Lease, Applicable Contract or Right-of-Way;

(v)    not transfer, sell, mortgage, pledge or dispose of any material portion of the Assets other than the (A) sale and/or disposal of Hydrocarbons in the ordinary course

of business and (B) sales of equipment that is no longer necessary in the operation of the Assets or for which replacement equipment has been obtained;

(vi)     not propose, or approve of, any operation with respect to the Assets anticipated to cost the owner of the Assets $50,000.00 or more per operation (excepting emergency operations required under presently existing Contract obligations and operations necessary to avoid a material monetary penalty or forfeiture provision of any applicable Contract or Law, all of which shall be deemed to be approved, provided Seller shall promptly notify Buyer of any emergency operation or operation to avoid monetary penalty or forfeiture excepted herein of which Seller has Knowledge); and

(vii)    not commit to do any of the foregoing.

For the avoidance of doubt, the pendency of the Chapter 11 Case and the effects thereof shall in no way be deemed a breach of this *Section 9.1(a)*.

(b)     If Seller requests that Buyer consent or non-consent to any action to be taken or not taken by Seller in connection with the Assets as contemplated by Section 9.1(a) and Buyer fails to respond to Seller's request within four (4) days after Buyer's receipt thereof, then Seller shall be permitted to take or not take such action as Seller deems advisable in Seller's sole discretion and Buyer shall be deemed to have approved of the same.

(c)     Buyer acknowledges Seller owns undivided interests in certain of the properties comprising the Assets, and Buyer agrees that the acts or omissions of the other Working Interest owners (including the operators) who are not Seller or any Affiliates of Seller shall not constitute a breach of the provisions of this *Section 9.1*, nor shall any action required by a vote of Working Interest owners constitute such a breach so long as Seller has voted its interest in a manner that complies with the provisions of this *Section 9.1*.

(d)     Without expanding any obligations which Seller may have to Buyer, it is expressly agreed that Seller shall never have any liability to Buyer with respect to the operation of the Assets between the Execution Date and Closing, including any breach or failure of *Section 9.1* greater than that which it might have as the operator to a non-operator under the applicable operating agreement (or, in the absence of such an agreement, under the AAPL 610 (1989 Revision) form Operating Agreement), IT BEING RECOGNIZED THAT, UNDER SUCH AGREEMENTS AND SUCH FORM, THE OPERATOR IS NOT RESPONSIBLE FOR ITS OWN NEGLIGENCE, AND HAS NO RESPONSIBILITY OTHER THAN FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

**9.2     Governmental Bonds.**  On or before the Closing Date, Buyer shall obtain all necessary bonds, letters of credit and guarantees to the extent necessary for Buyer's ownership of the Assets, all at Buyer's sole cost and expense.  Prior to the scheduled Closing Date, Buyer shall obtain replacements for those bonds, letters of credit and guarantees described on *Schedule 9.2*, to the extent such replacements are necessary for Buyer's ownership and/or operation of the Assets. In addition, at or prior to the Closing, Buyer shall deliver to Seller evidence of the posting of bonds or other security with all applicable Governmental Authorities meeting the requirements of such authorities to own and, where appropriate, operate, the Assets.

*9.3*     *Record Retention.*  Buyer, for a period of seven years following the Closing, will (a) retain the Records, (b) provide Seller, its Affiliates and their respective officers, employees and representatives with access to the Records during normal business hours for review and copying at Seller's expense and (c) provide Seller, its Affiliates and their respective officers, employees and representatives with access, during normal business hours, to materials received or produced after the Closing relating to any indemnity claim made under *Section 13.2* for review and copying at Seller's expense.

*9.4*     *Notifications.*  Buyer will notify Seller promptly after a discovery by Buyer that any representation or warranty of Seller contained in this Agreement is, becomes or will be untrue in any material respect on or before the Closing Date.

*9.5*     *Amendment of Schedules.*  Buyer agrees that, with respect to the representations and warranties of Seller contained in this Agreement, Seller shall have the continuing right until the Closing to add, supplement or amend the Schedules to its representations and warranties with respect to any matter hereafter arising or discovered which, if existing or known at the Execution Date or thereafter, would have been required to be set forth or described in such Schedules.  For purposes of determining whether the conditions set forth in *Article X* have been fulfilled, the Schedules to Seller's representations and warranties contained in this Agreement shall be deemed to include only that information contained therein on the Execution Date and shall be deemed to exclude all information contained in any addition, supplement or amendment thereto; provided, however, that if the Closing shall occur, then all Claims with respect to all matters disclosed pursuant to any such addition, supplement or amendment at or prior to the Closing shall be waived and Buyer shall not be entitled to make a claim with respect thereto pursuant to the terms of this Agreement or otherwise.

*9.6*     *Bankruptcy Court Approval*.

(a)     Seller and Buyer acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Applicable Contracts are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and, if necessary, conducting the Auction, and (ii) Buyer must provide adequate assurance of future performance as required under the Bankruptcy Code with respect to each Applicable Contract.

(b)     In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, Seller shall promptly notify Buyer in writing of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay.  Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.  Seller shall use commercially reasonable efforts to promptly defend any motion for reconsideration, or to alter, amend, stay or otherwise challenge the Sale Order or any appeal of the Sale Order, and shall prosecute such defense until the Sale Order is final and not subject to appeal, and Buyer agrees to cooperate in such efforts; provided that the absence of an appeal of the Sale Order shall not be a

condition to any Party's obligation to consummate the transactions contemplated hereby at Closing.

(c)    From and after the Execution Date and prior to the Closing or the valid termination of this Agreement, subject to *Section 9.8* hereof, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Bidding Procedures Order, Sale Order, or this Agreement.  If Buyer is the Successful Bidder at the Auction, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement.

(d)    Buyer agrees that it will, at Buyer's own cost, promptly take all actions that are reasonably requested by the Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

**9.7    Bankruptcy Filings.**  From and after the Execution Date and until the Closing Date, Seller shall use commercially reasonable efforts to deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that relate, in whole or in part, to this Agreement and the transactions contemplated hereby, or to Buyer or its respective agents or representatives, that are to be filed by Seller in the Bankruptcy Case in advance of its filing, in each case, if reasonably practicable under the circumstances before the filing of such papers. Notwithstanding the foregoing, Seller's failure to comply with this *Section 9.7* shall not constitute a breach under this Agreement, provided that upon discovery of such failure (or the termination of any emergency circumstance that prompted such failure), Seller shall use commercially reasonable efforts to remedy the failure to comply with this *Section 9.7*.

**9.8    Bidding Procedures.**  Buyer agrees and acknowledges that Seller, including through its representatives, is and may continue soliciting inquiries, proposals, or offers from third parties for the Assets, as contemplated by the Bidding Procedures and, from and after its entry, in accordance with the Bidding Procedures Order.

**9.9    Employees.**  Prior to the Closing Date, except as provided in this *Section 9.9*, without Seller's prior written consent, Buyer shall not (and shall cause its Affiliates not to) hire, retain or attempt to hire or retain any employee of Seller or in any way interfere with the relationship between Seller and any of its employees; provided, that the non-solicitation restriction in this *Section 9.9* shall not apply in the event an employee of Seller contacts Buyer or its Affiliates regarding employment in response to an advertisement identifying employment opportunities published by Buyer or its Affiliates in a newspaper of general circulation or on its web site or if an employee of Seller contacts Buyer or its Affiliates without having been directly solicited. Notwithstanding the foregoing or anything in the Confidentiality Agreement to the contrary, Buyer or its Affiliates, in its and their sole discretion, may make offers of employment to certain employees of Seller's or Seller's Affiliates' whose identity is communicated in a notice to Buyer ("***Available Employees***"), which notice shall be delivered by Seller to Buyer no later than ten Business Days after the Execution Date.  From and after the date of delivery of such notice until

US-DOCS\99440892.19

the Closing Date, and subject to all contact and communication with such individuals being coordinated through Seller, Buyer may interview such Available Employees during normal business hours, and Seller shall reasonably cooperate with Buyer to make such Available Employees available to Buyer for purposes of Buyer conducting interviews and making determinations.

## ARTICLE X
## BUYER'S CONDITIONS TO CLOSING

The obligations of Buyer to consummate the transactions provided for herein are subject, at the option of Buyer, to the fulfillment by Seller or waiver by Buyer, on or prior to the Closing, of each of the following conditions:

**10.1    Representations.**    The representations and warranties of Seller set forth in *Article VII* shall be true and correct in all respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made or given on and as of the Closing Date (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date), except for those breaches, if any, of such representations and warranties that in the aggregate would not have a Material Adverse Effect.

**10.2    Performance.**    Seller shall have materially performed or complied with all obligations, agreements and covenants contained in this Agreement as to which performance or compliance by Seller is required prior to or at the Closing Date.

**10.3    No Legal Proceedings.**    No material suit, action or other proceeding by any Third Party shall be pending before any Governmental Authority (a) seeking to restrain, prohibit, enjoin or declare illegal or (b) seeking substantial damages in connection with, the transactions contemplated by this Agreement.

**10.4    Title Defects and Environmental Defects.**    The sum of (a) all Title Defect Amounts for uncured Title Defects determined under *Section 5.2(d)(i)* prior to the Closing, less the sum of all Title Benefit Amounts determined under *Section 5.2(b)* prior to the Closing, plus (b) all Remediation Amounts for uncured Environmental Defects determined under *Article VI* prior to the Closing, shall be less than 20% of the Purchase Price.

**10.5    Closing Deliverables.**    (a) Seller shall have delivered to Buyer an officer's certificate in the form of *Exhibit F-1*, dated as of the Closing Date, certifying that the conditions set forth in *Section 10.1* and *Section 10.2* have been fulfilled, and (b) Seller shall be ready, willing and able to deliver to Buyer at the Closing the other documents and items required to be delivered by Seller under *Section 12.3*.

**10.6    Sale Order**.    The Sale Order shall have become a Final Order.

# ARTICLE XI
# SELLER'S CONDITIONS TO CLOSING

The obligations of Seller to consummate the transactions provided for herein are subject, at the option of Seller, to the fulfillment by Buyer or waiver by Seller on, or prior to the Closing of each of the following conditions:

**11.1     Representations.**     The representations and warranties of Buyer set forth in *Article VIII* shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made or given on and as of the Closing Date (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date).

**11.2     Performance.**     Buyer shall have materially performed or complied with all obligations, agreements and covenants contained in this Agreement as to which performance or compliance by Buyer is required prior to or at the Closing Date.

**11.3     No Legal Proceedings.**     No material suit, action or other proceeding by any Third Party shall be pending before any Governmental Authority (a) seeking to restrain, prohibit or declare illegal, or (b) seeking substantial damages in connection with, the transactions contemplated by this Agreement.

**11.4     Title Defects and Environmental Defects.**     The sum of (a) all Title Defect Amounts for uncured Title Defects determined under *Section 5.2(d)(i)* prior to the Closing, less the sum of all Title Benefit Amounts determined under *Section 5.2(b)* prior to the Closing, plus (b) all Remediation Amounts for uncured Environmental Defects determined under *Article VI* prior to the Closing, shall be less than 20% of the Purchase Price.

**11.5     Replacement Bonds.**     Buyer shall have obtained, in the name of Buyer, replacements for Seller's and/or its Affiliates' bonds, letters of credit and guarantees, and such other bonds, letters of credit and guarantees to the extent required by *Section 9.2*.

**11.6     Closing Deliverables.**     (a) Buyer shall have delivered to Seller an officer's certificate in the form of *Exhibit F-2*, dated as of the Closing Date, certifying that the conditions set forth in *Section 11.1* and *Section 11.2* have been fulfilled, and (b) Buyer shall be ready, willing and able to deliver to Seller at the Closing the other documents and items required to be delivered by Buyer under *Section 12.3*.

**11.7     Sale Order**.     The Sale Order shall have become a Final Order.

# ARTICLE XII
# CLOSING

**12.1     Date of Closing.**     Subject to the conditions stated in this Agreement, the sale by Seller and the purchase by Buyer of the Assets pursuant to this Agreement (the "***Closing***") shall occur on or before one (1) Business Day following the issuance of the Sale Order, or, if all of the conditions to Closing in *Article X* have not been satisfied or waived by such date, then three Business Days after such conditions have been satisfied or waived or such other date as Buyer and

US-DOCS\99440892.19

Seller may agree upon in writing.  The date on which the Closing actually occurs shall be the "***Closing Date***."

    ***12.2***    ***Place of Closing.***  The Closing shall be held at the offices of Seller located at 777 Main Street, Suite 800, Fort Worth, Texas 76102, or at such other place or in such other manner agreed to by the Parties.

    ***12.3***    ***Closing Obligations.***  At the Closing, the following documents shall be delivered and the following events shall occur, the execution of each document and the occurrence of each event being a condition precedent to the others and each being deemed to have occurred simultaneously with the others:

    (a)    Seller and Buyer shall execute, acknowledge and deliver the Assignment and Bill of Sale, in sufficient counterparts to facilitate recording in the applicable counties where the Assets are located.

    (b)    Seller and Buyer shall execute and deliver assignments, on appropriate forms, of state and other Leases of Governmental Authorities included in the Assets in sufficient counterparts to facilitate filing with the applicable Governmental Authority.

    (c)    Seller and Buyer shall execute and deliver an acknowledgement of the Preliminary Settlement Statement.

    (d)    Buyer shall deliver to Seller, to the account designated in the Preliminary Settlement Statement, by direct bank or wire transfer in same day funds, the Adjusted Purchase Price (after giving effect to the Deposit).

    (e)    Seller shall deliver, as applicable, letters in lieu of transfer orders in a form reasonably agreed to by the Parties directing all purchasers of production to make payment to Buyer of proceeds attributable to production from the Assets from and after the Effective Time, for delivery by Buyer to the purchasers of production.

    (f)    Seller shall deliver an executed statement described in Treasury Regulation §1.1445-2(b)(2) substantially in the form of *Exhibit E*.

    (g)    Seller shall deliver a recordable release in sufficient counterparts to facilitate recording of any trust, mortgages, financing statements, fixture filings and security agreements, in each case, securing Debt Contracts affecting the Assets.

    (h)    Seller and Buyer shall execute and deliver any other agreements, instruments and documents which are required by other terms of this Agreement to be executed and/or delivered at the Closing.

    ***12.4***    ***Records.***  In addition to the obligations set forth under *Section 12.3* above, but notwithstanding anything herein to the contrary, at any time after 30 Business Days following the Closing, Seller shall make available to Buyer the Records for pickup from Seller's offices during normal business hours.

## ARTICLE XIII
## ASSUMPTION; INDEMNIFICATION; SURVIVAL

**13.1    Assumption by Buyer.**    Without limiting Buyer's rights to indemnity under this *Article XIII*, from and after the Closing, Buyer assumes and hereby agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid and discharged) the following Liabilities (except to the extent discharged or released by the Sale Order) and no others: (a) all of the Seller's Liabilities under the Applicable Contracts, whether such Liabilities arise prior to, at, or after the Effective Time, except such Liabilities that are satisfied or discharged by the payment of Cure Costs (including, for the avoidance of doubt, any Applicable Contracts for which the Cure Costs were set as $0 and approved as such by virtue of the Sale Order or such other order authorizing the assumption and assignment of such Applicable Contracts); (b) all of Seller's plugging and abandonment obligations relating to the Leases, Wells and Units regardless of whether arising prior to, at, or after the Effective Time; (c) all of Seller's obligations to dismantle, decommission, abandon, dispose and remove any Personal Property and other property of whatever kind related to or associated with the ownership, use, operations and activities conducted by whomever on the Assets regardless of whether arising prior to, at, or after the Effective Time; (d) all of Seller's obligations to restore, clean up and/or remediate both the surface and the subsurface of any portion of the Assets in accordance with Applicable Contracts and Laws (including Environmental Laws) regardless of whether arising prior to, at, or after the Effective Time; (e) to the extent not already described in *Section 13.1(a)* through *Section 13.1(d)* above, all Liabilities arising from, related to, or associated with the Assets to the extent such Liabilities arise at and after the Effective Time; (f) those items that become Assumed Obligations pursuant to *Section 2.3*; (g) all Cure Costs; and (h) all obligations to properly cap and bury all flow lines and pipelines associated with any well located on the Assets (all of said obligations and Liabilities, subject to the exclusions below, herein being referred to as the "***Assumed Obligations***"); provided, Buyer does not assume any liabilities for Income Taxes or Franchise Taxes of Seller, or any obligations to pay royalties with respect to the Assets for the period prior to the Effective Time.

**13.2    Indemnities of Seller.**    Effective as of the Closing, subject to the limitations set forth in *Section 13.4* and *Section 13.8* or otherwise in this Agreement, Seller hereby defends, indemnifies and holds harmless Buyer and its Affiliates, and all of its and their respective equityholders, partners, members, directors, officers, managers, employees, agents and representatives (collectively, "***Buyer Indemnified Parties***") from and against any and all Liabilities, arising from, based upon, related to or associated with:

(a)    any breach by Seller of any of its representations or warranties contained in *Article VII*;

(b)    any breach by Seller of any of its covenants or agreements under this Agreement;

(c)    any liabilities for the Excluded Assets, the Income Taxes or Franchise Taxes of Seller, or royalties payable with respect to the Assets attributable to the period prior to the Effective Time;

(d)     the disposal or transportation of any Hazardous Substances by Seller attributable to its ownership or operation of the Assets to any location off of the lands covered by the Assets prior to the Effective Time in violation of Environmental Law;

(e)     claims by Third Parties for personal injury and/or death arising from operations on the Assets conducted by Seller prior to the Effective Time; and

(f)     any mispayment or nonpayment by Seller of any royalties or working interest payments attributable to the Assets or due under the terms of any Lease or Contract prior to the Effective Time (but excluding any amounts held in suspense that have been paid to Buyer).

**13.3    *Indemnities of Buyer.*** Effective as of the Closing, Buyer and its successors and assigns shall assume, be responsible for and hereby defends, indemnifies, holds harmless and forever releases Seller and its Affiliates, and all of its and their respective equityholders, partners, members, directors, officers, managers, employees, agents and representatives (collectively, "***Seller Indemnified Parties***") from and against any and all Liabilities arising from, based upon, related to or associated with:

(a)     any breach by Buyer of any of its representations or warranties contained in *Article VIII*;

(b)     any breach by Buyer of any of its covenants or agreements under this Agreement; and

(c)     the Assumed Obligations.

**13.4    *Limitation on Liability*.**

(a)     Seller shall not have any liability for any indemnification under *Section 13.2(a)* of this Agreement (i) for any individual Liability unless the amount with respect to such Liability exceeds the De Minimis Amount, and (ii) until and unless the aggregate amount of all Liabilities in excess of the De Minimis Amount for which Claim Notices are delivered by Buyer exceeds the Indemnity Deductible and then only to the extent such Liabilities exceed the Indemnity Deductible; provided that the adjustments to the Purchase Price under *Section 3.5* and any payments in respect thereof or any breaches of Seller's Fundamental Representations shall not be limited by this *Section 13.4(a)*.

(b)     Notwithstanding anything to the contrary contained in this Agreement, Seller shall not be required to indemnify Buyer for aggregate Liabilities in excess of amounts held in the Escrow Account. When all amounts have been disbursed from the Escrow Account, Seller shall have no further liability with respect to this Agreement.

**13.5    *Express Negligence.*** THE DEFENSE, INDEMNIFICATION, HOLD HARMLESS, RELEASE AND ASSUMED OBLIGATIONS PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE WHETHER OR NOT THE LIABILITIES, LOSSES, COSTS, EXPENSES AND DAMAGES IN QUESTION AROSE OR RESULTED SOLELY OR IN PART FROM THE GROSS, SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR VIOLATION

OF LAW OF OR BY ANY INDEMNIFIED PARTY, EXCEPT TO THE EXTENT RELATED TO THE WILLFUL MISCONDUCT OF THE INDEMNIFIED PARTY. BUYER AND SELLER ACKNOWLEDGE THAT THIS STATEMENT COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS CONSPICUOUS.

     **13.6**    **Exclusive Remedy.**   Notwithstanding anything to the contrary contained in this Agreement, from and after the Closing, *Section 13.2* contains Buyer's exclusive remedy against Seller (and/or the Seller Indemnified Parties) with respect to the transactions contemplated hereby and the sale of the Assets, including breaches of the representations, warranties, covenants and agreements of Seller contained in this Agreement or in any document delivered pursuant to this Agreement. Except for the remedies specified in *Section 13.2*, effective as of the Closing, Buyer, on its own behalf and on behalf of its Affiliates and the other Buyer Indemnified Parties, hereby releases, remises and forever discharges Seller and its Affiliates and all such Parties' equityholders, partners, members, directors, officers, employees, agents and representatives from any and all suits, legal or administrative proceedings, claims, demands, damages, losses, costs, Liabilities, interest or causes of action whatsoever, in Law or in equity, known or unknown, which Buyer or its Affiliates might now or subsequently may have, based on, relating to or arising out of the ownership, use or operation of any of the Assets prior to the Closing or the condition, quality, status, title or nature of any of the Assets prior to the Closing, including rights to contribution under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, breaches of statutory or implied warranties, nuisance or other tort actions, rights to punitive damages, common Law rights of contribution and rights under insurance maintained by Seller or any of its Affiliates.

     **13.7**    **Indemnification Procedures.**  All claims for indemnification under Section 4.1(d), Section 13.2 and Section 13.3 shall be asserted and resolved as follows:

        (a)     For purposes of *Section 4.1(d)* and this *Article XIII*, the term "**Indemnifying Party**" when used in connection with particular Liabilities shall mean the Party or Parties having an obligation to indemnify another Party or Parties with respect to such Liabilities pursuant to *Section 4.1(d)* or this *Article XIII*, and the term "**Indemnified Party**" when used in connection with particular Liabilities shall mean the Party or Parties having the right to be indemnified with respect to such Liabilities by another Party or Parties pursuant to *Section 4.1(d)* or this *Article XIII*.

        (b)     To make claim for indemnification under *Section 4.1(d), Section 13.2* or *Section 13.3*, an Indemnified Party shall notify the Indemnifying Party of its claim under this *Section 13.7*, including the specific details of and specific basis under this Agreement for its claim (the "**Claim Notice**"). In the event that the claim for indemnification is based upon a claim by a Third Party against the Indemnified Party (a "**Claim**"), the Indemnified Party shall provide its Claim Notice promptly after the Indemnified Party has actual knowledge of the Claim and shall enclose a copy of all papers (if any) served with respect to the Claim; provided that the failure of any Indemnified Party to give notice of a Claim as provided in this *Section 13.7* shall not relieve the Indemnifying Party of its obligations under *Section 4.1(d), Section 13.2* or *Section 13.3* (as applicable) except to the extent such failure results in insufficient time being available to permit the Indemnifying Party to effectively defend against the Claim or otherwise materially prejudices the Indemnifying Party's ability to defend against the Claim. In the event that the claim for indemnification is based upon an inaccuracy or breach of a representation, warranty, covenant or

agreement, the Claim Notice shall specify the representation, warranty, covenant or agreement that was inaccurate or breached.

(c)     In the case of a claim for indemnification based upon a Claim, the Indemnifying Party shall have 30 days from its receipt of the Claim Notice to notify the Indemnifying Party whether it admits or denies its liability to defend the Indemnified Party against such Claim at the sole cost and expense of the Indemnifying Party.  The Indemnified Party is authorized, prior to and during such 30 day period, to file any motion, answer or other pleading that it shall deem necessary or appropriate to protect its interests or those of the Indemnifying Party and that is not prejudicial to the Indemnifying Party.

(d)     If the Indemnifying Party admits its liability, it shall have the right and obligation to diligently defend, at its sole cost and expense, the Claim.  The Indemnifying Party shall have full control of such defense and proceedings, including any compromise or settlement thereof.  If requested by the Indemnifying Party, the Indemnified Party agrees to cooperate in contesting any Claim which the Indemnifying Party elects to contest.  The Indemnified Party may participate in, but not control, any defense or settlement of any Claim controlled by the Indemnifying Party pursuant to this *Section 13.7(d)*.  An Indemnifying Party shall not, without the written consent of the Indemnified Party, (i) settle any Claim or consent to the entry of any judgment with respect thereto which does not include an unconditional written release of the Indemnified Party from all liability in respect of such Claim or (ii) settle any Claim or consent to the entry of any judgment with respect thereto in any manner that may materially and adversely affect the Indemnified Party (other than as a result of money damages covered by the indemnity).

(e)     If the Indemnifying Party does not admit its liability or admits its liability but fails to diligently prosecute or settle the Claim, then the Indemnified Party shall have the right to defend against the Claim at the sole cost and expense of the Indemnifying Party, with counsel of the Indemnified Party's choosing, subject to the right of the Indemnifying Party to admit its liability and assume the defense of the Claim at any time prior to settlement or final determination thereof.  If the Indemnifying Party has not yet admitted its liability for a Claim, the Indemnified Party shall send written notice to the Indemnifying Party of any proposed settlement and the Indemnifying Party shall have the option for ten days following receipt of such notice to (i) admit in writing its liability for the Claim and (ii) if liability is so admitted, reject, in its reasonable judgment, the proposed settlement.

(f)     In the case of a claim for indemnification not based upon a Claim, the Indemnifying Party shall have 30 days from its receipt of the Claim Notice to (i) cure the Liabilities complained of, (ii) admit its liability for such Liability or (iii) dispute the claim for such Liabilities. If the Indemnifying Party does not notify the Indemnified Party within such 30 day period that it has cured the Liabilities or that it disputes the claim for such Liabilities, the amount of such Liabilities shall conclusively be deemed a liability of the Indemnifying Party hereunder.

**13.8    Survival.**    The representations and warranties of Seller in *Article VII* and the covenants and agreements of Seller (including the indemnity obligations of Seller in *Section 13.2*) shall survive the Closing until the expiration of the Holdback Period.  Subject to the foregoing, the remainder of this Agreement (including all of Buyer's representations, warranties and covenants, including the indemnity obligations of Buyer in *Section 13.3*) shall survive the Closing without time limit.  Representations, warranties, covenants and agreements shall be of no further force and effect after the date of their expiration.

**13.9    Waiver of Right to Rescission.**    Seller and Buyer acknowledge that, following the Closing, the payment of money, as limited by the terms of this Agreement, shall be adequate compensation for breach of any representation, warranty, covenant or agreement contained herein or for any other claim arising in connection with or with respect to the transactions contemplated by this Agreement.  As the payment of money shall be adequate compensation, following the Closing, Buyer and Seller waive any right to rescind this Agreement or any of the transactions contemplated hereby.

**13.10    Insurance, Taxes.**    The amount of any Liabilities for which any of Buyer Indemnified Parties is entitled to indemnification under this Agreement or in connection with or with respect to the transactions contemplated by this Agreement shall be reduced by any corresponding insurance actually received by Buyer or any Buyer Indemnified Party under the relevant insurance arrangements.

**13.11    Non-Compensatory Damages.**    NONE OF BUYER INDEMNIFIED PARTIES NOR SELLER INDEMNIFIED PARTIES SHALL BE ENTITLED TO RECOVER FROM SELLER OR BUYER, OR THEIR RESPECTIVE AFFILIATES, ANY SPECIAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, REMOTE OR SPECULATIVE DAMAGES, INCLUDING DAMAGES FOR LOST PROFITS OF ANY KIND ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, EXCEPT TO THE EXTENT ANY SUCH PARTY SUFFERS SUCH DAMAGES (INCLUDING COSTS OF DEFENSE AND REASONABLE ATTORNEY'S FEES INCURRED IN CONNECTION WITH DEFENDING OF SUCH DAMAGES) TO A THIRD PARTY, WHICH DAMAGES (INCLUDING COSTS OF DEFENSE AND REASONABLE ATTORNEY'S FEES INCURRED IN CONNECTION WITH DEFENDING AGAINST SUCH DAMAGES) SHALL NOT BE EXCLUDED BY THIS PROVISION AS TO RECOVERY HEREUNDER.  SUBJECT TO THE PRECEDING SENTENCE, BUYER, ON BEHALF OF EACH OF BUYER INDEMNIFIED PARTIES, AND SELLER, ON BEHALF OF EACH OF SELLER INDEMNIFIED PARTIES, WAIVE ANY RIGHT TO RECOVER ANY SPECIAL, INDIRECT, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, REMOTE OR SPECULATIVE DAMAGES, INCLUDING DAMAGES FOR LOST PROFITS OF ANY KIND, ARISING IN CONNECTION WITH OR WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**13.12    Treatment of Certain Payments.**    Any payments made to any Party pursuant to this *Article XIII* shall constitute an adjustment to the Final Price for Tax purposes and shall be treated as such by Buyer and Seller on their Tax Returns to the extent permitted by Law.

**13.13  Treatment of Applicable Contracts, Cure Costs.**  Subject to the terms of this *Section 13.13*, Buyer shall assume all Cure Costs, with such Cure Costs, for the avoidance of doubt, constituting Assumed Obligations under this Agreement.  Seller shall satisfy all Cure Costs at or prior to Closing, with Buyer reimbursing Seller in Cash at Closing for the amount of Cure Costs.  For avoidance of doubt, the obligation of Seller to satisfy Cure Costs at or prior to Closing is a requirement of this Agreement that would negate the ability of the Seller or any subsequent trustee to later claim that such payments were recoverable as preferences or fraudulent transfers.

(a)    No later than the Petition Date, Seller shall provide to Buyer a schedule of Seller's good faith estimate of the Cure Costs for each Applicable Contract (the "**Cure Schedule**").  Within five (5) Business Days after entry of the Bidding Procedures Order, Seller shall cause a notice to be issued to each non-Seller counterparty to an Applicable Contract, which notice shall state Seller's intention to assign and Buyer's intention to assume the Applicable Contracts and shall include the Cure Costs attributed to such Applicable Contract, as set forth in the Cure Schedule (the "**Cure Notice**").  Such non-Seller counterparties shall have the rights set forth in the Bidding Procedures with respect to the Cure Notice.

(b)    If it is discovered that an Applicable Contract should have been listed on the Cure Schedule but was not (any such Applicable Contract, a "**Previously Omitted Contract**"), Seller shall, promptly following discovery thereof (but in no event later than five (5) Business Days following discovery thereof), notify Buyer in writing of such Previously Omitted Contract and of Seller's good faith estimate of the Cure Costs relating thereto.  If a Previously Omitted Contract is discovered after the issuance of the Cure Notice, Seller shall promptly (but in no event later than five (5) Business Days following discovery thereof) file and serve a notice on the non-Seller counterparty(ies) to such Previously Omitted Contract notifying such counterparties of Seller's intention to assign and Buyer's intention to assume such Previously Omitted Contract, including the proposed Cure Costs relating thereto (the "**Previously Omitted Contract Notice**").  Such non-Seller counterparties shall have the rights set forth in the Bidding Procedures with respect to the Cure Notice.

(c)    Seller shall take all actions reasonably necessary to assume the Applicable Contracts and assign the Applicable Contracts to Buyer, provided that Seller shall not have any obligation to provide any assurance of future performance of any Applicable Contract to any non-Seller counterparty thereto.

(d)    Notwithstanding anything contained herein to the contrary, at any time prior to the Closing, Buyer shall have the right to remove any Applicable Contract from *Exhibit C* and, in such event, such Applicable Contract shall be considered an Excluded Asset for all purposes hereunder and Buyer shall not be responsible for any Cure Costs or other Liabilities related to such Applicable Contract.

(e)    Notwithstanding anything herein to the contrary, to the extent the assignment of any Applicable Contract is, after giving effect to sections 363 and 365 of the Bankruptcy Code, not permitted by law or not permitted without the consent of another Person, and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then (i) this Agreement shall not be deemed to constitute an assignment or attempt to assign such Applicable Contract or any right, interest or obligation

thereunder if such consent is not given, and the Closing shall proceed with respect to the remaining Assets without any reduction in the Purchase Price; (ii) no breach of this Agreement shall have occurred by virtue of the nonassignment; and (iii) if such consent is not given, the Seller and Buyer will, subject to any approval of the Bankruptcy Court that may be required, cooperate in a mutually agreeable arrangement for a reasonable period of time following the Closing under which Buyer would obtain the benefits and assume the obligations thereunder in accordance with this Agreement.  This cooperation shall not require any payment or other consideration from any Seller or Buyer (other than the Cure Costs, which shall be the responsibility of Buyer).

## ARTICLE XIV
## TERMINATION, DEFAULT AND REMEDIES

*14.1* *Right of Termination.*  This Agreement and the transactions contemplated herein may be terminated at any time prior to the Closing:

(a)    by Seller, at Seller's option, if any of the conditions set forth in *Article XI* (other than the condition set forth in *Section 11.4*) have not been satisfied on or before the Outside Date and, following written notice thereof from Seller to Buyer specifying the reason such condition is unsatisfied (including any breach by  Buyer of this Agreement), such condition remains unsatisfied for a period of ten Business Days after Buyer's receipt of written notice thereof from Seller;

(b)    by Buyer, at Buyer's option, if any of the conditions set forth in *Article X* (other than the condition set forth in *Section 10.4*) have not been satisfied on or before the Outside Date and, following written notice thereof from Buyer to Seller specifying the reason such condition is unsatisfied (including any breach by Seller of this Agreement), such condition remains unsatisfied for a period of ten Business Days after Seller's receipt of written notice thereof from Buyer;

(c)    by Buyer if the condition set forth in *Section 10.4* is not satisfied on or before the Outside Date or by Seller if the condition set forth in *Section 11.4* is not satisfied on or before the Outside Date;

(d)    by Buyer, if:

(i)    Buyer is not the Successful Bidder or the Backup Bidder at the Auction;

(ii)    Seller does not file the Sale Motion on or before the date that is three (3) Business Days after the Petition Date;

(iii)    the Bidding Procedures Order has not been entered by the Bankruptcy Court on or before the date that is forty-five (45) days after the Petition Date;

(iv)    the Sale Order has not been entered by the Bankruptcy Court on or before the date that is seventy-five (75) days after the Petition Date; or

(v)    Seller withdraws or seeks authority to withdraw the Sale Motion at any time after the filing thereof, or announces any stand-alone plan of reorganization or liquidation with respect to the Assets (or supports any such plan filed by another party);

(e)    by Buyer or Seller, if

(i)    Seller enters into a definitive agreement regarding a Superior Proposal, provided that in such event, Buyer shall be entitled to the payment of the Break-Up Fee and Expense Reimbursement; provided further that if such amount is paid in full, Buyer shall be precluded from any other remedy against the Sellers, at law or in equity or otherwise, and Buyer shall not seek to obtain any recovery, judgment or damages of any kind, including consequential, indirect or punitive damages, against the Sellers or any of their respective directors, officers, employees, partners, managers, members, shareholders or Affiliates or any of their respective representatives in connection with this Agreement, the Transaction Documents or the transactions contemplated hereby or thereby; or

(ii)    the Bankruptcy Court enters an order dismissing, or converting to a case under chapter 7 of the Bankruptcy Code, the Chapter 11 Case, where such order was not requested, encouraged, or supported by Seller;

(f)    by the mutual consent of the Parties; or

(g)    by Seller or Buyer if the Closing shall not have occurred on or before September 17, 2018 (the "***Outside Date***");

provided, however, that no Party shall have the right to terminate this Agreement pursuant to clause (a), (b) or (e) above if such Party is at such time in material breach of any provision of this Agreement.

*14.2    **Effect of Termination.*** If the obligation to close the transactions contemplated by this Agreement is terminated pursuant to any provision of *Section 14.1*, then, except as provided in *Section 3.2* and except for the provisions of *Article I*, *4.1(d) through (f)*, *4.2*, *4.3*, *13.11*, this *Section 14.2*, *Section 14.3* and *Article XV* (other than *Sections 15.2(b)*, *15.7 and 15.8*), this Agreement shall become void and the Parties shall have no liability or obligation hereunder except and to the extent such termination results from the willful breach by a Party of any of its covenants or agreements hereunder; provided that if Seller is entitled to and elects to receive the Deposit as liquidated damages pursuant to *Section 3.2*, then such retention shall constitute full and complete satisfaction of any and all damages Seller may have against Buyer. Notwithstanding the foregoing, if this Agreement is validly terminated by under *Section 14.1(d)(i)*, *Section 14.1(d)(v)*, or *Section 14.1(e)(i)*, Seller shall pay to Buyer, without duplication, the Break-Up Fee and the Expense Reimbursement. To the extent any portion of such Expense Reimbursement received by Buyer relates to any title, environmental or other diligence or consulting services with respect to the Assets, then, within one Business Day following Buyer's receipt of the Expense Reimbursement, Buyer shall deliver to Seller all reports, documents and/or opinions prepared by any Third Party in providing such services.

*14.3    **Return of Documentation and Confidentiality.*** Upon termination of this Agreement, Buyer shall return to Seller all title, engineering, geological and geophysical data,

environmental assessments and/or reports, maps, documents and other information furnished by Seller to Buyer or prepared by or on behalf of Buyer in connection with its due diligence investigation of the Assets, and shall destroy or obliterate all copies thereof and an officer of Buyer shall certify same to Seller in writing.

## ARTICLE XV
## MISCELLANEOUS

*15.1    Exhibits and Schedules.*  All of the Exhibits and Schedules referred to in this Agreement constitute a part of this Agreement.  Seller or Buyer and their respective counsel have received a complete set of Exhibits and Schedules prior to and as of the execution of this Agreement.

*15.2    Expenses and Taxes*.

(a)    Except as otherwise specifically provided in this Agreement, all fees, costs and expenses incurred by Seller or Buyer in negotiating this Agreement or in consummating the transactions contemplated by this Agreement shall be paid by the Person incurring the same, including, legal and accounting fees, costs and expenses.

(b)    All required documentary, filing and recording fees and expenses in connection with the filing and recording of the assignments (including the Assignment and Bill of Sale), conveyances or other instruments required to convey title to the Assets to Buyer shall be borne by Buyer.  Seller shall retain responsibility for, and shall bear and pay, all Income Tax Liability incurred or imposed on Seller with respect to the ownership of the Assets through the Closing Date and the transactions described in this Agreement.  Buyer shall assume responsibility for, and shall bear and pay, all state sales and use Taxes and transfer and similar Taxes (including any applicable interest or penalties) incurred or imposed with respect to the transactions described in this Agreement (the "*Transfer Taxes*").  Seller shall retain responsibility for, and shall bear, all Property Taxes assessed with respect to the ownership and operation of the Assets for (i) any period ending prior to the Effective Time and (ii) the portion of any Straddle Period ending immediately prior to the Effective Time.  All Property Taxes with respect to the ownership or operation of the Assets arising on or after the Effective Time (including all Straddle Period Property Taxes not apportioned to Seller) shall be allocated to and borne by Buyer.  To the extent the actual amount of a Property Tax is not known at the time an adjustment is to be made with respect to such Property Tax pursuant to *Section 3.3*, *Section 3.4* and *Section 3.5*, as applicable, the Parties shall utilize the most recent information available in estimating the amount of such Property Tax for purposes of such adjustment.  To the extent the actual amount of a Property Tax (or the amount thereof paid or economically borne by a Party) is ultimately determined to be different than the amount (if any) that was taken into account in the Final Settlement Statement as finally determined pursuant to *Section 3.5*, timely payments will be made from one Party to the others to cause each Party to bear the amount of such Property Tax that is allocable to such Party under this *Section 15.2*.  Any amounts which may become payable from Seller to Buyer pursuant to this *Section 15.2* shall constitute a super priority administrative expense of Seller under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code. For purposes of allocation between the Parties of Property Taxes that are payable with respect to

Straddle Periods, the portion of any such Property Taxes that are attributable to the portion of the Straddle Period that ends immediately prior to the Effective Time shall (i) in the case of Property Taxes that are based upon or related to income or receipts or imposed on a transactional basis, be deemed equal to the amount that would be payable if the Tax year or period ended immediately prior to the Effective Time; and (ii) in the case of other Property Taxes, be allocated pro rata per day between the period immediately prior to the Effective Time and the period beginning on the Effective Time.  For purposes of clause (i) of the preceding sentence, any exemption, deduction, credit or other item that is calculated on an annual basis shall be allocated pro rata per day between the period ending immediately prior to the Effective Time and the period beginning on the Effective Time.

(c)    Seller shall timely file any return with respect to Property Taxes due on or before the Closing Date or that otherwise relates solely to periods before the Closing Date (a "***Pre-Closing Tax Return***") and shall pay any Property Taxes shown due and owing on such Pre-Closing Tax Return, subject to Seller's right of reimbursement for any Property Taxes for which Buyer is responsible under *Section 15.2(b)*.

(d)    Notwithstanding anything in this Agreement to the contrary, Seller shall have the right at any time prior to Closing to assign all or a portion of its rights under this Agreement (the "***Assigned Rights***") to a Qualified Intermediary (as that term is defined in Section 1.1031(k)-1(g)(4)(v) of the Treasury Regulations) in order to accomplish the transaction in a manner that will comply, either in whole or in part, with the requirements of a like-kind exchange pursuant to Section 1031 of the Code (an "***Exchange***").  In the event any such Seller assigns the Assigned Rights to a Qualified Intermediary pursuant to this *Section 15.2(d)*, then such Seller agrees to notify Buyer in writing of such assignment at or before the Closing.  Buyer hereby consents to any such assignment and Buyer agrees to pay the Purchase Price (as may be adjusted under the terms of this Agreement) for the Assets into a qualified escrow or qualified trust account at Closing as directed by the Qualified Intermediary and such Seller in writing; provided that: (a) the Closing shall not be delayed or affected by reason of the Exchange, (b) such Seller shall effect its Exchange through an assignment of the Assigned Rights to a Qualified Intermediary, but such assignment shall not release such Seller from any of its Liabilities or obligations to Buyer under this Agreement and (c) Seller shall indemnify Buyer against any additional costs or Liabilities directly incurred by Buyer on account of such Seller's consummation of the transaction through an Exchange.  Each of Seller and Buyer hereby acknowledge and agree that any assignment of this Agreement by Seller pursuant to this *Section 15.2(d)* shall not release a Party from, or modify, any of its respective Liabilities and obligations (including indemnity obligations to each other) under this Agreement.  Buyer further consents to the reassignment, following the Closing, of all of the Assigned Rights that survive the Closing from the Qualified Intermediary to Seller.  Buyer by its consent to an Exchange shall not be responsible in any way for Seller's compliance with such Exchange.

**15.3    *Assignment.***  This Agreement may not be assigned by Buyer without the prior written consent of Seller.  In the event Seller consents to any such assignment, such assignment shall not relieve Buyer of any obligations and responsibilities hereunder.  Any assignment or other transfer by Buyer of any of the Assets shall not relieve Buyer of any of its obligations (including indemnity obligations) hereunder, as to the Assets so assigned or transferred.

*15.4    Preparation of Agreement.*  Seller, Buyer and their respective counsel participated in the preparation of this Agreement.  In the event of any ambiguity in this Agreement, no presumption shall arise based on the identity of the draftsman of this Agreement.

*15.5    Publicity.*

(a)    Buyer shall not make or issue any press release or other public announcements concerning the transactions contemplated by this Agreement without the prior consent of Seller, which consent shall not be unreasonably withheld; provided, however, that Seller has the right to prohibit Buyer from identifying Seller or its Affiliates by name in the Buyer's press release or other statement, which right may be exercised in Seller's sole and absolute discretion. If Buyer desires to make a public announcement, it shall first give Seller two Business Days written notification of its desire to make such a public announcement.  The written notification shall include (i) a request for consent to make the announcement and (ii) a written draft of the text of such public announcement.

(b)    Nothing in this *Section 15.5* shall prohibit any Party from issuing or making a public announcement or statement if such Party deems it necessary to do so in order to comply with any applicable Law or the rules of any stock exchange upon which the Party's or a Party's Affiliate's capital stock is traded; provided, however, that to the extent possible, prior written notification shall be given to the other Party at least two Business Days prior to any such announcement or statement.

(c)    Nothing in this *Section **Error! Reference source not found.*** shall prohibit Seller from making any filings or public statements in the Chapter 11 Case it determines are necessary or advisable to consummation of the transactions contemplated by this Agreement.

*15.6    Notices.*  All notices and communications required or permitted to be given hereunder shall be in writing and shall be delivered personally, or sent by overnight courier, or mailed by United States Express Mail or by certified or registered United States Mail with all postage fully prepaid, or sent by facsimile transmission (provided any such facsimile transmission is confirmed either orally or by written confirmation), or sent by electronic mail (provided any such electronic mail transmission is confirmed either orally or by written confirmation), in each case addressed to Seller or Buyer, as appropriate, at the address for such Person shown below or at such other address as Seller or Buyer shall have theretofore designated by written notice delivered to the other Party hereto:

<table>
<tr><td><em>If to Seller</em>:</td><td><em>If to Buyer</em>:</td></tr>
</table>

| | |
|---|---|
| Enduro Operating LLC | Mid-Con Energy Properties, LLC |
| 777 Main Street, Suite 800 | 2431 E 61st, Suite 850 |

*If to Seller*:                                                  *If to Buyer*:

Enduro Operating LLC                              Mid-Con Energy Properties, LLC
777 Main Street, Suite 800                       2431 E 61st, Suite 850
Fort Worth, Texas 76102                          Tulsa, Oklahoma  74136
Attention: Kevin D. Smith,                        Attention: Charles L. McLawhorn, III
Vice President – Land                              Telephone: (918) 743-7575
Telephone: (817) 529-8640                       Facsimile: (918) 743-8859
Facsimile: (817) 529-8450                        Email:  cmclawhorn@midcon-energy.com
Email: ksmith@endurores.com

Any notice given in accordance herewith shall be deemed to have been given only when delivered to the addressee in person, or by courier, or transmitted by facsimile transmission, or transmitted by electronic mail transmission (in each case) during normal business hours on a Business Day (or if delivered or transmitted after normal business hours on a Business Day or on a day other than a Business Day, then on the next Business Day), or upon actual receipt by the addressee during normal business hours on a Business Day after such notice has either been delivered to an overnight courier or deposited in the United States Mail, as the case may be (or if delivered after normal business hours on a Business Day or on a day other than a Business Day, then on the next Business Day).  Seller or Buyer may change the address, facsimile number or email address to which such communications are to be addressed by giving written notice to the other Party hereto in the manner provided in this *Section 15.6*.

**15.7    *Further Cooperation.***    After the Closing, Seller and Buyer shall execute and deliver, or shall cause to be executed and delivered, from time to time such further instruments of conveyance and transfer, and shall take such other actions as Seller or Buyer may reasonably request, to convey and deliver the Assets to Buyer, to perfect Buyer's title thereto and to accomplish the orderly transfer of the Assets to Buyer in the manner contemplated by this Agreement.  If any Party receives monies belonging to the other Party, such amount shall immediately be paid over to the proper Party.  If an invoice or other evidence of an obligation is received by a Party and such obligation is partially an obligation of both Seller and Buyer, then the Parties shall consult with each other and each Party shall promptly pay its portion of such obligation to the obligee.

**15.8    *Filings, Notices and Certain Governmental Approvals.***    Promptly after the Closing, Buyer shall (a) record the Assignment and Bill of Sale in the applicable county record and record all assignments of state Leases executed at the Closing in the records of the applicable Governmental Authority, (b) if applicable, send notices to vendors supplying goods and services for the Assets and to the operator of such Assets of the assignment of such Assets to Buyer, (c) actively pursue the unconditional approval of all applicable Governmental Authorities of the assignment of the Assets to Buyer and (d) actively pursue all other consents and approvals that may be required in connection with the assignment of the Assets to Buyer and the assumption of the Liabilities assumed by Buyer hereunder, that, in each case, is not obtained prior to the Closing. Buyer obligates itself to take any and all action required by any Governmental Authority in order

to obtain such unconditional approval, including the posting of any and all bonds or other security that may be required in excess of its existing lease, pipeline or area-wide bond.

*15.9    Entire Agreement; Conflicts.*    THIS AGREEMENT, THE EXHIBITS AND SCHEDULES HERETO, THE TRANSACTION DOCUMENTS AND THE CONFIDENTIALITY AGREEMENT COLLECTIVELY CONSTITUTE THE ENTIRE AGREEMENT BETWEEN SELLER AND BUYER PERTAINING TO THE SUBJECT MATTER HEREOF AND SUPERSEDE ALL PRIOR AGREEMENTS, UNDERSTANDINGS, NEGOTIATIONS AND DISCUSSIONS, WHETHER ORAL OR WRITTEN, OF SELLER AND BUYER PERTAINING TO THE SUBJECT MATTER HEREOF.    THERE ARE NO WARRANTIES, REPRESENTATIONS OR OTHER AGREEMENTS BETWEEN SELLER AND BUYER RELATING TO THE SUBJECT MATTER HEREOF EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, AND NEITHER SELLER NOR BUYER SHALL BE BOUND BY OR LIABLE FOR ANY ALLEGED REPRESENTATION, PROMISE, INDUCEMENT OR STATEMENTS OF INTENTION NOT SO SET FORTH.    IN THE EVENT OF A CONFLICT BETWEEN THE TERMS AND PROVISIONS OF THIS AGREEMENT AND THE TERMS AND PROVISIONS OF ANY EXHIBIT HERETO, THE TERMS AND PROVISIONS OF THIS AGREEMENT SHALL GOVERN AND CONTROL; PROVIDED, HOWEVER, THAT THE INCLUSION IN ANY OF THE EXHIBITS HERETO OF TERMS AND PROVISIONS NOT ADDRESSED IN THIS AGREEMENT SHALL NOT BE DEEMED A CONFLICT, AND ALL SUCH ADDITIONAL PROVISIONS SHALL BE GIVEN FULL FORCE AND EFFECT, SUBJECT TO THE PROVISIONS OF THIS *SECTION 15.9.*

*15.10    Parties in Interest*.    The terms and provisions of this Agreement shall be binding upon and inure to the benefit of Seller and Buyer and their respective successors and permitted assigns.    Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement, expressed or implied, is intended to confer on any Person other than Seller, Buyer and their successors and permitted assigns, or the Parties' respective related Indemnified Parties hereunder, any rights, remedies, obligations or Liabilities under or by reason of this Agreement; provided that only a Party and its respective successors and permitted assigns will have the right to enforce the provisions of this Agreement on its own behalf or on behalf of any of its related Indemnified Parties (but shall not be obligated to do so).

*15.11    Amendment.*    This Agreement may be amended only by an instrument in writing executed by the Party against whom enforcement is sought.

*15.12    Waiver; Rights Cumulative.*    Any of the terms, covenants, representations, warranties or conditions hereof may be waived only by a written instrument executed by or on behalf of the Party hereto waiving compliance.    No course of dealing on the part of Seller or Buyer, or their respective officers, employees, agents or representatives or any failure by Seller or Buyer to exercise any of their respective rights under this Agreement shall operate as a waiver thereof or affect in any way the right of such Person at a later time to enforce the performance of such provision.    No waiver by Seller or Buyer of any condition or any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation or

warranty.  The rights of Seller and Buyer under this Agreement shall be cumulative, and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.

*15.13  Governing Law; Jurisdiction; Venue; Jury Waiver.*  THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN SELLER AND BUYER SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAW; PROVIDED THAT, WHERE APPLICABLE, THE REAL PROPERTY LAWS OF WYOMING SHALL GOVERN ANY DISPUTES CONCERNING THE APPLICATION OF REAL PROPERTY LAW.  SELLER AND BUYER CONSENT TO THE EXERCISE OF JURISDICTION IN PERSONAM BY THE UNITED STATES FEDERAL DISTRICT COURTS LOCATED IN FORT WORTH, TARRANT COUNTY, TEXAS (OR IF THE FEDERAL DISTRICT COURTS DO NOT HAVE JURISDICTION, THEN THE STATE COURTS IN FORT WORTH, TARRANT COUNTY, TEXAS) FOR ANY ACTION ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY. ALL ACTIONS OR PROCEEDINGS WITH RESPECT TO, ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, RELATED TO OR FROM THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE EXCLUSIVELY LITIGATED IN THE UNITED STATES FEDERAL DISTRICT COURTS LOCATED IN FORT WORTH, TARRANT COUNTY, TEXAS (OR IF THE FEDERAL DISTRICT COURTS DO NOT HAVE JURISDICTION, THEN THE STATE COURTS IN FORT WORTH, TARRANT COUNTY, TEXAS).  SELLER AND BUYER WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

*15.14  Severability.*  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to any of Seller or Buyer.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

*15.15  Removal of Name.*  As promptly as practicable, but in any case within 30 days after the Closing Date, Buyer shall eliminate the names Enduro Operating and/or Enduro, and any variants thereof from the Assets acquired pursuant to this Agreement and, except with respect to such grace period for eliminating existing usage, shall have no right to use any logos, trademarks or trade names belonging to Seller or any of its Affiliates.

*15.16  Time is of the Essence.*  With respect to all dates and time periods in this Agreement, time is of the essence.

**15.17   Counterparts.**  This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all of such counterparts shall constitute for all purposes one agreement.  Any signature hereto delivered by a Party hereto by facsimile transmission shall be deemed an original signature hereto.

**15.18   Certain Midstream Assets.**  In the event any of the gas processing plant, related pipelines and/or disposal or injection wells identified on *Exhibit A-2* are held by Affiliates of Seller as of the Execution Date, Seller shall cause such Affiliates to either convey such interests to Seller at or prior to the Closing, or cause such Affiliates to convey such interests directly to Buyer at Closing pursuant to an instrument in substantially the form of the Assignment and Bill of Sale.

*[Signature page follows]*

US-DOCS\99440892.19

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first written above.

**SELLER:**

**ENDURO OPERATING LLC**

By: _____

    Kevin D. Smith

    Vice President – Land

**BUYER**

**MID-CON ENERGY PROPERTIES, LLC**
A Delaware limited liability company

By:  Mid-Con Energy Partners, LP, a
    Delaware limited partnership, its
    Sole member

By:  Mid-Con Energy GP, LLC, a
    Delaware limited liability company,
    its General Partner

    By: _____
    Name: Charles L. McLawhorn, III
    Title: Vice President & General Counsel

## EXHIBITS AND SCHEDULES

1.      The Section and subsection references set forth in the Exhibits and Schedules refer primarily to the Sections or subsections of that certain Purchase and Sale Agreement, by and between Enduro Operating LLC, as Seller, and Mid-Con Energy Properties, LLC, as Buyer (the "PSA").  Capitalized terms used herein but not defined have the respective meanings assigned to such terms in the PSA.

2.      Any fact or item which is clearly disclosed on any Schedule in such a way as to make its relevance or applicability to information called for by another Schedule or other Schedules reasonably apparent on its face shall be deemed to be disclosed on such other Schedule or Schedules, as the case may be, notwithstanding the omission of a reference or cross-reference thereto.

3.      Each of the Exhibits and Schedules is qualified in its entirety by reference to specific provisions of the PSA, and is not intended to constitute, and shall not be construed as constituting, representations or warranties of Seller, except and to the extent provided in the PSA.

4.      Inclusion of a matter on a Schedule in relation to a representation or warranty that addresses matters having a Material Adverse Effect shall not be deemed an indication that such matter does, or may, have a Material Adverse Effect.  Likewise, the inclusion of a matter on a Schedule to this Agreement in relation to a representation or warranty shall not be deemed an indication that such matter necessarily would, or may, breach such representation or warranty absent its inclusion on such Schedule.  Matters may be set forth on a Schedule for information purposes only, do not necessarily include other matters of a similar nature and shall not expand the scope of the representations and warranties set forth in the PSA.

# EXHIBIT A

## LEASES

[See attached]

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | LESSEE | DATE | CO | ST | BOOK | PAGE | ENTRY | CUM GROSS | NET ACRES | CUM NET ACRES | COLUMN NET ACRES | TRACT LEGAL DESCRIPTION | LEASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | COMM GROSS | NET ACRES | GOVT ACRES BY STATE | COLUM NET ACRES | TRACT LEGAL DESCRIPTION | BASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 475 00 015 000 | BLM WYW0320078 | 12/1/1945 | WASHAKIE | WY | 113 | 52 | | 320.0000 | 320.0000 | 320.0000 | 320.0000 | T47N R91W SEC 20 E2 | T47N R91W SEC 20 E2 |
| 475 00 016 000 | BLM WYW027524 | 4/1/1947 | WASHAKIE | WY | 9 | 198 | | 142.4600 | 142.4600 | 142.4600 | 142.4600 | T47N R91W SEC 18 LOTS 3 AND 4, SE4NW4, E2SW4 | T47N R91W SEC 7 (OT9 (##3 AC), LOT 10 (11.24 AC), LOT 11 (##.23 AC), LOT 12 (11.24 AC), LOT 12 (##3 AC), SE4 BELOW BASE OF PHOSPHORIA. SEC 18 N2NW, LOT 9, LOT 10, LOT 11, LOT 4 |
| 475 00 016 000 | BLM WYW027524 | 4/1/1950 | WASHAKIE | WY | | | | 4.4900 | 4.4900 | 4.4900 | 4.4900 | T47N R91W SEC 19 LOT 14 | T47N R91W SEC 19 LOT 14 |
| 475 00 016 000 | BLM WYW006876 | 7/1/1951 | WASHAKIE | WY | 128 | 450 | | 0.0000 | 155.121 | 0.0000 | 0.0000 | T47N R91W SEC 26: SE BELOW BASE OF PHOSPHORIA | T47N R91W SEC 26: 100% SURFACE TO BASE OF PHOSPHORIA, N4/255 S4% BELOW BASE PHOSPHORIA |
| 475 00 016 000 | BLM WYW043855 | 4/1/1974 | WASHAKIE | WY | 142 | 510 | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T47N R91W SEC 30: SE BELOW 30.8937 | T47N R91W SEC 33 BASE SEC 30: NE W% SURFACE TO 30.8937, 100% BELOW 30.8937 |
| 475 00 018 000 | BLM WYW043122 | 2/1/1946 | WASHAKIE | WY | 62 | 177 | | 120.0000 | 120.0000 | 120.0000 | 120.0000 | T46N R91W SEC 33 N2 | T46N R91W SEC 33 N2 SEC 7: W2E SEC 32 NE4, NE2 |
| 475 00 019 000 | BLM WYW043886 | 5/1/1951 | WASHAKIE | WY | 13 | 505 | | 0.0000 | 200.000 | 0.0000 | 0.0000 | T46N R91W SEC 7: S2SE SURFACE TO THE BASE OF PHOSPHORIA | T46N R91W SEC 7: 100% FROM SURFACE TO THE BASE OF PHOSPHORIA, 50% BELOW BASE OF PHOSPHORIA |

EXHIBIT A
LEASES

| LEASE NUMBER | VENDOR | DATE | CO | ST | BOOK | PAGE | ENTRY | QUM GROSS | NET ACRES | QUM NET ACRES BY TRACT | COLUM NET ACRES | TRACT LEGAL DESCRIPTION | LEASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 120.0000 | 120.0000 | 120.0000 | 120.0000 | T47N R91W<br>SEC 7: N2SE, SE2 SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 640.0000 | 320.0000 | 0.0000 | T47N R91W<br>SEC 8: ALL BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 640.0000 | 640.0000 | 640.0000 | 640.0000 | T47N R91W<br>SEC 8: ALL SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 400.0000 | 200.0000 | 0.0000 | T47N R91W<br>SEC 9: S2SE, W2, BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 400.0000 | 400.0000 | 400.0000 | 400.0000 | T47N R91W<br>SEC 9: S2SE, W2 SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 200.0000 | 200.0000 | 0.0000 | T47N R91W<br>SEC 17: N2SW, NW, SE BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 400.0000 | 400.0000 | 400.0000 | 400.0000 | T47N R91W<br>SEC 17: N2SW, NW, SE SURFACE TO BASE OF PHOSPHORIA | |
| 4530.00.000 | BLM WYW0052173 | 6/1/1951 | WASHAKIE | WY | 85 | 562 | | 0.0000 | 200.0000 | 0.0000 | 0.0000 | T47N R91W<br>SEC 23: SE SW BELOW BASE OF PHOSPHORIA | T47N R91W<br>SEC 23: SESW |
| | | | | | | | | 80.0000 | 40.0000 | 40.0000 | 40.0000 | T47N R91W<br>SEC 23: SESW SURFACE TO BASE OF PHOSPHORIA | |
| 4530.01.000 | BLM WYW0028441C | 6/1/1951 | WASHAKIE | WY | 41 | 437 | | 0.0000 | 200.0000 | 0.0000 | 0.0000 | T47N R91W<br>SEC 9: N2E, N2SE BELOW BASE OF PHOSPHORIA | T47N R91W<br>SEC 9: N2, N2SE |
| | | | | | | | | 400.0000 | 400.0000 | 400.0000 | 400.0000 | T47N R91W<br>SEC 9: N2, N2SE SURFACE TO BASE OF PHOSPHORIA | 30% SURFACE TO BASE OF PHOSPHORIA, 30% BELOW BASE OF PHOSPHORIA |
| 4530.02.000 | BLM WYW045618 | 11/1/1939 | WASHAKIE | WY | 128 | 437 | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T47N R91W<br>SEC 15: LOT 1 (60 AC), LOT 4 (40 AC), E2NW (80 AC) | SEC 15: E2, E2SW, LOT 1(13.171), LOT 2 (13.135), LOT 12 (.88), LOT 6 (13.171), LOT 7 (13.65), LOT 3 (40) |
| | | | | | | | | 280.0000 | 280.0000 | 280.0000 | 280.0000 | T47N R91W<br>SEC 15: LOT 3 (40 AC), SE, E2SW | SEC 15: LOT 5 (40 AC), LOT 6 (40 AC), E2NW BELOW 5SAT |
| 4530.03.000 | | | | | | | | 247.5200 | 247.5200 | 247.5200 | 247.5200 | T47N R91W<br>SEC 15: W, LOT 1(13.39 AC), LOT 11(13.37 AC), LOT 6<br>(13.79 AC), LOT 7 (13.89 AC), LOT 5 (40 AC) | |

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | LEASE GROSS | NET ACRES | GLNT ACRES BY DEPTH | CO GLNT NET ACRES | TRACT LEGAL DESCRIPTION | LEASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 43.00.021.000 | BLM WYW257832 | 8/1/1971 | WASHAKIE | WY | 533 | 54 | | 120.0000 | 120.0000 | 120.0000 | 120.0000 | T48N R91W SEC 3: LOTS 3, 4SW, NWNE | T48N R91W SEC 3: LOTS 3, 4SW, NWNE 100% SURFACE TO BASE OF PHOSPHORIA SEC 3: 2SW, NWSE SEC 11: NE |
| 43.00.024.000 | BLM WYW035973B | 6/1/1962 | WASHAKIE | WY | 111 | 194 | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T49N R91W SEC 15: LOT 15 SURFACE TO BASE OF PHOSPHORIA | T49N R91W SEC 3: LOT 15, NESW, SWNW SEC 5: LOT 5, LOT 6 100% SURFACE TO BASE OF PHOSPHORIA SEC 6: LOT 6, LOT 7B, LOT 26, LOT 8, LOT 9, SEC 6: LOTS 1-9, LOT 25, LOT 26, LOT 8, LOT 9, LOTS T4 N SURFACE TO BASE OF PHOSPHORIA |
| | | | | | | | | 240.0000 | 240.0000 | 240.0000 | 240.0000 | T49N R91W SEC 5: NWSW, SESW SEC 6: NESE, E2SW | |
| | | | | | | | | 204.1300 | 204.1300 | 161.2421 | 161.2421 | SURFACE TO BASE OF PHOSPHORIA | SEC 6: LOT 15 NE-A2, LOT 17 (NE-A2), LOT 25 NE-A2, LOT 25 NE-A2, LOT B 22 (N-A2), LOT 9 LOT 2 (2)? SURFACE TO BASE OF PHOSPHORIA |
| 43.00.025.000 | BLM WYW5464 | 5/1/1947 | WASHAKIE | WY | 155 | 126 | | 0.0000 | 0.0000 | 0.0000 | 0.0000 | T4 N R92W SEC 13: NESE, NE, SESE SURFACE TO BASE OF PHOSPHORIA | T4 N R92W SEC 13: NESE, NE, SESE (NE)N - REGION PHOSPHORIA |
| | | | | | | | | 280.0000 | 280.0000 | 280.0000 | 0.0000 | T4 N R92W SEC 13: N2SE, NE, SE SURFACE TO BASE OF PHOSPHORIA | |
| 43.00.026.000 | STATE OF WYOMING 04-12E11 | 7/16/1996 | WASHAKIE | WY | 108 | 501 | | 320.0000 | 320.0000 | 320.0000 | 320.0000 | T47N R91W SEC 32 | T47N R91W SEC 32 |
| 43.00.026.000 | BLM WYW02472 | 6/1/1951 | WASHAKIE | WY | 43 | 502 | | 40.0000 | 40.0000 | 210.0000 | 0.0000 | T48N R91W SEC 32: NWSE BELOW BASE OF PHOSPHORIA | T48N R91W SEC 15, LOT 15 SEC 22 ALL SEC 23 ALL SEC 26: SE, SESW 100% SURFACE TO BASE OF PHOSPHORIA, 50% BELOW BASE OF PHOSPHORIA |
| | | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T48N R91W SEC 15: NWSE SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 0.0000 | 200.0000 | 0.0000 | T48N R91W SEC 32: NWSE BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T48N R91W SEC 12: NWNE SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 0.0000 | 200.0000 | 0.0000 | T48N R91W SEC 32: SWSE BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T48N R91W SEC 32: SWSE SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 0.0000 | 200.0000 | 0.0000 | T48N R91W SEC 13: NWSW BELOW BASE OF PHOSPHORIA | |

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | QUAR GROSS | NET ACRES | COUNTY ACRES BY STATE | CO LEM NET ACRES | TRACT LEGAL DESCRIPTION | LEASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | T49N R51W<br>SEC 13: N4SW BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 320.0000 | 160.0000 | 0.0000 | T49N R51W<br>SEC 31: E2 BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 320.0000 | 320.0000 | 320.0000 | 320.0000 | T49N R51W<br>SEC 12: SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 260.0000 | 260.0000 | 0.0000 | T49N R51W<br>SEC 12: W2, C2E2, SWNE BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 320.0000 | 520.0000 | 520.0000 | 520.0000 | T49N R51W<br>SEC 12: N2, C2E2, SWNE SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 300.0000 | 300.0000 | 0.0000 | T49N R51W<br>SEC 13 E2, NE4, E2SW SW5W BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 600.0000 | 600.0000 | 600.0000 | 600.0000 | T49N R51W<br>SEC 13: E2, NW4, E2SW SW5W BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 300.0000 | 300.0000 | 0.0000 | T49N R51W<br>SEC 28: SE, S25W SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 200.0000 | 200.0000 | 200.0000 | 200.0000 | T49N R51W<br>SEC 28: SE, S25W SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 160.0000 | 160.0000 | 0.0000 | T49N R51W<br>SEC 30: W SE BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T49N R51W<br>SEC 30: SE BELOW BASE OF PHOSPHORIA | |
| 49 30 620 0 000 | BLM WY0049 L71 | 12/1/1948 | WASHAKIE | WY | 126 | 459 | | 0.0000 | 119.9450 | 0.0000 | 0.0000 | T47N R51W<br>SEC 2: SW4E, NWSE, NW4, LOT 3 (39.45 AC), LOT 4 (39.97 AC)<br>SEC 5: SWNE | T47N R51W<br>SEC 2: SW4E, NWSE, NW4, LOT 3 (39.45 AC), LOT 4 (39.97 AC), E2N2, SE<br>SEC 5: LOT 5 (39 57 AC), LOT 6, LOT 7, LOT 8, S2N2, SE |

Schedule A - 1

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | GMR GROSS | NET ACRES | GMR ACRES BY DEPTH | COLUMN NET ACRES | TRACT LEGAL DESCRIPTION | LEASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | BLM WYW0525427 | 7/1/1996 | WASHAKIE | WY | 325 | 541 | | 239.8900 | 239.8900 | 239.8900 | 239.8900 | BENEATH THE BASE OF THE PHOSPHORIA<br>T4 7N-R91W<br>SEC 2: S 2SW, NWSE, LOT 3 (38.3 AC), LOT 9 (39.97 AC)<br>SEC 5: SWSE<br>FROM THE SURFACE TO THE BASE OF THE PHOSPHORIA | 100% FROM THE SURFACE TO THE BASE OF THE PHOSPHORIA, 50% BENEATH THE BASE OF THE PHOSPHORIA<br>SEC 2: E 2E 2<br>SEC 5: LOT 5, LOT 6, S2NW |
| 478-00306.000 | BLM WYW0528938 | 12/1/1963 | WASHAKIE | WY | 128 | 466 | | 0.0000 | 955.1600 | 477.5800 | 0.0000 | T4 7N-R93W<br>SEC 1: LOTS 13&17 (41), LOTS 8 (38 AC), LOT 7 (38.76 AC), LOT 6 (38.71 AC)<br>ACG S2NE, N2SE, SE SE<br>SEC 11: N 2<br>SEC 2: SW, S2SE<br>BENEATH THE BASE OF THE PHOSPHORIA | |
| 478-00332.000 | BLM WYW0528938 | 12/1/1963 | WASHAKIE | WY | 128 | 466 | | 955.1600 | 955.1600 | 955.1600 | 955.1600 | T4 7N-R93W<br>SEC 1: LOTS 13&17 (41), LOTS 8 (38 AC), LOT 7 (38.76 AC), LOT 6 (38.71 AC)<br>ACG S2NE, N2SE, SE SE<br>SEC 11: N 2<br>SEC 2: SW, S2SE<br>FROM THE SURFACE TO THE BASE OF THE PHOSPHORIA | T4 7N-R93W<br>EDWOT4, LOT 1, LOT 8, SE<br>SEC 11: NWNE |
| 478-00306.000 | | 7/1/1956 | WASHAKIE | WY | 325 | 541 | | 0.0000 | 774.2150 | 774.2150 | 0.0000 | T4 7N-R93W<br>SEC 30: E2SW, LOT 5, LOT 6, SE BELOW BASE OF PHOSPHORIA | T4 7N-R93W<br>SEC 29: LOT 10, LOT 11, LOT 8, SE<br>SEC 11: NWNE |
| | | | | | | | | 318.4000 | 318.4000 | 319.2300 | 159.2300 | T4 7N-R93W<br>SEC 30: E2SW, LOT 5, LOT 6, SE SURFACE TO BASE OF PHOSPHORIA | 50% SURFACE TO BASE OF PHOSPHORIA, 25% BELOW BASE OF PHOSPHORIA |
| 478-00182.000 | BLM WYW0532506 | 2/1/1948 | WASHAKIE | WY | 42 | 177 | | 0.0000 | 40.0000 | 10.0000 | 0.0000 | T4 7N-R93W<br>SEC 11: NWNE BELOW BASE OF PHOSPHORIA | |
| 478-00183.000 | BLM WYW0532506 | | WASHAKIE | WY | 42 | 177 | | 40.0000 | 40.0000 | 20.0000 | 20.0000 | T4 7N-R93W<br>SEC 11: NWNE SURFACE TO BASE OF PHOSPHORIA | |
| 478-00311.000 | BLM WYW0532696 | 9/1/1990 | WASHAKIE | WY | 128 | 466 | | 223.0750 | 223.0750 | 223.0750 | 223.0750 | T4 8N-R91W<br>SEC 5: LOT 10, LOT 13, LOT 9, LOT 8, NWSW, S2NWW | T6 8N-R91W<br>SEC 5: LOT 10, LOT 13, LOT 9, NWSW, S2NWW |
| 478-00311.000 | BLM WYW0537243 | 9/1/1990 | WASHAKIE | WY | 60 | 2306 | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T4 8N-R91W<br>SEC 17: NE | T4 8N-R91W<br>SEC 17: NE |
| 478-00183.000 | | | | | | | | 40.0000 | 40.0000 | 0.0000 | 0.0000 | T4 8N-R91W<br>SEC 24: NWSE ALL DEPTHS SAVE AND EXCEPT FL8490' - 9,976' | T4 8N-R91W<br>SEC 24: E2SW, E2SE, SWSE, ALL DEPTHS SAVE AND EXCEPT FL8490' - 9,976' |
| | | | | | | | | 200.0000 | 200.0000 | 200.0000 | 200.0000 | T4 8N-R91W<br>SEC 24: E2SW, E2SE, SWSE, ALL DEPTHS SAVE AND EXCEPT FL8490' - 9,976' | |
| 478-00184.000 | | 3/1/1944 | WASHAKIE | WY | 131 | 559 | | 240.0000 | 240.0000 | 240.0000 | 240.0000 | T4 8N-R91W<br>SEC 25: 2NW, NE | |
| 478-00184.000 | | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T4 7N-R91W<br>SEC 35: NWNW<br>SEC 25: NE | |
| 478-00145.000 | BLM WYW045483 | 7/1/1951 | WASHAKIE | WY | 128 | 455 | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T4 7N-R91W<br>SEC 19: SW | T4 7N-R91W<br>SEC 19: SW<br>SEC 27: S2 |
| 478-00145.000 | BLM WYW045483 | | | | | | | 320.0000 | 320.0000 | 320.0000 | 320.0000 | T4 7N-R91W<br>SEC 27: S2 | T4 7N-R91W<br>SEC 27: S2 |
| 478-00306.000 | BLM WYW0514625 | 2/1/1965 | WASHAKIE | WY | 108 | 177 | | 102.8000 | 102.8000 | 102.8000 | 102.8000 | T4 7N-R91W<br>SEC 19: LOT 10, LOT 15, LOT 11, LOT 9, LOT 5 | T4 7N-R91W<br>SEC 19: E2SW, LOT 7 (13.3 AC), NWSW, LOT 8 (42 AC), LOT 9 (60 AC), LOT 10<br>(31.4 5 AC), LOT 11 (13.49 AC), LOT 12 (69 AC) |
| | | | | | | | | 200.0000 | 200.0000 | 200.0000 | 200.0000 | T4 7N-R91W<br>SEC 24: NE, NESE | |

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | CUM GROSS | NET ACRES | CUM NET ACRES 85% | COLUM NET ACRES | TRACT LEGAL DESCRIPTION | BASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 43.00.087.000 | BLM WY040016 | 12/1/1965 | WASHAKIE | WY | 138 | 183 | | 131.4900 | 131.4900 | 131.4900 | 131.4900 | T43N R91W SEC19:E2SE4,LOT11,LOT8 | T44N R92W SEC19:LOT11,SW,LOT4, SW4NE4,SW4 N2N OF THE BASE OF THE PHOSPHORIA SEC1:LOT 16, W2SI - ALL DEPTHS |
| 43.00.092.000 | 2D LEASE A | 6/29/1944 | WASHAKIE | WY | 8 | 70 | | 59.9950 | 59.9950 | 59.9950 | 59.9950 | BELOW THE BASE OF THE PHOSPHORIA T44N R92W SEC1: LOT 11, SW | |
| 43.00.093.000 | BLM WY04030 | 5/1/1950 | WASHAKIE | WY | 128 | 475 | | 240.0000 | 200.0000 | 100.0000 | 100.0000 | BELOW THE BASE OF THE PHOSPHORIA T44N R92W SEC1:LOT8, S2N4, S4NE4 | |
| 43.00.094.000 | BLM WY040170 | 6/1/1958 | WASHAKIE | WY | 121 | 287 | | 128.7100 | 128.7100 | 64.3550 | 64.3550 | T44N R92W SEC1: LOT2 | |
| 43.00.095.000 | BLM WY045108 | 3/1/1950 | WASHAKIE | WY | 128 | 468 | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T44N R92W SEC1: NE NW | T44N R92W SEC1: NE NW |
| | BLM WY040478 | 3/1/1950 | WASHAKIE | WY | 128 | 475 | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T44N R92W SEC1: NWNW | T44N R92W SEC1: NWNW |
| 43.00.096.000 | BLM WY040478 | 5/1/1950 | WASHAKIE | WY | 128 | 475 | | 475.6000 | 475.6000 | 475.6000 | 475.6000 | SEC2:LOT3,LOT4,LOT5,LOT7, LOT8, S2NW, SW, SWN4, LOT16,LOT17,148-99 AC), LOT7,148-99 AC), LOT7,148-99 ALL S2NW, SW, SWN4, NWSE | SEC2:LOT3,LOT5,LOT7,LOT8,148-99 AC),LOT7,148-99 AC), NW, SWSE, S2N2 |
| | | | | | | | | 377.6100 | 377.6100 | 377.6100 | 377.6100 | SEC3: LOT5, LOT6, N2SE, S2NE, S2SE | |
| 43.00.098.000 | BLM WY045192 | 5/1/1950 | WASHAKIE | WY | 128 | 475 | | 98.3100 | 98.3100 | 98.3100 | 98.3100 | SEC3: LOT7:(20.06 AC),LOT 10:(34.78 AC),LOT11:(18-31 AC),TRACT 1 (21.61 AC),TRACT 2 (18.31 AC) | T44N R92W SEC3: LOT7:(20.06 AC),LOT10:(34.78 AC),LOT11:(18-31 AC),TRACT 1 (21.61 AC),TRACT 2 (18.31 AC) |
| 43.00.100.000 | BLM WY040170 | 3/1/1967 | WASHAKIE | WY | 136 | 31 | | 0.0000 | 120.0000 | 0.0000 | 40.0000 | BILLING TRACT- ALLOCATED BY DRAFT FROM TILT | T44N R92W SEC15: E2, S2NW, SW |
| | | | | | | | | | | | | CARSON HOLD Y:100 AC CARSON-HOLD Y:100 AC - 28.69% UNIVERSAL OIL AC - 26.74% MAINCLUB AC - 7.50% | SEC 15: E2, S2NW, SW |
| | | | | | | | | | | | | LN= 100% / 100% | |
| | | | | | | | | | | | | | 50 N FROM SURFACE TO BASE OF PHOSPHORIA; 20% BELOW PHOSPHORIA |
| | | | | | | | | 0.0000 | 160.0000 | 160.0000 | 0.0000 | T44N R92W SEC14: N4 BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 160.0000 | 160.0000 | 160.0000 | 80.0000 | T44N R92W SEC14: N4 SURFACE TO BAS OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 560.0000 | 160.0000 | 0.0000 | T44N R92W SEC15: E2, S2NW, SW BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 560.0000 | 560.0000 | 280.0000 | 280.0000 | T44N R92W SEC15: E2, S2NW, SW SURFACE TO BASE OF PHOSPHORIA | SEC15: E2, S2NW, SW SURFACE TO BASE OF PHOSPHORIA |
| 43.00.102.000 | BLM WY045165258 | 2/1/1965 | WASHAKIE | WY | 134 | 645 | | 320.0000 | 320.0000 | 320.0000 | 320.0000 | T47N R92W SEC13: W2 | T47N R92W SEC13: W2 |
| | BLM WY040296BLN | 6/1/1958 | WASHAKIE | WY | 121 | 287 | | 397.2800 | 397.2800 | 397.2800 | 397.2800 | T47N R92W SEC15: S2N2,SW,LOT3,LOT4,LOT 7, LOT8, LINE | SEC15: S2N2,SW,LOT3,LOT4,LOT 7, LOT8, LINE (OF 9.39.39 AC),LOT7 (39.53 AC), LOT7 (39.53 AC), (OF 9.39.39 AC) |
| 43.00.104.000 | BLM WY045701SW | 8/1/1939 | WASHAKIE | WY | 93 | 639 | | 36.0000 | 36.0000 | 36.0000 | 36.0000 | T44N R93W SEC2: LOT17, E9 | T44N R93W SEC2: LOT17, E9 |
| 43.00.105.000 | BLM WY045401 | 6/1/1975 | WASHAKIE | WY | 44 | 2134 | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T47N R92W SEC21: W2W | T47N R92W SEC21: W2W |
| 43.00.106.000 | BLM WY45507 | 6/1/1975 | WASHAKIE | WY | 44 | 2134 | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T47N R92W SEC15: SW2 ACROSS BASE OF PHOSPHORIA | SEC15: SW2 ACROSS BASE OF PHOSPHORIA |

EXHIBIT A
LEASES

| LEASE NUMBER | VENDOR | OD | ST | BOOK | PAGE | ENTRY | COM GROSS | NET ACRES | GLNT ACRES BY DEPTH | COLUM NET ACRES | TRACT LEGAL DESCRIPTION | BASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 43.00.047.000 | BLM WY06114.05 | | 5/3/1951 | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T4RN-R93W<br>SEC 5: SESE | T4RN-R93W<br>SEC 5: SESE |
| 43.00.048.000 | BLM WY0450275 | WASHAKIE | WY | 93 | 528 | 461 | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T4RN-R93W<br>SEC 6: LOT 13 | T4RN-R93W<br>SEC 6: LOT 13<br>SEC 6: LOT 83 (40 AC), LOT 15 (40 AC), LOT 7 (10.39 AC), LOT 7 (33.19 AC), LOT 9 (20.13 AC), LOT 9 (24.43 AC), LOT 8 (20.92 AC), LOT 18 (40 AC), LOT 18 (34.1 AC), LOT 28 (34.4 AC), LOT 8 (22.82 AC), LOT 15 (27.63 AC) |
| 43.00.049.000 | BLM WY0450760 | WASHAKIE | WY | 44 | 86 | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T4RN-R93W<br>SEC 6: LOT 14 | T4RN-R93W<br>SEC 6: LOT 14 |
| 43.00.050.000 | BLM WY06412.12 | WASHAKIE | WY | 44 | 519 | | 206.0000 | 206.0000 | 206.0000 | 206.0000 | T4RN-R93W<br>SEC 5: LOT 10, LOT 15, LOT 16, LOT 7, LOT 8, LOT 9 | T4RN-R93W<br>SEC 6: LOT 10, LOT 15, LOT 11, LOT 7, LOT 14, LOT 15, LOT 16, LOT 21, LOT 8, LOT 9 |
| 43.00.051.000 | BLM WY0450980 | WASHAKIE | WY | 93 | 534 | | 200.0000 | 200.0000 | 200.0000 | 200.0000 | T4RN-R93W<br>SEC 6: NESW, LOT 12 | T4RN-R93W<br>SEC 6: EDNW, LOT 5, LOT 6, SE |
| 43.00.051.000 | BLM WY0450980 | | 6/1/1951 | 44 | 657 | | 79.7800 | 79.7800 | 79.7800 | 79.7800 | T4RN-R93W<br>SEC 7: EDNW, LOT 5, LOT 6, SE | T4RN-R93W<br>SEC 6: LOT 15, SWSW |
| | | | 2/1/1951 | | | | 119.0400 | 119.0400 | 119.0400 | 119.0400 | T4RN-R93W<br>SEC 6: LOT 15, SWSW | |
| | | | | | | | 79.7800 | 79.7800 | 79.7800 | 79.7800 | | |
| 43.00.052.000 | BLM WY0450760 | WASHAKIE | WY | 44 | | | 0.0000 | 40.0000 | 210.0000 | 0.0000 | T4RN-R93W<br>SEC 1: SENW BELOW BASE OF PHOSPHORIA | T4RN-R93W<br>SEC 1: SENW 100% SURFACE TO BASE OF PHOSPHORIA, 30% BELOW BASE OF PHOSPHORIA |
| | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T4RN-R93W<br>SEC 1: SWNW SURFACE TO BASE OF PHOSPHORIA | T4RN-R93W<br>SEC 1: SWNW SURFACE TO BASE OF PHOSPHORIA |
| 43.00.053.000 | BLM WY06412.12 | WASHAKIE | WY | 44 | 519 | | 0.0000 | 40.0000 | 40.0000 | 0.0000 | T4RN-R93W<br>SEC 2: SSE BELOW BASE OF PHOSPHORIA | T4RN-R93W<br>SEC 2: E2SE 100% SURFACE TO BASE OF PHOSPHORIA, 30% BELOW BASE OF PHOSPHORIA |
| | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T4RN-R93W<br>SEC 2: SSE SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | 0.0000 | 210.0000 | 250.0000 | 0.0000 | T4RN-R93W<br>SEC 2: NSEE BELOW BASE OF PHOSPHORIA | |
| | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T4RN-R93W<br>SEC 2: NSEE SURFACE TO BASE OF PHOSPHORIA | |
| 43.00.054.000 | BLM WY0450980 | WASHAKIE | WY | 93 | 534 | | 0.0000 | 120.0000 | 120.0000 | 0.0000 | T4RN-R93W<br>SEC 9: NSEE, NE BELOW BASE OF PHOSPHORIA | T4RN-R93W<br>SEC 9: NENE, NE<br>SEC 15: SEL<br>SEC 15: NWL<br>SEC 16: NENW |
| | | | | | | | 240.0000 | 240.0000 | 240.0000 | 240.0000 | T4RN-R93W<br>SEC 9: NSEE, NE SURFACE TO BASE OF PHOSPHORIA | 100% SURFACE TO BASE OF PHOSPHORIA, 30% BELOW BASE OF PHOSPHORIA |
| | | | | | | | 0.0000 | 520.0000 | 520.0000 | 0.0000 | T4RN-R93W<br>SEC 10: ALL BELOW BASE OF PHOSPHORIA | |
| | | | | | | | 640.0000 | 640.0000 | 640.0000 | 640.0000 | T4RN-R93W<br>SEC 10: ALL SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | 0.0000 | 520.0000 | 520.0000 | 0.0000 | T4RN-R93W<br>SEC 11: ALL BELOW BASE OF PHOSPHORIA | |

Exhibit A - 3

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | CUM GROSS | NET ACRES | GOVT ACRES BY DEPT | COLUM NET ACRES | TRACT LEGAL DESCRIPTION | LEASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 49.30.03.000 | BLM WYW0691712 | 12/1/1948 | WASHAKIE | WY | 128 | 482 | | 640.0000 | 640.0000 | 640.0000 | 0.0000 | T47N R91W — SEC 15 ALL SURFACE TO BASE OF PHOSPHORIA | T47N R91W — SEC 34 ALL: 100% SURFACE TO BASE OF PHOSPHORIA, 50% BELOW PHOSPHORIA |
| 49.30.04.000 | BLM WYW093999 | 9/1/1951 | WASHAKIE | WY | 64 | 129 | | 0.0000 | 320.0000 | 160.0000 | 0.0000 | T47N R91W — SEC 35 W1/4 E1/2N BASE OF PHOSPHORIA | T47N R91W — SEC 15 N2NE, NE: 100% SURFACE TO BASE OF PHOSPHORIA, 50% BELOW PHOSPHORIA |
| 49.30.05.000 | BLM WYW0694566 | 6/1/1975 | WASHAKIE | WY | 8 | 657 | | 120.0000 | 320.0000 | 320.0000 | 120.0000 | T47N R91W — SEC 15 W2 SURFACE TO BASE OF PHOSPHORIA | T47N R91W — SEC 15 W2NE, NE: SURFACE TO BASE OF PHOSPHORIA, 50% BELOW BASE OF PHOSPHORIA |
| 49.30.05.200 | BLM WYW114960B | 6/1/1961 | WASHAKIE | WY | 93 | 634 | | 40.0000 | 80.0000 | 40.0000 | 0.0000 | T47N R91W — SEC 15 SENW BELOW BASE OF PHOSPHORIA | T47N R91W — SEC 15 SENW: 100% SURFACE TO BASE OF PHOSPHORIA |
| 49.30.07.000 | BLM WYW5741 | 6/1/1947 | WASHAKIE | WY | 130 | 430 | | 80.0000 | 80.0000 | 80.0000 | 80.0000 | T47N R91W — SEC 24 N2NW SURFACE TO BASE OF PHOSPHORIA | T47N R91W — SEC 24 N2NW BELOW THE PHOSPHORIA |
| 49.30.05.100 | | | | | | | | 0.0000 | 640.0000 | 640.0000 | 0.0000 | T47N R91W — SEC 34 ALL | T47N R91W — SEC 34 ALL: 100% SURFACE TO BASE OF PHOSPHORIA, 50% BELOW PHOSPHORIA |
| | | | | | | | | 640.0000 | 640.0000 | 640.0000 | 640.0000 | 30% BELOW THE BASE OF THE PHOSPHORIA | |
| | | | | | | | | 0.0000 | 240.0000 | 240.0000 | 0.0000 | SEC 34 ALL SURFACE TO THE BASE OF PHOSPHORIA | |
| | | | | | | | | 240.0000 | 240.0000 | 240.0000 | 240.0000 | T47N R91W — SEC 33 N2SE, NE: 100% SURFACE TO BASE OF PHOSPHORIA, 30% BELOW PHOSPHORIA | |
| | | | | | | | | 0.0000 | 210.0000 | 210.0000 | 0.0000 | T47N R91W — SEC 35 N2SE, NE SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T47N R91W — SEC 35 SENW BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 120.0000 | 120.0000 | 120.0000 | 120.0000 | T47N R91W — SEC 22 SENW, W2SE | |
| | | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T47N R91W — SEC 26 N2N, N2SN, SESW BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 200.0000 | 200.0000 | 200.0000 | 200.0000 | T47N R91W — SEC 28 N2SW, N2NW, SWNW | |
| | | | | | | | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T47N R91W — SEC 28 N2NW SURFACE TO BASE OF PHOSPHORIA | |
| 49.30.06.000 | BLM WYW56468 | 12/1/1976 | WASHAKIE | WY | 17 | 664 | | 400.0000 | 400.0000 | 400.0000 | 240.0000 | SEC 23 ALL; SEC 28 N2NW, N2SW; SEC 29 N2NE, SWNE; SEC 25 SWNE 40% FROM SURFACE TO DEPTH OF 300 FT BELOW THE STRATIGRAPHIC EQUIVALENT OF THE DEPTH DRILLED IN THE ALTO ET AL 29-1 | 40% FROM SURFACE TO DEPTH OF 300 FT BELOW THE STRATIGRAPHIC EQUIVALENT OF THE DEPTH DRILLED IN THE ALTO ET AL 29-1 |
| 49.30.05.300 | | 6/1/1961 | WASHAKIE | WY | 130 | 447 | | 40.0000 | 40.0000 | 24.0000 | 24.0000 | T45N R91W — SEC 25 SWNE | 60% FROM SURFACE TO DEPTH OF 300 FT BELOW THE STRATIGRAPHIC EQUIVALENT OF THE DEPTH DRILLED IN THE ALTO ET AL 29-1 |
| 49.30.05.000 | BLM WYW110.000 | 6/1/1961 | WASHAKIE | WY | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T44N R91W — SEC 6 LOT 10, LOT 11, LOT 14, LOT 15 | T44N R91W — SEC 6 LOT 10, LOT 11, LOT 14, LOT 15 76.54 ALL SURFACE TO BASE OF PHOSPHORIA, 30% BELOW BASE OF PHOSPHORIA |

Exhibit A - X

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | COM GROSS | NET ACRES | GOVT ACRES BY STATE | CO CUM NET ACRES | TRACT LEGAL DESCRIPTION | BASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | T46N R91W<br>SEC 6: SENW, S2NE, E2SE, LOTS 26, LOT 19, LOT 13, LOT 20, LOT 21, LOT 22, LOT 23, LOT 24<br>100% ALL LOT T45 |
| | | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T46N R91W<br>SEC 6: LOT 24 | |
| | | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T46N R91W<br>SEC 6: NENW (LOT 21) | |
| | | | | | | | | 366.9500 | 366.9500 | 365.9500 | 366.9500 | T44N R91W<br>SEC 6: SENW, S2NE, E2SE, LOTS 19, 20, 21, 23 | |
| | | | | | | | | 167.7700 | 167.7700 | 167.7700 | 131.6995 | T44N R91W<br>SEC 6: LOT 30, LOT 31, LOT 11, LOT 19, LOT 15<br>100% BELOW 291' BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 167.7700 | 167.7700 | 0.0000 | T44N R91W<br>SEC 6: LOT 30, LOT 31, LOT 11, LOT 19, LOT 15<br>78.5% SURFACE TO 291' BELOW BASE OF PHOSPHORIA | |
| 45.00.061.000 | BLM WYW0120036 | 12/1/1995 | WASHAKIE | WY | 138 | 183 | | 86.6500 | 86.6500 | 632515 | 68.0536 | T44N R91W<br>SEC 6: LOT 26, LOT 27 | T46N R91W<br>SEC 6: LOT 26, LOT 27<br>SEC 7: LOT 6 |
| | | | | | | | | 43.3100 | 43.3100 | 32.4415 | 32.4415 | T44N R91W<br>SEC 7: LOT 6 | |
| 45.00.061.000 | BLM WYW0247075 | 2/1/1950 | WASHAKIE | WY | 126 | 490 | | 48.8700 | 48.9700 | 48.8700 | 48.8700 | T44N R92W<br>SEC 4: LOT 5<br>T46N R92W<br>SEC 4: LOT 4<br>T46N R92W<br>SEC 4: LOT 7<br>T46N R92W<br>SEC 4: LOT 8 | T46N R92W<br>SEC 4: LOTS 4, 5, 7, 8 |
| | | | | | | | | 48.8700 | 48.8700 | 48.8700 | 48.8700 | | |
| | | | | | | | | 48.7700 | 48.7700 | 48.7700 | 48.7700 | | |
| | | | | | | | | 48.6700 | 48.6730 | 48.6700 | 48.6700 | | |
| 45.00.061.000 | LEASE 1 & LARS ET UR | 5/1/1950 | WASHAKIE | WY | 11 | 566 | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T47N R92W<br>SEC 22: NE NE<br>SEC 23: NWNW | T47N R92W<br>SEC 22: NE NE<br>SEC 23: NWNW |
| | | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | | |
| 45.00.061.000 | BLM WYW151775 | 6/1/1968 | WASHAKIE | WY | 135 | 23 | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T47N R92W<br>SEC 24: SE3 | T47N R92W<br>SEC 24: NW, N2 SE, S2E<br>SEC 25: E2NE, SENW, NE SE - 100% OF ALL LOT 2 FW<br>SEC 25: SWNE - 100% OF 8.75 NE2W BASE OF PHOSPHORIA FW |
| | | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T47N R92W<br>SEC 24: NWSE | |
| | | | | | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T47N R92W<br>SEC 25: SWNE BELOW BASE OF PHOSPHORIA | |

Exhibit A - 79

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | GWA GROSS | NET ACRES | GWMY ACRES BY TRACT | COLUMN NET ACRES | TRACT LEGAL DESCRIPTION | LEASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| 4530.004.000 | BLM WYW057914 | 8/1/1959 | WASHAKIE | WY | 53 | 620 | | 0.0000 | 40.0000 | 0.0000 | 0.0000 | T9N R91W SEC 25: SWNE SURFACE TO BASE OF PHOSPHORIA | T9N R91W SEC 25: LOT1 E1/2, LOT1 B |
| 4530.005.000 | BLM WYW0149433 | 6/4/1951 | WASHAKIE | WY | 56 | 95 | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T9N R92W SEC 25: SWSW | T9N R92W SEC 25: SWSW |
| 4530.006.000 | BLM WYW49385 | 5/1/1951 | WASHAKIE | WY | 43 | 438 | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T9N R91W SEC 25: N2 BELOW THE BASE OF PHOSPHORIA | T9N R92W SEC 25: N2 NE SEC 25: N2 NE SEC 24: N2SW |
| | | | | | | | | 120.0000 | 120.0000 | 120.0000 | 320.0000 | T9N R91W SEC 15: N2 SURFACE TO BASE OF PHOSPHORIA | 100% SURFACE TO BASE OF PHOSPHORIA, 50% BELOW BASE OF PHOSPHORIA |
| | | | | | | | | 0.0000 | 320.0000 | 160.0000 | 0.0000 | T9N R91W SEC 22: N2 BELOW THE BASE OF PHOSPHORIA | |
| | | | | | | | | 320.0000 | 320.0000 | 320.0000 | 320.0000 | T9N R91W SEC 22: N2 SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 80.0000 | 400.0000 | 0.0000 | T9N R91W SEC 24: N2N BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 80.0000 | 80.0000 | 800.0000 | 80.0000 | T9N R91W SEC 14: N2SW SURFACE TO BASE OF PHOSPHORIA | |
| 4530.007.000 | STATE OF WYOMING 0-26017 | 3/16/1916 | WASHAKIE | WY | 48 | 30 | | 0.0000 | 160.0000 | 800.0000 | 0.0000 | SEC 11: NW1 LIMITED 20 PPH2 BELOW BASE OF PHOSPHORIA | T7N R92W SEC 31: NW |
| | | | | | | | | 160.0000 | 140.0000 | 120.0000 | 120.0000 | T7N R90W SEC 14: NW LIMITED SURFACE TO BASE OF PHOSPHORIA | |
| 4530.008.000 | BLM WYW048121M | 6/1/1949 | WASHAKIE | WY | 60 | 527 | | 0.0000 | 40.0000 | 400.0000 | 0.0000 | T7N R90W SEC 20: SWNW BELOW BASE OF PHOSPHORIA | T7N R90W SEC 20: SE |
| | | | | | | | | 40.0000 | 40.0000 | 400.0000 | 40.0000 | T7N R90W SEC 20: SWNW SURFACE TO BASE OF PHOSPHORIA | 100% SURFACE TO BASE OF PHOSPHORIA, 50% BELOW BASE OF PHOSPHORIA |
| | | | | | | | | 0.0000 | 120.0000 | 120.0000 | 0.0000 | T7N R90W SEC 20: NENW SDNW BELOW SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 120.0000 | 120.0000 | 120.0000 | 120.0000 | T7N R90W SEC 20: NENW SDNW SURFACE TO BASE OF PHOSPHORIA | |
| 4530.009.000 | BLM WYW51760 | 6/1/1948 | WASHAKIE | WY | 132 | 505 | | 0.0000 | 40.0000 | 120.0000 | 0.0000 | T7N R90W SEC 31: NENE BELOW BASE OF PHOSPHORIA | T7N R90W SEC 31: NENE SEC 32: NDNW |
| | | | | | | | | 40.0000 | 40.0000 | 20.0000 | 20.0000 | T7N R90W SEC 31: NENE SURFACE TO BASE OF PHOSPHORIA | 50% SURFACE TO BASE OF PHOSPHORIA, 25% BELOW BASE OF PHOSPHORIA |
| | | | | | | | | 0.0000 | 80.0000 | 200.0000 | 0.0000 | T7N R90W SEC 32: N2NW BELOW BASE OF PHOSPHORIA | |

Exhibit A - 15

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | CUM GROSS | NET ACRES | CUM NET ACRES BY TRIBE | CUM NET ACRES | TRACT LEGAL DESCRIPTION | LEASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 43-0070.000 | BLM WYW02296 | 5/1/1951 | WASHAKIE | WY | 61 | 553 | | 80.0000 | 80.0000 | 40.0000 | 40.0000 | T47N R91W SEC 32 N2NW SURFACE TO BASE OF PHOSPHORIA | T47N R91W SEC 32 L1 L2 |
| 43-0071.000 | BLM WYW01767 | 6/1/1958 | WASHAKIE | WY | 112 | 301 | | 320.0000 | 320.0000 | 320.0000 | 0.0000 | T47N R91W SEC 32 N2SW BELOW BASE OF PHOSPHORIA SEN SURFACE TO BASE OF PHOSPHORIA, 2FS BELOW BASE OF PHOSPHORIA | T47N R91W SEC 32 N2SW BELOW BASE OF PHOSPHORIA |
| 43-0072.000 | BLM WYW028609 | 2/1/1943 | WASHAKIE | WY | 128 | 498 | | 40.0000 | 40.0000 | 40.0000 | 20.0000 | T47N R91W SEC 32 N2SW BELOW BASE OF PHOSPHORIA | T06N 89 8W SEC 6 L1F 12 SEC 17 SWSE |
| 43-0073.000 | BLM WYW06 | 2/1/1950 | WASHAKIE | WY | 128 | 530 | | 40.0000 | 40.0000 | 40.0000 | 24.1330 | T47N R91W SEC 21 N2 NE | T06N 91W SEC 6 L1F 12 SEC 17 SWSE |
| 43-0074.000 | BLM WYW0226.46 | 5/1/1942 | WASHAKIE | WY | 118 | 74 | | 80.0000 | 80.0000 | 40.0000 | 28.4647 | T47N R91W SEC 35 NWNW, N2NW SEC 24 NE2NE | SEC 30 L1 L2NW, L1FS L1FS L1FS L1FS N2SE, NE, N2SW |
| 43-0075.000 | BLM WYW12173 | 6/1/1958 | WASHAKIE | WY | 32 | 530 | | 240.0000 | 240.0000 | 240.0000 | 53.3134 | T47N R91W SEC 24 N2SE, SENE SEC 26 N2SW, NW, N2SE | SEC 2 L1F1, L2F2, L1F3, L2F4, N2NE |
| 43-0076.000 | BLM WYW018441A | 3/1/1951 | WASHAKIE | WY | 96 | 217 | | 80.0000 | 80.0000 | 80.0000 | 123.4055 | T47N R91W SEC 29 SWSW LIMITED TO PHOSPHORIA FORMATION SEC 29 NWSW, SE2SE LIMITED TO PHOSPHORIA FORMATION | SEC 2 L1F1, L2F2, L1F3, L2F4, N2NE SEC 29 SWSW, S2SW LIMITED TO PHOSPHORIA FORMATION ONLY |
| 43-0077.000 | BLM WYW02528 | 7/1/1966 | WASHAKIE | WY | 106 | 6 | | 160.0000 | 160.0000 | 160.0000 | 80.0000 | T47N R91W | T47N R91W SEC 21 SE SEC 22 S2 |
| 43-0078.000 | BLM WYW05491 | 5/1/1951 | WASHAKIE | WY | 61 | 556 | | 0.0000 | 133.1430 | 133.1430 | 160.0000 | T47N R91W SEC 1 L1F1, L2F1, L2NE, SE BELOW BASE OF PHOSPHORIA SEC 1 L1F1, L2F1, L2NE, SE SURFACE TO BASE OF PHOSPHORIA | T47N R91W SEC 1 L1F1, L2F1, L2NE, SE SEC 23 N2, N2SE SEC 24 N2, N2SE |
| 43-0079.000 | | | | | | | | 133.1430 | 133.1430 | 133.1430 | 133.1430 | T47N R91W | 100% SURFACE TO BASE OF PHOSPHORIA, 50% BELOW BASE OF PHOSPHORIA |
| 43-0080.000 | | | | | | | | 0.0000 | 240.0000 | 240.0000 | 0.0000 | T47N R91W SEC 23 N2, N2SE BELOW BASE OF PHOSPHORIA | |
| 43-0081.000 | | | | | | | | 480.0000 | 480.0000 | 480.0000 | 480.0000 | T47N R91W SEC 13 N2, N2SE SURFACE TO BASE OF PHOSPHORIA | |
| 43-0082.000 | | | | | | | | 0.0000 | 320.0000 | 320.0000 | 0.0000 | T47N R91W SEC 24 N2SE, NE, S2NW BELOW THE BASE OF PHOSPHORIA | |
| 43-0083.000 | | | | | | | | 320.0000 | 320.0000 | 320.0000 | 320.0000 | T47N R91W SEC 24 N2SE, NE, S2NW SURFACE TO BASE OF PHOSPHORIA | |
| 43-0084.000 | BLM WYW02355 | 5/1/1951 | WASHAKIE | WY | 44 | 129 | | 0.0000 | 665.588 | 665.588 | 0.0000 | T47N R91W SEC 35 S2SE 100% SURFACE TO BASE OF PHOSPHORIA, 0% BELOW BASE OF PHOSPHORIA | SEC 35, S2SE 100% SURFACE TO BASE OF PHOSPHORIA, 8 6.0000 BELOW BASE OF PHOSPHORIA |
| 43-0085.000 | | | | | | | | 80.0000 | 80.0000 | 80.0000 | 80.0000 | T47N R91W SEC 35 S2SE SURFACE TO BASE OF PHOSPHORIA | |

Exhibit A - 72

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | CUM GROSS | NET ACRES | GOVT ACRES/ROYALTY ACRES | COLUM NET ACRES | TRACT LEGAL DESCRIPTION | BASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 43.00.88.000 | BLM WY0906582 | 5/1/1951 | WASHAKIE | WY | 43 | 484 | | 0.0000 | 80.0000 | 40.0000 | 40.0000 | T4.7N-R93W | T4.7N-R93W SEC 17, S2SW |
| 43.00.88.000 | BLM WY0035280 | 10/1/1930 | WASHAKIE | WY | 55 | 413 | | 80.0000 | 80.0000 | 80.0000 | 80.0000 | T4.7N-R93W SEC 17, S2SW SURFACE TO BASE OF PHOSPHORIA | T4.7N-R93W SEC 17, S2SW SURFACE TO BASE OF PHOSPHORIA |
| 43.00.88.000 | BLM WY0471452 | 10/1/1940 | WASHAKIE | WY | 56 | 1262 | | 80.0000 | 200.0000 | 200.0000 | 80.0000 | T4.7N-R93W SEC 17, LOT 7, LOT 8 | T4.7N-R93W SEC 17, LOT 7, LOT 8 |
| 43.00.88.000 | BLM WY0045413 | 6/1/1950 | WASHAKIE | WY | 62 | 236 | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T4.7N-R93W SEC 11 S2NW, S6NW, W2SW | T4.7N-R93W SEC 11 S2NW, S6NW, W2SW |
| 43.00.88.000 | BLM WY0491484 | 6/1/1951 | WASHAKIE | WY | 93 | 624 | | 80.0000 | 80.0000 | 80.0000 | 80.0000 | T4.7N-R93W SEC 8, N2NE | T4.7N-R93W SEC 8, N2NE |
| 43.00.88.000 | STATE OF WYOMING 0-8664 | 6/2/1949 | WASHAKIE | WY | 128 | 507 | | 80.0000 | 80.0000 | 80.0000 | 80.0000 | T4.7N-R93W SEC 16, E2SW | T4.7N-R93W SEC 16, E2SW |
| 43.00.88.000 | BLM WY494499 | 6/2/1974 | WASHAKIE | WY | 128 | 512 | | 0.0000 | 73.2742 | 73.2742 | 0.0000 | T4.7N-R93W SEC 16, E2SW | T4.7N-R93W SEC 16, E2SW |
| | | | | | | | | 80.0000 | 77.1528 | 77.1528 | | T4.7N-R93W SEC 32, W2NE BEGIN BASE OF PHOSPHORIA | R6 48 EARN SURFACE TO BASE OF PHOSPHORIA, R6 48 EARN BEGIN BASE OF PHOSPHORIA |
| 43.00.88.000 | BLM WY0838196 | 1/1/1972 | WASHAKIE | WY | 131 | 436 | | 93.7580 | 93.7580 | 93.7580 | 93.7580 | T4.7N-R93W SEC 30, LOT 11, LOT 12, SE/SW | T4.7N-R93W SEC 30, LOT 11, LOT 12, SE/SW |
| 43.00.88.000 | BLM WY946640 | 3/1/1975 | WASHAKIE | WY | 25 | 554 | | 40.0000 | 30.0000 | 30.0000 | 30.0000 | T4.7N-R93W SEC 7, E2SW | T4.7N-R93W SEC 7, E2SW |
| 43.00.88.000 | BLM WY425037 | 6/1/1972 | WASHAKIE | WY | 130 | 630 | | 200.0000 | 200.0000 | 200.0000 | 200.0000 | T4.7N-R93W SEC 8, N2S2, S2N2 | T4.7N-R93W SEC 8, N2S2, S2N2 |
| 43.00.88.000 | BLM WY0937618 | 2/1/1951 | WASHAKIE | WY | 56 | 317 | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T4.7N-R93W SEC 17, N2E | T4.7N-R93W SEC 17, N2E |
| 43.00.88.000 | | | | | | | | 120.0000 | 120.0000 | 120.0000 | 120.0000 | T4.7N-R93W SEC 5, N2NE, S6NE | T4.7N-R93W SEC 5, N2NE, S6NE |
| 43.00.88.000 | STATE OF WYOMING 0-10138 | 4/16/1951 | WASHAKIE | WY | 63 | 533 | | 0.0000 | 80.0000 | 80.0000 | 0.0000 | T4.7N-R93W SEC 16 S2SW BEGIN BASE OF PHOSPHORIA FM | T4.7N-R93W SEC 16 S2SW SURFACE TO BASE OF PHOSPHORIA, S2N BELOW BASE OF PHOSPHORIA |
| | | | | | | | | 80.0000 | 80.0000 | 80.0000 | 80.0000 | T4.7N-R93W SEC 16 S2SW SURFACE TO BASE OF THE PHOSPHORIA FM | |
| 43.00.88.000 | BLM WY978171 | 9/1/1947 | WASHAKIE | WY | 139 | 331 | | 0.0000 | 60.0000 | 60.0000 | 0.0000 | T4.7N-R93W, S2SW, SURFACE TO BASE OF PHOSPHORIA | 50% SURFACE TO BASE OF PHOSPHORIA, 25% BELOW BASE OF PHOSPHORIA |
| | | | | | | | | 120.0000 | 60.0000 | 60.0000 | 60.0000 | T4.7N-R93W, S2SW, S6SW, SURFACE TO BASE OF PHOSPHORIA | |
| 43.00.88.000 | BLM WY0035989 | 10/1/1950 | WASHAKIE | WY | 55 | 413 | | 640.0000 | 640.0000 | 640.0000 | 640.0000 | T4.7N-R93W SEC 7 ALL | T4.7N-R93W SEC 7 ALL |
| 43.00.88.000 | BLM WY981731 | 4/1/1949 | WASHAKIE | WY | 61 | 41 | | 480.0000 | 480.0000 | 480.0000 | 480.0000 | T4.7N-R93W SEC 10, NE, N2 | T4.7N-R93W SEC 10, NE, N2 |
| 43.00.88.000 | | | | | | | | 80.0000 | 80.0000 | 80.0000 | 80.0000 | T4.7N-R93W SEC 22, E2SW | T4.7N-R93W SEC 14, NE/NW, NE/NE |
| 43.00.88.000 | | | | | | | | 200.0000 | 200.0000 | 200.0000 | 200.0000 | T4.7N-R93W SEC 24, W2NW, N2N2 | |
| 43.00.88.000 | STATE OF WYOMING 0-8317 | 11/26/1990 | WASHAKIE | WY | 128 | 538 | | 160.0000 | 120.0000 | 120.0000 | 120.0000 | T4.7N-R93W SEC 24 | T4.7N-R93W SEC 24 |
| 43.00.88.000 | BLM WY0351202 | 12/1/1976 | WASHAKIE | WY | 18 | 811 | | 320.0000 | 320.0000 | 320.0000 | 320.0000 | T4.7N-R93W SEC 8, W2NW, W2SW | T4.7N-R93W SEC 8, W2NW, W2SW SEC 15, E2 ES, S6NW, W2NW, W2SW SEC 16 E2SE |
| 43.00.88.000 | | | | | | | | 80.0000 | 80.0000 | 80.0000 | 80.0000 | T4.7N-R93W SEC 38, E2SE | SEC 36 E2SE |
| 43.00.88.000 | | | | | | | | 280.0000 | 280.0000 | 280.0000 | 280.0000 | T4.7N-R93W SEC 30, W2SW, E2NE, S6NW | |
| 43.00.88.000 | BLM WY0085924 | 2/1/1948 | WASHAKIE | WY | 62 | 177 | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T4.7N-R93W SEC 32, SE | T4.7N-R93W SEC 4, LOT 13, LOT 14, LOT 15 N2, LOT 16 N2, LOT 17 S2, LOT 18 LOT 19 |
| | | | | | | | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T4.7N-R93W SEC 34, NE | T4.7N-R93W SEC 34, NE N6 SURFACE TO DMIST 10NW, W2W DMIST 10NE1, SE SEC 34, NW SURFACE TO DMIST 10NE1, NE LOT 18 LOT 17 22 E2SE, LOT 8 22 ES, LOT 9 W6, LOT 10 E6 |

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | COM GROSS | NET ACRES | COM NET ACRES BY STATE | CO COM NET ACRES | TRACT LEGAL DESCRIPTION | LEASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 0.0000 | 160.0000 | 160.0000 | 0.0000 | T4 7N R11W SEC 13: NW BELOW 10445' | |
| | | | | | | | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T4 7N R11W SEC 35: NW SURFACE TO 10445' | |
| | | | | | | | | 160.0000 | 160.0000 | 160.0000 | 80.0000 | T4 7N R11W SEC 35: SE | |
| | | | | | | | | 160.0000 | 160.0000 | 161.4400 | 84.5400 | T4NR R11W SEC 4: LOT 1 (22.29), LOT 4 (22.03), LOT 12 (22.00), LOT 8 (22.25), LOT 9 (40), LOT 16 (40) | |
| | | | | | | | | 720.0000 | 720.0000 | 720.0000 | 720.0000 | T4NR R11W SEC 4: LOT 11 (40), LOT 12 (40), LOT 13 (40), LOT 14 (40), LOT 3 (40), LOT 16 (40) N/2 N/2 SE; CONTAINING 720 ACRES | |
| | | | | | | | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T4 7N R11W SEC 12: SW | |
| | | | | | | | | 160.0000 | 160.0000 | 160.0000 | 80.0000 | T4 7N R11W SEC 13: SW | |
| | | | | | | | | 160.0000 | 160.0000 | 160.0000 | 80.0000 | T4 7N R11W SEC 32: NE BELOW 10625' | |

Exhibit A - 16

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | ST | CO | BOOK | PAGE | ENTRY | CUM GROSS | NET ACRES | GOVT ACRES BY STATE | COLUM NET ACRES | TRACT LEGAL DESCRIPTION | BASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | CUM GROSS | NET ACRES | CO NET ACRES BY DEPTH | COLUM NET ACRES | TRACT LEGAL DESCRIPTION | LEASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 159.6700 | 159.6700 | 159.6700 | 159.6700 | T47N R91W<br>SEC 2: LOT 5, LOT 6, S2NE SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 319.5600 | 0.0000 | 0.0000 | T47N R91W<br>SEC 3: ALL BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 639.1200 | 639.1200 | 639.1200 | 639.1200 | T47N R91W<br>SEC 3: ALL SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 319.4600 | 0.0000 | 0.0000 | T47N R91W<br>SEC 4: ALL BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 636.9200 | 636.9200 | 636.9200 | 636.9200 | T47N R91W<br>SEC 4: ALL SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 80.0000 | 0.0000 | 0.0000 | T47N R91W<br>SEC 5: SW BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T47N R91W<br>SEC 5: SW SURFACE TO BASE OF PHOSPHORIA | |
| | | | | | | | | 0.0000 | 320.0000 | 0.0000 | 0.0000 | T47N R91W<br>SEC 32: ALL BELOW BASE OF PHOSPHORIA | |
| | | | | | | | | 640.0000 | 640.0000 | 640.0000 | 640.0000 | T47N R91W<br>SEC 32: ALL SURFACE TO BASE OF PHOSPHORIA | |
| 453040.000 | STATE OF WYOMING O-33830 | 4/16/1951 | WASHAKIE | WY | 63 | 528 | | 0.0000<br>320.0000 | 320.0000<br>320.0000 | 0.0000<br>320.0000 | 0.0000<br>320.0000 | T47N R91W<br>SEC 36: N2 BELOW BASE OF PHOSPHORIA<br>T47N R91W<br>SEC 36: N2 SURFACE TO BASE OF PHOSPHORIA | T47N R91W<br>SEC 15: N2 100% SURFACE TO BASE OF PHOSPHORIA, 10% BELOW BASE OF PHOSPHORIA |
| 453040.000 | STATE OF WYOMING O-28537 | 4/16/1951 | WASHAKIE | WY | 63 | 523 | | 0.0000<br>240.0000 | 120.0000<br>240.0000 | 0.0000<br>240.0000 | 0.0000<br>240.0000 | T47N R91W<br>SEC 16: N2SW, SE BELOW BASE OF PHOSPHORIA FM<br>T47N R91W<br>SEC 16: N2SW, SE SURFACE TO BASE OF PHOSPHORIA FM | SEC 16: 50% N2SW, SE 100% SURFACE TO BASE OF PHOSPHORIA, 50% BELOW BASE OF PHOSPHORIA |

Exhibit A - 3c

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | CO | ST | BOOK | PAGE | ENTRY | COM GROSS | NET ACRES | COM NET ACRES | GOVT ACRES BY DEPT | COLUM NET ACRES | TRACT LEGAL DESCRIPTION | BASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 431.00412.000 | BLM WYW055675 | WASHAKIE | WY | 63 | 501 | | 0.0000 | 40.0000 | 40.0000 | 210.0000 | 0.0000 | T4 7N-R92W<br>SEC 29: SWSE | T4 7N-R92W<br>SEC 29: SWSE<br>100% SURFACE TO BASE OF PHOSPHORIA, 50% BELOW BASE OF PHOSPHORIA |
| 431.00412.000 | BLM WYW020866A | WASHAKIE | WY | 63 | 457 | | 40.0000 | 40.0000 | 40.0000 | 450.0000 | 40.0000 | T4 7N-R92W<br>SEC 29: SESE | T4 7N-R92W<br>SEC 29: SESE<br>SEC 29: SENE BELOW BASE OF PHOSPHORIA |
| 431.00412.000 | BLM WYW042667 | WASHAKIE | WY | 52 | 176 | | 0.0000 | 318.3200 | 318.3200 | 0.0000 | | T4 7N-R92W<br>SEC 26: ALL BELOW BASE OF PHOSPHORIA<br>SEC 27: ALL SURFACE TO BASE OF PHOSPHORIA | T4 7N-R92W<br>SEC 27: E2NW, LOT 3, LOT 4, LOT 7, N2SE, NE, N2SW<br>100% SURFACE TO BASE OF PHOSPHORIA, 50% BELOW BASE OF PHOSPHORIA |
| 431.00412.000 | STATE OF WYOMING 74-01919 | WASHAKIE | WY | 8 | 55 | | 640.0000 | 640.0000 | 640.0000 | 640.0000 | 640.0000 | T4 8N-R92W<br>SEC 06: ALL | T4 8N-R92W<br>SEC 06: ALL |
| 431.00412.000 | BLM WYW023497 | WASHAKIE | WY | 71 | 2002 | | 477.5200 | 477.5200 | 477.5200 | 477.5200 | 477.5200 | T4 7N-R92W<br>SEC 35: E2NW, LOT 5, LOT 6, LOT 7, N2SE, NE, NESW SURFACE TO BASE OF PHOSPHORIA | |
| 431.00412.000 | BLM WYW082065 | WASHAKIE | WY | 18 | 552 | | 120.0000 | 120.0000 | 120.0000 | 120.0000 | 120.0000 | T4 7N-R93W<br>SEC 04: S2SW, S2SE, SW | T4 7N-R93W<br>SEC 04: S2 |
| 431.00412.000 | STATE OF WYOMING 75-3767 | WASHAKIE | WY | 121 | 309 | | 84.6900 | 84.6900 | 84.6900 | 84.6900 | 84.6900 | T4 7N-R93W<br>SEC 02: N2NW, S2NW, SW | T4 7N-R93W<br>SEC 02: N2 |
| 431.00412.000 | BLM WYF417805 | WASHAKIE | WY | 71 | 2002 | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T4 7N-R93W<br>SEC 19: NESE | T4 7N-R93W<br>SEC 19: NESE |
| 431.00408.000 | BLM WYW182845 | WASHAKIE | WY | | | | 44.7600 | 44.7600 | 44.7600 | 44.7600 | 44.7600 | T4 8N-R92W<br>SEC 11: LOT 13 | T4 8N-R92W<br>SEC 11: LOT 13 |
| 431.00408.000 | BLM WYW182808 | WASHAKIE | WY | | | | 640.0000 | 640.0000 | 640.0000 | 640.0000 | 640.0000 | T4 6N-R92W | T4 6N-R92W |

Exhibit A - 17

EXHIBIT A
LEASES

| LEASE NUMBER | LESSOR | DATE | CO | ST | BOOK | PAGE | ENTRY | GIM GROSS | NET ACRES | GIM NET ACRES 25% WI | COLUMN NET ACRES | TRACT LEGAL DESCRIPTION | LEASE LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 45130/42.000 | BLM WYW181110 | 10/1/2012 | WASHAKIE | WY | | | | 40.0000 | 40.0000 | 40.0000 | 40.0000 | T6 7N R92W<br>SEC 23: SWNW, S2<br>SEC 24: S2NE | T6 7N R92W<br>SEC 23: SWNW, S2<br>SEC 24: S2NE |
| 45130/42.000 | BLM WYW181124 | 10/1/2012 | WASHAKIE | WY | | | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | T6 7N R91W<br>SEC 12: LOTS 3, 4, SWNW, SW<br>SEC 13: NE, 2W<br>SEC 13: SWNE<br>SEC 13: NE<br>SEC 23: W2<br>SEC 22: SWNW, NWSW<br>SEC 27: NE<br>SEC 33: N2NW | T6 7N R91W<br>SEC 12: LOTS 3, 4, SWNW, SW<br>SEC 13: NE, 2W<br>SEC 13: SWNE<br>SEC 13: NE<br>SEC 23: W2<br>SEC 22: SWNW, NWSW<br>SEC 27: NE<br>SEC 33: N2NW |
| 45130/42.000 | BLM WYW181120 | 10/1/2012 | WASHAKIE | WY | | | | 1,360.0000 | 1,360.0000 | 1,360.0000 | 1,360.0000 | T6 8N R92W<br>SEC 25: ALL<br>SEC 24: N2<br>SEC 23: N2<br>SEC 24: SWNW, SE2S, SWSE<br>SEC 27: SW<br>SEC 35: NWNE, E2SW | T6 8N R92W<br>SEC 25: ALL<br>SEC 24: N2<br>SEC 23: N2<br>SEC 24: SWNW, SE2S, SWSE<br>SEC 27: SW<br>SEC 35: NWNE, E2SW |
| 45130/42.000 | BLM WYW181131 | 10/1/2012 | WASHAKIE | WY | | | | 666.8700 | 666.8700 | 666.8700 | 666.8700 | T6 8N R91W<br>SEC 12: S2<br>SEC 12: NWSE<br>SEC 30: LOTS 3, 4, S2SE, NESW | T6 8N R91W<br>SEC 12: S2<br>SEC 12: NWSE<br>SEC 30: LOTS 3, 4, S2SE, NESW |
| 45130/42.000 | BLM WYW181781 | 4/1/2013 | BIG HORN | WY | | | | 1,006.6300 | 1,006.6300 | 1,006.6300 | 1,006.6300 | T6 9N R92W<br>SEC 1: LOTS 3, 4, SESW<br>SEC 5: LOT 7, S2SW<br>SEC 11: LOT 3, SWNE<br>SEC 9: NENE, SWNE, SENW, NESE<br>SEC 11: LOT 3, SWNW, NWSW<br>SEC 11: LOTS 3, N2NW | T6 9N R92W<br>SEC 1: LOTS 3, 4, SESW<br>SEC 5: LOT 7, S2SW<br>SEC 11: LOT 3, SWNE<br>SEC 9: NENE, SWNE, SENW, NESE<br>SEC 11: LOT 3, SWNW, NWSW<br>SEC 11: LOTS 3, N2NW |
| 45130/42.000 | BLM WYW181768 | 4/1/2013 | WASHAKIE | WY | | | | 1713.0700 | 1713.0700 | 1713.0700 | 1713.0700 | T6 9N R91W<br>SEC 5: LOTS 5, 6, 13-14<br>SEC 6: LOTS 4, N2, N2SW, N2SE<br>SEC 9: ALL<br>SEC 16: W2<br>SEC 15: W2 | T6 9N R91W<br>SEC 5: LOTS 5, 6, 13-14<br>SEC 6: LOTS 4, N2, N2SW, N2SE<br>SEC 9: ALL<br>SEC 16: W2<br>SEC 15: W2 |
| 45130/42.000 | BLM WYW182859 | 4/1/2014 | WASHAKIE | WY | | | | 120.0000 | 120.0000 | 120.0000 | 120.0000 | T6 8N R90W<br>SEC 1: SWNE, NWSE<br>SEC 6: SENE | T6 8N R90W<br>SEC 1: SWNE, NWSE<br>SEC 6: SENE |
| 45130/42.000 | BLM WYW182863 | 2/1/2015 | WASHAKIE | WY | | | | 160.0000 | 160.0000 | 160.0000 | 160.0000 | WASHAKIE COUNTY, WYOMING<br>T6 8N R91W<br>SEC 30: ALL | WASHAKIE COUNTY, WYOMING<br>T6 8N R91W<br>SEC 30: ALL |
| 45130/85.000 | BLM WYW184709 | 12/1/2015 | WASHAKIE | WY | | | | 640.0000 | 640.0000 | 640.0000 | 640.0000 | T6AN R92W E9 H94<br>SEC 25: ALL<br>SEC 15: ALL<br>100% RECORD TITLE<br>100% OPERATING RIGHTS, LIMITED TO DEPTHS<br>ALL OPERATING RIGHTS BELOW 100 FEET BELOW THE PHOSPHORIA FORMATION, AS<br>DEFINED AS THE STRATIGRAPHIC EQUIVALENT OF THAT FORMATION SHOWN ON THIS LOG<br>FOR THE BLOCKER EXPLORATION COMPANY, TENNECO FEDERAL NO 1-25 LOCATED IN<br>SECTION 25, T6AN R92W, WASHAKIE CO, WYOMING, WITH A TOP OF 11000 TOTAL<br>VERTICAL DEPTH AND A BASE OF 11,200 FEET TOTAL VERTICAL DEPTH | T6AN R92W E9 H94<br>SEC 25: ALL<br>SEC 15: ALL<br>100% RECORD TITLE<br>100% OPERATING RIGHTS, LIMITED TO DEPTHS<br>ALL OPERATING RIGHTS BELOW 100 FEET BELOW THE PHOSPHORIA FORMATION, AS<br>DEFINED AS THE STRATIGRAPHIC EQUIVALENT OF THAT FORMATION SHOWN ON THIS LOG<br>FOR THE BLOCKER EXPLORATION COMPANY, TENNECO FEDERAL NO 1-25 LOCATED IN<br>SECTION 25, T6AN R92W, WASHAKIE CO, WYOMING, WITH A TOP OF 11000 TOTAL<br>VERTICAL DEPTH AND A BASE OF 11,200 FEET TOTAL VERTICAL DEPTH |

Exhibit A - 35

## **EXHIBIT A-1**

### **WELLS, UNITS AND ALLOCATED VALUES**

[See attached]

**EXHIBIT A-1**
**WELLS, UNITS AND ALLOCATED VALUES**

Exhibit A-1-1

| WELL NUMBER | WELL NAME | OPERATOR | Curr Well Status | API NUMBER | COUNTY | STATE | LEGAL | BPO GWI% | BPO NRI% | APO GWI% | APO NRI% | ALLOCATED VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20001.000000 | NO WATER CREEK UNIT PHDS | ENDURO OPERATING LLC | CORP-NRT | | WASHAKIE | WY | | 94.44010% | 78.41565% | | | $2,366,481 |
| 20019.001.00 | SCHRANTZ USA 5 | ENDURO OPERATING LLC | PR-NRT | 4904328824 | WASHAKIE | WY | S 32, T 47N, R 91W | 100.00000% | 84.41016% | | | $407,677 |
| 20064.001.00 | ALVARADO UNIT 26 1PH | ENDURO OPERATING LLC | PR-NRT | 4904321161 | WASHAKIE | WY | S 26, T 46N, R 92W | 100.00000% | 87.50000% | | | $406,071 |
| 20001.000000 | COTTONWOOD CREEK ST UNIT PHDS | ENDURO OPERATING LLC | CORP-NRT | CORP | WASHAKIE | WY | | 97.63161% | 81.61474% | | | $585,989 |
| 20001.000000 | COTTONWOOD CREEK UNIT TENSLEEP | ENDURO OPERATING LLC | CORP-NRT | CORP | WASHAKIE | WY | | 100.00000% | 83.88462% | | | $582,256 |
| 20010.001.00 | STATE 16-24 | ENDURO OPERATING LLC | PR-NRT | 4904320569 | WASHAKIE | WY | S 36, T 47N, R 91W | 100.00000% | 81.25000% | | | $158,366 |
| 20010.002.00 | COTTONWOOD CREEK ST 2 | ENDURO OPERATING LLC | PR-NRT | 4904320605 | WASHAKIE | WY | S 35, T 47N, R 91W | 100.00000% | 81.56250% | | | $510,609 |
| 20030.001.00 | CHAMBERS STATE 2 36 | ENDURO OPERATING LLC | PR-NRT | 4904320314 | WASHAKIE | WY | S 36, T 48N, R 92W | 100.00000% | 84.50000% | | | $89,923 |
| 20000.000000 | COTTONWOOD CREEK UNIT PHDS | ENDURO OPERATING LLC | CORP-NRT | CORP | WASHAKIE | WY | | 91.09880% | 76.75511% | | | $85,530 |
| 20030.001.00 | SMITH USA 1-30 | ENDURO OPERATING LLC | PR-NRT | 4904320362 | WASHAKIE | WY | S 30, T 47N, R 91W | 100.00000% | 84.76500% | | | $84,164 |
| 20021.001.00 | TOLMAN USA 2 | ENDURO OPERATING LLC | PR-NRT | 4904320053 | WASHAKIE | WY | S 28, T 47N, R 91W | 100.00000% | 87.50000% | | | $53,164 |
| 20030.001.00 | STATE 1 | ENDURO OPERATING LLC | PR-NRT | 4904320304 | WASHAKIE | WY | S 36, T 48N, R 92W | 100.00000% | 84.50000% | | | $46,674 |
| 20030.003.00 | CHAMBERS STATE 4 36 | ENDURO OPERATING LLC | PR-NRT | 4904320794 | WASHAKIE | WY | S 36, T 48N, R 92W | 100.00000% | 84.50000% | | | $37,332 |
| 20009.001.00 | SOUTH FRISBY UNIT PHDS | ENDURO OPERATING LLC | PR-NRT | CORP | WASHAKIE | WY | | 100.00000% | 81.25000% | | | $32,479 |
| 2001.001.00 | COTTON STATE 70 3767 36 1 | ENDURO OPERATING LLC | PR-NRT | 4904320409 | WASHAKIE | WY | S 36, T 47N, R 91W | 100.00000% | 81.25000% | | | $28,065 |
| 2001.001.00 | COTTONWOOD CREEK NPA 189 | ENDURO OPERATING LLC | SI-NRT | 4904320640 | WASHAKIE | WY | S 7, T 47N, R 91W | 100.00000% | 82.50000% | | | $22,665 |
| 2008.001.00 | FEDERAL WS1020 44 CCU | ENDURO OPERATING LLC | PR-NRT | 4904320657 | WASHAKIE | WY | S 8, T 47N, R 91W | 100.00000% | 81.25000% | | | $19,766 |
| 20010.002.00 | EARL SCHRANTZ USA 3 | ENDURO OPERATING LLC | PR-NRT | 4904320050 | WASHAKIE | WY | S 32, T 47N, R 91W | 100.00000% | 84.41016% | | | $16,680 |
| 2002.001.00 | CALDWELL USA 17 | ENDURO OPERATING LLC | PR-NRT | 4904323083 | WASHAKIE | WY | S 7, T 47N, R 90W | 55.48065% | 43.82406% | 55.48065% | 47.37922% | $13,673 |
| 20020.001.00 | COTTONWOOD CREEK NPA 262 | ENDURO OPERATING LLC | PR-NRT | 4904310737 | WASHAKIE | WY | S 5, T 48N, R 91W | 91.00075% | 70.07562% | | | $12,842 |
| 20020.001.00 | EARL SCHRANTZ USA 1 | ENDURO OPERATING LLC | PR-NRT | 4904305173 | WASHAKIE | WY | S 33, T 47N, R 91W | 100.00000% | 84.41016% | | | $9,562 |
| 20028.002.00 | CALDWELL 2 20 | ENDURO OPERATING LLC | PR-NRT | 4904310399 | WASHAKIE | WY | S 20, T 47N, R 91W | 100.00000% | 84.00000% | | | $5,159 |
| 20023.001.00 | USA FAIRE A 22 | ENDURO OPERATING LLC | PR-NRT | 4904320394 | WASHAKIE | WY | S 32, T 47N, R 92W | 100.00000% | 82.50000% | | | $957 |
| 20001.001.00 | CCU 284 | ENDURO OPERATING LLC | PR-NRT | 4904321149 | WASHAKIE | WY | S 7, T 47N, R 90W | 100.00000% | 83.88462% | | | $727 |
| 20005.001.00 | FEDERAL 1 HH | ENDURO OPERATING LLC | PR-NRT | 4904320858 | WASHAKIE | WY | S 28, T 48N, R 91W | 100.00000% | 84.41016% | | | $636 |
| 20030.004.00 | CHAMBERS STATE 5 36 | ENDURO OPERATING LLC | PR-NRT | 4904320320 | WASHAKIE | WY | S 36, T 48N, R 92W | 100.00000% | 84.50000% | | | $595 |
| 20043.001.00 | COTTONWOOD CREEK FED 35 5 | ENDURO OPERATING LLC | PR-NRT | 4904320854 | WASHAKIE | WY | S 35, T 47N, R 91W | 100.00000% | 81.25000% | | | $476 |
| 20004.000000 | SLICK CREEK UNIT FRONTIER | ENDURO OPERATING LLC | CORP-NRT | CORP | WASHAKIE | WY | | 100.00000% | 86.52415% | | | $0 |
| 20003.001.00 | SLICK CREEK 3 5 | ENDURO OPERATING LLC | SI-NRT | CORP | WASHAKIE | WY | | 100.00000% | 86.52415% | | | $0 |
| 20007.001.00 | FEDERAL WS1020 35 1 CCU | ENDURO OPERATING LLC | SI-NRT | 4904320373 | WASHAKIE | WY | S 35, T 47N, R 91W | 100.00000% | 81.25000% | | | $0 |
| 20012.001.00 | FEDERAL WS1020 35 1 CCU | ENDURO OPERATING LLC | PA-NRT | 4904320412 | WASHAKIE | WY | S 35, T 47N, R 91W | 100.00000% | 81.25000% | | | $0 |
| 20012.001.00 | COTTONWOOD CREEK FEDERAL 21 1 | ENDURO OPERATING LLC | SI-NRT | 4904320766 | WASHAKIE | WY | S 2, T 46N, R 93W | 100.00000% | 82.50000% | | | $0 |
| 20014.001.00 | COTTONWOOD WZ76 SC 2 34 | ENDURO OPERATING LLC | SI-NRT | 4904320473 | WASHAKIE | WY | S 2, T 46N, R 93W | 100.00000% | 82.50000% | | | $0 |
| 20015.001.00 | COTTONWOOD CREEK FEDERAL 26 23 | ENDURO OPERATING LLC | SI-NRT | 4904320625 | WASHAKIE | WY | S 26, T 47N, R 91W | 100.00000% | 75.00000% | | | $0 |
| 20018.001.00 | COTTONWOOD CREEK 26 21 | ENDURO OPERATING LLC | SI-NRT | 4904320601 | WASHAKIE | WY | S 26, T 47N, R 91W | 100.00000% | 75.00000% | | | $0 |
| 20018.001.00 | KINSEY FEDERAL 1 | ENDURO OPERATING LLC | SI-NRT | 4904305176 | WASHAKIE | WY | S 27, T 47N, R 91W | 100.00000% | 71.50000% | | | $0 |
| 20024.001.00 | LACOY FEDERAL 13 1 | ENDURO OPERATING LLC | PA-NRT | 4904320077 | WASHAKIE | WY | S 13, T 47N, R 92W | 100.00000% | 82.50000% | | | $0 |
| 20026.001.00 | ROTH FEDERAL 1 7 | ENDURO OPERATING LLC | SI-NRT | 4904320172 | WASHAKIE | WY | S 7, T 46N, R 91W | 100.00000% | 82.50000% | | | $0 |
| 20026.001.00 | SOUTH FRISBY 5 | ENDURO OPERATING LLC | SI-NRT | 4904320053 | WASHAKIE | WY | S 19, T 47N, R 91W | 100.00000% | 85.50000% | | | $0 |
| 20027.001.00 | SOUTH FRISBY 8 | ENDURO OPERATING LLC | SI-NRT | 4904320479 | WASHAKIE | WY | S 24, T 47N, R 92W | 100.00000% | 85.50000% | | | $0 |
| 20028.001.00 | CALDWELL 1 20 | ENDURO OPERATING LLC | SI-NRT | 4904320520 | WASHAKIE | WY | S 29, T 45N, R 91W | 100.00000% | 82.50000% | | | $0 |
| 20030.001.00 | AUTUS BLACKHAWK 44 21 | ENDURO OPERATING LLC | TA-NRT | 4904320074 | WASHAKIE | WY | S 21, T 45N, R 92W | 100.00000% | 82.50000% | | | $0 |
| 20013.001.00 | SOUTH FRISBY 4 FEDERAL 44 21 | ENDURO OPERATING LLC | TA-NRT | 4904305280 | WASHAKIE | WY | S 8, T 47N, R 91W | 100.00000% | 87.50000% | | | $0 |
| 20044.001.00 | COTTONWOOD CREEK NPA 076 | ENDURO OPERATING LLC | INJ-NRT | 4904320595 | WASHAKIE | WY | S 8, T 47N, R 91W | 100.00000% | 81.50000% | | | $0 |
| 20035.001.00 | COTTONWOOD CREEK NPA 085 | ENDURO OPERATING LLC | INJ-NRT | 4904320644 | WASHAKIE | WY | S 9, T 47N, R 90W | 100.00000% | 81.50000% | | | $0 |
| 20036.001.00 | COTTONWOOD CREEK NPA 197 | ENDURO OPERATING LLC | SI-NRT | 4904320258 | WASHAKIE | WY | S 8, T 47N, R 90W | 0.00000% | 0.00000% | | | $0 |
| 20038.001.00 | CGU 209 | ENDURO OPERATING LLC | SI-NRT | 4904320709 | WASHAKIE | WY | S 29, T 47N, R 91W | 100.00000% | 82.50000% | | | $0 |
| 20039.001.00 | NEBEKER 11 29 | ENDURO OPERATING LLC | SI-NRT | 4904320712 | WASHAKIE | WY | S 29, T 47N, R 91W | 100.00000% | 82.50000% | | | $0 |
| 20040.001.00 | EAST NEBER 29 1 | ENDURO OPERATING LLC | PA-NRT | 4904305279 | WASHAKIE | WY | S 29, T 45N, R 91W | 91.09880% | 76.75511% | | | $0 |
| 20041.001.00 | AUTUS BLACKHAWK 44 21 | ENDURO OPERATING LLC | SI-NRT | 4904305589 | WASHAKIE | WY | S 21, T 45N, R 92W | 91.09880% | 76.75511% | | | $0 |
| 20012.001.00 | SOUTH FRISBY 3 | ENDURO OPERATING LLC | PA-NRT | 4904320826 | WASHAKIE | WY | S 24, T 45N, R 91W | 97.63161% | 78.41585% | | | $0 |
| 20043.001.00 | COTTONWOOD CREEK NPA 281 | ENDURO OPERATING LLC | PA-NRT | 4904320053 | WASHAKIE | WY | S 21, T 45N, R 92W | 94.44107% | 78.41585% | | | $0 |
| 20005.001.00 | BASSI FEDERAL 33 24 WI21343 1H | ENDURO OPERATING LLC | PA-NRT | 4904320225 | WASHAKIE | WY | S 8, T 47N, R 90W | 100.00000% | 86.26538% | | | $0 |
| 20004.000000 | CGU 209 | ENDURO OPERATING LLC | PA-NRT | 4904320650 | WASHAKIE | WY | S 8, T 47N, R 90W | 100.00000% | 86.35538% | | | $0 |
| 20052.001.00 | COTTONWOOD CREEK FED 19 1 | ENDURO OPERATING LLC | PA-NRT | 4904320352 | WASHAKIE | WY | S 17, T 47N, R 90W | 100.00000% | 81.25000% | | | $0 |
| 20000.214.00 | CGU 129 INJ | ENDURO OPERATING LLC | PA-NRT | 4904320459 | WASHAKIE | WY | S 24, T 48N, R 92W | 91.09880% | 76.75511% | | | $0 |
| N/A | MIDSTREAM ASSETS | | | | | | | | | | | $529,000 |
| **TOTAL** | | | | | | | | | | | | **$5,000,000** |

## **EXHIBIT A-2**

**MIDSTREAM ASSETS**

[See attached]

EXHIBIT A-2
MIDSTREAM ASSETS

RIGHTS OF WAYS, EASEMENTS, ETC.

| ROW/GRANT NO | GRANTOR | GRANTEE | DATE | TYPE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 49.00150.000 | KELLY BROTHERS INC. | COTTONWOOD CREEK INC | 11/4/2009 | ROW | WY | WASHAKIE | | | | .87 ACRES 50 RLB 6.5" STEEL OIL PIPELINE, BEING 3,793.57' IN LENGTH, 10' IN WIDTH ACROSS THE FOLLOWING LANDS:<br>T48N R92W<br>SEC 36 SESE, SWSE, SESW<br>SEC 35 NWNE, NENW |
| 49.00151.000 | BLM WYW-0000176 | COTTONWOOD CREEK INC | 11/5/1951 | ROW | WY | WASHAKIE & BIG HORN | | | | 10.0 ACRES ROW, COTTONWOOD CREEK PUMP STATION FACILITY SITE:<br>T48N R91W<br>SEC 23: 10 ACRE TRACT ROW GRANTED FOR PUMP STATION FURTHER DESCRIBED AS FOLLOWS: BEGINNING AT A POINT NORTH 47 DEGREES 25' WEST 1,512' FROM THE SOUTH QUARTER CORNER OF SAID SECTION 26; THENCE NORTH 330'; THENCE NORTH 30 DEGREES 00' WEST 402'; THENCE WEST 402'; THENCE SOUTH 330'; THENCE EAST 660'; TO THE POINT OF BEGINNING CONTAINING TEN (10) ACRES MORE OR LESS IN THE SW (SECTION 26, T48N-R92W, 6TH P.M. WYOMING. |
| 49.00154.000 | BLM WYW-040449 | COTTONWOOD CREEK INC | 1/5/1950 | ROW | WY | WASHAKIE | | | | 89.15 ACRES ROW OIL PIPELINE BEING 55,014' IN LENGTH, 63.15 ACRES. TELEPHONE LINE 12.76 ACRES, PUMP STATION 6.00 ACRES.<br>T48N R90W<br>SEC 29 SWNW, NWSW<br>SEC 30 NE, NWNW, W2SE<br>SEC 31 NWNE<br>T48N R91W<br>SEC 19 S2SE, LOT 8<br>SEC 25 N2N2<br>SEC 26 N2N2<br>SEC 27 N2N2<br>SEC 28 N2NE, NW<br>SEC 29 NE, N2NW<br>SEC 30 N2NE, NENW, LOT 5<br>T48N R92W<br>SEC 15 S2SW<br>SEC 17 SWSW<br>SEC 22 W2NE, S2NE, NESW, N2SE<br>SEC 23 N2S2, SWNW<br>SEC 24 S2SE, SW |
| 49.00154.000 | BLM WYW-0046909 | COTTONWOOD CREEK INC | 1/22/1957 | ROW | WY | WASHAKIE & BIG HORN | | | | 41.61 ACRES ROW, ADINANZA GURELE 8" OIL PIPELINE, BEING 36,179.20' IN LENGTH, 50' IN WIDTH.<br>T48N R91W<br>SEC 5 LOT 8<br>SEC 6: S2NE, E2SW, NWSE, LOTS 8, 14<br>T48N R91W<br>SEC 26 SWSW, W2SESW<br>SEC 27 S2SE<br>SEC 22 SESE<br>SEC 33 S2SE<br>SEC 34 S2NW, N2SW, SWSW, NWSE<br>SEC 34 N2N2, SWNW<br>T48N R92W<br>SEC 1: SESE<br>SEC 10 SESE<br>SEC 11 S2SW, E2SE, SWSE<br>SEC 12 N2NE, SWNE, SENW, N2SW |
| 49.00155.000 | BLM WYW-041923 | COTTONWOOD CREEK INC | 10/10/1973 | ROW | WY | WASHAKIE | | | | PIPELINE ROW CONTAINING 36.78 ACRES BEING 32,177.60' IN LENGTH, 50' IN WIDTH:<br>T47N R91W<br>SEC 30 SENW, NESW, W2SE, NENW, LOTS 5, 6, 8<br>SEC 31 NENE, SENE<br>T47N R92W<br>SEC 24 W2NE, SENW, E2SW, SWSW, SWSE<br>SEC 25 N2NE, NWNW |

EXHIBIT A-1
MIDSTREAM ASSETS

| ROW/GRANT NO | GRANTEE | GRANTOR | DATE | TYPE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 49.0019.000 | BLM WYW-041605 | COTTONWOOD CREEK INC | 6/21/1974 | ROW | WY | WASHAKIE | | | | 28.973 ACRE ROW AREA GATHERING LINE AND MESA GATHERING CATHODIC PROTECTION FACILITIES BEING 25,241.2F IN LENGTH, 50' IN WIDTH.<br><br>T46N R91W<br>SEC 6: LOTS 9,11,12,14,18,19,20, SENW<br><br>T46N R91W<br>SEC 1: LOTS 11,12<br><br>T47N R90W<br>SEC 31: LOTS 6,7, E2NW,S2SE<br><br>T47N R91W<br>SEC 24: SWNW, W2SW, SESW<br>SEC 25: E2W2, SWSE |
| 49.0017.000 | WYW-047028 | COTTONWOOD CREEK INC | 2/18/1975 | ROW | WY | WASHAKIE | | | | 1.133 ACRES ROW-COTTONWOOD STATION 2 RECTIFIER, SKID WELL GROUND BED AND RELATED FACILITIES BEING 986.66' IN LENGTH, 50' IN WIDTH.<br><br>T46N R91W<br>SEC 29: NENE |
| 49.0018.000 | BLM WYW-057619 | COTTONWOOD CREEK INC | 4/7/1977 | ROW | WY | WASHAKIE | | | | 11.66 ACRE PIPELINE FACILITIES CONNECTING OIL PRODUCING LEASES TO EXISTING MARATHON PIPELINES BEING 10,465' IN LENGTH, 50' IN WIDTH.<br><br>T47N R91W<br>SEC 29: N2SW, SWSW<br>SEC 30: LOTS 8,9 SENW<br><br>T47N R92W<br>SEC 1: LOT 4, SWNW, W2SW, SESW<br>SEC 12: NWNW, NENW |
| 49.0013.000 | BLM WYW-039185 | WASHAKIE PIPELINE COMPANY LLC | 8/18/2008 | ROW | WY | WASHAKIE | | | | ROW GRANT WYW-039185 OIL PIPELINE AND VARIOUS STORAGE TANK AND RECTIFIER, CONTAINING 148.022 ACRES BEING 50' WIDE, 125,565.3' LENGTH (144.123 ACRES); 25' WIDE, 1,100' LENGTH (.633 ACRES); 20' WIDE, 1,079.25' LENGTH (.50 ACRES); 16' WIDE, 2,072.58' LENGTH (.761 ACRES)<br><br>TANK SITE: 250' WIDE, 360' LENGTH AND CONTAINS 2.0008 ACRES MORE OR LESS:<br><br>T47N R90W<br>SEC 7: LOT 8, W2NE, SESW, SE<br>SEC 8: W2SW<br>SEC 18: LOT 5, E2NE, N2SE<br><br>T46N R91W<br>SEC 6: LOTS 5, 16<br><br>T47N R91W<br>SEC 7: N2NE, NENW, LOTS 5,6<br>SEC 8: N2N2, SENE<br>SEC 9: SWNW, N2S2, SESE<br>SEC 10: S2S2,NESE<br>SEC 11: S2NW, SENW, N2SW<br>SEC 13: SWNE, SENW, S2NW, W2SW<br>SEC 14: E2SE<br>SEC 15: NWNW, N2NW<br>SEC 22: S2S2,NESE<br>SEC 23: E2NE,N2S2<br>SEC 24: W2NW<br>SEC 27: N2NW<br>SEC 28: N2NE,SWNE,S2NW,NESW, W2SE,SESE<br>SEC 29: S2NE, SESW, NWSE, SWSE<br>SEC 31: SENE, NESE, SWSE<br>SEC 32: N2NW, SWNW<br>SEC 33: NENE<br><br>T47N R92W<br>SEC 1: W2SE |

EXHIBIT A-2
MIDSTREAM ASSETS

| ROW/GRANT NO | GRANTEE | GRANTEE | DATE | TYPE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 49.00160.000 | BLM WYW-060228 | COTTONWOOD CREEK INC | 4/24/1978 | ROW | WY | WASHAKIE | | | | 14.612 ACRES PIPELINE ROW LOCATED IN THE RATTLESNAKE, SOUTH PRERY AND SUCH OIELD FIELDS BEING 22,207' IN LENGTH, 50' IN WIDTH;<br>T4EN R91W<br>SEC 2: S2NW<br>SEC 11: N2NE, NE2NW<br>SEC 12: N2NW, SWNE, E2SW, NWSE<br>SEC 13: E2NW<br>T4EN R91W<br>SEC 23: NE2SW<br>SEC 24: N2NW<br>SEC 26: SESW, SWSE |
| 49.00161.000 | BLM WYW-060344 | COTTONWOOD CREEK INC | 11/25/1977 | ROW | WY | WASHAKIE | | | | 1.560 ACRES PIPELINE ROW, ALTOS 13-1 RATTLESNAKE AREA, BEING 1,094' IN LENGTH, 50' IN WIDTH;<br>T4EN R91W<br>SEC 12: SESW, SWSE<br>SEC 13: N2NE |
| 49.00163.000 | BLM WYW-061961 | COTTONWOOD CREEK INC | 4/24/1978 | ROW | WY | WASHAKIE | | | | 7.575 ACRE PIPELINE ROW FRERY AREA PIPELINE BEING 6600' IN LENGTH, 50' IN WIDTH;<br>T4TN R91W<br>SEC 19: SENW, NESW, NWSE, LOTS 9, 12<br>SEC 20: LOTS |
| 49.00164.000 | BLM WYW-061257 | COTTONWOOD CREEK INC | 7/3/1978 | ROW | WY | WASHAKIE | | | | .82 ACRE PIPELINE ROW TO SERVE FEDERAL C0184A 12-1, 730.24' IN LENGTH, 50' WIDE;<br>T4TN R91W<br>SEC 12: SWSE |
| 49.00165.000 | BLM WYW-064959 | COTTONWOOD CREEK INC | 1/3/1979 | ROW | WY | WASHAKIE | | | | 6.97 ACRES PIPELINE FOR ALTOS 12-1 WELL EXTENSION IN THE NEBER DOME (SOUTH<br>FRDM GATHERING DISTRICT AMENDMENT ADDED PIPELINE AND PUMPING UNIT TO<br>CONNECT C0184A #12-13 FEDERAL WELL TO THE EXISTING CRUDE OIL GATHERING<br>SYSTEM, BEING 6,072.26' IN LENGTH, 50' WIDE;<br>T4EN R91W<br>SEC 12: LOTS 3, 6, SWNW, NENW, NWNE, NWSE |
| 49.00166.000 | BLM WYW-067938 | COTTONWOOD CREEK INC | 8/16/1979 | ROW | WY | WASHAKIE | | | | 23.75 ACRES PIPELINE ROW TO SERVE C0184A 12-4, ALTOS 32-2, ALTOS MARCH<br>7-1, ALTOS MARCH 7-2, 7-1 NOWATER, 8-1 NOWATER, AND 8-3 NOWATER WELLS<br>LOCATED IN THE SLICK CREEK AND NOWATER OIL FIELDS, BEING 18,442.24' IN<br>LENGTH, 50' IN WIDTH;<br>T4EN R91W<br>SEC 7: LOTS 6-10, N2NE, E2NW<br>SEC 8: NWNE, N2NW<br>T4EN R92<br>SEC 12: LOTS 1,2,4, SWNE, NESW, NWSE |
| 49.00167.000 | BLM WYW-067939 | COTTONWOOD CREEK INC | 8/27/1979 | ROW | WY | WASHAKIE | | | | 7.660 ACRES IN ROW FOR GATHERING LINES BONANZA-MANDERSON AREA, BEING<br>9,028' IN LENGTH, 50' IN WIDTH;<br>T4TN R91W<br>SEC 19: N2SE, SESE<br>SEC 29: SWNW, NWSW<br>SEC 30: NENE, SENW |
| 49.00168.000 | BLM WYW-071296 | COTTONWOOD CREEK INC | 8/7/1980 | ROW | WY | WASHAKIE | | | | PIPELINE ROW SERVING WELL EXTENSIONS IN THE RATTLESNAKE AREA OF<br>THE COTTONWOOD-HIDDEN DOME GATHERING DISTRICT, 50' IN WIDTH CONTAINING<br>5.446 ACRES;<br>T4TN R91W<br>SEC 25: SW |

EXHIBIT A-2
MIDSTREAM ASSETS

| ROW/GRANT NO | GRANTEE | GRANTOR | DATE | TYPE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 49.00169.000 | BLM WYW-078693 | COTTONWOOD CREEK INC | 4/28/1982 | ROW | WY | WASHAKIE & BIG HORN | | | | 50.927 ACRES ROW GATHERING LINES BONANZA-MANORISON AREA, BEING 40,237.3' IN LENGTH, 50' IN WIDTH: T48N-R95W SEC 5: LOTS 7,8,9 SWSW SEC 6: TRACT 56, LOTS 13,14, SWNW SEC 8: NWNE, S2NE, NESE SEC 9: W2SW, SESW, SWSE SEC 15: SWNW, N2SW, SESW, SWSE SEC 22: N2NE T49N-R95W SEC 1: LOTS, S2NE T48N-R93W SEC 31: LOTS 11, 12 |
| 49.00170.000 | BLM WYW-084686 | COTTONWOOD CREEK INC | 12/11/1984 | ROW | WY | WASHAKIE | | | | RIGHT OF WAY GRANT WYW-084686 T47N-R91W SEC 18: E2SW, SWSE ROW TO CONNECT SOUTH FRISBY 18-5 FEDERAL OIL WELL TO OIL GATHERING SYSTEM, BEING 3,300' LONG (0.24 MILES), 50' IN WIDTH AND CONTAINS 1.450 ACRES |
| 49.00171.000 | BLM WYW-084797 | COTTONWOOD CREEK INC | 12/7/1984 | ROW | WY | WASHAKIE | | | | 14.63 ACRE PIPELINE ROW FOR VARIOUS WELLS BRENT 23-1, BRENT FED 1, TEM 23-17, A4710 26-1, TEM FED FRISBY #1 BRENT FED 13-2R, A4710 23-3 23-6, 26-3 TO MARATHON'S CRUDE OIL GATHERING SYSTEM, BEING 12,550.18' IN LENGTH, 50' IN WIDTH: T47N-R91W SEC 23: W2NE, SENW, N2SE, SESE SEC 24: SWSW SEC 25: E2NW, N2NE, NESW, NWSE |
| 49.00172.000 | BLM WYW-094307 | COTTONWOOD CREEK INC | 10/28/1986 | ROW | WY | WASHAKIE | | | | .64 ACRE ROW GRANT PROTECTION FACILITIES AT HIDDEN DOME RECTIFIER: T48N-R91W SEC 25: E2NW T48N-R91W SEC 24: SW |
| 49.00173.000 | BLM WYW-133920 | COTTONWOOD CREEK INC | 4/26/1956 | ROW | WY | BIG HORN | | | | 13.75 ACRES ROW SERVICING BONANZA PIPELINE, BEING 10,240' IN LENGTH, 50' IN WIDTH: T48N-R95W SEC 2: NESE SEC 11: NENE SEC 12: E2SW SEC 23: NW SEC 24: NENW, NESW T48N-R95W SEC 27: NE, NENW, NESE |
| 49.00174.000 | WYW-165316 | COTTONWOOD CREEK INC | 8/12/1953 | ROW | WY | WASHAKIE | | | | 1.695 ACRE PIPELINE ROW, DURKEE-NEIBER LOOP, BEING 425.00' IN LENGTH, 50' IN WIDTH: T48N-R92W SEC 17: SWSW |
| 49.00175.000 | VERNON I BOWER ET UX | THE OHIO OIL COMPANY | 9/7/1956 | ROW | WY | WASHAKIE | 65 | 115 | | T48N-R92W |

EXHIBIT A-1
MIDSTREAM ASSETS

| ROW/GRANT NO | GRANTOR | GRANTEE | DATE | TYPE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 491001.76.000 | HANOVER IRRIGATION DISTRIC | THE OHIO OIL COMPANY | 9/26/1956 | WCP | WY | WASHAKIE | 78 | 437 | | SEC 15 NENW / T48N-R92W / SEC 15 PART OF THE NENW |
| 491001.77.000 | I OWEN EVERT ET UX | THE OHIO OIL COMPANY | 9/7/1956 | | WY | WASHAKIE | 65 | 114 | | T48N-R92W / SEC 15 W2W2, SENW |
| 491001.78.000 | ROBERT H RICHINS ET AL | MARATHON PIPE LINE COMPANY | 9/17/1987 | STL | WY | WASHAKIE | 52 | 377 | | T48N-R92W / SEC 15 SWSW |
| 491001.79.000 | LOWER HANOVER CANAL ASSOD | THE OHIO OIL COMPANY | 10/30/1956 | WCP | WY | WASHAKIE | 78 | 439 | | T48N-R92W / SEC 15 SWNW |
| 491001.80.000 | STATE OF WYOMING HIGHWAY C | THE OHIO OIL COMPANY | 10/22/1956 | RCL | WY | WASHAKIE | | | | T48N-R92W / SEC 15 SWNW / SEC 22 & 21 |
| 491001.81.000 | CHICAGO, BURLINGTON & QUIN | THE OHIO OIL COMPANY | 12/16/1957 | RRL | WY | WASHAKIE | | | | CONTRACT FOR PIPE LINE ACROSS RIGHT OF WAY / LOCATED NEAR RAILROAD SURVEY MILE POST 378.29 / RAILROAD'S PRINT NO. 90384 / T48N-R92W / SEC 20 NWNW |
| 491001.82.000 | STATE OF WYOMING | MARATHON PIPE LINE COMPANY | 4/3/1974 | RDW | WY | WASHAKIE | 139 | 515 | | T47N-R91W / SEC NE2NE, SENE |
| 491001.83.000 | THE PURE OIL COMPANY & TEX | THE OHIO OIL COMPANY | 3/25/1954 | RDW | WY | WASHAKIE | 48 | 382 | | T48N-R92W / SEC 21 SESW AND THAT PORTION ON THE SWSE LYING WEST OF THE CHICAGO, / BURLINGTON AND QUINCY RAILROAD |
| 491001.84.000 | HANOVER IRRIGATION DISTRIC | THE OHIO OIL COMPANY | 10/4/1947 | RDW | WY | WASHAKIE | | | | T48N-R92W / SEC 15 NEAR THE NORTHEAST CORNER OF TRACT 48 ON THE N2E (CROSSING FOR / NUBER DOME – CRAFT HAHA?* PIPE LINE) / T48N-R92W / SEC 15 NEAR THE CENTER OF THE SE2W (CROSSING FOR THE HIDDEN DOME – DURKEE / 8" PIPE LINE) |
| 491001.85.000 | LOWER HANOVER CANAL ASSOD | THE OHIO OIL COMPANY | 2/7/1948 | RDW | WY | WASHAKIE | 82 | 142 | | T48N-R92W / SEC 15 NEAR THE SOUTHEAST CORNER OF THE SWSWSW |
| 491001.86.000 | LOUISE HERGERT ET WR | THE OHIO OIL COMPANY | 8/8/1947 | RDW | WY | WASHAKIE | 9 | 475 | | T48N-R92W / SEC 21 E2 / SEC 22 W2NW |
| 491001.87.000 | FRED DE LUIS ET UX | MARATHON PIPE LINE COMPANY | 9/18/1968 | RDW | WY | WASHAKIE | 115 | 126 | | T48N-R92W / SEC 22 NWNW |
| 491001.88.000 | MARTEN MARTEN NXEM ET UX | THE OHIO OIL COMPANY | 8/8/1947 | RDW | WY | WASHAKIE | 9 | 478 | | T48N-R92W / SEC 21 W2NE, E2NW |
| 491001.89.000 | SOREN SORENSEN | THE OHIO OIL COMPANY | 8/9/1947 | RDW | WY | WASHAKIE | 9 | 477 | | T48N-R92W / SEC 21 W2NW |
| 491001.90.000 | WYOMING HIGHWAY COMMISSION | WYOMING HIGHWAY COMMISSION | 7/31/1947 | RCL | WY | WASHAKIE | | | | T48N-R92W / SEC 21 ALL / SEC 22 ALL |
| 491001.91.000 | JAKE DELDS | THE OHIO OIL COMPANY | 8/7/1947 | RDW | WY | WASHAKIE | 9 | 478 | | T48N-R92W / SEC 15 THAT PART OF THE SE2E LYING EAST OF THE CHICAGO, BURLINGTON, AND / QUINCY RAILROAD RIGHT OF WAY |
| 491001.92.000 | CHICAGO, BURLINGTON & QUIN | THE OHIO OIL COMPANY | 7/23/1947 | RDW | WY | WASHAKIE | | | | T48N-R92W / SEC 20 ALL |
| 491001.93.000 | CHICAGO, BURLINGTON & QUIN | THE OHIO OIL COMPANY | 8/27/1947 | RDW | WY | WASHAKIE | | | | T48N-R92W / SEC 17 ALL |
| 491001.94.000 | MABEL F INGELS ET AL | THE OHIO OIL COMPANY | 4/2/1947 | RDW | WY | WASHAKIE | 9 | 309 | | T48N-R92W / SEC 22 SWSW, SESW |
| 491001.95.000 | MYRON L TOLMAN ET UX | THE OHIO OIL COMPANY | 8/11/1947 | RDW | WY | WASHAKIE | 9 | 479 | | T48N-R92W / SEC 15 SWSW / SEC 20 SWSW |
| 491001.96.000 | AMOS R SMALL ET UX | THE OHIO OIL COMPANY | 10/30/1947 | RDW | WY | WASHAKIE | 9 | 481 | | T48N-R92W / SEC 18 SESW / SEC 19 N2NE, NENW |
| 491001.97.000 | JAMES G KELLY ET AL | THE OHIO OIL COMPANY | 8/20/1947 | RDW | WY | WASHAKIE | 9 | 480 | | T48N-R92W / SEC 18 S2SE |
| 491001.98.000 | WASHAKIE COUNTY OF WYOMING | THE OHIO OIL COMPANY | 10/22/1956 | RP | WY | WASHAKIE | | 311 | | ACROSS COUNTY ROAD RSW AT A POINT NEAR THE N4NW OF SEC. 22 T48N-R92W, |

Exhibit A-1-5

EXHIBIT A-1
MIDSTREAM ASSETS

| ROW/GRANT NO | GRANTEE | GRANTOR | DATE | TYPE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 491007(9).000 | BOARD OF COUNTY COMMISSION | THE OHIO OIL COMPANY | 10/7/1947 | ROW | WY | WASHAKIE | 65 | 273 | | WEST OF THE LOWER HANOVER CANAL AND THENCE ALONG THE SOUTH SIDE OF SAID COUNTY ROAD HIGH ACROSS SECTIONS 21 & 20 TO A POINT IN THE NW¼NE OF SEC. 20 T48N-R91W, APPROXIMATELY 275' WEST OF THE CENTER LINE OF THE C. B. & Q. RAILROAD COMPANY'S MAIN TRACK, A TOTAL DISTANCE OF 1.49 MILES, MORE OF LESS ... (legal description continues) |
| 491004.000 | BLM WYW-0019851 | COTTONWOOD CREEK INC | 4/24/1956 | ROW | WY | BIG HORN | | | | 40.815 ACRES 7' & 8' LINE ANTIWORTH-BONANZA PIPELINE ROW, BEING 46,516.71' IN LENGTH, 50'W WIDTH: ... T48N-R93W ... SEC 7: SWNE, NEAW, SE, LOTS 5, 6 ... |
| 491041.000 | BLM WYW-126226 | COTTONWOOD CREEK INC | 1/7/1993 | ROW | WY | WASHAKIE | 100 | 348 | | 90.5 ACRES GAS PIPELINE ROW WITH OTHER FACILITIES, THE ROW FOR POWER LINE, CROSSES PUBLIC LAND FOR A DISTANCE OF 4480' IN LENGTH, 25' IN WIDTH (2.64 AC) AND ROW FOR GROUND BED AND RECTIFIER FACILITIES CROSSES PUBLIC LANDS, 1000' IN LENGTH, 25' IN WIDTH (.57 ACRES): ... |
| 491001.000 | BLM WYW-094115 | SPECTRUM ENERGY INC | 2/4/1998 | ROW | WY | WASHAKIE | 39 | 438 | | 90.5 ACRES GAS PIPELINE ROW WITH OTHER FACILITIES (INJECTION WELL, DISPOSE) 3.3 ACRES, GAS PLANT SITE (373.5000? 22.38 ACRES), ROADS (50? ... ) 4.85 ACRES, GAS PIPELINE (50? 25.37 34' 27.24 ACRES): ... |
| 491002.000 | JOHN B. JOYCE AND NANCY A. | INTRENERGY CORPORATION | 10/10/1996 | ROW | WY | BIG HORN | | | | |
| 491003.000 | STATE OF WYOMING 5876 | HILAND ENERGY PARTNERS LLC | 5/13/2005 | ROW | WY | BIG HORN | 75 | 1011 | | STATE OF WYOMING, GRANT OF EASEMENT NO. 5876, CONTAINING 3.93 ACRES LYING |

EXHIBIT A-1-7
MIDSTREAM ASSETS

| ROW/GRANT NO | GRANTOR | GRANTEE | DATE | TYPE | COUNTY | ST | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | BETWEEN PARALLEL RIGHT OF WAY LINES 30' APART, BEING 15' ON EACH SIDE, BEING S.70X.80' IN LENGTH, 30' IN WIDTH: T6N-R25W SEC 16 NWNW, SWNW, E2SW, SWSE |
| 49.00004.000 | ENTERLINE RANCH | INTERENERGY CORPORATION | 9/6/1996 | ROW | BIG HORN | WY | | | | 59 ACRES,52 RODS), BEING 807 IN LENGTH, 30' IN WIDTH: T6N-R5W SEC 16 NWNW |
| 49.00005.000 | NEWMAN BROTHERS DRILLING COMPANY | 6/12/1987 | | ROW | BIG HORN | WY | 39 | 436 | | 24 ACRES PIPELINE EASEMENT AND ROW BEING 731 IN LENGTH, 20' IN WIDTH: T6N-R25W SEC 15: SE1/4 MORE PARTICULARLY DESCRIBED AS FOLLOWS: FROM THE SOUTH QUARTER CORNER OF SAID SECTION 15 N 38 DEGREES 40' 11" W FOR A DISTANCE OF 306.20'; THE TRUE POINT OF BEGINNING OF SAID STRIP; THENCE N 43 DEGREES 00' 38" W, FOR A DISTANCE OF 16.05'; THENCE N 1 DEGREE 51' 23" E FOR A DISTANCE OF 207.67'; THENCE S 88 DEGREES 26' E FOR A DISTANCE OF 447.39' TO A POINT ON THE EAST LINE OF SAID SE1/4; THE POINT OF ENDING OF SAID STRIP; FROM WHICH THE SOUTH QUARTER CORNER OF SAID SECTION 15 BEARS S 1 DEGREE 30', 34" W, A DISTANCE OF 531.99'. THE BASIS OF BEARING OF THE ABOVE DESCRIBED STRIP IS NORTH BETWEEN THE WEST QUARTER CORNER AND THE NORTHWEST SECTION CORNER OF SAID SECTION 15 |
| 49.00006.000 | KEITH HAMILTON | INTERENERGY CORPORATION | 10/21/1996 | ROW | BIG HORN | WY | 39 | 436 | | 2.20 ACRES PIPELINE ROW 179 RODS) BEING 2,904' IN LENGTH, 30' IN WIDTH: T6N-R5W SEC 29 SW |
| 49.00007.000 | BLM-WYW-138750 | INTERENERGY CORPORATION | 12/23/1996 | ROW | WASHAKIE & BIG HORN | WY | 10073 | 241.450 | | 15.13 ACRES PIPELINE ROW, WITH OTHER FACILITIES (INEETON WELL, GAS PLANT, ROADS) BEING 24,512' IN LENGTH, 50' IN WIDTH: T47N-R93W SEC 2: SWNW, W2SW, LOT 3 SEC 10: E2E2 SEC 11: NWNW SEC 15: NENE,S2NE,W2SE,SESE SEC 22: NENE SEC 23: SWNW,NW3W,W4SE T48N-R93W SEC 1: SWNW, W2SW, LOT 4 SEC 2: SESE, LOTS 1,2 SEC 11: SESE SEC 12: W2W2 SEC 13: NWNE,E2NW,NESE,LOT 1 SEC 10: NW,NSW,S2SW,W2SE SEC 14: SWSW SEC 15: W2W,SENE,E2NW,S2SE,SESE SEC 23: W2NW,SWNW,E2SW,SWSE SEC 26: W2SW SEC 26: N2NE,SENE,LESE SEC 35: NENE T50N-R93W SEC 19: SWSE SEC 28: SWSE SEC 29: SWNE,NE2NW,SE1NW,N2SE SEC 30: NENE SEC 33: SESE |

EXHIBIT A-1.2
MIDSTREAM ASSETS

| ROW/GRANT NO | GRANTOR | GRANTEE | DATE | TYPE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 4910008.000 | BLM WYW 065973 | MONTANA-DAKOTA UTILITIES COMPANY | 11/17/1978 | ROW | WY | BIG HORN | 73 | 443 | | 20.55 ACRES NATURAL GAS PIPELINE GOBEL CREEK UNIT #, 25,743.00' IN LENGTH, 50' IN WIDTH; T49N R93W, SEC 5: S2NE,SENW,NESW,SWSW, LOT 1, SEC 6: S2SE, SEC 7: NWNE,NENW, LOT 1,2, T50 R93W, SEC 32: SESE, SEC 33: SWNE,SENW,N2SW,SWSW, T49 R94W, SEC 11: E2NE, SEC 12: S2NE,N2SW,NWSE,W2NW,SENW |
| 4910009.000 | ARMY CORPS OF ENGINEERS 19 | INTERENERGY CORPORATION | 10/24/1996 | ROW | WY | BIG HORN | 0 | 0 | | PIPELINE ROW CROSSING WATERS OF THE UNITED STATES AT SEVERAL LOCATIONS, INCLUDING THE NOWOOD RIVER, NATIONWIDE PERMIT 12, NO. 199640461, BEING APPROXIMATELY 280' IN LENGTH; T50N R93W, SEC 31: E2E2 |
| 4910010.000 | BLM WYW 041297 | FARMERS UNION CENTRAL EXCHANGE INC | 7/10/1956 | ROW | WY | WASHAKIE & BIG HORN | 10073 | 521-654 | | 168.82 ACRES PIPELINE ROW BEING 197,040' IN LENGTH, 50' IN WIDTH; T44N R91W, SEC 5: LOT 11, W2SE, SEC 7: W2E2, SEC 18: SWSE, SEC 19: LOT 9, W2NE, T45N R91W, SEC 5: LOT 6, E2SW, SENW, SWNE, SEC 8: E2W2, SEC 17: NENW, W2SW, W2SW, SEC 20: W2W2, SEC 29: NWNW, SEC 30: E2NE, NESE, SWSE, SEC 31: LOTS 5, 6, 9, 12,NENW, T47N R91W, SEC 5: LOT 7, E2SE, SENW, SWNE, SEC 6: W2E2, SEC 7: W2E2, SEC 17: W2E2, SEC 20: W2E2, SEC 29: E2E2, SEC 32: N2NE, T48N R91W, SEC 3: LOTS 7, 8, SWNW, W2SW, SEC 4: W2E2, SEC 9: E2SE, S2NE, SEC 10: W2W2, SEC 20: NESE, SWSE, SEC 21: NWNW, NWSW, SWNW, SEC 29: E2W2, SEC 32: E2W2, T49N R93W, SEC 35: W2W2 |
| 4910011.000 | BLM WYW 127024 | INTERENERGY CORPORATION | 3/2/1993 | ROW | WY | WASHAKIE | 100 | 342 | | 385.343 ACRES BEING A BURIED GAS GATHERING SYSTEM CONSISTING OF 3 SEGMENTS |

**EXHIBIT A-2**
**MIDSTREAM ASSETS**

| ROW/GRANT NO | GRANTOR | GRANTEE | DATE | TYPE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | OF 3", 4", 6" AND 8" POLY PIPELINE ; SEGMENTS 1 & 2 ARE FROM THE SOUTH COTTONWOOD LATE MAIN AND COTTONWOOD UNITS TO WASHAKIE MIDSTREAM COTTONWOOD COMPRESSOR STATION [SOUTH COTTONWOOD] ; SEGMENT 3 IS FROM THE 8 MILE LOW PRESSURE TO THE 8 MILE COMPRESSOR STATION [8 MILE COMPRESSOR], 50' IN WIDTH; |
| 450002.000 | BLM WYW-079466 | TENNECO OIL COMPANY | 4/5/1982 | ROW | WY | WASHAKIE | 100 | 338 | | T47N-R95W SEC 7: N2NE, SWNE, SENW SEC 25: LOT 7 |
| 450003.000 | BLM WYW-108424 | HILAND PARTNERS LP | 5/24/1988 | ROW | WY | WASHAKIE | | | | T47N-R95W SEC 4: SESW SEC 7: SESE SEC 8: SW2NW, E2SE SEC 9: NWNE, S2NE, E2NW, SW, W2SE SEC 10: N2SW, SWSW SEC 14: SESW, S2SE, NS2SW SEC 15: W2NE, NW, W2SW, SESW, W2SE SEC 16: SESE SEC 17: W2NW SEC 22: SWNE, NW SEC 23: N2NE, SENE, SESW, S2SE SEC 24: S2NE, W2NW2, SESW, N2SE, NWNE SEC 25: W2NE SEC 26: NWNE, S2NE, NW, NW2SW, S2SW, E2SE SEC 27: NE2NE, S2NE, SENW SEC 35: N2NE, SENE, NENW |
| 450004.000 | BLM WYW-94118 | SOCONY-VACUUM OIL CO | 5/10/1954 | ROW | WY | WASHAKIE | 100 | 338 | | 2.87 ACRES ROW FOR GAS PIPELINE, BEING 2,500' IN LENGTH, 50' IN WIDTH; T47N-R91W SEC 18: E2NW, NESE |
| 450005.000 | BLM WYW-140097 | INTERENERGY CORPORATION | 7/30/1997 | ROW | WY | WASHAKIE | 100 | 300 | | 38.4 ACRES ROW BEING 33,422.4' IN LENGTH, 50' IN WIDTH; T47N-R92W SEC 2: LOT 3, S2NW, W2SW SEC 3: E2 SEC 11: NWNW SEC 15: NENE, S2NE, W2SE SEC 22: N2NE SEC 34: E2NW, NESW |
| 450006.000 | BLM WYW-089760 | INTERENERGY CORPORATION | 10/18/1995 | ROW | WY | WASHAKIE | 100 | 297 | | 28.88 ACRES FOR GAS GATHERING PIPELINE TO CONNECT COTTONWOOD CREEK UNIT, BEING 25,185.60' IN LENGTH, 50' IN WIDTH; T47N-R91W SEC 2: SESE SEC 10: N2SE, SWSE SEC 11: NE, N2NW, SWNW, NWSW SEC 13: SENE, NW, NESW, W2SE |
| 450007.000 | STATE OF WYOMING #5895 | INTERENERGY CORPORATION | 4/13/1997 | ROW | WY | WASHAKIE | 101 | 2047 | | 32 ACRES ROW FOR FACILITY SITE FOR TELEPHONE AND TELEGRAPH, BEING 2500' IN LENGTH, 30' IN WIDTH; T47N-R92W SEC 23: SWNE, E2NW, E2SW |
| | | | | | | | | | | 4.33 ACRES ROW GAS PIPELINE, BEING 3,874.14' IN LENGTH, 30' IN WIDTH; T48N-R92W SEC 36: SWNE, S2NW, SWSE |
| 450008.000 | BARBARA (DUBS) | INTERENERGY CORPORATION | 11/19/1992 | ROW | WY | WASHAKIE | 62 | 1738 | | 2.88 ACRES ROW FOR 4" GAS PIPELINE, BEING 5,025.51' IN LENGTH, 25' IN WIDTH; |

**EXHIBIT A-2**
**MIDSTREAM ASSETS**

| ROW/GRANT NO | GRANTEE | DATE | TYPE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| 4910019.000 | JAYNE MORTON | 11/9/1992 | ROW | WY | WASHAKIE | 60 | 594 | | T47N-R92W SEC 22 T-29-2; 1.45 ACRES ROW NATURAL GAS PIPELINE, BEING 3,525.84' IN LENGTH, 25' IN WIDTH; T47N-R92W SEC 22: W2SE |
| 4910020.000 | M. A. BILLING AND VIRGINIA | 11/9/1992 | ROW | WY | WASHAKIE | 62 | 1741 | | .27 ACRES ROW FOR NATURAL GAS PIPELINE, BEING 464.23' IN LENGTH, 25' IN WIDTH; T47N-R92W SEC 22: SESW |
| 4910021.000 | SPECTRUM ENERGY INC | 12/11/1987 | ROW | WY | WASHAKIE | | | | 11.82 ACRES ROW GAS GATHERING PIPELINE, BEING 27,702' IN LENGTH, 50' IN WIDTH; T47N-R91W SEC 8: SE4 SEC 9: N2SW, SW4W, SE SEC 14: N2SW, WSE, SESE SEC 15: N2NW, NENE, SENE, NESE SEC 22: N2NW, NENW, SWNW, SENW SEC 18: NESE |
| 4910022.000 | TENNECO OIL COMPANY | 8/20/1982 | ROW | WY | WASHAKIE | | | | 1.11 ACRES ROW FOR GAS PIPELINE, BEING 5,418.82' IN LENGTH, 25' IN WIDTH; T47N-R92W SEC 23: SE4NE SEC 24: NENW, S2NW, N2NE |
| 4910023.000 | STATE OF WYOMING #1955 | 10/22/1997 | ROW | WY | WASHAKIE | 101 | 2260 | | 2.95 ACRES ROW FOR NATURAL GAS PIPELINE, BEING 6,417.73' IN LENGTH, 20' IN WIDTH; T47N-R92W SEC 16: NWNE, N2NW, SENW |
| 4910024.000 | BLM WYW-141761 | 6/30/1997 | ROW | WY | WASHAKIE | 100 | 308 | | .12 ACRES ROW FOR GAS PIPELINE COMPRESSOR SITE (COTTONWOOD 70X BOOSTER COMPRESSOR SITE); T47N-R90W SEC 17: NWNW |
| 4910025.000 | BLM WYW-142396 | 12/29/1997 | ROW | WY | WASHAKIE | 100 | 312 | | 13.67 ACRES ROW FOR GAS GATHERING SYSTEM TO CONNECT WELL #54, #263, #157, BEING 22,287.20' IN LENGTH, 100' IN WIDTH; T47N-R91W SEC 3: SWSW SEC 4: LOTS 7, 8, SWNE, SENW, N2SE, SESE SEC 5: LOT 5 SEC 10: W2NW, SENW, E2SW T48N-R91W SEC 22: N2SE SEC 33: SWSW |
| 4910026.000 | SPECTRUM ENERGY INC | 10/6/1986 | ROW | WY | WASHAKIE | 100 | 320 | | 3.18 ACRES ROW GAS GATHERING LINE BEING 2,770' IN LENGTH, 50' IN WIDTH; T47N-R92W SEC 1: SWNW, LOT 4 |
| 4910027.000 | BLM WYW-141767 | 6/18/1997 | ROW | WY | WASHAKIE | 100 | 330 | | SEC 74 T7N-R90W1N & 1W; 42.21 ACRES PIPELINE FOR WELL CONNECTIONS (INLAND GAS PLANT) IN COTTONWOOD CREEK, BEING 38,849.9' IN LENGTH, 50' IN WIDTH; T47N-R90W SEC 8: NENW, SWSW, NWSE, S2SE SEC 9: SW2SW, SESW SEC 17: N2NW, SENW, SENW, NESE SEC 18: NENE SEC 19: SE2NE SEC 20: SE2NW |

EXHIBIT A-2
MIDSTREAM ASSETS

| ROW/GRANT NO | GRANTEE | GRANTEE | TYPE | DATE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 4910028.000 | BLM WYW-076087 | BIRKET EXPLORATIONS INC | ROW | 8/13/2014 | WY | WASHAKIE | | | | 9.9796 ACRES TO ACCESS ROAD FOR BRENT 23-1 FEDERAL WELL SITE, BEING 18.22FT LENGTH, 37 IN WIDTH; T47N-R91W SEC 19- LOTS 7 AND 8; T47N-R92W SEC 13- W2SE, NW, NE3W, W2SW SEC 14-SE1E SEC 23-NE3E SEC 24-N3NE SEC 24-NENE, N2NW, E2NW |
| 4910029.000 | BLM WYW-089719 | HANSON OPERATING COMPANY INC | ROW | 4/18/1985 | WY | WASHAKIE | | | | 359.91 ACRES ROW GAS PIPELINE FOR MONEY BUTTE FEDERAL #2, #3 AND COXSA GOVT #18-1 WELLS, BEING 9,904.00' IN LENGTH, 50.00' IN WIDTH; T47N-R91W SEC 18- LOTS 11, 12, SESW, SE SEC 19-LOT 6 T47N-R91W SEC 13-SESE SEC 24-N2NE, NE3W, E2NW |
| 4910030.000 | BLM WYW-152442 | HILAND ENERGY PARTNERS LLC | ROW | 12/17/2003 | WY | WASHAKIE | | | | 9.98 ACRES ROW - NATURAL GAS GATHERING PIPELINE TO SMALL GATHERING COMPRESSOR (3.79 ACRES BEING 5,047 IN LENGTH, 50' IN WIDTH) AS AMENDED TO INCLUDE COTTONWOOD DREEK OIL FIELD (4,190 ACRES BEING 7,900' IN LENGTH, 25' IN WIDTH); T47N-R91W SEC 17-S2NE,NWSE T47N-R91W SEC 1-SESW, SWSE SEC 2-S2SW SEC 5-NWNE SEC 8-S2SE SEC 11-NWNE, NENW SEC 12-NWNE SEC 17-NWNE, N2NW T48N-R91W SEC 33-SWSE |
| 4910031.000 | BLM WYW-156331 | HILAND ENERGY PARTNERS LLC | ROW | 11/12/2003 | WY | WASHAKIE | | | | 1.378 ACRES ROW NATURAL GAS GATHERING PIPELINE FROM WELL CGU #182 TO AN EXISTING 8" GATHERING LINE, BEING 2,400' IN LENGTH, 25' IN WIDTH; T47N-R91W SEC 4-LOTS 2,8, S2NW |
| 4910032.000 | BLM WYW-156330 | HILAND ENERGY PARTNERS LLC | ROW | 11/12/2003 | WY | WASHAKIE | | | | .804 ACRES ROW - NATURAL GAS GATHERING PIPELINE FROM WELL #22 TO AN EXISTING 4" GATHERING LINE NEAR THE #34-43 WELL, BEING 1,400' IN LENGTH, 25' IN WIDTH; T47N-R91W SEC 4-LOT4 |
| 4910033.000 | BLM WYW-156307 | HILAND ENERGY PARTNERS LLC | ROW | 1/31/2003 | WY | WASHAKIE | | | | .69 ACRES ROW, NATURAL GAS GATHERING PIPELINE FROM CGU #21 WELL TO CGU #246, BEING 1,200' IN LENGTH, 25' IN WIDTH; T47N-R91W SEC 13-SWNW & NWSE4 |
| 4910034.000 | BLM WYW-156306 | HILAND ENERGY PARTNERS LLC | ROW | 1/31/2003 | WY | WASHAKIE | | | | .83 ACRES ROW, NATURAL GAS GATHERING PIPELINE FROM CGU #249 WELL TO CGU #106, BEING 1400' IN LENGTH, 25' IN WIDTH; T47N-R91W SEC 13-SWNW SEC 24-NE4NW |
| 4910035.000 | BLM WYW-152438 | HILAND ENERGY PARTNERS LLC | ROW | 8/8/2001 | WY | WASHAKIE | | | | 2.44 ACRES ROW 4" PIPELINE FROM WELL CGU #158 TO AN EXISTING GAS GATHERING SYSTEM, BEING 2,140.97 IN LENGTH, 50' IN WIDTH; |

EXHIBIT A-1
MIDSTREAM ASSETS

| ROW/GRANT NO | GRANTEE | GRANTOR | DATE | TYPE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 49.0016.000 | BLM WYW 152423 | HILAND ENERGY PARTNERS LLC | 4/1/2001 | ROW | WY | WASHAKIE | | | | 3.35 ACRES ROW, 4" NATURAL GAS GATHERING PIPELINE FROM CGJ #26 TO EXISTING GATHERING SYSTEM, BEING 2,878.94' IN LENGTH, 50' IN WIDTH: T47N R91W SEC 13 SWSW SEC 13 NESW SEC 14 SE SE SEC 23 NE NE SEC 24 N2NW |
| 49.0017.000 | BLM WYW 152422 | HILAND ENERGY PARTNERS LLC | 4/1/2001 | ROW | WY | WASHAKIE | | | | 1.82 ACRES ROW, 4" NATURAL GAS GATHERING PIPELINE FROM CGJ #25 TO AN EXISTING GATHERING SYSTEM, BEING 1,635.55' IN LENGTH, 50' WIDTH: T47N R91W SEC 14 SE SE SEC 23 N2NE |
| 49.0018.000 | BLM WYW 152437 | HILAND ENERGY PARTNERS LLC | 8/5/2001 | ROW | WY | WASHAKIE | | | | 2.46 ACRES ROW, 4" NATURAL GAS PIPELINE FROM CGJ #16 TO AN EXISTING GATHERING SYSTEM, BEING 2,140.93' IN LENGTH, 50' WIDTH: T47N R91W SEC 14 SWNE SE NW, NWSE |
| 49.0019.000 | THE STATE OF WYOMING HIGHWAY | FARMERS UNION CENTRAL EXCHANGE INC | 4/17/1956 | ROW | WY | WASHAKIE | 0 | 0 | | T47N R91W SEC 29 ROAD CROSSING |
| 49.0040.000 | STATE OF WYOMING #L37 | FARMERS UNION CENTRAL EXCHANGE INC | 2/1/1957 | ROW | WY | WASHAKIE | 0 | 0 | | 1.28 ACRES EASEMENT FOR OIL PIPELINE DESCRIBED AS A STRIP OF LAND FOR AN OIL PIPELINE 20' IN WIDTH, BEING 10' ON EACH SIDE OF A CENTERLINE ACROSS THE W2 NE OF ORIGINAL SECTION 16 (RESURVEY TRACT 39, T44N R91W, SESW AND W2SE AND NE NE OF SEC 16, T44N R91W OF THE 6TH PM, WASHAKIE COUNTY, WY BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT A POINT ON THE SOUTH LINE OF SAID TRACT 39, T44N R91W, 397' EAST OF THE SOUTHWEST CORNER THEREOF; THENCE N 5 DEGREES 58' WEST 1,234'; THENCE NORTH 17 DEGREES 41' EAST 991'; THENCE NORTH 1 DEGREE 45' WEST 1,632'; THENCE NORTH 9 DEGREES 57' EAST 287'; THENCE NORTH 15 DEGREES 18' WEST 1,325' TO A POINT ON THE NORTH LINE OF SAID TRACT 39, 310' EAST OF THE NORTHWEST CORNER THEREOF; CONTAINING 2.33 ARES MORE OR LESS; AND BEGINNING AT A POINT ON THE SOUTH LINE OF SAID SEC 16, T44N R91W, 670' WEST OF THE SOUTH QUARTER CORNER THEREOF; THENCE NORTH 20 DEGREES 53' EAST 995'; THENCE NORTH 35 DEGREES 45' EAST 1265'; THENCE NORTH 46 DEGREES 30' EAST 1,077'; THENCE NORTH 17 DEGREES 43' EAST 582'; THENCE NORTH 12 DEGREES 53' EAST 2,722' TO A POINT ON THE NORTH LINE OF SAID SECTION 16, 732' WEST OF THE NORTHEAST CORNER THEREOF; CONTAINING 2.77 ACRES, MORE OR LESS. T44N R91W |
| 49.0041.000 | WAYNE L VOSS AND MAE Y VD | FARMERS UNION CENTRAL EXCHANGE INC | 7/18/1956 | ROW | WY | WASHAKIE | | 0 | | 3.084 ACRES OIL PIPELINE ROW IN THE NW OF THE SE AND THE SW OF THE NE OF SECTION 18, T44N R91W, 6TH PRINCIPAL MERIDIAN, WASHAKIE COUNTY, WY SAID RIGHT OF WAY TO BE 50' IN WIDTH, BEING 25' ON EACH SIDE OF THE FOLLOWING DESCRIBED CENTERLINE: BEGINNING AT A POINT 625' EAST OF THE NORTHWEST CORNER OF LOT 8, SECTION 18, T44N R91W OF THE 6TH PRINCIPAL MERIDIAN OR AT A SURVEY STATION MARKED 23+06; THENCE N 3 DEGREES 33' E A DISTANCE OF 2637' TO A POINT 778' EAST OF THE NORTHEAST CORNER OF LOT 6, SECTION 18 T44N R91W OF THE 6TH PRINCIPAL MERIDIAN OR TO A SURVEY STATION ON SAID OIL PIPELINE MARKED 243+78 BEING A TOTAL LENGTH ON ENVIRON E VOSS LAND OF 2672' OR 162 RODS, SAID RIGHT OF WAY HAVING A TOTAL OF 3.084 ACRES. |
| 49.0042.000 | J.GOTH MCCARTHY ETAL | FARMERS UNION CENTRAL EXCHANGE INC | 3/7/1957 | ROW | WY | HOT SPRINGS | 38 | 401 | | 19.59 ACRES PIPELINE ROW, BEING 17.068' IN LENGTH, 50' WIDTH: T43N R91W SEC 6: W2NW, SENW, NESW T44N R91W |

EXHIBIT A-2
MIDSTREAM ASSETS

| ROW/GRANT NO | GRANTEE | GRANTOR | DATE | TYPE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 49.00453.000 | MAUNA TOWER LLC | WASHAKIE MIDSTREAM SERVICES LLC | 8/1/2014 | TOWER | WY | WASHAKIE | | | | SEC 19: LOTS 1 AND H OF TRACT 38<br>SEC 30: E2NE<br>SEC 31: E2NW, W2SW, NESW<br>COMMUNICATIONS USE LEASE BLM WYW-065012<br>T47N-R93W<br>SEC 2: W2SW<br>SEC 3: NESE, SESE<br>SEC 9: NENE<br>SEC 10: NWNE, N2NW<br>SEC 11: NWNW |
| 49.00645.000 | BUREAU OF LAND MANAGEMENT | WASHAKIE MIDSTREAM SERVICES LLC | 1/31/2013 | ROW | WY | WASHAKIE | | | | ROW GRANT WYW-165272, BEING 50' WIDE, 24,960' LONG, CONTAINING 28.65 ACRES, MORE OR LESS, DESCRIBED AS FOLLOWS:<br>6TH PM, WASHAKIE COUNTY, WY<br>T47N-R93W<br>SEC 2: LOTS 3 AND 4, S2NW, W2SW<br>T48N-R93W<br>SEC 14: NW½E, E2SE<br>SEC 23: E2NE, SWNE, NESE, W2SE<br>SEC 26: W2E2, SESW<br>SEC 35: E2W2 |
| 49.00647.000 | WYOMING DEPARTMENT OF TRANSPORTATION | WASHAKIE MIDSTREAM SERVICES LLC | 2/13/2011 | EASE | WY | WASHAKIE | | | | NATURAL GAS GATHERING LINE CROSSING WY STATE HIGHWAY #16 - EXISTING<br>6" STEEL LINE<br>6283 XING - WYOMING DOT<br>T47N-R93W<br>SEC 27 |
| 49.00648.000 | WYOMING DEPARTMENT OF TRANSPORTATION | WASHAKIE MIDSTREAM SERVICES LLC | 2/13/2011 | EASE | WY | WASHAKIE | | | | NATURAL GAS GATHERING LINE CROSSING WY STATE HIGHWAY #16 - EXISTING<br>2 POLY LINES<br>6284 XING - WYOMING DOT<br>T47N-R93W<br>SEC 27 |
| 49.00649.000 | WYOMING DEPARTMENT OF TRANSPORTATION | WASHAKIE MIDSTREAM SERVICES LLC | 2/13/2011 | EASE | WY | WASHAKIE | | | | NATURAL GAS GATHERING LINE CROSSING WY STATE HIGHWAY #16 - EXISTING<br>3" HD POLY LINE<br>6285 XING - WYOMING DOT<br>T47N-R93W<br>SEC 27 |
| 49.00670.000 | HIGHLAND ENERGY PARTNERS LLC | WASHAKIE MIDSTREAM SERVICES LLC | 12/1/1987 | EASE | WY | WASHAKIE | | | | NATURAL GAS GATHERING LINE CROSSING WY STATE HIGHWAY #16 - 2" PVC, 4" STL (4Z86)<br>42322 ELEC - WYOMING DOT<br>T47N-R93W<br>SEC 29 |
| 49.00671.000 | WYOMING DEPARTMENT OF TRANSPORTATION | WASHAKIE MIDSTREAM SERVICES LLC | 4/23/2013 | EASE | WY | WASHAKIE | | | | NATURAL GAS PIPE LINE CROSSING WY STATE HIGHWAY #16 TO EXPAND THE GATHERING SYSTEM<br>T47N-R93W<br>SEC 24 MILEPOST 12.618<br>GPS COORDINATES -<br>ENTERING R/W LONGITUDE 44.03141 DEG LATITUDE 107.73094 DEG<br>EXITING R/W LONGITUDE 44.03032 DEG LATITUDE 107.73112 DEG<br>ROUTE US HIGHWAY 16 MAINTENANCE SECTION WAGER |
| 49.00672.000 | WYOMING DEPARTMENT OF TRANSPORTATION | WASHAKIE MIDSTREAM SERVICES LLC | 3/20/2013 | EASE | WY | WASHAKIE | | | | NATURAL GAS PIPE LINE CROSSING WY STATE HIGHWAY #16 TO EXPAND THE GATHERING SYSTEM<br>T47N-R93W<br>SEC 24 MILEPOST 11.884<br>GPS COORDINATES -<br>ENTERING R/W LONGITUDE 44.03337 DEG LATITUDE 107.72547 DEG<br>EXITING R/W LONGITUDE 44.03504 DEG LATITUDE 107.72529 DEG<br>ROUTE US HIGHWAY 16 MAINTENANCE SECTION WAGER |
| 49.00842.000 | BLM WYW-165082 | COTTONWOOD CREEK INC | 6/4/2008 | ROW | WY | WASHAKIE | | | | 19.082 ACRES ROW - GATHERING PIPELINE REPLACING A PORTION EXISTING POLYN ROW WYW-070849 - PORTION OF LINE IS FROM CO2 BATTER #9 SYSTEM #4 TO THE COTTONWOOD CREEK #2 STATION, BEING 56,324.98' IN LENGTH, 50' IN WIDTH<br>T47N-R91W<br>SEC 5: SWNE, SENW, W2SE, LOT 7<br>SEC 8: NWNE<br>T48N-R91W<br>SEC 29: E2W2<br>SEC 32: E2W2 |

**EXHIBIT A-2**
**MIDSTREAM ASSETS**

| ROW/GRANT NO | GRANTOR | GRANTEE | DATE | TYPE | ST | COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| 49.00413.000 | BLM WYW-004 8007 | COTTONWOOD CREEK INC | 7/26/1956 | ROW | WY | WASHAKIE | | | | 14.230 ACRES ROW COTTONWOOD HIDDEN HIDDEN DOME OIL PIPE LINE, BEING 12.3 MI IN LENGTH, 50' IN WIDTH; T47N-R90W; SEC 5 W2W; SEC 6 SENE, NE4; SEC 8 W2NW, NW6W |
| 49.00414.000 | BLM WYW-110378 | COTTONWOOD CREEK INC | 8/31/1990 | ROW | WY | WASHAKIE | | | | T48N-R90W; SEC 25 SWNW, W2SW; SEC 32 NWNW; .35 ACRES ROW CATHODIC PROTECTION FACILITIES COTTONWOOD NO. 1, BEING 837 IN LENGTH, 25' IN WIDTH; T47N-R90W; SEC 5 SW5W |

**INJECTION WELLS:**

| WELL NUMBER | WELL NAME | OPERATOR | API NUMBER | STATE | LEGAL |
|---|---|---|---|---|---|
| 25000180.00 | 14 41 TENNECO GOVT 14 1A | WASHAKIE MIDSTREAM SERVICES LLC | 4904310284 | WY | S 14, T 47N, R 92W |
| 25000182.00 | BRENT FEDERAL W74153 23 1 | WASHAKIE MIDSTREAM SERVICES LLC | 4904328518 | WY | S 23, T 47N, R 92W |

## **EXHIBIT B**

**EXCLUDED ASSETS**

-None-

# EXHIBIT C

**APPLICABLE CONTRACTS**

[See attached]

Exhibit C

EXHIBIT C
APPLICABLE CONTRACTS

Exhibit C-1

RIGHTS OF WAYS, EASEMENTS, ETC.

| OUT TYPE | LEASE NO | LEASE NAME | EFF DATE | STATE | REC COUNTY | BOOK | PAGE | ENTRY | LEGAL DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| ROW | BLM WYW 150990 | CONTINENTAL RESOURCES INC | 1/10/2001 | WY | WASHAKIE | | | | RIGHT OF WAY GRANT WYW 150990<br>T47N-R91W<br>SEC 29: S2NE, N2SE, S2SE<br>COVERS 137.69 ACRES |
| ROW | BLM WYW 081774 | CONTINENTAL RESOURCES INC | 5/13/1983 | WY | WASHAKIE | | | | RIGHT OF WAY GRANT BLM WYW 081774<br>COVERING 169.696 ACRES<br>T44N-R90W<br>SEC 6: W2 NW (LOT 8, 12)<br><br>T46N-R91W<br>SEC 11: S2NE, NWNW, (LOT 8) S2NW<br><br>T46N-R91W<br>SEC 19: LOT 12, SE3W, SWSE<br>SEC 27: SWSW<br>SEC 28: N2SW, NWSE, S2SE<br>SEC 29: N2SE, SWNW, N2SW<br>SEC 30: LOTS 5, 6, N2NE, SENE<br>SEC 34: N2NE, SENE, NENW, NESE<br>SEC 35: SWNW, W2SW, SESW |
| ROW | BLM WYW 152443 | CONTINENTAL RESOURCES INC | 11/1/2001 | WY | WASHAKIE | | | | T46N-R91W<br>SEC 19: LOTS 7, 12<br><br>RIGHT OF WAY GRANT WYW 152443<br>T47N-R91W<br>SEC 25: W2SW<br>SEC 26: SENE, S2SE<br>SEC 35: N2NE, SENE, NENW<br>COVERING 11.470 ACRES |
| ROW | BLM WYW 084692 | CONTINENTAL RESOURCES INC | 8/3/1984 | WY | WASHAKIE | | | | RIGHT OF WAY GRANT BLM WYW 084692<br>T47N-R91W<br>SEC 25: W2SW<br>SEC 26: E2NE, E2SE<br>BEING 50' WIDE, 4900' LONG (0.93 MILES) AND CONTAINS 5.620 ACRES |
| ROW | BLM WYW 032156 | AMOCO PRODUCTION COMPANY | 1/10/1972 | WY | WASHAKIE | | | | PIPELINE RIGHT OF WAY GRANT BLM WYW 032156<br>CONTAINING 30.790 ACRES<br>T47N-R91W<br>SEC 7: LOTS 7, 8, S2NE<br>SEC 8: N2NW<br><br>T47N-R92W<br>SEC 10: S2SE<br>SEC 11: SWSW, SWSE, N2SE<br>SEC 12: N2SW, S2NE<br>SEC 15: NWNW, NENW, NWNE |
| ROW | BLM WYW 94104 | CONTINENTAL RESOURCES INC | 2/4/1991 | WY | WASHAKIE | | | | 37.88 ACRES BLM ROW WYW-94104<br>T47N-R91W<br>SEC 7: LOT 11<br>SEC 19: LOTS 9 AND 12, NE3W, SE<br>SEC 20: SWNW, NWSW<br>SEC 28: SW, NWSE<br>SEC 29: S2E3<br>SEC 30: LOTS 5-10, N2NE, E2NW, NE3W, SE<br>SEC 31: NWNE, NENW<br><br>T47N-R93W<br>SEC 1: S2NE4, E2SW, SWSE<br>SEC 11: LOT 1, S2NE, E2SW, N2SE, SWSE<br>SEC 12: W2NE, SENE, W2SW, SE3W, NESE<br>SEC 13: S2NE, NWNE, W2SW<br>SEC 14: N2NE, SENE, NENW<br>SEC 23: N2NE, S2SE, SWSE<br>SEC 25: N2NE, SENE |
| ROW | BLM WYW 152428 | ENDURO OPERATING LLC | 1/2/2013 | WY | WASHAKIE | | | | PIPELINE RIGHT OF WAY GRANT BLM WYW-0152428, 1" POLY GAS SUPPLY LINE TO SERVICE FEDERAL #1-4H WELL, CONTAINING .291 ACRES BEING 50' WIDE, 253.8' LENGTH:<br><br>T47N-R91W<br>SEC 29: SESE |
| ROW | BLM WYW 111357 | BASS ENTERPRISES PRODUCTION CO | 8/8/2014 | WY | WASHAKIE | | | | BLM ROW GRANT WYW-111357 |

**EXHIBIT C**
**APPLICABLE CONTRACTS**

Exhibit C-2

| Type | Number | BLM No. | Counterparty | Date | State | Area | Description |
|---|---|---|---|---|---|---|---|
| ROW | 4910407.000 | BLM WYW 165036 | CONTINENTAL RESOURCES INC | 11/2/2006 | WY | WASHAKIE | CONTAINING 7.730 ACRES (16,841.20' X 20') ALLOWS RIGHT TO CONSTRUCT, OPERATE, MAINTAIN AND TERMINATE A(N) PRODUCED WATER TRANSFER LINE FROM COTTONWOOD EXTENSION UNIT TO COTTONWOOD CREEK UNIT WATER STATION #2 FOR SURFACE DISCHARGE INTO "BASS" DRAINAGE ON FEDERAL LANDS DESCRIBED AS FOLLOWS: T47N-R90W SEC 30: E2SW, SWSE, LOTS 7, 8 SEC 31: N2NE, SENE, NESE  T47N-R91W SEC 24: SWNW, W2SW, SESW SEC 25: W2NW, SENW, N2NE |
| ROW | 4910447.000 | BLM WYW 165275 | ENDURO OPERATING LLC | 12/31/2012 | WY | WASHAKIE | RIGHT OF WAY GRANT BLM WYW-081774 COVERING 149.696 ACRES T46N-R90W SEC 6: W2 NW (LOT 8, 12) T46N-R91W SEC 1: S2NE, NWNW, (LOT 8) S2NW T65N-R91W SEC 19: LOT 12, E2SW, SWSE SEC 27: SW4W SEC 28: N2SW, NWSE, S2SE SEC 29: NESE, SWNW, N2SW SEC 30: LOTS 5, 6, N2NE, SENE SEC 34: N2NE, SENE, NWNW, NESE SEC 35: SWNW, W2SW, SESW  T46N-R91W SEC 19: LOTS 7, 12  41.45 ACRES, ROW OF WAY GRANT, ACCESS ROAD TO SERVE NOWATER CREEK UNIT, BEING 24,128.6' IN LENGTH, 50' IN WIDTH (4.57 MILES) T46N-R91W SEC 5: LOTS 7, 10 AND 11  T47N-R91W SEC 19: LOTS 8, 9, 10 AND 12 SEC 29: SW, SWNW SEC 30: LOTS 5, 8, 9 AND 12, S2NW, E2SW, SWSE SEC 31: LOT 9, NENW, SENW, SWNE, N2SE, E2NE, NWNE SEC 32: NWSW, SWSW, SESW, NWSE, SWSE, NWNE, NENW, NWNW |
| WATER | 4910452.000 | USBLM WRP5 904375 8100 WYR033 | ENDURO OPERATING LLC | 5/2/2014 | WY | WASHAKIE | T47N-R90W SEC 4: NWNW (1780' FILL, 1980' FILL) GPS 43.0556 107.0174 WATER SUPPLY WELL CO2 WATER WELL #4 |
| ROW | 4910456.000 | BLM WYW 165320 | SM ENERGY COMPANY | 5/7/2015 | WY | WASHAKIE | 26.417 ACRES TO ACCESS ROAD FOR ALVARADO UNIT 25-2PH WELL SITE, BEING GRANTED AS FOLLOWS: 1) NON-UPGRADED ROAD: 50' WIDE X 7,075.20' (1.34 MILES) AND CONTAINS 8.121 ACRES MORE OR LESS, 2) EXISTING ROAD: 50' WIDE X 15,840' LONG (3.0 MILES) AND CONTAINS 18.182 ACRES, MORE OR LESS; TOTAL LENGTH 22,915.20' LONG (4.34 MILES) AND CONTAINS 26.303 ACRES, MORE OR LESS, AS AMENDED AMENDMENT #1 50' WIDE X 100' LONG AND (2) 18" X 50' CULVERTS (0.057 ACRES) T46N-R92W SEC 10: SWNE, N2NW, SENW, N2SE, SESE SEC 11: SWSW SEC 14: NWNW, SWNW, NESW, W2SE, S3SE SEC 23: S2NE, E2NW, W2SE SEC 24: W2NW, NWNW2, SW2NW2 |
| ROW | 4910656.000 | BLM WYW-144887 | CONTINENTAL RESOURCES INC | 10/9/1998 | WY | WASHAKIE | T46N-R91W SEC 2: LOTS 7, 10, 11 T47N-R91W SEC 8: NWNE |

**EXHIBIT C**
**APPLICABLE CONTRACTS**

| Type | Contract # | Ref | Parties | Eff Date | State | County | Book | Page | Entry | Description |
|---|---|---|---|---|---|---|---|---|---|---|
| ROW | 4950437.000 | 16202-AUGE WYOMING DOT | CONTINENTAL RESOURCES INC | 5/1/1962 | WY | WASHAKIE | | | | OIL TRANSMISSION LINE CROSSING WY STATE HIGHWAY 16; T4FN-R91W; SEC C7 — SEC 27-3W0W; SEC 28-N4NE, S2NE, S2NW, N4SE; SEC 29-S0HE; SEC 34-S4NE, N2HW, NE4W, N4SE; SEC 35-N2SW, S4SW, SW4SE |
| ROW | 4950468.000 | 51937-RKGB WYOMING DOT | CONTINENTAL RESOURCES INC | 9/29/1998 | WY | WASHAKIE | | | | NATURAL GAS DISTRIBUTION LINE CROSSING WY STATE HIGHWAY #16; 4" STEEL GAS LINE IN A 10" STEEL CASING, MIN 3'; 51937-RKGB WYOMING DOT; T4FN-R91W; SEC C7 |
| ROW | 4950458.000 | 34280-RKHQ WYOMING DOT | CONTINENTAL RESOURCES INC | 1/1/1981 | WY | WASHAKIE | | | | OIL GATHERING LINE CROSSING WY STATE HIGHWAY #16 - 3" LINE, 5" CSG; 34280-RKHQ WYOMING DOT; T4FN-R91W; SEC C6 |
| ROW | 4950459.000 | 37074-RKGH WYOMING DOT | CONTINENTAL RESOURCES INC | 1/1/1981 | WY | WASHAKIE | | | | CROSSING WY STATE HIGHWAY #16 - 4" CASING; 37074-RKGH - WYOMING DOT; T4FN-R91W; SEC C3 |
| ROW | 4950460.000 | 16812-AUGH WYOMING DOT | CONTINENTAL RESOURCES INC | 6/1/1963 | WY | WASHAKIE | | | | NATURAL GAS DISTRIBUTION LINE, ENCROACHMENT OF WY STATE HIGHWAY #16 - 2" LINE; 16812-AUGH - WYOMING DOT; T4FN-R91W; SEC C3 |
| ROW | 4950461.000 | 16812-AUGH WYOMING DOT | CONTINENTAL RESOURCES INC | 6/1/1963 | WY | WASHAKIE | | | | NATURAL GAS DISTRIBUTION LINE CROSSING WY STATE HIGHWAY #16 - 2" LINE; 16812-AUGH - WYOMING DOT; T4FN-R91W; SEC C3 |
| ROW | 4950462.000 | 28667-ATWR WYOMING DOT | CONTINENTAL RESOURCES INC | 11/1/1976 | WY | WASHAKIE | | | | OIL TRANSMISSION LINE CROSSING WY STATE HIGHWAY #16; 28667-ATWR - WYOMING DOT; T4FN-R91W; SEC C3 |
| ROW | 4950463.000 | 20119-AUGR WYOMING DOT | CONTINENTAL RESOURCES INC | 4/1/1968 | WY | WASHAKIE | | | | WATER DISTRIBUTION LINE CROSSING WY STATE HIGHWAY #16 - 3" LINE; 20119-AUGR - WYOMING DOT; T4FN-R91W; SEC C4 |
| ROW | 4950464.000 | 34423-BKDO WYOMING DOT | CONTINENTAL RESOURCES INC | 3/1/1981 | WY | WASHAKIE | | | | OIL GATHERING LINE CROSSING WY STATE HIGHWAY #16 - 3" LINE, 5" CASING; 34423-BKDO - WYOMING DOT; T4FN-R91W; SEC C5 |
| ROW | 4950465.000 | 65537-CTDN WYOMING DOT | CONTINENTAL RESOURCES INC | 5/19/2014 | WY | WASHAKIE | | | | WATER DISTRIBUTION LINE CROSSING WY STATE HIGHWAY #16 - 4" SDR, 9 POLY PIPE IN 8" CONDUIT, WATER SUPPLY LINE 6' DEEP; 65537-CTDN - WYOMING DOT; T4FN-R91W; SEC C4 |

**CONTRACTS:**

| CONTRACT NUMBER | CONTRACT TYPE | EFF DATE | PARTIES TO AGREEMENT | COUNTY | STATE | BOOK | PAGE | ENTRY |
|---|---|---|---|---|---|---|---|---|
| CA0908 | SEISMIC AGREEMENT | 1/17/2013 | | WASHAKIE | WY | | | |
| CA0908 | UNIT AGMT/UNIT OPERATING AGMT | 5/1/2010 | SLICK CREEK UNIT - GENERAL PETROLEUM CORPORATION, OPERATOR | WASHAKIE | WY | | | |
| CA0909 | FARMOUT AGREEMENT | 4/19/1968 | UNION TEXAS PETROLEUM, FARMOR, AND TENNECO OIL COMPANY, FARMEE | WASHAKIE | WY | | | |
| CA1010 | JOINT OPERATING AGREEMENT | 7/14/1950 | SLICK CREEK UNIT - GENERAL PETROLEUM CORPORATION, OPERATOR | WASHAKIE | WY | | | |
| CA1011 | FARMOUT AGREEMENT AND OPERATING AGMT | 10/9/1970 | DESANA CORPORATION, OPERATOR, AND PAN AMERICAN PETROLEUM CORPORATION, NON-OPERATOR | WASHAKIE | WY | | | |
| CA1012 | POOLING AGREEMENT | 10/9/1970 | STANDARD OIL AND GAS COMPANY AND GENERAL PETROLEUM CORPORATION | WASHAKIE | WY | | | |

Exhibit C-3

**EXHIBIT A**
**APPLICABLE CONTRACTS**

| | Description | Formal Description | Contract Date | County | State | | | |
|---|---|---|---|---|---|---|---|---|
| CA3013 | UNIT OPERATING AGMT | NO WATER CREEK UNIT - PHILLIPS PETROLEUM COMPANY, OPERATOR, AND AMARILLO OIL COMPANY ET AL, NON-OPERATOR | 5/4/1966 | WASHAKIE | WY | | | |
| CA3014 | UNIT AGMT | NO WATER CREEK UNIT - PHILLIPS PETROLEUM COMPANY, OPERATOR, AND AMARILLO OIL COMPANY ET AL, NON-OPERATOR | 5/4/1966 | WASHAKIE | WY | | | |
| CA3018 | UNIT AGMT | COTTONWOOD CREEK EXIT UNIT - GULF OIL CORPORATION, OPERATOR, AND TENNECO OIL COMPANY ET AL, NON-OPERATORS | 8/30/1973 | WASHAKIE | WY | | | |
| CA3019 | UNIT OPERATING AGMT | COTTONWOOD CREEK EXIT UNIT - GULF OIL CORPORATION, OPERATOR, AND TENNECO OIL COMPANY ET AL, NON-OPERATORS | 9/8/1952 | WASHAKIE | WY | | | |
| CA3023 | UNIT AGMT/UNIT OPERATING AGMT | SOUTH FRISBY UNIT - TENNECO OIL COMPANY, OPERATOR | 1/1/1973 | WASHAKIE | WY | 114 | 61-99 | 289879 |
| CA3024 | UNIT AGMT/UNIT OPERATING AGMT | COTTONWOOD CREEK UNIT - STANDLIND OIL AND GAS COMPANY, OPERATOR | 9/8/1952 | WASHAKIE | WY | | | |
| CA3025 | UNIT AGMT/UNIT OPERATING AGMT | COTTONWOOD CREEK UNIT - STANDLIND OIL AND GAS COMPANY, OPERATOR | 2/11/1953 | WASHAKIE | WY | | | |
| CA3030 | COMMUNITIZATION AGMT | PERRY R. BASS, INC, OPERATOR | 8/21/1992 | WASHAKIE | WY | | | 34752 |
| CA3045 | SEISMIC AGREEMENT | SEISCO, INC., LICENSOR, AND TRIGUIRD RESOURCE PARTNERS LLC, LICENSEE | 1/30/2013 | BIG HORN / HOT SPRINGS / WASHAKIE | WY WY WY | | | |
| CA3050 | COMMUNITIZATION AGMT | BASS ENTERPRISES PRODUCTION CO, OPERATOR | 6/7/1979 | WASHAKIE | WY | | | |
| CA3211 | COMMUNITIZATION AGMT | TENNECO OIL COMPANY, OPERATOR | 7/23/1979 | WASHAKIE | WY | | | |
| CA3212 | COMMUNITIZATION AGMT | STANDCO OIL COMPANY, INC., OPERATOR | 3/17/1970 | WASHAKIE | WY | | | |
| CA3213 | COMMUNITIZATION AGMT | CONTINENTAL RESOURCES, INC., OPERATOR | 2/9/2000 | WASHAKIE | WY | | | |
| CA3214 | COMMUNITIZATION AGMT | STANDCO OIL COMPANY, INC., OPERATOR | 3/10/1970 | WASHAKIE | WY | | | |
| CA3215 | COMMUNITIZATION AGMT | STANDCO OIL COMPANY, INC., OPERATOR | 6/29/1971 | WASHAKIE | WY | | | |
| CA3216 | COMMUNITIZATION AGMT | STANDLIND OIL AND GAS COMPANY, OPERATOR | 11/25/1956 | WASHAKIE | WY | | | |
| CA3217 | COMMUNITIZATION AGMT | PAN AMERICAN PETROLEUM CORPORATION, OPERATOR | 12/10/1970 | WASHAKIE | WY | | | |
| CA3218 | COMMUNITIZATION AGMT | TENNECO OIL COMPANY, OPERATOR | 4/2/1979 | WASHAKIE | WY | | | |
| CA3219 | COMMUNITIZATION AGMT | GULF OIL CORPORATION, OPERATOR | 5/22/1971 | WASHAKIE | WY | | | |
| CA3220 | COMMUNITIZATION AGMT | TENNECO OIL COMPANY, OPERATOR | 8/1/1979 | WASHAKIE | WY | | | |

**MARKETING:**

| CONTRACT DATE | DESCRIPTION | COUNTY, STATE | FORMAL DESCRIPTION |
|---|---|---|---|
| 3/1/2012 | COTTONWOOD CREEK OIL SALE | WASHAKIE, WY | Crude Oil Purchase Agreement, dated March 15, 2012 between Merit Energy Company and Enduro Operating LLC |
| 8/1/2013 | WORLAND SWEET SALE | WASHAKIE, WY | Crude Oil Purchase Agreement, dated September 5, 2013 between Merit Energy Company and Enduro Operating LLC |
| 11/15/2017 | CONDENSATE PURCHASE | WY | Condensate Purchase Agreement, dated November 15, 2017 between Wild Energy Transmission, Inc. and Enduro Operating LLC |
| 11/1/2011 | WORLAND GAS SALE | WY | Gas Sales Agreement, dated October 1, 2011 between Rainbow Gas Company and Washakie Midstream Services LLC |
| 7/1/1988 | GAS PURCHASE - BADLANDS 1-26 & HIGHWAY 1-26 | WASHAKIE, WY | Gas Purchase Agreement, dated April 1, 1988 between Carol Holy Oil Corporation and Washakie Midstream Services LLC |
| 4/1/1990 | GAS PURCHASE - FRISBY #2 | WASHAKIE, WY | Gas Purchase Agreement, dated April 1, 1990 between Carol Holy Oil Corporation and Washakie Midstream Services LLC |
| 2/1/1993 | CONDENSATE PURCHASE | WY | Gas Purchase Agreement, dated February 1, 1993 between Carol Holy Oil Corporation and Washakie Midstream Services LLC |
| 2/1/1993 | GAS PURCHASE - FEDERAL 1-25, USA 4 | WASHAKIE, WY | Gas Purchase Agreement, dated January 1, 1996 between Carol Holy Oil Corporation and Washakie Midstream Services LLC |
| 1/1/1996 | GAS PURCHASE - HERBALLY 1-11-28 | WASHAKIE, WY | Gas Purchase Agreement, dated November 4, 1985 between Devon Energy Corporation and Washakie Midstream Services LLC |
| 5/1/1996 | GAS PURCHASE - RATTLESNAKE BATTERY | WASHAKIE, WY | Gas Purchase Agreement, dated November 4, 1985 between Devon Energy Corporation and Washakie Midstream Services LLC |

Exhibit C - 4

**EXHIBIT C**
**ASSIGNABLE CONTRACTS**

| | | | |
|---|---|---|---|
| 6/24/1985 | GAS PURCHASE - HONEYBUTTE #4 | WASHAKIE, WY | Gas Purchase Agreement, dated June 24, 1985 between Hanson Operating Company, Inc. and Washakie Midstream Services LLC |
| 4/12/1988 | GAS PURCHASE - HONEYBUTTE #10 | WASHAKIE, WY | Gas Purchase Agreement, dated April 12, 1988 between Hanson Operating Company, Inc. and Washakie Midstream Services LLC |
| 6/8/2012 | GAS PURCHASE: CANA #1 SEC14 48N 92W, LEASES: WYW-173983, WYW-173984, AND WYW-93768 | WASHAKIE, WY | Gas Purchase Contract, dated June 8, 2012 between Huntington Energy LLC and Washakie Midstream Services LLC |
| 4/1/1990 | GAS PURCHASE - GOVERNMENT 1-3, 1-4 | WASHAKIE, WY | Gas Purchase Agreement, dated April 1, 1990 between Legacy Reserves Operating and Washakie Midstream Services LLC |
| 5/1/2001 | GAS PURCHASE | BIG HORN, WY | Gas Purchase Contract, dated May 8, 2011 between Sierra Hamilton and Drilling Company and Washakie Midstream Services LLC |
| 4/1/2012 | PROPANE SALE | WASHAKIE, WY | Natural Gas Liquids Purchase Agreement, dated February 22, 2018 between Tidgross Midstream, LLC and Washakie Midstream Services LLC |
| 6/1/2012 | NGL SALE | WASHAKIE, WY | Natural Gas Liquids Marketing Agreement, dated March 25, 2014 between Tidgross Midstream, LLC and Washakie Midstream Services LLC |
| 8/9/1990 | GAS PURCHASE - ALTUS 19-2, 18-1 & FEDERAL 18-5 | WASHAKIE, WY | Gas Purchase Agreement, dated August 9, 1990 between Washakie Energies Company and Washakie Midstream Services LLC |
| 1/1/1993 | GAS PURCHASE - SLICK CREEK 12-5, SLICK CREEK 12-6, FEDERAL 18-1, AND COSEKA FEDERAL 12-3-A, COSEKA FEDERAL 12-2 | WASHAKIE, WY | Gas Purchase Agreement, dated January 1, 1993 between Washakie Energies Company and Washakie Midstream Services LLC |
| 3/1/2012 | RECEIPT POINT OPERATIONAL BALANCING AGREEMENT | WASHAKIE, WY | Receipt Point Operational Balancing Agreement, dated March 1, 2012 between Williston Basin Interstate Pipeline Company and Washakie Midstream Services LLC |
| 7/1/1996 | GAS PURCHASE - HILAND 23.5-6, 7-9 | WASHAKIE, WY | Gas Purchase Agreement, dated April 1, 1990 between Wind River Oil & Gas LLC and Washakie Midstream Services LLC |
| 10/17/2013 | PIPELINE CONNECTION AGREEMENT | WASHAKIE, WY | Pipeline Connection Agreement, dated October 17, 2013 between Huntington Energy LLC and Washakie Pipeline Company LLC |

Exhibit C-5

## **EXHIBIT D**

**FORM OF ASSIGNMENT AND BILL OF SALE**

[See attached]

## ASSIGNMENT AND BILL OF SALE

STATE OF [ ● ]  §
§  KNOW ALL PERSONS BY THESE PRESENTS
COUNTY OF [ ● ]  §

This ASSIGNMENT AND BILL OF SALE (this "***Assignment***") is from ENDURO OPERATING LLC, a Delaware limited liability company ("***Assignor***"), whose address is 777 Main Street, Suite 800, Fort Worth, TX 76102, to MID-CON ENERGY PROPERTIES, LLC, a Delaware limited liability company ("***Assignee***"), whose address is 2431 E 61st, Suite 850, Tulsa, OK 74136, and is effective as of 12:01 a.m., Central Time on January 1, 2018 (the "***Effective Time***"). Assignor and Assignee shall be referred to herein individually as "***Party***" and collectively as the "***Parties***."

## ARTICLE I
## DEFINITIONS

**Section 1.1    Definitions**.  Capitalized terms used herein and not otherwise defined in this Assignment (including Article III) shall have the meanings given to such terms in that certain Purchase and Sale Agreement, dated [ ● ] [ ● ], 2018, by and between Assignor and Assignee (the "***Purchase and Sale Agreement***").

## ARTICLE II
## ASSIGNMENT OF ASSETS

**Section 2.1    Assignment**.  Assignor, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby grants, deeds, bargains, assigns, transfers, and conveys unto Assignee, all of Assignor's right, title and interest in and to the following, (other than the Excluded Assets, as hereinafter defined) (collectively, and subject to such exclusions, the "***Assets***"):

(a)  the oil and gas leases described in **Exhibit A** (collectively, the "***Leases***");

(b)  the wells located on the Leases or on any other lease or lands with which any Lease has been pooled or unitized, including oil and/or gas wells, condensate wells, water wells and injection or disposal wells, whether or not currently producing, shut-in, plugged or abandoned, including those set forth in **Exhibit A-1** (collectively, the "***Wells***"), and in all Hydrocarbons produced therefrom or allocated thereto;

(c)  all unitization and pooling agreements in effect with respect to any of the Leases or Wells and the units created thereby (collectively, the "***Units***");

(d)  all Applicable Contracts;

(e)  all Rights-of-Way that are used in connection with the ownership or operation of any of the Leases, Wells, Units, Midstream Assets or other Assets;

(f)    all equipment, machinery, fixtures and other personal and mixed property, operational and nonoperational, known or unknown, that are solely used in connection with any of the Leases, Wells, Units, Midstream Assets or other Assets, including, pipelines, gathering systems, well equipment, casing, tubing, pumps, motors, fixtures, machinery, compression equipment, flow lines, processing and separation facilities, structures, materials and other items solely used in the operation thereof (collectively, the "***Personal Property***");

(g)    all Imbalances relating to the Assets;

(h)    the easements, surface leases and rights-of-way more particularly described on *Exhibit A-2*, together with the gas processing plant, related pipelines and/or disposal or injection wells located thereon and/or described on **Exhibit A-2** (the "***Midstream Assets***");

(i)    copies of all of the files, records, information and data, whether written or electronically stored, relating to the Assets in Assignor's or its Affiliates' possession, including:  (i) land and title records; (ii) Applicable Contract files; (iii) correspondence; (iv) operations, environmental, production, accounting and Property Tax records, and (v) facility and well records (collectively, the "***Records***"); and

(j)    geophysical, seismic and related technical data and information relating to the Assets and any interpretations thereof, but only to the extent the same may be transferred without payment of money.

**TO HAVE AND TO HOLD** the Assets unto Assignee, its successors and assigns, forever, subject, however, to all the terms and conditions of this Assignment.

**Section 2.2    Excluded and Reserved Assets**.    The Assets shall not include, and Assignor hereby reserves and retains, the Excluded Assets.

### ARTICLE III
### ADDITIONAL DEFINITIONS

The following terms, as used herein, shall have the meanings set forth below:

"***Closing Date***" means [ ● ] [ ● ], 2018.

"***Contract***" shall mean any written or oral contract, agreement, agreement regarding indebtedness, indenture, debenture, note, bond, loan, collective bargaining agreement, lease, mortgage, franchise, license agreement, purchase order, binding bid, commitment, letter of credit or any other legally binding arrangement, including farmin and farmout agreements; participation, exploration and development agreements, crude oil, condensate and natural gas purchase and sale, gathering, transportation and marketing agreements; operating agreements; balancing agreements; unitization agreements; processing agreements; facilities or equipment leases; production handling agreements; and other similar contracts, but excluding, however, any Lease, Right-of-Way or other instrument creating or evidencing an interest in the Assets or any real property used in connection with the operations of any Assets.

"***Excluded Assets***" shall mean (a) all of Assignor's corporate minute books, financial records and other business records that relate to Assignor's business generally (including the ownership and operation of the Assets); (b) all trade credits, all accounts, receivables and all other proceeds, income or revenues attributable to the Assets with respect to any period of time prior to the Effective Time; (c) all rights, claims and causes of action of Assignor relating to the Assets that are attributable to periods of time prior to the Effective Time (including claims for adjustments or refunds); (d) subject to Section **Error! Reference source not found.** of the Purchase and Sale Agreement, all rights and interests relating to the Assets (i) under any existing policy or agreement of insurance, (ii) under any bond or (iii) to any insurance or condemnation proceeds or awards arising, in each case, from acts, omissions or events, or damage to or destruction of property; (e) all Hydrocarbons produced and sold from the Assets with respect to all periods prior to the Effective Time; (f) all claims of Assignor for refunds of or loss carry forwards with respect to (i) Property Taxes or any other Taxes attributable to any period (or portion thereof) prior to the Effective Time, (ii) Income or Franchise Taxes or (iii) any Taxes attributable to the Excluded Assets; (g) all personal computers and associated peripherals and all radio and telephone equipment, including SCADA servers and software; (h) all of Assignor's proprietary computer software, patents, trade secrets, copyrights, names, trademarks, logos and other intellectual property; (i) all documents and instruments of Assignor protected by an attorney-client privilege; (j) all data that cannot be disclosed to Assignee as a result of confidentiality arrangements under agreements with Third Parties; (k) all audit rights arising under any of the Applicable Contracts or otherwise with respect to any period prior to the Effective Time or to any of the Excluded Assets, except for any Imbalances; (l) all geophysical, seismic and related technical data and information relating to the Assets and any interpretations thereof to the extent the same may not be transferred without payment of money; (m) documents prepared or received by Assignor or its Affiliates with respect to (i) lists of prospective purchasers for the Assets, (ii) bids submitted by other prospective purchasers of the Assets, (iii) analyses by Assignor or its Affiliates of any bids submitted by any prospective purchaser, (iv) correspondence between or among Assignor, its representatives and any prospective purchaser other than Assignor and (v) correspondence between Assignor or any of its representatives with respect to any of the bids, the prospective purchasers or the transactions contemplated by this Agreement; (n) all personnel files; (o) all deposits, letters of credit and other collateral posted by Assignor in connection with the ownership or operation of any Assets; (p) all of Assignor's reserve analyses, including all interpretations of such reserves and decline curves; and (q) the property set forth on **Exhibit B**.

## ARTICLE IV
## SPECIAL WARRANTY

From and after the Closing Date until the end of the Holdback Period, Assignor hereby warrants Defensible Title to the Leases, Fee Interests and Wells unto Assignee against every Person whomsoever lawfully claims the same or any part thereof by, through or under Assignor, but not otherwise, subject, however, to the Permitted Encumbrances and the limitations set forth in Section 5.1(c)(ii) in the Purchase and Sale Agreement. Following the end of the Holdback Period, the special warranty of Defensible Title hereunder will terminate and have no further force and effect except with respect to any special warranty claim validly asserted by Assignee in writing to Assignor prior to the end of the Holdback Period. Assignor hereby assigns to Assignee all rights, claims, and causes of action on title warranties given or made by Assignor's

predecessors (other than any Affiliates of Assignor), and Assignee is specifically subrogated to all rights which Assignor may have against such predecessors, to the extent Assignor may legally transfer such rights and grant such subrogation.

ARTICLE V
DISCLAIMERS

(a)     EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY SET FORTH IN ARTICLE VII OF THE PURCHASE AND SALE AGREEMENT AND THE SPECIAL WARRANTY OF TITLE SET FORTH HEREIN, (I) ASSIGNOR MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, AND (II) ASSIGNOR EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ASSIGNEE OR ANY OF ITS AFFILIATES, EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING, ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ASSIGNEE BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF ASSIGNOR OR ANY OF ITS AFFILIATES).

(b)     EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED OTHERWISE IN ARTICLE VII OF THE PURCHASE AND SALE AGREEMENT AND THE SPECIAL WARRANTY OF TITLE SET FORTH HEREIN, AND WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ASSIGNOR EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (I) TITLE TO ANY OF THE ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSETS, (IV) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (V) THE PRODUCTION OF HYDROCARBONS FROM THE ASSETS, (VI) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS OR THE PROPERTIES UNDERLYING THE ASSETS, (VII) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY ASSIGNOR OR THIRD PARTIES WITH RESPECT TO THE ASSETS, (VIII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO ASSIGNEE OR ITS AFFILIATES OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO AND (IX) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT. EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED OTHERWISE IN ARTICLE VII OF THE PURCHASE AND SALE AGREEMENT AND THE SPECIAL WARRANTY OF TITLE SET FORTH HEREIN, ASSIGNOR FURTHER

**DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, OF MERCHANTABILITY, FREEDOM FROM LATENT VICES OR DEFECTS, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY OF THE ASSETS, RIGHTS OF A PURCHASER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT ASSIGNEE SHALL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS OR DEFECTS (KNOWN OR UNKNOWN, LATENT, DISCOVERABLE OR UNDISCOVERABLE), AND THAT ASSIGNEE HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS OF THE ASSETS AS ASSIGNEE DEEMS APPROPRIATE. FOR THE AVOIDANCE OF DOUBT, ASSIGNEE ACKNOWLEDGES AND AGREES THAT ASSIGNEE CANNOT RELY ON OR FORM ANY CONCLUSIONS FROM ASSIGNOR'S METHODOLOGIES FOR THE DETERMINATION AND REPORTING OF ANY ASSET TAXES THAT WERE UTILIZED FOR ANY TAX PERIOD (OR PORTION THEREOF) BEGINNING PRIOR TO THE CLOSING DATE FOR PURPOSES OF CALCULATING AND REPORTING ASSET TAXES ATTRIBUTABLE TO ANY TAX PERIOD (OR PORTION THEREOF) BEGINNING AFTER THE CLOSING DATE, IT BEING UNDERSTOOD THAT ASSIGNEE MUST MAKE ITS OWN DETERMINATION AS TO THE PROPER METHODOLOGIES THAT CAN OR SHOULD BE USED FOR ANY SUCH LATER TAX RETURN.**

**(c)    ASSIGNOR HAS NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO (I) TITLE TO THE ASSETS OR (II) ENVIRONMENTAL LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT OR THE PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT, OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSETS OR THE PROPERTIES UNDERLYING THE ASSETS, AND NOTHING IN THIS AGREEMENT OR OTHERWISE SHALL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY, AND ASSIGNEE SHALL BE DEEMED TO BE OBTAINING THE ASSETS "AS IS" AND "WHERE IS" WITH ALL FAULTS FOR PURPOSES OF THEIR ENVIRONMENTAL CONDITION AND THAT ASSIGNEE HAS MADE OR CAUSED TO BE MADE OR WILL MAKE OR CAUSE TO BE MADE SUCH TITLE AND ENVIRONMENTAL INSPECTIONS OF THE ASSETS AS ASSIGNEE DEEMS APPROPRIATE.**

**(d)    ASSIGNOR AND ASSIGNEE AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 4.3 OF THE PURCHASE AND SALE AGREEMENT ARE "*CONSPICUOUS*" DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LAW.**

## ARTICLE VI
## ASSUMED OBLIGATIONS

Without limiting Assignee's rights to indemnity under Article XIII of the Purchase and Sale Agreement, from and after the Closing, Assignee assumes and hereby agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid and discharged) the following Liabilities (except to the extent discharged or released by the Sale Order) and no others: (a) all of the Assignor's Liabilities under the Applicable Contracts, whether such Liabilities arise prior to, at, or after the Effective Time, except such Liabilities that are satisfied or discharged by the payment of Cure Costs (including, for the avoidance of doubt, any Applicable Contracts for which the Cure Costs were set as $0 and approved as such by virtue of the Sale Order or such other order authorizing the assumption and assignment of such Applicable Contracts); (b) all of Assignor's plugging and abandonment obligations relating to the Leases, Wells and Units regardless of whether arising prior to, at, or after the Effective Time; (c) all of Assignor's obligations to dismantle, decommission, abandon, dispose and remove any Personal Property and other property of whatever kind related to or associated with the ownership, use, operations and activities conducted by whomever on the Assets regardless of whether arising prior to, at, or after the Effective Time; (d) all of Assignor's obligations to restore, clean up and/or remediate both the surface and the subsurface of any portion of the Assets in accordance with Applicable Contracts and Laws (including Environmental Laws) regardless of whether arising prior to, at, or after the Effective Time; (e) to the extent not already described in Section 13.1(a) through Section 13.1(d) of the Purchase and Sale Agreement, all Liabilities arising from, related to, or associated with the Assets to the extent such Liabilities arise at and after the Effective Time; (f) those items that become Assumed Obligations pursuant to Section 2.3 of the Purchase and Sale Agreement; (g) all Cure Costs; and (h) all obligations to properly cap and bury all flow lines and pipelines associated with any well located on the Assets (all of said obligations and Liabilities, subject to the exclusions below, herein being referred to as the "***Assumed Obligations***"); provided, Assignee does not assume any liabilities for Income Taxes or Franchise Taxes of Assignor.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.1**    **Assignment Subject to Agreement**.  This Assignment is expressly made subject to the terms of the Purchase and Sale Agreement (which terms shall control in the event of a conflict herewith).  The Purchase and Sale Agreement contains certain representations, warranties, covenants, indemnities and agreements between the Parties, some of which may survive the delivery of this Assignment, as more particularly provided for therein, but Third Parties may conclusively rely on this Assignment to vest title to the Assets in Assignee. Notwithstanding the foregoing and for the avoidance of doubt, this Assignment is only intended to convey the Assets set forth herein.

**Section 8.2**    **Separate Assignments**.  Where separate assignments of Assets have been or will be executed for filing with and approval by applicable Governmental Authorities, any such separate assignments (a) shall evidence this Assignment and assignment of the applicable Assets herein made and shall not constitute any additional Assignment or assignment of the Assets, (b) are not intended to modify, and shall not modify, any of the terms, covenants and

conditions or limitations on warranties set forth in this Assignment and are not intended to create, and shall not create, any representations, warranties or additional covenants of or by Assignor to Assignee, and (c) shall be deemed to contain all of the terms and provisions of this Assignment, as fully and to all intents and purposes as though the same were set forth at length in such separate assignments.

**Section 8.3** **Governing Law; Jurisdiction, Venue, Jury Waiver**. THIS ASSIGNMENT AND THE LEGAL RELATIONS BETWEEN ASSIGNOR AND ASSIGNEE SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAW; PROVIDED THAT, WHERE APPLICABLE, THE REAL PROPERTY LAWS OF WYOMING SHALL GOVERN ANY DISPUTES CONCERNING THE APPLICATION OF REAL PROPERTY LAW. ASSIGNOR AND ASSIGNEE CONSENT TO THE EXERCISE OF JURISDICTION IN PERSONAM BY THE UNITED STATES FEDERAL DISTRICT COURTS LOCATED IN FORT WORTH, TARRANT COUNTY, TEXAS (OR IF THE FEDERAL DISTRICT COURTS DO NOT HAVE JURISDICTION, THEN THE STATE COURTS IN FORT WORTH, TARRANT COUNTY, TEXAS) FOR ANY ACTION ARISING OUT OF THIS ASSIGNMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY. ALL ACTIONS OR PROCEEDINGS WITH RESPECT TO, ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, RELATED TO OR FROM THIS ASSIGNMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE EXCLUSIVELY LITIGATED IN THE UNITED STATES FEDERAL DISTRICT COURTS LOCATED IN FORT WORTH, TARRANT COUNTY, TEXAS (OR IF THE FEDERAL DISTRICT COURTS DO NOT HAVE JURISDICTION, THEN THE STATE COURTS IN FORT WORTH, TARRANT COUNTY, TEXAS). ASSIGNOR AND ASSIGNEE WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 8.4** **Binding Effect**. This Assignment shall be binding upon, and shall inure to the benefit of, the Parties, and their respective successors and permitted assigns; provided, however, that nothing in this Assignment shall assign or grant, or in any way operate to assign or grant, any right, title or interest in, to or under the Purchase and Sale Agreement to any successor or assign of Assignee with respect to the Assets or any part thereof, it being expressly understood that rights, titles and interests under the Purchase and Sale Agreement may only be obtained or assigned in strict accordance with the terms thereof.

**Section 8.5** **Amendments**. This Assignment may be amended only by an instrument in writing executed by the Party against whom enforcement is sought.

**Section 8.6** **Counterparts**. This Assignment may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all of such counterparts shall constitute for all purposes one agreement. To facilitate recordation, there may be omitted from the Exhibits to this Assignment in certain counterparts descriptions of

the Assets located in recording jurisdictions other than the jurisdiction in which the counterpart is being filed or recorded.

[*Signature Pages Follow*]

EXECUTED as of the dates set forth below, but effective as of the Effective Time.

**ASSIGNOR:**

**ENDURO OPERATING LLC**


By: _____
Name:
Title:

**ACKNOWLEDGMENT**

| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

    This instrument was acknowledged before me on this _____ day of [ ● ], 2018, by [_____] as [_____] of ENDURO OPERATING LLC, a Delaware limited liability company, on behalf of said limited liability company.


_____
Notary Public - State of Texas

[*Signature Page to Assignment and Bill of Sale*]

**ASSIGNEE:**

**MID-CON ENERGY PROPERTIES, LLC**

By: _____
Name:
Title:

## ACKNOWLEDGMENT

STATE OF [ ● ]                                          §
                                                        §
COUNTY OF [ ● ]                                         §

   This instrument was acknowledged before me on this _____ day of [ ● ], 2018, by [_____] as [_____] of MID-CON ENERGY PROPERTIES, LLC a Delaware limited liability company.


_____
Notary Public - State of [ ● ]

*[Signature Page to Assignment and Bill of Sale]*

## **Exhibit A**
**Leases**

[See attached.]

## **Exhibit A-1**
**Wells and Units**

[See attached.]

**<u>Exhibit A-2</u>**
**Midstream Assets**

[See attached.]

## **Exhibit B**
**Excluded Assets**

-None-

## EXHIBIT E

**FORM OF NON-FOREIGN AFFIDAVIT**

## CERTIFICATION OF NON-FOREIGN STATUS

**[_____], 2018**

Section 1445 of the Internal Revenue Code provides that a buyer of a United States real property interest must withhold tax if the seller is a foreign person.  For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity.  Enduro Operating LLC, a Delaware limited liability company ("*Seller*"), is disregarded as an entity separate from Enduro Resource Holdings LLC, a Delaware limited liability company ("*Transferor*"), and Transferor is, therefore, treated as the transferor of properties to which Seller holds legal title for U.S. federal income tax purposes. To inform Mid-Con Properties, LLC, a Delaware limited liability company ("*Transferee*"), that withholding of tax is not required upon the disposition of a United States real property interest owned by Transferor, the undersigned hereby certifies the following on behalf of Transferor:

1.      Transferor is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations).

2.      Transferor is not a disregarded entity as defined in Treas. Reg. § 1.1445-2(b)(2)(iii);

3.      Transferor's U.S. employer identification number is 27-2036288; and

4.      Transferor's office address is 777 Main Street, Suite 800, Fort Worth, Texas 76102.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

**TRANSFEROR:**

**ENDURO RESOURCE HOLDINGS LLC**

_____
Name:
Title:

Exhibit E

## EXHIBIT F-1

### FORM OF SELLER CLOSING CERTIFICATE

### SELLER'S CERTIFICATE

### [_____], 2018

This Seller's Certificate (this "*Certificate*") is delivered pursuant to Section 10.5 of that certain Purchase and Sale Agreement, dated **[_____]**, 2018 (as amended from time to time, the "*Purchase Agreement*"), by and between Enduro Operating LLC, a Delaware limited liability company ("*Seller*"), and Mid-Con Properties, LLC, a Delaware limited liability company ("*Buyer*"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Purchase Agreement.

The undersigned, in his capacity as an officer of Seller, hereby certifies on behalf of Seller to Buyer that:

1.      All representations and warranties of Seller set forth in the Purchase Agreement are true and correct in all respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made or given on and as of the Closing Date (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date), except for those breaches, if any, of such representations and warranties that in the aggregate would not have a Material Adverse Effect.

2.      Seller has materially performed or complied with all obligations, agreements and covenants contained in the Purchase Agreement as to which performance or compliance by Seller is required prior to or at the Closing Date.

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date first written above.

**ENDURO OPERATING LLC**


By:     _____
Name:
Title:

**EXHIBIT F-2**

**FORM OF BUYER CLOSING CERTIFICATE**

**BUYER'S CERTIFICATE**

**[_____], 2018**

This Buyer's Certificate (this "***Certificate***") is delivered pursuant to Section 11.6 of that certain Purchase and Sale Agreement, dated **[_____]**, 2018 (as amended from time to time, the "***Purchase Agreement***"), by and between Enduro Operating LLC, a Delaware limited liability company ("***Seller***"), and Mid-Con Properties, LLC, a Delaware limited liability company ("***Buyer***").  Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Purchase Agreement.

The undersigned, in his capacity as an officer of Buyer, hereby certifies on behalf of Buyer to Seller that:

1.     All representations and warranties of Buyer set forth in the Purchase Agreement are true and correct in all material respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made or given on and as of the Closing Date (other than representations and warranties that refer to a specified date, which need only be true and correct on and as of such specified date).

2.     Buyer has materially performed or complied with all obligations, agreements and covenants contained in the Purchase Agreement as to which performance or compliance by Buyer is required prior to or at the Closing Date.

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date first written above.

**MID-CON ENERGY PROPERTIES, LLC**


By:     _____
Name:
Title:

## EXHIBIT G

**FORM OF BIDDING PROCEDURES**

[See attached]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENDURO RESOURCE PARTNERS LLC, *et al.*, | ) | Case No. 18-_____ (___) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS

On [ ● ], 2018, the United States Bankruptcy Court for the District of Delaware (the "***Court***") entered the *Order (I) Approving Bidding Procedures in Connection with Sale of Assets of the Debtors, (II) Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief* [Docket No. __] (the "***Bidding Procedures Order***"),[2] by which the Court approved the following procedures (the "***Bidding Procedures***"). These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "***Auction***") for the sale (the "***Sale***") of substantially all of the Debtors' assets in one or more packages (each, an "***Asset Package***," and, collectively, the "***Assets***") to be determined with the consent of the Majority First Lien Lenders (as defined below), which shall initially consist of:

- the North Dakota Package;

- the Wyoming Package;

- the North Louisiana Package; and

- the Trust Related Assets Package.

For the avoidance of doubt, interested parties may bid on any Asset Packages individually or in any combination, including all of the Assets.

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's United States federal tax identification number, if applicable, or other applicable identification number, are:  Enduro Resource Partners LLC (6288); Enduro Resource Holdings LLC (5571); Enduro Operating LLC (7513); Enduro Management Company LLC (5932); Washakie Midstream Services LLC (7562); and Washakie Pipeline Company LLC (7798).  The debtors' mailing address is 777 Main Street, Suite 800, Fort Worth, Texas 76102.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

1.    **Submissions to the Debtors**.

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided (collectively, the "***Notice Parties***"):

A.    **Debtors**. Enduro Resource Partners, 777 Main Street, Suite 800, Fort Worth, Texas 76102, Attn: Jonny Brumley (jsbrumley@endurores.com) and Kim Weimer (kweimer@endurores.com).

B.    **Debtors' Proposed Counsel**. Proposed Counsel to the Debtors, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, Attn: Caroline Reckler (caroline.reckler@lw.com) and Matthew Warren (matthew.warren@lw.com); and Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael Nestor (mnestor@ycst.com) and Kara Coyle (kcoyle@ycst.com).

C.    **Debtors' Proposed Financial Advisors**. Proposed financial advisors to the Debtors, Evercore Group L.L.C. ("***Evercore***"), 55 East 52nd Street, New York, New York 10055, Attn: Stephen Hannan (hannan@evercore.com) and Matthew Moss (matthew.moss@evercore.com); and Alvarez & Marsal North America, LLC ("***A&M***"), 2100 Ross Avenue, Dallas, Texas 75201, Attn: Jim Grady (jgrady@alvarezandmarsal.com) and Taylor Atwood (tatwood@alvarezandmarsal.com).

D.    **Counsel to First Lien Agent**. Counsel to the agent under the Debtors' first lien credit facility (the "***First Lien Agent***," and the lenders holding more than 50 percent of the outstanding loans under such credit facility, the "***Majority First Lien Lenders***"), Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Damian S. Schaible and Aryeh Ethan Falk (enduro.auction@davispolk.com).

E.    **Financial Advisors to First Lien Agent**. Financial advisors to the First Lien Agent, RPA Advisors, LLC, One Rockefeller Plaza, Tenth Floor, New York, New York 10020, Attn: Barry Kesler (bkesler@rpaadvisors.com).

2.    **Potential Bidders**.

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity (other than any Stalking Horse Bidder) interested in consummating a Sale (a "***Potential Bidder***") must deliver or have previously delivered, if determined to be necessary by the Debtors in their sole discretion:

(i)    an executed confidentiality agreement on terms acceptable to the Debtors (a "***Confidentiality Agreement***"), to the extent not already executed; and

(ii)    the most current audited and latest unaudited financial statements (the "***Financials***") of the Potential Bidder (or, if the Potential Bidder is an entity

formed for the purpose of acquiring the Assets (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors and their advisors and the Majority First Lien Lenders, and (y) a written commitment acceptable to the Debtors and their advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale).

**3.      Stalking Horse Bidders.**

The Debtors have entered into agreements (each, a "***Stalking Horse Agreement***") with parties (each, a "***Stalking Horse Bidder***") who will act as stalking horse for the North Dakota Package, the Wyoming Package, and the Trust Related Assets Package.  The Debtors, with the consent of the Majority First Lien Lenders, may (a) select one or more parties to act as a Stalking Horse Bidder for the North Louisiana Package, (b) negotiate the terms of and enter into one or more Stalking Horse Agreements with any such Stalking Horse Bidder for the North Louisiana Package (subject to higher or better bids as contemplated herein), and (c) agree to provide Bid Protections to such Stalking Horse Bidder, subject to approval of the Court after notice and an opportunity to object as set forth below; *provided* that no insider or affiliate of the Debtors shall be entitled to any Bid Protections.

Parties that are interested in serving as a Stalking Horse Bidder with respect to the North Louisiana Package are requested to submit proposed Stalking Horse Agreements by June 15, 2018 (the "***Proposed Stalking Horse Agreement Submission Deadline***").  If, under the proposed Stalking Horse Agreement selected by the Debtors, the proposed Stalking Horse Bidder will be entitled to Bid Protections in the aggregate worth four percent (4%) or less of the purchase price thereunder, the Debtors shall file a notice of entry into any Stalking Horse Agreement(s) with respect to the North Louisiana Package (a "***Stalking Horse Notice***") with the Court on or before June 19, 2018 (the "***Stalking Horse Notice Deadline***"), which notice(s) shall include any applicable proposed Stalking Horse Agreement(s) and set forth the terms of the Bid Protections proposed to be given to any such Stalking Horse Bidder(s) for the North Louisiana Package.  The Stalking Horse Notice shall be served (a) counsel to the First Lien Agent; (b) counsel to the Debtors' second lien lenders; (c) counsel to any statutory committee appointed in the Debtors' chapter 11 cases; and (d) the Office of the United States Trustee for the District of Delaware (collectively, the "***Stalking Horse Notice Parties***"), with no further notice being required.  The Stalking Horse Notice Parties shall have until seven (7) calendar days from the filing of a Stalking Horse Notice (the "***Bid Protections Objection Deadline***") to file an objection solely as to any proposed Bid Protections related thereto and serve such objection upon the Stalking Horse Notice Parties.  Once the Bid Protections Objection Deadline has passed, (a) if no objection has been timely filed, the Stalking Horse Agreement and the Bid Protections shall be deemed approved under the Bidding Procedures Order; or (b) if an objection has been timely filed, the Court may enter an order (the "***Stalking Horse Approval Order***") approving the Debtors' entry into the proposed Stalking Horse Agreement(s), and the Bid Protections related thereto, (x) upon certification of counsel if such objection has been resolved, or (y) after an emergency hearing.

The Debtors shall have the right to extend the Proposed Stalking Horse Agreement Submission Deadline and the Stalking Horse Notice Deadline, in each case with the consent of the Majority First Lien Lenders.

4.      **Qualified Bidders.**

    (a)    A "***Qualified Bidder***" is a Potential Bidder whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, whose Bid is a Qualified Bid, and that the Debtors, with the consent of the Majority First Lien Lenders,[3] determine should be considered a Qualified Bidder. Within two business days after the Bid Deadline, the Debtors' advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder with respect to a particular Asset Package and shall provide to the Stalking Horse Bidder for such Asset Package (if any) a copy of each Qualified Bid submitted by a Qualified Bidder relating to such Asset Package. Each Stalking Horse Bidder shall be deemed a Qualified Bidder at all times and for all purposes with respect to the Asset Package to which its Bid (each, a "***Stalking Horse Bid***") relates, and notwithstanding anything in these Bidding Procedures, each Stalking Horse Bid shall be deemed a Qualified Bid for all purposes.

    (b)    If any Potential Bidder is determined by the Debtors and the Majority First Lien Lenders not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit and all accumulated interest thereon on or within five business days after the Bid Deadline.

    (c)    Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Except as otherwise set forth in an applicable Stalking Horse Agreement, without the written consent of the Debtors and the Majority First Lien Lenders, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase their consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided that* any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

5.      **Due Diligence**.

    Only Potential Bidders that, upon submission of a Qualified Bid, will be Qualified Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room and to additional non-public information regarding the Debtors. **No Qualified Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement.** The Debtors will provide to each Qualified Bidder reasonable due diligence information, as requested by such Qualified Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post all written due diligence provided to any Qualified Bidder to the Debtors' electronic data room. For all Qualified Bidders other than the Stalking Horse Bidders, the due diligence period will end on the Bid Deadline, and subsequent to the expiration of the due

---

[3]    In each instance in these Bidding Procedures where the consent of the Majority First Lien Lenders is required, an email or, solely during the Auction, verbal confirmation, from counsel to the First Lien Agent to proposed counsel to the Debtors shall be sufficient to confirm such consent.

diligence period, the Debtors shall have no obligation to furnish any due diligence information. Each Stalking Horse Bidder's due diligence period has expired or will expire in accordance with the applicable Stalking Horse Agreement.

The Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or the Sale to any person except to a Qualified Bidder or to such Qualified Bidder's duly authorized representatives to the extent expressly permitted by the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Qualified Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide such information to Qualified Bidders who, at such time and in the Debtors' reasonable business judgment after consultation with the First Lien Agent, have not established, or who have raised doubt, that such Qualified Bidder intends in good faith to, or has the capacity to, consummate the applicable Sale.

The Debtors also reserve the right, subject to the terms of any Stalking Horse Agreement, to withhold any diligence materials that the Debtors determine are sensitive after notifying the Qualified Bidder requesting such materials of such determination. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Qualified Bidder in accordance with these Bidding Procedures.

**All due diligence requests must be directed to Evercore Group L.L.C., 55 East 52nd Street, New York, New York 10055, Attention: Matthew Moss; Phone number: (646) 264-2384; Email: matthew.moss@evercore.com.**

(a)     **Communications with Qualified Bidders**.

Notwithstanding anything to the contrary in these Bidding Procedures, all direct communications between and amongst Qualified Bidders regarding the Debtors or their Assets shall involve the Debtors and the Debtors' advisors. No Potential Bidder shall communicate with any other Potential Bidder absent prior written consent from the Debtors.

(b)     **Due Diligence from Qualified Bidders**.

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Qualified Bidder to consummate the applicable Sale. Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine, with the consent of the Majority First Lien Lenders, that such bidder is no longer a Qualified Bidder or that a bid made by such Qualified Bidder is not a Qualified Bid.

The Debtors, the First Lien Agent, the First Lien Lenders (as defined below), and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable Confidentiality Agreement or the confidentiality provisions under the First Lien Credit Agreement, if applicable, except as otherwise set forth in this section of these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or otherwise

in connection with the chapter 11 cases or in accordance with the terms of any applicable Confidentiality Agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Debtors and the Debtors' advisors may disclose confidential information: (i) with the prior written consent of such bidder; (ii) to the bidder disclosing the confidential information; and (iii) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

**6.    Bid Requirements**.

A proposal, solicitation, or offer (each, a "***Bid***") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (the "***Bid Requirements***") as determined by the Debtors, in their reasonable business judgment, and with the consent of the Majority First Lien Lenders, shall constitute a "***Qualified Bid***"). Each Stalking Horse Agreement will be deemed a Qualified Bid for all purposes.

**(a)    Assets**. Each Bid must clearly state which assets and liabilities of the Debtors that the Qualified Bidders are agreeing to purchase and assume.

**(b)    Purchase Price**. Each Bid must clearly set forth the purchase price to be paid for the applicable Asset Package, including and identifying separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids (the "***Purchase Price***"). Each Bid must also specify how the Purchase Price is allocated among the Assets within the applicable Asset Package and, if the Bid is for assets in more than one Asset Package, how the Purchase Price is allocated among the applicable Asset Packages.

**(c)    Minimum Bid**. The aggregate consideration proposed by each Bid must equal or exceed the sum of (the "***Minimum Bid***"):

- $47,800,000 in cash for the North Dakota Package;

- $5,675,000 in cash for the Wyoming Package;

- For the North Louisiana Package, a cash reserve price to be determined by the Debtors with the consent of the Required Supporting Lenders; and

- $29,100,000 in cash for the Trust Related Assets Package.

**(d)    Deposit**. Each Bid, other than a Stalking Horse Bid, must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate cash and non-cash Purchase Price of the Bid, to be held in a segregated account to be identified and established by the Debtors (the "***Deposit***"). Except with respect to a Stalking Horse Bid, the Debtors reserve the right, with the consent of the Majority First Lien Lenders, to increase the percentage of the Purchase Price to be included in the Deposit.

(e)     **Assumption of Obligations**.  Each Bid must expressly assume all of the obligations contemplated to be assumed by, and on terms no less favorable to the Debtors than, the applicable Stalking Horse Agreement (if any), as determined in the Debtors' business judgment, and after consultation with the Majority First Lien Lenders.  If no Stalking Horse Agreement exists as to the Asset Package subject to such Bid, the Bid must expressly state all the obligations to be assumed by the Bidder pursuant to such Bid.  Other than the obligations to be assumed, the Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "***Encumbrances***"), and any Encumbrances shall attach to the net proceeds of the Sales after payment of any applicable Bid Protections.

(f)     **The Same or Better Terms**. In addition to the Purchase Price meeting or exceeding the applicable Minimum Bid, each Bid must be on terms that are not more burdensome or conditional, in the Debtors' business judgment and after consultation with the First Lien Agent, than the terms of the applicable Stalking Horse Agreement (if any). Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid.  If a Stalking Horse Agreement exists as to the Asset Package subject to the Bid, each Bid must be based on the form of the applicable Stalking Horse Agreement and must include a copy of the applicable Stalking Horse Agreement clearly marked to show all changes requested by the Qualified Bidder, including those relating to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid (the "***Qualified Bid Documents***").

(g)     **Committed Financing**.  To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing documented to the satisfaction of the Debtors and the Majority First Lien Lenders that demonstrates that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions.  Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have only those covenants and conditions acceptable to the Debtors and the Majority First Lien Lenders.

(h)     **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtors' business judgment, and after consultation with the First Lien Agent, than those set forth in the applicable Stalking Horse Agreement (if any).

(i)     **Identity**.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Qualified Bidder if such Qualified Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific persons and counsel whom Evercore and Latham & Watkins LLP should contact regarding such Bid.

(j)     **Demonstrated Financial Capacity**.  A Qualified Bidder must have, in the Debtors' business judgment, with the consent of the Majority First Lien Lenders, the necessary financial capacity to consummate the proposed transactions required by its Bid (including, if necessary, to obtain transfer of any of the Debtors' permits and to obtain any necessary surety bonds or other financial assurances) and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

(k)     **Time Frame for Closing**.  Closing of the Sale as to any Asset Package related to a Bid by a Qualified Bidder (a "***Closing***") must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors and the Majority First Lien Lenders.

(l)     **Binding and Irrevocable**.  Except as provided herein, a Qualified Bidder's Bid for a particular Asset Package shall be irrevocable unless and until the Debtors accept a higher Bid for such Asset Package and such Qualified Bidder is not selected as the Backup Bidder for such Asset Package.  If selected as Backup Bidder, such Bid shall be irrevocable until the Closing of a Successful Bid for such Asset Package.

(m)     **Expenses; Disclaimer of Fees**.  Each Bid (other than a Stalking Horse Bid) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidders) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(n)     **Authorization**.  Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors and the Majority First Lien Lenders) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(o)  **As-Is, Where-Is**.  Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid.

(p)  **Adherence to Bid Procedures**.  By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

(q)  **Regulatory Approvals and Covenants**.  A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the applicable Sale, if any, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible) and any undertakings that will be required by the Debtors in connection with such regulatory and third party approvals.

(r)  **Consent to Jurisdiction**.  The Qualified Bidder must submit to the jurisdiction of and entry of final orders by the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the transaction documents related to the Sale, and the Closing, as applicable.

(s)  **Bid Deadline.** Each Bid must be transmitted via email (in .pdf or similar format) so as to be ***actually received*** on or before 5:00 p.m. (prevailing Eastern Time) on July 11, 2018 (the "***Bid Deadline***") by:

(i)  The Debtors, Enduro Resource Partners, 777 Main Street, Suite 800, Fort Worth, Texas 76102, Attn:  Jonny Brumley (jsbrumley@endurores.com) and Kim Weimer (kweimer@endurores.com);

(ii)  Proposed counsel to the Debtors, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611, Attn:  Caroline Reckler (caroline.reckler@lw.com) and Matthew Warren (matthew.warren@lw.com);

(iii)  Proposed co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn:  Michael Nestor (mnestor@ycst.com) and Kara Coyle (kcoyle@ycst.com);

(iv)    Proposed financial advisors to the Debtors, Evercore, 55 East 52nd Street, New York, New York 10055, Attn: Stephen Hannan (hannan@evercore.com) and Matthew Moss (matthew.moss@evercore.com);

(v)    Counsel to the applicable Stalking Horse Bidder, if any;

(vi)    Counsel to the First Lien Agent, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Damian S. Schaible and Aryeh Ethan Falk (enduro.auction@davispolk.com); and

(vii)    Financial advisors to the First Lien Agent, RPA Advisors, LLC, One Rockefeller Plaza, Tenth Floor, New York, New York 10020, Attn: Barry Kesler (bkesler@rpaadvisors.com).

**7.    Right to Credit Bid.**

For purposes hereof, should the First Lien Agent and/or the lenders under the First Lien Credit Agreement[4] (the "*First Lien Lenders*") submit a credit bid, the First Lien Agent and/or First Lien Lenders shall be deemed to be a Qualified Bidder, and any such credit bid shall be considered a Qualified Bid and may be submitted  at any time prior to or at the Auction provided that it otherwise complies with the requirements for a Qualified Bid as set forth above, provided, that, (a) in the case of a credit bid by the First Lien Agent, the First Lien Agent shall have provided the Debtors with copies of any direction by the Lenders under the First Lien Credit Agreement to authorize the submission of such credit bid by the First Lien Agent, and (b) notwithstanding anything to the contrary in these Bidding Procedures, from and after the submission of such credit bid, the Debtors shall not be required to consult with the First Lien Agent or First Lien Lenders or obtain the consent of the First Lien Agent or Majority First Lien Lenders in connection with the sale of the Asset Package subject to such credit bid unless and until such credit bid is withdrawn in writing by the First Lien Agent and/or First Lien Lenders, as applicable; *provided* that neither the First Lien Agent nor the First Lien Lenders shall be entitled to any Bid Protections (as defined in these Bidding Procedures). Credit bids, if any, by the First Lien Agent and/or First Lien Lenders will not impair or otherwise affect the Stalking Horse Bidders' entitlement to the Bid Protections granted under the Bidding Procedures Order; *provided* that the First Lien Lenders shall not be entitled to make such a credit bid as to any Asset Package which is subject to a Stalking Horse Agreement which exceeds the Stalking Horse Bid as to that Asset Package.

**8.    Auction**.

If the Debtors receive a Qualified Bid for a given Asset Package, other than the applicable Stalking Horse Bid for such Asset Package, if any, the Debtors will conduct the Auction to determine the Successful Bidders with respect to such Asset Package.  If the Debtors do not receive a Qualified Bid for a given Asset Package (other than the Stalking Horse Bid for such Asset

---

[4]    "*First Lien Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of August 1, 2013, by and among Enduro Resource Partners LLC, as borrower, Bank of America, N.A., as administrative agent, and the lenders and other parties thereto (as subsequently modified, amended, or supplemented from time to time).

Package, if applicable), the Debtors will not conduct the Auction as to such Asset Package and shall designate the Stalking Horse Bidder's Bid for such Asset Package, if any, as the Successful Bid for such Asset Package.

No later than 2 calendar days after the Bid Deadline, by 5:00 p.m. (prevailing Eastern time), the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid for the Asset Package for which such Qualified Bidder submitted a Bid, as determined in the Debtors' reasonable business judgment, with the consent of the Majority First Lien Lenders (the "***Baseline Bid***"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid for each Asset Package and which Qualified Bid constitutes the Successful Bid for each Asset Package shall take into account any factors the Debtors, after consultation with the First Lien Agent, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things: (a) the number, type, and nature of any changes to the applicable Stalking Horse Agreement, if any, requested by the Qualified Bidder, including the type and amount of Assets sought and obligations to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the tax consequences of such Qualified Bid (collectively, the "***Bid Assessment Criteria***").

If an Asset Package is subject to a Stalking Horse Agreement, and if a Qualified Bid by a bidder other than a Stalking Horse Bidder is selected as to the Baseline Bid for that Asset Package, then the Stalking Horse Bidder may elect to match any such Baseline Bid and the bid by the Stalking Horse Bidder shall therefore be considered the Baseline Bid for purposes of any Auction relating to that Asset Package. In matching any such Baseline Bid, the Stalking Horse Bidder shall be entitled to a credit against the amount of any such matching bid equal to the amount of the Stalking Horse Bidder's Bid Protections pursuant to the Applicable Stalking Horse Agreement to take into account that, if the Stalking Horse is the Successful Bidder (as defined below), no payment of the Stalking Horse's Bid Protections will be required. Conversely, if a Bidder other than the Stalking Horse Bidder is the Successful Bidder as to any Asset Package subject to a Stalking Horse Agreement, the net proceeds available to the Selling Debtor will be reduced by the amount of the applicable Bid Protections payable to the Stalking Horse Bidder.

The Auction shall take place at 10:00 a.m. (prevailing Central time) on July 16, 2018, at the offices of Latham & Watkins LLP, 811 South Main Street, Suite 3700, Houston, Texas 77002, or such later date and time as selected by the Debtors with the consent of the Majority First Lien Lenders. The Debtors shall file a notice of the date and time for the Auction no later than 5:00 p.m. (prevailing Eastern time) on July 13, 2018. The Auction shall be conducted in a timely fashion according to the following procedures:

(a)    **The Debtors Shall Conduct the Auction**.

The Debtors and their advisors shall direct and preside over the Auction. At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid for each Asset Package. All incremental Bids made thereafter for a given Asset Package shall be Overbids (defined below) for

such Asset Package and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on such Asset Package. The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only the Debtors, the Qualified Bidders, the First Lien Agent, any First Lien Lender, and each such parties' respective legal and financial advisors shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives. Only Qualified Bidders shall be entitled to bid at the Auction.

(b)     **Terms of Overbids**.

"*Overbid*" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid and accepted by the Debtors as a higher or otherwise better bid. Each applicable Overbid must comply with the following conditions:

(i)     **Minimum Overbid Increment**. The initial Overbid for a given Asset Package, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid for such Asset Package, giving effect to the credit for the Bid Protections for any Stalking Horse Bid that is a Baseline Bid (as described below), by an incremental amount that is not less than:

- $100,000 for the North Dakota Package;

- $500,000 for the Wyoming Package;

- $500,000 for the North Louisiana Package; and

- $500,000 for the Trust Related Assets Package (each, a "***Minimum Overbid Increment***"), with any Overbid for multiple Asset Packages incorporating an aggregate incremental amount equal to the sum of each applicable Minimum Overbid Increment;

(such initial Overbid, the "***Initial Minimum Overbid***"); and each successive applicable Overbid for a given Asset Package shall exceed the then-existing Overbid for such Asset Package by an incremental amount that is not less than the Minimum Overbid Increment, with any Overbid for multiple Asset Packages incorporating an aggregate incremental amount equal to the sum of each applicable Minimum Overbid Increment. Except as otherwise provided in any Stalking Horse Agreement, the Debtors reserve the right, after consultation with the First Lien Agent, to announce reductions in the Minimum Overbid Increment for a given Asset Package at any time during the Auction, other than with respect to the Initial Minimum Overbid. For the avoidance of doubt, if any Overbid is made as to any Asset Package for which there is a Stalking Horse Agreement, the Stalking Horse Bidder shall

be entitled to a dollar-for-dollar credit against the amount of any such Overbid equal to the amount of the Stalking Horse Bidder's Bid Protections pursuant to the Applicable Stalking Horse Agreement to take into account that, if the Stalking Horse is the Successful Bidder (as defined below), no payment of the Stalking Horse's Bid Protections will be required. Conversely, if a Bidder other than the Stalking Horse Bidder is the Successful Bidder as to any Asset Package subject to a Stalking Horse Agreement, the net proceeds available to the Selling Debtor will be reduced by the amount of the applicable Bid Protections of the Stalking Horse Bidder.

(ii)    **Consideration**.  Additional consideration in excess of the amount set forth in the respective Baseline Bid may include: (a) cash and/or noncash consideration; *provided*, *however*, that the value for such noncash consideration shall be determined by the Debtors in their reasonable business judgment, with the consent of the Majority First Lien Lenders; (b) in the case of a Bid by the First Lien Agent or the First Lien Lenders, subject to Section 6 of these Bid Procedures, a credit bid of up to the full amount of the First Lien Lenders' allowed secured claims, *provided*, *however*, that nothing herein shall impact any parties' rights with respect to either (I) challenges to the liens or claims of the First Lien Agent or the First Lien Lenders, including any challenges under section 363(k) of the Bankruptcy Code, or (II) assertions under section 506(c) of the Bankruptcy Code or the effects that such challenges or assertions have, if any, on the ability of the First Lien Agent or the First Lien Lenders to credit bid; and (c) in the case of a Bid by the Stalking Horse Bidder, a credit against the Bid equal to the full amount of the Stalking Horse Bidder's Bid Protections under the applicable Stalking Horse Agreement.

(iii)    **Conclusion of Each Overbid Round**.  Upon the solicitation of each round of applicable Overbids, the Debtors, with the consent of the Majority First Lien Lenders, may announce a deadline (as the Debtors may, in their business judgment, and with the consent of the Majority First Lien Lenders, extend from time to time, the "***Overbid Round Deadline***") by which time any Overbids must be submitted to the Debtors.

(iv)    **Overbid Alterations**.  An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, and after consultation with the First Lien Agent, but shall otherwise comply with the terms of these Bidding Procedures.

(v)    **Announcing Highest Bid**.  Subject to the rights of any Stalking Horse Bidder, subsequent to each Overbid Round Deadline, the Debtors, with the consent of the Majority First Lien Lenders, shall announce for each Asset Package whether the Debtors have identified in the initial applicable

13

Overbid round, an Overbid as being higher or otherwise better than the Initial Minimum Overbid for such Asset Package, or in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid for a given Asset Package (for each Asset Package, the "***Prevailing Highest Bid***").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

(c)     **Consideration of Overbids**.

The Debtors reserve the right, in their reasonable business judgment, and with the consent of the Majority First Lien Lenders, to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Debtors and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, and with the consent of the Majority First Lien Lenders, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

(d)     **Closing the Auction**.

(i)     The Auction shall continue until there is only one Bid for each Asset Package that the Debtors determine, in their reasonable business judgment, with the consent of the Majority First Lien Lenders, to be the highest or otherwise best Bid for such Asset Package.  Such Bid shall be declared the "***Successful Bid***," for such Asset Package and such Qualified Bidder, the "***Successful Bidder***" for such Asset Package at which point the Auction will be closed as to that Asset Package.  The Auction shall not close with respect to any Asset Package unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

(ii)    For the avoidance of doubt, but without limiting the Bid Protections or the provisions of any Stalking Horse Agreement, nothing in these Bidding Procedures shall prevent the Debtors from exercising their respective fiduciary duties under applicable law.

(iii)   The Debtors shall have no obligation to consider any Bids or Overbids submitted after the conclusion of the Auction, and may not consider any such Bid if a Stalking Horse Bidder has made the Successful Bid or the Backup Bid, and any such Bids or Overbids shall be deemed untimely and shall not constitute a Qualified Bid unless the Debtors, with the consent of the Majority First Lien Lenders, permit such Bid or Overbid.

(iv)     As soon as reasonably practicable after closing the Auction, the Debtors shall cause the Qualified Bid Documents for each Successful Bid and Backup Bid to be filed with the Court.

**(e)     No Collusion; Good-Faith *Bona Fide* Offer**.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction on the terms of its Qualified Bid if selected as the Successful Bidder.

**9.     Backup Bidder**.

(a)     Notwithstanding anything in these Bidding Procedures to the contrary, but subject to the terms of any Stalking Horse Agreement, if an Auction is conducted for a given Asset Package, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Asset Package, as determined by the Debtors in the exercise of their reasonable business judgment, and with the consent of the Majority First Lien Lenders (the "***Backup Bid***"), shall be required to serve as a backup bidder (the "***Backup Bidder***") for such Asset Package, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

(b)     The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, subject to the terms of any Stalking Horse Agreement, until the closing of the transaction with the applicable Successful Bidder; *provided* that nothing shall diminish the rights of a Stalking Horse Bidder under any Stalking Horse Agreement. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder or as may otherwise be provided in any Stalking Horse Agreement.

(c)     If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may, with the consent of the Majority First Lien Lenders, select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes, subject to the terms of any Stalking Horse Agreement.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.  Subject to the terms of any applicable Stalking Horse Agreement, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including specific performance.

10.    **Highest or Otherwise Best Bid**.

When determining the highest or otherwise best Bid for a given Asset Package, as compared to other Bids for such Asset Package, the Debtors may consider the Bid Assessment Criteria in addition to any other factors that the Debtors, and after consultation with the Majority First Lien Lenders, deem appropriate; *provided* that the fact a Bid, if any, is comprised of a credit bid shall not be a factor considered by the Debtors in their determination of the highest or otherwise best Bid.

11.    **Reservation of Rights**.

Subject to the rights of the Stalking Horse Bidders under the terms of their respective Stalking Horse Agreements, the Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, and with the consent of the Majority First Lien Lenders, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) cancelling the Auction; and (e) rejecting any or all bids or Bids; *provided*, *however*, that no such modification may alter, impair, or reduce the rights or protections of any Stalking Horse Bidder under these Bidding Procedures or under the applicable Stalking Horse Agreement.

12.    **Consent to Jurisdiction**.

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of and entry of final orders by the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Qualified Bid Documents, as applicable.

13.    **Sale Hearing**.

A hearing to consider approval of each Sale of the Assets to the Successful Bidders (or to approve the Stalking Horse Agreement(s), as applicable, if no Auction is held) (the "*Sale Hearing*") is currently scheduled to take place at 10:00 a.m. (prevailing Eastern time) on July 19, 2018, or as soon thereafter as the Debtors may be heard, before the Honorable [____], at the Court, 824 North Market Street, [____], Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors, with the consent of the Majority First Lien Lenders, by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder).**

At the Sale Hearing, the Debtors shall present the Successful Bids to the Court for approval.

14.     **Stalking Horse Rights**.

To provide an incentive and to compensate the Stalking Horse Bidders for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have, with the consent of the Majority First Lien Lenders, agreed to pay the respective Stalking Horse Bidders, under the conditions and in the amount set forth in the Bidding Procedures Order, (a) a break-up fee in the amount of:

- $1,350,000 for the North Dakota Package;

- $100,000 for the Wyoming Package; and

- $825,000 for the Trust Related Assets Package;

(each, a "***Break-Up Fee***"), payable pursuant to the terms of each Stalking Horse Agreement in the event that a Stalking Horse Agreement is terminated due to the Debtors entering into an alternative transaction or in other circumstances set forth in the applicable Stalking Horse Agreement, and (b) a reasonable expense reimbursement equal to:

- up to $450,000 for the North Dakota Package;

- up to $75,000 for the Wyoming Package; and

- up to $275,000 for the Trust Related Assets Package;

(each, an "***Expense Reimbursement***" and together with each applicable Breakup Fee, the "***Bid Protections***"), payable pursuant to the terms of each Stalking Horse Agreement in the event that a Stalking Horse Agreement is terminated due to the Debtors entering into an alternative transaction or in other circumstances set forth in the applicable Stalking Horse Agreement. The Bid Protections will be an allowed administrative expense priority claim in accordance with the terms of each Stalking Horse Agreement; *provided*, *however*, that such claim shall in no circumstances be *pari passu* with or senior to the claims granted to the First Lien Agent and/or the First Lien Lenders under any order of the Court granting such parties adequate protection, except that the Bid Protections shall be paid with first priority out of the proceeds of or as a precondition of the Successful Bid.  In the event a Stalking Horse Bidder is not the Successful Bidder, such Stalking Horse Bidder shall deliver to the Debtors any diligence reports prepared in connection with its Bid within two (2) business days following the conclusion of the Sale Hearing.

A Stalking Horse Bidder shall have standing to appear and be heard on all issues related to the Auction, the Sale, and related matters, including the right to object to the sale of the Assets or any portion thereof (including the conduct of the Auction and interpretation of these Bidding Procedures).

15.     **No Modification of Bidding Procedures**.

Except as provided by Section 10 hereof, these Bidding Procedures may not be modified except with the express written consent of the Debtors and the Majority First Lien Lenders.

16.     **Return of Deposit; Remedies**.

The Deposit of the Successful Bidder shall be applied to the respective Purchase Price of such transaction at closing. Subject to the terms of any applicable Stalking Horse Agreement, the Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder, and the Backup Bidder) on or within three business days after the Auction. Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon.

Except as otherwise set forth in the Stalking Horse Agreement with respect to an applicable Stalking Horse Bidder, if a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court, *provided* that nothing herein shall prohibit any party from seeking an additional hearing or order of the Court.

Notwithstanding anything to the contrary contained herein, in the event of a conflict between the remedies set forth in these Bidding Procedures as they relate to a Stalking Horse Bidder, and the remedies set forth in the applicable Stalking Horse Agreement, the remedies set forth in the Stalking Horse Agreement will control.

17.     **Fiduciary Out**.

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of a Debtors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law; *provided* that in the event of any such action, all rights and remedies of any Stalking Horse Bidder in these Bidding Procedures or any Stalking Horse Agreement shall be preserved.

18.     **Contract Procedures**

Within five (5) business days from the entry of the Bidding Procedures Order, the Debtors shall file and serve on all counterparties (the "***Counterparties***") to their executory contracts and unexpired leases (the "***Contracts***") a notice (the "***Cure Notice***") of (a) the potential assumption by the Debtors and assignment to the Successful Bidder(s) of the Contracts, and (b) the proposed amount necessary, under section 365(b)(1) of the Bankruptcy Code, to cure any outstanding monetary defaults and compensate the Counterparties for any pecuniary losses in connection with such assumption and assignment (the "***Proposed Cure Costs***").

If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts Schedule but was

not (any such Contract, a "***Previously Omitted Contract***"), the Debtors shall, promptly following discovery thereof (but in no event later than five (5) Business Days following discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted Contract notifying such counterparties of the Debtors' intention to assume and assign such Previously Omitted Contract to the Successful Bidder, including the proposed Cure Costs relating thereto (the "***Previously Omitted Contract Notice***").

Each Counterparty shall have until the earlier to occur of (x) 5:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable), and (y) the Sale Hearing (the "***Contract Objection Deadline***") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, the amount of the Proposed Cure Costs, but excluding any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code or on the basis of the identity of the Successful Bidder.  Any such objection must be filed and served on the Debtors and their proposed co-counsel, the First Lien Agent and its counsel, and the applicable Stalking Horse Bidder (if any) and its counsel, so as to be actually received by the Contract Objection Deadline.  Any unresolved such objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.  If any objections to the amount of Proposed Cure Costs remain unresolved as of the date of the Closing of the Sale of any Asset Package, the Debtors may deposit the disputed amount of Proposed Cure Costs relating to such Asset Package in a segregated account to hold pending resolution of such objections.

Each Counterparty may raise objections as to adequate assurance of future performance or on the basis of the identity of the Successful Bidder until the earlier to occur of (x) 5:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of a notice identifying the applicable Successful Bidder, which, for the avoidance of doubt, may be provided with the Cure Notice or the Previously Omitted Contract Notice or at any time thereafter with respect to the Stalking Horse Bidders, and (y) the Sale Hearing (the "***Buyer Specific Objection Deadline***").  Any such objection must be filed and served on the Debtors and their proposed co-counsel, the First Lien Agent and its counsel, and the applicable Successful Bidder or Stalking Horse Bidder (if any), as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline.  Any unresolved such objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

[*Remainder of page intentionally left blank.*]

Dated: _____
      Wilmington, Delaware

Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1253
Email:         mnestor@ycst.com
               kcoyle@ycst.com

- and -

George A. Davis (pro hac vice pending)
Mitchell A. Seider (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York 10022
Telephone:     (212) 906-1200
Facsimile:     (212) 751-4864
Email:         george.davis@lw.com
               mitchell.seider@lw.com

- and -

Caroline A. Reckler (*pro hac vice* pending)
Matthew L. Warren (*pro hac vice* pending)
Jason B. Gott (*pro hac vice* pending)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:     (312) 876-7700
Facsimile:     (312) 993-9767
Email:         caroline.reckler@lw.com
               matthew.warren@lw.com
               jason.gott@lw.com

*Proposed Counsel for Debtors and Debtors in Possession*

## **SCHEDULE 3.3**

**PRE-EFFECTIVE TIME CAPITAL EXPENDITURES**

-None-

## SCHEDULE 7.4

**CONSENTS**

Gas Purchase Agreement, dated April 1, 1990 between White Rock Oil & Gas, LLC and Washakie Midstream Services LLC

## <u>SCHEDULE 7.6</u>

## LITIGATION

-None-

## **SCHEDULE 7.7**

**VIOLATION OF LAWS**

[See attached]

SCHEDULE 7.7
VIOLATION OF LAWS

| TYPE | WELL NUMBER | WELL NAME | Well Status | OPERATOR | API NUMBER | COUNTY | STATE | LEGAL | BPO GWI% | BPO NRI% | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WELL | 20000.005.00 | COU 7 | S-NRT | ENDURO OPERATING LLC | 4904305201 | WASHAKIE | WY | 57, T-47N, R-91W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.012.00 | COU 16 | PR-NRT | ENDURO OPERATING LLC | 4904305271 | WASHAKIE | WY | S-14, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.015.00 | COU 20 | PR-NRT | ENDURO OPERATING LLC | 4904305270 | WASHAKIE | WY | S-13, T-47N, R-91W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.021.00 | COU 23 | PR-NRT | ENDURO OPERATING LLC | 4904305304 | WASHAKIE | WY | S-11, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.025.00 | COU 25 | S-NRT | ENDURO OPERATING LLC | 4904305240 | WASHAKIE | WY | S-24, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.027.00 | COU 32 | S-NRT | ENDURO OPERATING LLC | 4904305236 | WASHAKIE | WY | S-23, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.034.00 | COU 34 | S-NRT | ENDURO OPERATING LLC | 4904305248 | WASHAKIE | WY | S-24, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.036.00 | COU 36 | S-NRT | ENDURO OPERATING LLC | 4904305234 | WASHAKIE | WY | S-22, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.039.00 | COU 40 | S-NRT | ENDURO OPERATING LLC | 4904305196 | WASHAKIE | WY | S-24, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.030.00 | COU 46 | S-NRT | ENDURO OPERATING LLC | 4904305305 | WASHAKIE | WY | S-11, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.048.00 | COU 48 | S-NRT | ENDURO OPERATING LLC | 4904305241 | WASHAKIE | WY | S-8, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.05.00 | COU 67 | S-NRT | ENDURO OPERATING LLC | 4904305288 | WASHAKIE | WY | S-8, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.06.00 | COU 69 | S-NRT | ENDURO OPERATING LLC | 4904305252 | WASHAKIE | WY | S-5, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.06.00 | COU 83 | TA-NRT | ENDURO OPERATING LLC | 4904305262 | WASHAKIE | WY | S-17, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.083.00 | COU 85 | S-NRT | ENDURO OPERATING LLC | 4904305247 | WASHAKIE | WY | S-17, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.067.00 | COU 86 | PR-NRT | ENDURO OPERATING LLC | 4904305293 | WASHAKIE | WY | S-7, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.06.00 | COU 89 | S-NRT | ENDURO OPERATING LLC | 4904305243 | WASHAKIE | WY | S-5, T-47N, R-91W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.093.00 | COU 93 | S-NRT | ENDURO OPERATING LLC | 4904320318 | WASHAKIE | WY | S-5, T-47N, R-91W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.103.00 | COU 103 | S-NRT | ENDURO OPERATING LLC | 4904320190 | WASHAKIE | WY | S-22, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.07.00 | COU 121 | S-NRT | ENDURO OPERATING LLC | 4904320441 | WASHAKIE | WY | S-5, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.125.00 | COU 123 | S-NRT | ENDURO OPERATING LLC | 4904320380 | WASHAKIE | WY | S-26, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.091.00 | COU 125 | S-NRT | ENDURO OPERATING LLC | 4904320832 | WASHAKIE | WY | S-22, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.126.00 | COU 126 | S-NRT | ENDURO OPERATING LLC | 4904320560 | WASHAKIE | WY | S-23, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.109.00 | COU 128 | S-NRT | ENDURO OPERATING LLC | 4904320443 | WASHAKIE | WY | S-14, T-47N, R-91W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.104.00 | COU 151 INJ | PR-NRT | ENDURO OPERATING LLC | 4904320581 | WASHAKIE | WY | S-14, T-47N, R-90W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.110.00 | COU 160 | S-NRT | ENDURO OPERATING LLC | 4904320505 | WASHAKIE | WY | S-9, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.112.00 | COU 161 | S-NRT | ENDURO OPERATING LLC | 4904320481 | WASHAKIE | WY | S-9, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.113.00 | COU 163 | PR-NRT | ENDURO OPERATING LLC | 4904320567 | WASHAKIE | WY | S-14, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.168.00 | COU 168 | S-NRT | ENDURO OPERATING LLC | 4904320605 | WASHAKIE | WY | S-12, T-47N, R-91W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.117.00 | COU 169 | S-NRT | ENDURO OPERATING LLC | 4904320728 | WASHAKIE | WY | S-8, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.118.00 | COU 190 | PR-NRT | ENDURO OPERATING LLC | 4904320739 | WASHAKIE | WY | S-8, T-47N, R-90W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.141.00 | COU 212 | S-NRT | ENDURO OPERATING LLC | 4904320778 | WASHAKIE | WY | S-17, T-47N, R-90W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.144.00 | COU 214 | S-NRT | ENDURO OPERATING LLC | 4904320770 | WASHAKIE | WY | S-17, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.125.00 | COU 219 | S-NRT | ENDURO OPERATING LLC | 4904320741 | WASHAKIE | WY | S-11, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.149.00 | COU 220 | PR-NRT | ENDURO OPERATING LLC | 4904320745 | WASHAKIE | WY | S-17, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.15.00 | COU 222 | S-NRT | ENDURO OPERATING LLC | 4904320749 | WASHAKIE | WY | S-7, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.152.00 | COU 225 | S-NRT | ENDURO OPERATING LLC | 4904320748 | WASHAKIE | WY | S-12, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.07.00 | COU 227 | PR-NRT | ENDURO OPERATING LLC | 4904320773 | WASHAKIE | WY | S-11, T-47N, R-90W | 91.098800% | 76.755131% | |
| WELL | 20000.184.00 | COU 238 | S-NRT | ENDURO OPERATING LLC | 4904320803 | WASHAKIE | WY | S-8, T-47N, R-90W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.185.00 | COU 243 | S-NRT | ENDURO OPERATING LLC | 4904320786 | WASHAKIE | WY | S-7, T-47N, R-90W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.155.00 | COU 244 | S-NRT | ENDURO OPERATING LLC | 4904320771 | WASHAKIE | WY | S-7, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.168.00 | COU 252 | S-NRT | ENDURO OPERATING LLC | 4904320808 | WASHAKIE | WY | S-8, T-47N, R-91W | 91.098800% | 76.755131% | |
| WELL | 20000.17.00 | COU 253 | PR-NRT | ENDURO OPERATING LLC | 4904320809 | WASHAKIE | WY | S-17, T-47N, R-90W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.176.00 | COU 254 | S-NRT | ENDURO OPERATING LLC | 4904320778 | WASHAKIE | WY | S-17, T-47N, R-90W | 91.098800% | 76.755131% | Low volume gas well, SI to build press. and turn sales periodically |
| WELL | 20000.178.00 | COU 255 | S-NRT | ENDURO OPERATING LLC | 4904321108 | WASHAKIE | WY | S-7, T-47N, R-90W | 81.876000% | 76.755131% | |
| WELL | 20000.180.00 | COU 122 | S-NRT | ENDURO OPERATING LLC | 4904321120 | WASHAKIE | WY | S-20, T-47N, R-92W | 87.834000% | 76.755131% | |
| WELL | 20000.181.00 | COU 257 | S-NRT | ENDURO OPERATING LLC | 4904320164 | WASHAKIE | WY | S-2, T-46N, R-92W | 86.524550% | 86.524550% | |
| WELL | 20000.182.00 | COU 258 | S-NRT | ENDURO OPERATING LLC | 4904320782 | WASHAKIE | WY | S-2, T-46N, R-92W | 86.263070% | 86.263070% | |
| WELL | 20005.00.00 | COU 261 | S-NRT | ENDURO OPERATING LLC | 4904320190 | WASHAKIE | WY | S-2, T-46N, R-92W | 100.00000% | 86.263070% | |
| WELL | 20005.00.00 | SLICK CREEK 804456 30H | S-NRT | ENDURO OPERATING LLC | 4904320753 | WASHAKIE | WY | S-33, T-47N, R-92W | 100.00000% | 86.263070% | |
| WELL | 20000.184.00 | COU 272 | S-NRT | ENDURO OPERATING LLC | 4904320786 | WASHAKIE | WY | S-7, T-47N, R-90W | 100.00000% | 86.263070% | |
| WELL | 20000.185.00 | COU 277 | S-NRT | ENDURO OPERATING LLC | 4904320803 | WASHAKIE | WY | S-32, T-47N, R-91W | 100.00000% | 86.043400% | |
| WELL | 20000.190.00 | COU 278 | S-NRT | ENDURO OPERATING LLC | 4904320808 | WASHAKIE | WY | S-35, T-47N, R-91W | 100.00000% | 81.250000% | |
| WELL | 20014.00.00 | COU 227 | S-NRT | ENDURO OPERATING LLC | 4904320826 | WASHAKIE | WY | S-32, T-46N, R-91W | 81.250000% | 81.250000% | Plant to RTP 2018 |
| WELL | 20013.00.00 | COTTONWOOD W2763E 2 34 | S-NRT | ENDURO OPERATING LLC | 4904302473 | WASHAKIE | WY | S-2, T-46N, R-91W | 82.500000% | 82.500000% | |
| WELL | 20015.00.00 | COTTONWOOD CREEK FEDERAL 26 23 | S-NRT | ENDURO OPERATING LLC | 4904320625 | WASHAKIE | WY | S-26, T-47N, R-91W | 75.000000% | 75.000000% | |
| WELL | 20017.00.00 | COTTONWOOD CREEK 26 21 | S-NRT | ENDURO OPERATING LLC | 4904320561 | WASHAKIE | WY | S-26, T-47N, R-91W | 86.263070% | 86.263070% | |
| WELL | 20026.00.00 | SOUTH FRISBY 5 | S-NRT | ENDURO OPERATING LLC | 4904302613 | WASHAKIE | WY | S-19, T-47N, R-91W | 85.500000% | 85.500000% | |
| WELL | 20027.00.00 | SOUTH FRISBY 8 | S-NRT | ENDURO OPERATING LLC | 4904320479 | WASHAKIE | WY | S-24, T-47N, R-91W | 85.500000% | 85.500000% | |

SCHEDULE 7.7
VIOLATION OF LAWS

| TYPE | WELL NUMBER | WELL NAME | OPERATOR | Well Status | API NUMBER | COUNTY | STATE | LEGAL | BPO GW % | BPO NRI % | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WELL | 20035.001.00 | CALDWELL 1-20 | ENDURO OPERATING LLC | SI-NRT | 4904320596 | WASHAKIE | WY | S-20, T-47N, R-91W | 100.00000% | 84.00000% | |
| WELL | 20038.001.00 | NEIBER 11 29 | ENDURO OPERATING LLC | SI-NRT | 4904320790 | WASHAKIE | WY | S-29, T-45N, R-91W | 100.00000% | 82.50000% | Plant to RTP 2018 |
| WELL | 20030.001.00 | NEIBER 80 | ENDURO OPERATING LLC | SI-NRT | 4904305697 | WASHAKIE | WY | S-30, T-45N, R-91W | 100.00000% | 80.00000% | Plant to RTP 2018 |
| WELL | 20040.001.00 | EAST NEIBER 29 21 | ENDURO OPERATING LLC | SI-NRT | 4904320520 | WASHAKIE | WY | S-29, T-45N, R-91W | 100.00000% | 82.50000% | Plant to RTP 2018 |
| WELL | 20000.032.00 | CGI 37 | ENDURO OPERATING LLC | SI-NRT | 4904305297 | WASHAKIE | WY | S-9, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.042.00 | CGI 47 | ENDURO OPERATING LLC | SI-NRT | 4904305190 | WASHAKIE | WY | S-4, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.047.00 | CGI 55 | ENDURO OPERATING LLC | SI-NRT | 4904305313 | WASHAKIE | WY | S-4, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.061.00 | CGI 81A | ENDURO OPERATING LLC | SI-NRT | 4904320610 | WASHAKIE | WY | S-27, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.095.00 | CGI 135 | ENDURO OPERATING LLC | SI-NRT | 4904320465 | WASHAKIE | WY | S-31, T-48N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.105.00 | CGI 156 | ENDURO OPERATING LLC | SI-NRT | 4904320564 | WASHAKIE | WY | S-10, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.108.00 | CGI 159 (N) | ENDURO OPERATING LLC | INJ-NRT | 4904320566 | WASHAKIE | WY | S-10, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.117.00 | CGI 184 | ENDURO OPERATING LLC | TA-NRT | 4904320637 | WASHAKIE | WY | S-27, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20004.005.00 | TENGLEP 11 8 (N) | ENDURO OPERATING LLC | SI-NRT | 4904320218 | WASHAKIE | WY | S-7, T-47N, R-90W | 83.88462% | 83.88462% | Classified as Idle Well per BLM |
| WELL | 20002.002.00 | CCKU 11 1 | ENDURO OPERATING LLC | TA-NRT | 4904320170 | WASHAKIE | WY | S-1, T-47N, R-90W | 97.63361% | 81.62474% | Classified as Idle Well per BLM |
| WELL | 20005.006.00 | SLICK CREEK 6 WD44 366 35 31 | ENDURO OPERATING LLC | TA-NRT | 4904320636 | WASHAKIE | WY | S-35, T-47N, R-92W | 100.00000% | 86.26571% | Classified as Idle Well per BLM |
| WELL | 20005.008.00 | SLICK CREEK UNIT 8 PHOS | ENDURO OPERATING LLC | TA-NRT | 4904305164 | WASHAKIE | WY | S-34, T-47N, R-92W | 100.00000% | 86.26571% | Classified as Idle Well per BLM |
| WELL | 20018.001.00 | KNISLY FEDERAL 1 | ENDURO OPERATING LLC | SI-NRT | 4904305176 | WASHAKIE | WY | S-27, T-47N, R-91W | 100.00000% | 73.50000% | Classified as Idle Well per BLM |
| WELL | 20041.001.00 | ALTUS BLACKHAWK 44 21 | ENDURO OPERATING LLC | TA-NRT | 4904320474 | WASHAKIE | WY | S-21, T-45N, R-92W | 100.00000% | 76.11500% | Classified as Idle Well per BLM |
| AIR PERMIT | N/A | NO WATER CREEK UNIT PHOS | ENDURO OPERATING LLC | N/A | N/A | WASHAKIE | WY | N/A | N/A | N/A | Air Permit NOV for battery and several wells; agreed to pay $15,000 in April, 2018; waiting on approved signed settlement agreement from WY DEQ to submit payment |

Schedule 7.7 - 2

## **SCHEDULE 7.8**

**PREFERENTIAL RIGHTS**

-None-

### SCHEDULE 7.9

**ROYALTIES, EXPENSES, ETC.**

| Caption / Title / Description | Cause Number | Jurisdiction |
|---|---|---|
| Audit by Wyoming Department of Audit, Mineral Audit Division alleging underpayment of federal gas lease royalties | Audit Issue Letter dated April 3, 2017<br><br>Case No. 15-00684<br><br>Reference No. MR116200 | State of Wyoming Department of Audit, Mineral Audit Division |

## SCHEDULE 7.10

### IMBALANCES

| Enduro Entity | Counterparty | Product | Volume | Unit | Due | Effective Date |
|---|---|---|---|---|---|---|
| Washakie Midstream LLC | WBI Energy Transmission | Gas | 145.60 | MMBtu | Enduro | 12/31/2017 |

## SCHEDULE 7.11

## PROPERTY TAXES

-None-

## SCHEDULE 7.13

**SUSPENSE FUNDS**

| Package Description | Net Amount as of Effective Time |
|:---:|:---:|
| Wyoming | $33,789.93 |

## SCHEDULE 7.14

**NOTICES**

[See attached]

SCHEDULE 7.14
NOTICES

| TYPE | WELL NUMBER | WELL NAME | Well Status | OPERATOR | API NUMBER | COUNTY | STATE | LEGAL | BPO GWI % | BPO NRI % | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WELL | 20000105.00 | CGU 7 | S-NRT | ENDURO OPERATING LLC | 4904305201 | WASHAKIE | WY | S5, T47N, R91W | 91.09880% | 76.75515% | Low volume gas well, SI to build press, and turn sales periodically |
| WELL | 20000121.00 | CGU 16 | PR-NRT | ENDURO OPERATING LLC | 4904305271 | WASHAKIE | WY | S14, T47N, R91W | 91.09880% | 76.75515% | Low volume gas well, SI to build press, and turn sales periodically |
| WELL | 20000116.00 | CGU 20 | PR-NRT | ENDURO OPERATING LLC | 4904305270 | WASHAKIE | WY | S13, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000115.00 | CGU 22 | PR-NRT | ENDURO OPERATING LLC | 4904305309 | WASHAKIE | WY | S11, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000112.00 | CGU 25 | S-NRT | ENDURO OPERATING LLC | 4904305240 | WASHAKIE | WY | S24, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000127.00 | CGU 32 | S-NRT | ENDURO OPERATING LLC | 4904305236 | WASHAKIE | WY | S23, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000134.00 | CGU 34 | S-NRT | ENDURO OPERATING LLC | 4904305248 | WASHAKIE | WY | S20, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000136.00 | CGU 36 | S-NRT | ENDURO OPERATING LLC | 4904305234 | WASHAKIE | WY | S22, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000133.00 | CGU 40 | S-NRT | ENDURO OPERATING LLC | 4904305196 | WASHAKIE | WY | S24, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000142.00 | CGU 48 | S-NRT | ENDURO OPERATING LLC | 4904305174 | WASHAKIE | WY | S16, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000155.00 | CGU 67 | S-NRT | ENDURO OPERATING LLC | 4904305238 | WASHAKIE | WY | S8, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000169.00 | CGU 69 | S-NRT | ENDURO OPERATING LLC | 4904305252 | WASHAKIE | WY | S5, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000056.00 | CGU 71 | S-NRT | ENDURO OPERATING LLC | 4904305205 | WASHAKIE | WY | S8, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000073.00 | CGU 73 | TA-NRT | ENDURO OPERATING LLC | 4904305217 | WASHAKIE | WY | S17, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000083.00 | CGU 83 | S-NRT | ENDURO OPERATING LLC | 4904305183 | WASHAKIE | WY | S14, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000086.00 | CGU 86 | PR-NRT | ENDURO OPERATING LLC | 4904305293 | WASHAKIE | WY | S7, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000089.00 | CGU 89 | S-NRT | ENDURO OPERATING LLC | 4904305268 | WASHAKIE | WY | S35, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000098.00 | CGU 98 | S-NRT | ENDURO OPERATING LLC | 4904305189 | WASHAKIE | WY | S5, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000103.00 | CGU 103 | S-NRT | ENDURO OPERATING LLC | 4904320190 | WASHAKIE | WY | S22, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000123.00 | CGU 123 | S-NRT | ENDURO OPERATING LLC | 4904320441 | WASHAKIE | WY | S5, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000125.00 | CGU 125 | S-NRT | ENDURO OPERATING LLC | 4904320383 | WASHAKIE | WY | S26, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000126.00 | CGU 126 | S-NRT | ENDURO OPERATING LLC | 4904320382 | WASHAKIE | WY | S22, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000128.00 | CGU 128 | S-NRT | ENDURO OPERATING LLC | 4904320571 | WASHAKIE | WY | S23, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000151.00 | CGU 151 (NI) | S-NRT | ENDURO OPERATING LLC | 4904320558 | WASHAKIE | WY | S14, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000160.00 | CGU 160 | S-NRT | ENDURO OPERATING LLC | 4904320580 | WASHAKIE | WY | S9, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000161.00 | CGU 161 | S-NRT | ENDURO OPERATING LLC | 4904320581 | WASHAKIE | WY | S9, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000163.00 | CGU 163 | PR-NRT | ENDURO OPERATING LLC | 4904320567 | WASHAKIE | WY | S14, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000168.00 | CGU 168 | PR-NRT | ENDURO OPERATING LLC | 4904320565 | WASHAKIE | WY | S14, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000117.00 | CGU 190 | S-NRT | ENDURO OPERATING LLC | 4904320604 | WASHAKIE | WY | S11, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000149.00 | CGU 199 | S-NRT | ENDURO OPERATING LLC | 4904320739 | WASHAKIE | WY | S8, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000212.00 | CGU 212 | S-NRT | ENDURO OPERATING LLC | 4904320728 | WASHAKIE | WY | S12, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000214.00 | CGU 214 | S-NRT | ENDURO OPERATING LLC | 4904320739 | WASHAKIE | WY | S8, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000118.00 | CGU 218 | PR-NRT | ENDURO OPERATING LLC | 4904320747 | WASHAKIE | WY | S14, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000144.00 | CGU 220 | S-NRT | ENDURO OPERATING LLC | 4904320780 | WASHAKIE | WY | S11, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000222.00 | CGU 222 | PR-NRT | ENDURO OPERATING LLC | 4904320737 | WASHAKIE | WY | S17, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000225.00 | CGU 225 | S-NRT | ENDURO OPERATING LLC | 4904320745 | WASHAKIE | WY | S7, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000227.00 | CGU 227 | S-NRT | ENDURO OPERATING LLC | 4904320749 | WASHAKIE | WY | S20, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000118.00 | CGU 228 | PR-NRT | ENDURO OPERATING LLC | 4904320748 | WASHAKIE | WY | S12, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000243.00 | CGU 243 | S-NRT | ENDURO OPERATING LLC | 4904320786 | WASHAKIE | WY | S5, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000244.00 | CGU 244 | S-NRT | ENDURO OPERATING LLC | 4904320784 | WASHAKIE | WY | S8, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000252.00 | CGU 252 | S-NRT | ENDURO OPERATING LLC | 4904320785 | WASHAKIE | WY | S8, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000253.00 | CGU 253 | S-NRT | ENDURO OPERATING LLC | 4904320777 | WASHAKIE | WY | S17, T47N, R90W | 91.09880% | 76.75515% | Low volume gas well, SI to build press, and turn sales periodically |
| WELL | 20000254.00 | CGU 254 | PR-NRT | ENDURO OPERATING LLC | 4904320778 | WASHAKIE | WY | S17, T47N, R90W | 91.09880% | 76.75515% | Low volume gas well, SI to build press, and turn sales periodically |
| WELL | 20000255.00 | CGU 255 | S-NRT | ENDURO OPERATING LLC | 4904321108 | WASHAKIE | WY | S17, T47N, R90W | 81.82600% | 76.75515% | |
| WELL | 20000257.00 | CGU 257 | PR-NRT | ENDURO OPERATING LLC | 4904320779 | WASHAKIE | WY | S20, T47N, R90W | 91.09880% | 76.75515% | |
| WELL | 20000258.00 | CGU 258 | S-NRT | ENDURO OPERATING LLC | 4904320782 | WASHAKIE | WY | S12, T47N, R91W | 91.09880% | 76.75515% | |
| WELL | 20000260.00 | CGU 260 | S-NRT | ENDURO OPERATING LLC | 4904320190 | WASHAKIE | WY | S20, T47N, R90W | 100.00000% | 86.52450% | |
| WELL | 20000261.00 | CGU 261 | S-NRT | ENDURO OPERATING LLC | 4904320745 | WASHAKIE | WY | S33, T47N, R91W | 100.00000% | 86.26557% | |
| WELL | 20000272.00 | CGU 272 | S-NRT | ENDURO OPERATING LLC | 4904320151 | WASHAKIE | WY | S21, T46N, R90W | 100.00000% | 86.26557% | |
| WELL | 20000277.00 | CGU 277 | S-NRT | ENDURO OPERATING LLC | 4904320594 | WASHAKIE | WY | S30, T47N, R91W | 100.00000% | 86.04340% | |
| WELL | 20000278.00 | CGU 278 | S-NRT | ENDURO OPERATING LLC | 4904320808 | WASHAKIE | WY | S35, T47N, R91W | 81.25000% | 81.25000% | |
| WELL | 20014002.00 | CCKU 127 | S-NRT | ENDURO OPERATING LLC | 4904320626 | WASHAKIE | WY | S17, T47N, R91W | 81.25000% | 81.25000% | |
| WELL | 20012002.00 | CCKU 122.2 | S-NRT | ENDURO OPERATING LLC | 4904321108 | WASHAKIE | WY | S17, T47N, R90W | 87.82500% | 82.50000% | |
| WELL | 20001006.00 | SLICK CREEK 804305615 | S-NRT | ENDURO OPERATING LLC | 4904320473 | WASHAKIE | WY | S1, T46N, R91W | 100.00000% | 75.00000% | |
| WELL | 20001006.00 | SLICK CREEK UNIT 1 | S-NRT | ENDURO OPERATING LLC | 4904320628 | WASHAKIE | WY | S26, T47N, R91W | 100.00000% | 86.54550% | |
| WELL | 20005000.00 | SLICK CREEK 804306-25 | S-NRT | ENDURO OPERATING LLC | 4904320164 | WASHAKIE | WY | S12, T46N, R92W | 100.00000% | 86.26557% | |
| WELL | 20005004.00 | SLICK CREEK 804306-30H | S-NRT | ENDURO OPERATING LLC | 4904320199 | WASHAKIE | WY | S26, T47N, R91W | 100.00000% | 86.26557% | |
| WELL | 20005003.00 | SLICK CREEK 804306-30H | S-NRT | ENDURO OPERATING LLC | 4904320153 | WASHAKIE | WY | S33, T47N, R90W | 100.00000% | 86.26557% | |
| WELL | 20001006.00 | SLICK CREEK 4 | S-NRT | ENDURO OPERATING LLC | 4904320161 | WASHAKIE | WY | S1, T46N, R92W | 100.00000% | 86.26557% | |
| WELL | 20007000.00 | SOUTH FRISBY 2 | S-NRT | ENDURO OPERATING LLC | 4904320594 | WASHAKIE | WY | S30, T47N, R91W | 100.00000% | 86.04340% | |
| WELL | 20013000.00 | FEDERAL W93032-35 1 CCU | S-NRT | ENDURO OPERATING LLC | 4904320374 | WASHAKIE | WY | S35, T47N, R91W | 81.25000% | 81.25000% | |
| WELL | 20011000.00 | COTTONWOOD CREEK FEDERAL 21 | S-NRT | ENDURO OPERATING LLC | 4904320626 | WASHAKIE | WY | S17, T47N, R91W | 81.25000% | 81.25000% | |
| WELL | 20014000.00 | COTTONWOOD W27635C 2 34 | S-NRT | ENDURO OPERATING LLC | 4904320473 | WASHAKIE | WY | S2, T46N, R91W | 82.50000% | 82.50000% | |
| WELL | 20015000.00 | COTTONWOOD CREEK FEDERAL 26 23 | S-NRT | ENDURO OPERATING LLC | 4904320625 | WASHAKIE | WY | S26, T47N, R91W | 75.00000% | 75.00000% | Plant to RTP 2018 |
| WELL | 20017000.00 | COTTONWOOD CREEK 26 21 | S-NRT | ENDURO OPERATING LLC | 4904320651 | WASHAKIE | WY | S26, T47N, R91W | 100.00000% | 85.50000% | |
| WELL | 20026001.00 | SOUTH FRISBY 6 | S-NRT | ENDURO OPERATING LLC | 4904320263 | WASHAKIE | WY | S19, T47N, R91W | 100.00000% | 85.50000% | |
| WELL | 20027001.00 | SOUTH FRISBY 8 | S-NRT | ENDURO OPERATING LLC | 4904320479 | WASHAKIE | WY | S24, T47N, R91W | 100.00000% | 85.50000% | |

Schedule 7.14 - 1

SCHEDULE 5.14
NOTICES

| TYPE | WELL NUMBER | WELL NAME | OPERATOR | Well Status | API NUMBER | COUNTY | STATE | LEGAL | BPO GOI % | BPO NRI % | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WELL | 20033.001.00 | CALDWELL 1 20 | ENDURO OPERATING LLC | S-NRT | 49043203796 | WASHAKIE | WY | S-20, T-47N, R-91W | 100.00000% | 84.00000% | |
| WELL | 20038.001.00 | NEBER 11 29 | ENDURO OPERATING LLC | S-NRT | 49043203790 | WASHAKIE | WY | S-29, T-45N, R-91W | 100.00000% | 82.50000% | Plant to RTP 2018 |
| WELL | 20030.001.00 | NEBER 80 | ENDURO OPERATING LLC | S-NRT | 49043205687 | WASHAKIE | WY | S-30, T-45N, R-91W | 100.00000% | 80.00000% | Plant to RTP 2018 |
| WELL | 20040.001.00 | EAST NEBER 29 21 | ENDURO OPERATING LLC | S-NRT | 49043205120 | WASHAKIE | WY | S-29, T-45N, R-91W | 100.00000% | 82.50000% | Plant to RTP 2018 |
| WELL | 20050.032.00 | CGU 37 | ENDURO OPERATING LLC | S-NRT | 49043205297 | WASHAKIE | WY | S-9, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.042.00 | CGU 47 | ENDURO OPERATING LLC | S-NRT | 49043205190 | WASHAKIE | WY | S-4, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.047.00 | CGU 55 | ENDURO OPERATING LLC | S-NRT | 49043205313 | WASHAKIE | WY | S-4, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.063.00 | CGU 81A | ENDURO OPERATING LLC | S-NRT | 49043206310 | WASHAKIE | WY | S-27, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.095.00 | CGU 135 | ENDURO OPERATING LLC | S-NRT | 49043203665 | WASHAKIE | WY | S-31, T-48N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.105.00 | CGU 156 | ENDURO OPERATING LLC | S-NRT | 49043202564 | WASHAKIE | WY | S-31, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.108.00 | CGU 159 I NJ | ENDURO OPERATING LLC | INJ-NRT | 49043205566 | WASHAKIE | WY | S-10, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20000.137.00 | CGU 184 | ENDURO OPERATING LLC | TA-NRT | 49043202637 | WASHAKIE | WY | S-25, T-47N, R-91W | 91.09880% | 76.75511% | Classified as Idle Well per BLM |
| WELL | 20002.002.00 | TEN GLEP 11 8 INJ | ENDURO OPERATING LLC | S-NRT | 49043202118 | WASHAKIE | WY | S-7, T-47N, R-90W | 97.61361% | 83.88462% | Classified as Idle Well per BLM |
| WELL | 20005.006.00 | CCKU 11 1 | ENDURO OPERATING LLC | TA-NRT | 49043202170 | WASHAKIE | WY | S-31, T-47N, R-90W | 100.00000% | 81.62474% | Classified as Idle Well per BLM |
| WELL | 20005.008.00 | SLICK CREEK UNIT #306 35 31 | ENDURO OPERATING LLC | TA-NRT | 49043206306 | WASHAKIE | WY | S-35, T-47N, R-92W | 100.00000% | 86.26577% | Classified as Idle Well per BLM |
| WELL | 20005.008.00 | SLICK CREEK UNIT 8 PH05 | ENDURO OPERATING LLC | TA-NRT | 49043205164 | WASHAKIE | WY | S-34, T-47N, R-92W | 100.00000% | 86.26577% | Classified as Idle Well per BLM |
| WELL | 20018.001.00 | KINSLEY FEDERAL 1 | ENDURO OPERATING LLC | S-NRT | 49043205176 | WASHAKIE | WY | S-34, T-47N, R-92W | 100.00000% | 71.50000% | Classified as Idle Well per BLM |
| WELL | 20041.001.00 | ALTUS BLACKHAWK 44 21 | ENDURO OPERATING LLC | TA-NRT | 49043202474 | WASHAKIE | WY | S-21, T-45N, R-92W | 100.00000% | 76.11000% | Classified as Idle Well per BLM |
| AIR PERMIT | N/A | NO WATER CREEK UNIT PH05 | ENDURO OPERATING LLC | N/A | N/A | WASHAKIE | WY | N/A | N/A | N/A | Air Permit NOV for battery and several wells; agreed to pay $15,000 in April, 2018; waiting on approved signed settlement agreement from WY DEQ to submit payment |

## SCHEDULE 7.15

## MECHANICAL INTEGRITY

-None-

## <u>SCHEDULE 7.16</u>

## MATERIAL CONTRACTS

-None-

**SCHEDULE 9.1**

**ONGOING OPERATIONS**

| Property No. | AFE Date | AFE Number | OP. AFE No. | Well/AFE Name | Surface Location | Project Description | Field Name | Operator | API | Estimate | Enduro Estimated Cost | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 28000.000.00 | 2/9/2018 | 018WY-0001 | N/A | CALDWELL USA BTRY | Sec 20-T47N-R91W | Upgrade oil storage tanks | Cottonwood Creek | Enduro | NA | $ 39,750 | $ 39,750 | COMPLETE |
| 20029.001.00 | 4/3/2018 | 018WY-0002 | N/A | SMITH USA 1-30 | Sec 30-T47N-R91W | Fish Tbg & RTP | Frisby South | Enduro | 4904320362 | $ 115,000 | $ 115,000 | COMPLETE |

Schedule 9.1

## SCHEDULE 9.2

## GOVERNMENTAL BONDS

| | Bond No | Principal | Location | Obligee Name | Bond Filed With | Bond Description | Bond Amount |
|---|---------|-----------|----------|--------------|-----------------|------------------|-------------|
| 1 | B007126 | Enduro Operating LLC | WY | State of Wyoming | Wyoming Office of State Lands and Investments - Mineral Leasing | Corporate Surety Bond - Bond of Lessee | $100,000 |
| 2 | B007127 | Enduro Operating LLC | WY | State of Wyoming | Wyoming Oil and Gas Conservation Commission | Owner's Blanket Bond | $100,000 |
| 3 | B007168 | Washakie Midstream Services LLC | WY | United States America | U.S. Department of the Interior, Bureau of Land Management, Worland Field Office | Right-of-Way Surety Bond iro Permit No. WYW-94115 (Well 23-1) | $25,000 |
| 4 | B007169 | Washakie Midstream Services LLC | WY | United States America | U.S. Department of the Interior, Bureau of Land Management, Worland Field Office | Right-of-Way Surety Bond iro Permit No. WYW-94115 (Well 14-1A) | $25,000 |
| 5 | B007433 | Enduro Operating LLC | WY | State of Wyoming | Wyoming Office of State Lands and Investments - Mineral Leasing | Performance Bond for Non-Producing Hydrocarbon Wells (State Lease #0-10939 S16, T47N, R91W, Washakie County | $303,150 |
| 6 | B007704 | Washakie Midstream Services LLC | WY | United States America | U.S. Department of the Interior, Bureau of Land Management, Worland Field Office | Right-of-Way Surety Bond iro Permit Serial No. WYW-094115 Hiland Gas Plant, various pipelines and access roads. | $350,000 |

Schedule 9.2

| 7 | B010483 | Enduro Operating LLC | WY | United States of America | U.S. Department of the Interior, Bureau of Land Management, Worland Field Office | Right-of-Way Permit for Permit 165320 | Bond No. WYW- | $72,406 |

Schedule 9.2